ADMINISTRACIÓN DE JUSTICIA

**CENTRAL COURT OF INVESTIGATION [JUZGADO CENTRAL DE INSTRUCCIÓN] Nº 5**

**DP [Preliminary Proceedings] 1396/2019**

**DOCUMENT SUPPORTING THE REQUEST FOR THE EXTRADITION OF CHRISTOPHER PHILIP AHN**

I, José de la Mata Amaya, Judge of Central Court of Investigation [Juzgado Central de Instrucción] number 5 of the National High Court [Audiencia Nacional], make this statement in support of the **REQUEST FOR THE EXTRADITION** of Christopher Philip **AHN** (hereinafter "AHN"), in order that he may be tried in Spain for the following offences:

(i) Causing injuries (art. 147 of the Penal Code: three months' to three years' imprisonment).

(ii) Illegal restraint (arts. 163 and 165 of the Penal Code: two to four years' imprisonment).

(iii) Threats (arts. 169 and 171 of the Penal Code: six months to two years' imprisonment).

(iv) Breaking and entering (arts. 202 and 203 of the Penal Code: six months to two years' imprisonment).

(v) Robbery with violence and intimidation (arts. 237,241, 242: two to five years' imprisonment).

(vi) Criminal organisation (art.570 bis of the Penal Code: four to eight years' imprisonment).

MINISTERIO DE JUSTICIA – SUBDIRECCIÓN GENERAL DE COOPERACIÓN JURÍDICA INTERNACIONAL – EXTRADICIONES

ADMINISTRACION DE JUSTICIA

Under Article 23 of the Organic Law on the Judiciary, it corresponds to Spanish jurisdiction in criminal matters to hear proceedings for crimes and misdemeanours committed in Spanish territory, subject to the provisions of any international treaties to which Spain is a party. The North Korean Embassy, located in calle Dario Aparicio 43 in Madrid, is on Spanish territory and falls within Spanish jurisdiction.

**FACTS**

A. Overview

Christopher Philip **AHN** arrived at Adolfo Suarez-Madrid-Barajas Airport on 22/02/2019 at 8:10 on American Airlines flight 94 from JFK airport in New York (USA). The passport photograph of **AHN**, from passport control at Adolfo Suarez-Madrid-Barajas Airport, corresponding to that flight, appears in Annex 1.

Later on the same day, a group of individuals, led by Adrian **HONG CHANG**, and including **AHN** himself, entered the seat of the Embassy of the Democratic People's Republic of North Korea in Madrid by force, using imitation pistols and knives. They then kidnapped all of the staff, hitting them and causing injuries to some, among them the Commercial Attaché. They then proceeded to search the entire building, taking possession of a couple of pen drives, two computers, two hard drives (one of them used for storing images from the security cameras) and an Huawei Honor mobile telephone with commercial number 645.659.070 and IMEI numbers: 861201038670115 and 861201038491702. Finally, they fled with three diplomatic vehicles belonging to the North Korean Embassy, specifically, a Mercedes Viano CD 416003, a

MINISTERIO DE JUSTICIA – SUBDIRECCIÓN GENERAL DE COOPERACIÓN JURÍDICA INTERNACIONAL – EXTRADICIONES –

ADMINISTRACION DE JUSTICIA

Toyota Rav-4 CD 416002 and an Audi A8 CD 416001, which were recovered later.

B. The Attack on the Embassy

The charges against **AHN**, causing injuries [lesiones], illegal restraint [detenciones ilegales], threats [amenazas], breaking and entering [allanamiento de morada], robbery with violence [robo con violencia] and criminal organisation [organización criminal], arise among other evidence from: (i) statements by victims (Yun Sok **SO** (23 February 2019 and 3 April 2019); Song Jin **CHOE** (25 February 2019); Cho Sun **HI** (20 March 2019); Song Guk **JANG** (24 April 2019); Ok Gyong **JANG** (25 April 2019); and Hak Rim **JU** (24 April 2019); (ii) statements by witnesses (Chol Hak **KIM** (23 April 2019); Kwang Hyok **PAE** (23 April 2019); and Myong Nam **JONG** (23 April 2019); (iii) images from the embassy closed-circuit television system, the business store SHOKE and the business hardware store FERRETERIA DELICIAS; and (iv) police reports from the investigation.[1] The events supporting these charges occurred as follows:

The Embassy of the Democratic People's Republic of Korea (Embassy) is located in calle Darío Aparicio 43, in Madrid.

There were seven people inside the Embassy on 22 February 2019: Ok Gyong **JANG**, [redacted], Song Guk **JANG**, Song Jin **CHOE**, Hak Rim **JU**, Cho Sun **HI** and Yun Sok **SO** (the latter being the Commercial Attaché of the Democratic People's Republic of Korea).

---

1 Copies of the victim statements can be found in Annex 2 and of the witness statements in Annex 3.

MINISTERIO DE JUSTICIA – SUBDIRECCIÓN GENERAL DE COOPERACIÓN JURÍDICA – EXTRADICIONES

ADMINISTRACION DE JUSTICIA

At 17:00, **CHOE** was carrying out gardening work in the Embassy's garden together with **JU** and **JANG.**

At 16:34, **HONG CHANG**, together with another person, travelled from calle Río Adaja 13 to Calle Darío Aparicio 26 in Madrid (arriving at 16:48), seat of the Embassy, in order to carry out the attack.

At 17:00, **HONG CHANG** called at the door asking to see Yun Sok **SO,** the Embassy's Commercial Attaché.

Meanwhile, his companion remained waiting on the first roundabout in close proximity to the Embassy.

**CHOE** opened the door and, hearing the request of **HONG CHANG**, granted him access and allowed him to enter the Embassy's premises, telling him to wait on a bench in the patio whilst he went to find **SO.**

Minutes prior to this, a white SEAT ALHAMBRA with registration plate 4824-KMT, had parked on the second roundabout located in Calle Viñas del Pardo. Five people got out of the car and walked towards the door of the Embassy, where they joined the person who was waiting nearby, and together they headed to the door of the Embassy.

**HONG CHANG**, taking advantage of a momentary oversight by **CHOE**, opened the door of the Embassy, granting access to the individuals who were positioned outside, including **AHN**.

There are images from the security cameras of the embassy, in particular from the security camera that covers the entry door to the embassy in which **AHN** appears clearly, being one of the people in the group that attacked the embassy. These photographs appear in Annex 4 of this document.

MINISTERIO DE JUSTICIA EXTRADICIONES

ADMINISTRACION DE JUSTICIA

They immediately entered the Embassy building carrying knives, iron bars and handguns (imitation), and started to violently hit those inside, until they managed to restrain them and immobilise them using hinged handcuffs and cable ties.[2]

Thus, they attacked **CHOE**, they hit him, tied him up with cable ties and placed a bag over his head.

They also tied up and hit **JU** and (SONG GUK) **JANG**, moving the three of them to the Embassy's meeting room.

---

2 There are security camera images from the shop called "Shoke", *La Boutique del Policía* [the police officer's boutique], in Calle Juan de Urbieta and from "Ferretería Delicias" hardware store, at Paseo de las Delicias, 46 - both in Madrid – which show **HONG CHANG** and Sam **RYU** (another member of the group) buying a variety of objects on 20 and 22 February 2019, which were later used in the attack on the Embassy. Some of these objects were subsequently recovered by the police authorities.

The products bought by **HONG CHANG** at "Shoke" on 22 February 2019 included, among others: (i) 4 combat knives; (ii) 6 imitation pistols; (iii) 5 flash-lights; (iv) 4 balaclavas (Ski Mask); (v) a shoulder holster; y (vi) 5 pairs of hinged handcuffs. At least one of each of these items was recovered from inside the Embassy and in the garden and outer courtyard at the rear of the Embassy. Photographs of these items can be found in Annex 5.

The products bought by **RYU** at "Ferretería Delicias" hardware store on 20 and 22 February 2019 were, among others: (i) two rolls of black electrical tape; (ii) a pair of pliers; (iii) a telescopic ladder; (iv) five pairs of safety glasses; and (v) a pair of bolt cutters. The telescopic ladder was found in the trunk of the Seat Alhambra with registration plate 4824-KNT. The other items were recovered from inside and outside the Embassy. Photographs of these items can be found in Annex 5.

Annex 5 also includes photographs of: (i) a door which appears to have been forced using a crowbar (two were bought by **RYU**); (ii) cable ties; (iii) defence spray and (iv) a pair of scissors.

MINISTERIO DE JUSTICIA
SUBDIRECCIÓN GENERAL DE COOPERACIÓN JURÍDICA INTERNACIONAL
- EXTRADICIONES -

ADMINISTRACION DE JUSTICIA

A number of the assailants, including **AHN**, also attacked **SO**, hitting him and causing different injuries and forcibly took him to one of the bathrooms. **SO** resisted this and started to struggle with his attackers, until he was restrained and his arms were tied behind his back with cable ties. They covered his head with a bag whilst threatening him with iron bars and what appeared to be firearms pointed at the back of his neck. **AHN** was one of the people who directly and personally participated in attacking, assaulting and immobilising **SO.** [3]

Approximately 30 minutes later the attackers took SO to the Embassy's meeting room, and they also took **CHOE**, **YU** and **JANG** to the same location.

Whilst the attack was underway, the wife of **SO**, Ok Gyong **JANG** and her son, [redacted] were in a bedroom with the door locked shut, although the attackers were able to force it open and enter the room to reach her and the child.

They did not restrain them or tie them up, but one of the attackers stayed guarding them so that they could not leave.

In addition, **HI**, wife of (SONG GUK) **JANG**, was on the top floor of the Embassy, and when she heard everything that was happening she went into a room, locking it shut, until the attackers started hammering on the door in order to gain access.

---

[3] On 3 April 2019 **SO** carried out a photographic identification and identified one of the attackers in photograph number 4, which proved to be the photo corresponding to **AHN** (previously obtained from his Linkedin profile), (See Annex 2).

MINISTERIO DE JUSTICIA - SUBDIRECCION GENERAL DE COOPERACION JURIDICA INTERNACIONAL - EXTRADICIONES

ADMINISTRACION DE JUSTICIA

Before they managed to do this, **HI** attempted to escape via the room's terrace. She ended up falling to the ground, sustaining various injuries but was able to escape and left the Embassy's premises via the paddle tennis court, which has an exit directly out onto the street. There she was seen by another witness, who helped her and requested medical and police assistance.

A medical team from *SAMUR*, the Municipal Emergency Assistance and Rescue Service in Madrid, went immediately to the scene of the events and started to treat her. She was seriously injured.

A police unit also immediately attended the scene and was informed by the victim that various people had attacked the Embassy.

After establishing a security perimeter, the police officers with professional identity numbers 122.334, 122.271 and 115.581, moved to the door of the Embassy and called at the door. The person who opened the door was **HONG CHANG**, who had affixed a pin bearing the face of the leader of the Democratic People's Republic of Korea to the lapel of his jacket, presenting himself as a representative or person in authority at the Embassy and told them that there was no problem. He further stated that if a person of North Korean nationality had been injured then the police officers must inform the Consulate officially.

After approximately 60 minutes in the meeting room, three of the attackers took **SO** to one of the rooms in the basement. There, two of the attackers urged him to leave North Korea, identifying themselves as members of a human rights association or movement for the liberation of North Korea.

ADMINISTRACION DE JUSTICIA

When **SO** told them that he would not betray his country and would not defect, the two attackers who engaged with him left the room, leaving **SO** guarded by the third attacker. 15 minutes passed and various attackers entered. They tied him up again and once more placed a black bag over his head.

The assailants held the people who were in the Embassy for several hours, keeping them immobilised with hinged handcuffs and cable ties at all times and hitting them.

During this time they proceeded to systematically search different offices in the Embassy, taking possession of a couple of pen drives, two computers, two hard drives (one of them used for storing images from the security cameras) and an Huawei Honor mobile telephone with commercial number 645.659.070 and IMEI numbers: 861201038670115 and 861201038491702.

They then took possession of three vehicles belonging to the Embassy, and the majority of the attacking group proceeded to leave the Embassy in these three vehicles at approximately 21:40, leaving the people who they had detained inside the embassy immobilised with cable ties and hinged handcuffs.

The vehicles were a Mercedes Viano CD 416003, a Toyota RAC-4 CD 416002 and an Audi CD 416001. The three vehicles were recovered and returned to their owners. The leader of the group of assailants, Adrian **HONG CHANG** and one of the members of the group remained inside the Embassy until the three vehicles had left.

MINISTERIO DE JUSTICIA – SUBDIRECCION GENERAL DE COOPERACION JURIDICA INTERNACIONAL – EXTRADICIONES

ADMINISTRACION
DE JUSTICIA

At 21.30, a Mercedes E220 1953-KCJ, from UBER, was parked outside the Embassy. It had been booked by **HONG CHANG** for a journey from the door of the North Korean Embassy to Toledo.

**HONG CHANG,** proceeded to cancel this service at 21:40, possibly because it was clear that he could not leave the Embassy by the front, as there were different police units at the scene.

Immediately afterwards, **HONG CHANG**, always using the alleged identity of the UBER user Oswaldo **TRUMP**, proceeded to book a new UBER service, for 21:46, on this occasion to Avenida de Valdemarín nº 56, which is precisely the rear of the North Korean Embassy.

At this point, **HONG CHANG** and the other attacker left the Embassy by the rear, crossing an area of wasteland where they threw away an Italian identity card in the name of Matthew **CHAO** and some of the items they had used for attacking the Embassy (imitation pistols, combat knives, defense spray and cable ties), and then fled the scene. The following day they left for New York (United States of America) on a flight departing from Lisbon [4].

At 21:50 three North Korean students, Kwang Hyok **PAE**, Myong Nam **JONG** and Chol Hak **KIM**, approached the Embassy.

One of them called at the Embassy door and as he did not receive a response, he proceeded to jump over the Embassy's fence in order to assist the victims.

MINISTERIO DE JUSTICIA
SUBDIRECCION GENERAL DE COOPERACION JURIDICA INTERNACIONAL
EXTRADICIONES

[4] Matthew CHAO is one of the identities used by **HONG CHANG.**

ADMINISTRACION DE JUSTICIA

Immediately afterwards, they opened the Embassy door from the inside and the victims started to leave, still tied up. They received immediate assistance from the police.

At 22:35, **SO**, in his capacity as Commercial Attaché of the Embassy, issued written authority to the police unit for them to proceed "to enter the diplomatic legation for the purposes of conducting a search and determining whether all was in order and checking that there is no one inside who was not from the diplomatic legation."

Furthermore, **SO** issued a new written authorisation to the police unit for them to enter the diplomatic legation "in order for the forensic police to carry out the corresponding visual inspection and collect any items that may have been handled by the attackers."

The Mercedes Viano CD 416003 was found abandoned shortly afterwards, with the doors open and the engine running, on calle Galileo, 57, in Madrid.

The Toyota RAV 4 CD-416002 was found shortly afterwards, at approximately 23:10, on Avenida de Europa number 7, in Pozuelo de Alarcón. The AUDI A8 CD416001, was located at approximately 04:30 at Avenida Monforte de Lemos nº 93, open and with the keys inside.

**HONG CHANG,** in a statement made before FBI special agents in Los Angeles (California, United States), on 14/03/2019, stated that one of the people who participated in the attack on the embassy was Christopher Philip **AHN**, aged approximately 37 and a former United States Marine. He affirmed

MINISTERIO DE JUSTICIA – SUBDIRECCION GENERAL DE COOPERACION JURIDICA – EXTRADICIONES

ADMINISTRACION DE JUSTICIA

that **AHN** is from Chino (California) and lives close to Koreatown, in Los Angeles [5].

1. **INITIATION OF CRIMINAL PROCEEDINGS AND RULING ORDERING THE PROVISIONAL CUSTODY OF CHRISTOPHER PHILIP AHN**

Judicial proceedings were initiated on 23/02/2019, on the basis of an official police communication presented by the investigating police unit.

On 11/04/2019 a Ruling ordering provisional custody, communicated and without bail was issued against **AHN**. This ruling ordering provisional custody serves to enable **AHN** to be brought before the Court to be tried for the six crimes indicated. A copy of this ruling can be found in Annex 6.

2. **APPLICABLE ARTICLES AND TIME BARS**

Copies of the articles of the Spanish Penal Code pertaining to the six charges made against **AHN** - Articles 147, 163, 165, 169, 171, 202, 203, 237, 241, 242 and 570 bis. - can be found in Annex 7.

Under Article 131 of the Penal Code all the offences, except membership in a criminal organisation, have a time bar of five years. The offence of membership of a criminal organisation has a time bar of ten years. The offences were committed on 22 February 2019; as such they are clearly not time-barred under Articles 131 and 132. A copy of Articles 131 and 132 can also be found in Annex 7. There is no other legislation that bars the prosecution.

---

5 This statement took place in March, in the indicated date, in spite that the Ruling ordering provisional custody against **AHN** which states that it took place in February. On 25 April 2019 (Ok Gyong) **JANG** identified photograph number 2 from among those shown to her, which proved to be that of **HONG CHANG** as one of the men who attacked the Embassy. (See Annex 2). She was so afraid during the attack that she thought of committing suicide and even tried to cut the veins on one of her wrists with a razor blade. (See Annex 2).

MINISTERIO DE JUSTICIA - EXTRADICIONES

ADMINISTRACION DE JUSTICIA

The Spanish Penal Code states in Article 27 that those criminally responsible for crimes and misdemeanours are the principals and their accessories. The concept of principal is defined in Article 28 which says that perpetrators are those who perpetrate the act alone, jointly or by means of another person whom they use as an instrument. In addition, it states that the following shall also be deemed perpetrators: (i) whoever directly induces another or others to commit a crime and (ii) whoever cooperates in committing a crime with an act without which it would not have been committed. A copy of Articles 27 and 28 can also be found in Annex 7.

A copy of the Art. 23 Organic Law on the Judiciary, regarding the competence of the Spanish Jurisdiction to handle this case is also included in Annex 7.

## 3. IDENTIFICATION

Christopher Philip **AHN**, born on [redacted]1981 is the holder of United States of America passport number [redacted]1236. Annex 2 contains the photograph of **AHN** that was identified by **SO** as one of the people who attacked him in the Embassy.

Madrid, 14 May 2019

JUZGADO CENTRAL DE INSTRUCCION N.º

José de la Mata Amaya

MINISTERIO DE JUSTICIA – SUBDIRECCION GENERAL DE COOPERACION JURIDICA INTERNACIONAL – EXTRADICIONES

ADMINISTRACION
DE JUSTICIA

## ANNEX 1

## PASSPORT PHOTOGRAPH OF CHRISTOPHER AHN



MINISTERIO DE JUSTICIA
SUBDIRECCION GENERAL DE COOPERACION JURIDICA INTERNACIONAL
- EXTRADICIONES -

ADMINISTRACIÓN DE JUSTICIA

ANNEX 2

STATEMENTS OF THE VICTIMS

# RECORD OF STATEMENT

**Full Name: Yun SOK SO**
**NIE [Foreign resident ID]: [redacted]359-M**
**Place of birth: North Korea**
**Date: [redacted]1979**
**Son/daughter of: So Jae MYONG and Ju Yong SUKM**
**Address: Calle Darío Aparicio, 43, Madrid**
**Telephone: 91 307 87 76**

--- Issued in Madrid, at the station of the Provincial Intelligence Services, on 23 February 2019 at 12:45 by the above-mentioned officers assigned to the aforementioned Provincial Intelligence Services, who are acting as the Presiding Officer and Secretary, respectively, for the purposes of this record and with regard to the events that gave rise thereto:

-- Under the provisions of Article 284 of the Law of Criminal Procedure and Article 6 of Law 4/2015 of 27 April on the Statute of Victims of Crime, he is informed that if the perpetrator is not identified within seventy-two hours, these proceedings shall not be sent to the judicial authority, without prejudice to his right to reiterate the complaint before the State Prosecutor's Office or the investigating court.

--- During this act he is informed of his rights, under the provisions of Law 4/2015 and the Law of Criminal Procedure (Articles 109, 109 bis, 110 and 771.1). VICTIM.

--- He appears at this station freely and voluntarily in order to provide new information regarding the events that gave rise to these proceedings. He is the Commercial Attaché at the North Korean Embassy, acting as Ambassador, and states the following:

--- At approximately 17:00 on 22/02/2019 a person of Asian origin rang the Embassy access bell and one of the employees who was inside, Song Jin CHOE (hereinafter CHOE), went to answer the call via the video intercom and saw a person who told him that he had come to visit the declarant (hereinafter SO) as he was a friend of his and indicated that he had brought a present for SO, at which CHOE allowed him to enter the embassy premises as far as one of the common areas in order to wait there. At that point the declarant, SO, who had also heard the bell came downstairs to see who had called.

This person had come to the Embassy a couple of weeks ago and SO had a conversation with him, although it was at the door of the Embassy, in which he introduced himself politely in order to conduct an interview with SO. This unknown individual even left the declarant a business card which he will submit to the proceedings. He even posed for a photo with this individual with the latter's telephone. The unknown individual told him he knew "Alejandro", a Spanish person who works with North Korea, but SO subsequently sent an email to Alejandro asking him if he knew this

ADMINISTRACIÓN DE JUSTICIA

person (the name on the business card) and Alejandro said he did not. SO states that if he looks at his computer, he could find out the exact date of the visit.

--- SO could see that CHOE and this person were close to the main entrance to the embassy, although before he arrived at the place where CHOE and this person were, he had to take a telephone call that was underway on one of the embassy's landlines. When he finished the call he saw five or six individuals entering behind CHOE and this person, pushing CHOE and the other person, brandishing firearms and bladed weapons, hitting CHOE and moving toward SO, whom they began to hit when they reached him, causing him a number of injuries and they took him forcibly to one of the bathrooms, at which SO resisted and started to struggle with the attackers, until his arms were finally tied behind his back with cable ties. They covered his head with a bag whilst threatening him with iron bars and firearms pointed at the back of his neck, telling him not to resist, speaking in perfect Korean with a recognisable South Korean accent.

--- SO indicates that while he was undergoing this attack he saw the attackers doing the same to CHOE, although they separated them and SO lost sight of CHOE even though they were able to hold a conversation such that SO guessed that he was in the hall near the bathroom where he was.

--- SO believes they were there for approximately 30 minutes, until three of the attackers picked him up and carried him from the bathroom to the embassy meeting room and some of the other attackers did the same with CHOE, then the attackers brought two other embassy employees to the same room, Hak Rim YU (hereinafter YU) and Song Guk JANG (hereinafter JANG), who were sweeping in the gardens when the attack took place. There their hands were tied and they were held there by the attackers.

--- SO and the other three employees remained with their hands tied in the meeting room for at least an hour and, because of the pain they were feeling, they asked the attackers to untie their arms, at which the assailants told them to shut their mouths and keep silent. SO states that he could not see how many attackers may have been guarding them, although he did hear them talking to each other in English, however, given the noise that other assailants were making, he guessed that they were entering the rooms in the building, hammering hard against any doors that were locked. While he was in the meeting room, SO heard the bell ring; he thinks it was the police after they found Cho Sun HI injured in the street, which he will explain later.

--- While the attack was in progress, SO's wife Jang Ok GYONG (hereinafter GUONG) and his son K[redacted] J[redacted] S[redacted] were in the bedroom with the door locked and although the attackers were able to force their way inside, she and her son were not restrained or tied up, but one of the attackers stayed guarding them so that they could not leave.

--- Cho Sun HI (hereinafter HI), JANG's wife, was on the top floor and when she heard everything that was happening she went into her room,

locking it shut, until the attackers started hammering on the door in order to gain access. However, before they managed to get inside, HI attempted to escape via the room's terrace. She ended up falling to the ground, sustaining various injuries but was able to escape and left the Embassy premises via the Paddle tennis court, which has an exit directly out onto the street, where she was seen by a member of the public and she was helped and treated by Police medical personnel.

ADMINISTRACIÓN DE JUSTICIA

--- After spending an hour in the meeting room, SO was again carried to one of the rooms in the basement, where he was thrown to the ground face down and some time later he was sat on a chair, with his feet and hands still tied and the bag still over his head, such that SO asked them to untie his hands, at which his assailants told him in South Korean to calm down and finally they untied his hands and removed the bag. At this point he was able to see the persons who were holding him captive, one of whom was the first person who entered the embassy premises, who was at least 180 cm tall, with a sparse, thin beard and a moustache, with long dark hair in a ponytail, with Asian features, 30-35 years old, wearing a black suit, a white shirt and a black tie with white dots. He could see that one of the other attackers was approximately 172 cm tall, Asian features, with black hair cut in a modern raised style, with white skin, approximately 35-38 years old, wearing a dark suit, black tie, white shirt and black tie with pink stripes [sic] and brown shoes. These two men engaged in a conversation with him while a third man was guarding him, who was approximately 180 cm tall, with prescription glasses and a balaclava that covered his head and half of his face, carrying a pistol on the right-hand side of his belt, and a fourth individual who moved in and out of the room who was approximately 168 cm tall with a thin, sparse beard and a moustache.

--- SO states that these two persons, and mainly the second one, told him, urged him, that the North Koreans should abandon their country (meaning North Korea) and identified themselves as members of a human rights movement association that helps North Koreans who escape from their country and are suffering from famine, while also telling him that the North Korean government has very little time left and other associations in other countries are going to do the same thing as them. SO states that during this act his understanding was that these persons were trying to make SO and the other employees betray their country and its leader to become the ambassador of a new state set up by them, a "free" state. These persons went on to say that if he decided not to work with them they were offering to help him settle in another country outside North Korea where he would have a good life, while also constantly denigrating his political leader in North Korea, insisting that his government was about to fall and again offering SO the chance to abandon his country. SO refused each and every one of the offers and told them emphatically to desist as he found it insulting and would never accept.

--- In an attempt to safeguard the other embassy employees and his wife and son, SO said that no reprisals would be taken against them and he guaranteed their physical safety if they left the embassy. However, they replied that one of the women was shouting outside in the street and they asked SO to make the woman return to the embassy and he offered again to safeguard them and asked them to leave the embassy, although they were afraid that the police were outside waiting for them. The first man asked him for an embassy car in order to leave, at which SO asked him how many of them there were and he answered 10 or 11, to which

ADMINISTRACIÓN DE JUSTICIA

So replied that they would not fit in one vehicle and half of them should walk out. The man said no, he should give them more vehicles, to which SO agreed.

--- The two persons to whom he spoke left the room leaving the third individual to guard him, with whom SO did not interact at any time. After approximately 15 minutes a number of assailants came in and tied his hands with cable ties again and covered his head again with the black bag. SO does not know whether he was left alone or if somebody was guarding him. At the same time he could hear the attackers destroying the furniture, specifically four pictures of his political leaders, which he considered a serious affront. After the uproar, the embassy became very quiet, which caused SO considerable worry regarding the safety of his wife and son, as he did not know what was happening. Some time later he began to hear CHOE calling him, then his wife and son appeared by his side and proceeded to release him.

--- Once SO was set free he went outside the building and saw that the cars were not inside, he saw that the assailants had gone and he saw the police officers outside the embassy who asked them not to come out until the events had been clarified.

--- SO states that the keys were not inside the vehicles so the attackers must have found them during their search of the rooms.

--- He wishes to state that the other three persons who were outside the Embassy when they were freed, Kwang Hyok PAE, Myong Nam JONG and Chol Hak KIM, are students at Nebrija University and they went there because they were calling the Embassy and were unable to contact anyone and, following the security guidelines in such cases, they went to see if there was a problem and noticed that something was happening.

--- When asked what he believes was the motive for the attack, **HE REPLIES:** that it was not robbery, even though they took a laptop computer (encrypted), another computer belonging to Mr JANG, two hard drives, one of which is the hard drive with the security images, two memory sticks and his gold-coloured Honor-brand mobile phone (645659070), but they were not interested in the safes and documents.

He thinks it was carried out by professionals who received bribes and the aim was to "recruit" the declarant and discredit his country.

He states that nevertheless they have another hard disk with security images in the basement, which he offers to submit to this investigation without any problems via the company that manages them.

-- When asked to say whether the intruders used mobile telephones during the attack to communicate with each other, **HE STATES:**

He did not hear anything but one of the assailants, the one with the ponytail, told him that he had people outside watching.

--- When asked to say how many people he believes carried out the attack on the Embassy, **HE REPLIES:** he does not know but he estimates between 8 and 12 persons.

-- When asked to say whether, as the representative of his government, he gives his authorisation to perform a visual inspection of the two seized vehicles, **HE REPLIES:** of course, he has no objection at all and, if so required, the routes on the GPS devices inside them may be analysed in case they can offer the investigation any useful information.

ADMINISTRACIÓN DE JUSTICIA

-- When asked to say if the Embassy has insurance, **HE STATES:** no, it did until last year but it is no longer valid.

-- When asked for an approximate evaluation of the damage caused in the Embassy and the stolen items, **HE REPLIES:** the non-material damage and the affront are inestimable and the material losses could be as high as THREE THOUSAND EUROS (€3,000).

-- Finally he wishes to state that he still fears a second attack and as such he requests police protection. He requests that when travelling by car, he wants at least two police officers to accompany him inside the vehicle because he is afraid that they may be followed and at some point a further attempt may be made to harm them. Apart from the Embassy, there is a residence where their students live, at [redacted], and he fears that the attackers may know of it and wish to harm them.

-- He has nothing more to state, and, having read this document, he signs it to show his conformity along with the Presiding Officer, which I, the Secretary, **CERTIFY**.

ADMINISTRACIÓN DE JUSTICIA

# RECORD OF STATEMENT

**Full Name: Yun SOK SO**
**NIE [Foreign resident ID]: [redacted]359-M**
**Place of birth: North Korea**
**Date: [redacted]1979**
**Son/daughter of: Jae Myong SO and Yong Suk JU**
**Address: Calle Darío Aparicio, 43, Madrid**
**Telephone: 91 307 87 76**

## RECORD OF PHOTOGRAPHIC IDENTIFICATION.

Issued in Madrid, at the station of the Madrid Provincial Intelligence Services, at **19:20** on 03 April 2019 by the above-mentioned National Police Force officers assigned to the Madrid Provincial Intelligence Services, who are acting as the Presiding Officer and Secretary, respectively, who for the purposes of this record and with regard to the events under investigation hereby **RECORD:**

— Mr Yun **SOK SO,** NIE Y-[redacted]359-M, Commercial Attaché at the Embassy of the Democratic People's Republic of Korea in Madrid, appears at this Station, after having been summonsed to do so, in order to conduct an interview with the investigating officers.
— The declarant was the victim of the events that occurred at the aforementioned Embassy on 22 February 2019, which led to the opening of Preliminary Proceedings [Diligencias Previas] number 1396/19 by Central Court of Investigation number 5.
-- Yun SOK SO, NIE [redacted]359-M, made a statement regarding these events on 23 February 2019 at the Police Station of the Madrid Provincial Intelligence Services, which was forwarded to said Court via Official Communication number 852/19 of 27/02/2019.
-- During this act, after being shown the document "Annex 1", attached hereto, which includes nine still shots of nine males of Asian origin, numbered 1 to 9, HE RECOGNISES WITHOUT DOUBT the male who appears in still shot number 4 as one of the persons who took part in the attack on the Democratic People's Republic of Korea on 22 February 2019 and the declarant signs on the aforementioned still shots as proof thereof.
-- Specifically, he was one of the 4 or 5 people who, at the start of the attack, hit him at the entrance to the property until they managed to restrain him, assaulting him and hitting him in order to then immobilise him.
-- He has nothing more to state, and, having read this document, he signs it to show his conformity along with the Presiding Officer, which I, the Secretary, **CERTIFY.**

MINISTERIO
DEL INTERIOR

DIRECCIÓN GENERAL
DE LA POLICÍA

CUERPO NACIONAL DE POLICÍA
Jefatura Superior de Policía
de Madrid
Brigada Provincial de Información

AI

# ANEXO - 1 -



1



2



3



4



5



6



7



8



9

JEFATURA SUPERIOR DE POLICÍA - MADRID - BRIGADA PROVINCIAL DE INFORMACIÓN

ADMINISTRACION DE JUSTICIA

# RECORD OF STATEMENT

**Full Name: Song Jin CHOE**
**NIE [Foreign resident ID]: [redacted]384-X**
**Place of birth: North Korea**
**Date: [redacted]1988**
**Son/daughter of: Jong Gwan CHOE and Jong Sil RI**
**Address: Calle Darío Aparicio, 43, Madrid**
**Telephone: 689365073.**

--- Issued in Madrid, at the station of the Provincial Intelligence Services, on 25 February 2019 at 16:00 by the above-mentioned officers assigned to the aforementioned Provincial Intelligence Services, who are acting as the Presiding Officer and Secretary, respectively, for the purposes of this record and with regard to the events that gave rise thereto:

-- Under the provisions of Article 284 of the Law of Criminal Procedure and Article 6 of Law 4/2015 of 27 April on the Statute of Victims of Crime, he is informed that if the perpetrator is not identified within seventy-two hours, these proceedings shall not be sent to the judicial authority, without prejudice to your right to reiterate the complaint before the State Prosecutor's Office or the investigating court.

--- During this act he is informed of his rights, under the provisions of Law 4/2015 and the Law of Criminal Procedure (Articles 109, 109 bis, 110 and 771.1).

--- He appears at this station freely and voluntarily after having been summonsed to do so, accompanied by Yun SOK SO (hereinafter SO), NIE [redacted]359-M, born in North Korea on[redacted]1979, son of So Jae MYONG and Ju Yong SUKM, address Calle Darío Aparicio número 43, Madrid and contact telephone number 91 307 87 76, whom the declarant designates to act as interpreter as he prefers to make his statement in his mother tongue, in order to provide new information regarding the events that gave rise to these proceedings, he states that:

--- His job at the North Korean Embassy is that of administrative officer.

--- At approximately 17:00 on 22 February 2019 he was engaged in cleaning work in the garden of the Embassy when the bell rang. The declarant opened the door and encountered a man of Asian origin with long dark hair tied in a ponytail, wearing a black suit, tie and white shirt and over 180 cm tall. This male addressed the declarant in Spanish and claimed he had an appointment with the Commercial Attaché at the Embassy and that he had telephoned the Embassy before he arrived. The declarant, after asking the male to wait inside the premises, led him to a bench near the main door of the building and told him to wait. When CHOE returned he discovered the individual near the entrance door to the premises again, which he found unusual, but he approached him. When he reached him they both went back towards the main door to the Embassy when suddenly, as Mr SO was approaching to receive the

ADMINISTRACIÓN DE JUSTICIA

visitor, a group of 5-6 males unexpectedly forced them inside the building by hitting them and three of the males launched themselves at the declarant, two of whom were armed with pistols, and another group launched themselves at Mr SO. At that time the assailants were addressing CHOE and Mr SO in Korean, with a South Korean accent.

--- The three males who attacked CHOE took him to a hall in the house, separating him from Mr SO, whom they put in a bathroom. At this point the men told CHOE to be calm and not to move, they had a South Korean accent and used vocabulary that is characteristic of said country. He remembers the following features of the individuals:

--- The first was approximately 1.75 m tall, of normal build, with dark hair, Asian features, approximately 28-35 years old, dressed in a dark leather-style jacket, with a checked shirt. He had a pistol.

The second one was approximately 1.70 or 1.72 m tall, of normal build, with slightly long dark hair, Asian features, approximately 30 years old, dressed in a light brown jacket, wearing glasses. He also had a pistol.

--- The third one was approximately 1.70 or 1.72 m tall, of normal build, with dark hair, Asian features, approximately 30-32 years old, dressed in black clothes, holding a crowbar.

--- At that point the individuals tied the declarant up using black cable ties and covered his head with a black cloth bag and secured his feet with grey adhesive tape. He remained in this condition for approximately forty minutes. During that time, when CHOE attempted to talk to the attackers, they refused to talk and simply told him to remain still and calm. He thinks the assailants may have communicated with each other using walkie-talkie devices until one of them ordered them to stop communicating that way. At times they spoke to each other in English and sometimes Korean, using what CHOE thinks were code words, such as "make-up".

--- After that time had passed, the attackers picked the declarant up and carried him to an adjoining meeting room, having first changed his cable ties for hinged handcuffs. Once in that room CHOE encountered Mr SO, with Hak Rim JU (hereinafter JU) and Song Guk JANG (hereinafter JANG), fellow Embassy employees. Both Mr JU and Mr JANG were in the Embassy garden carrying out maintenance work along with the declarant before the attack.

--- While they were in that room the assailants did not allow the victims to communicate with each other and they threatened them saying that if they tried to speak they would gag them. They remained in the room for over three hours. During that time CHOE sensed that they took Mr SO to another room.

-- While CHOE was being held in the meeting room he heard the doorbell ring and somebody went out to open the door. A conversation took place in Spanish. He believes the person who spoke on behalf of the assailants was the male with the ponytail who first rang the doorbell.

-- While he was being held in the room, the declarant heard the attackers moving around the various rooms in the building, occasionally making banging noises and putting objects into rucksacks, as he heard zips being closed.

ADMINISTRACIÓN DE JUSTICIA

--- During some of the physical contact he had with these persons the declarant had the sensation that one of the assailants had calluses on his hands, a symptom of strong or hard-working hands, the result of physical or military work.

--- At one point after a long wait suddenly there was silence and the declarant managed to remove the bag from his head using his knees and the adhesive tape from his feet and then he helped his two colleagues JANG and JU. After this they began to call Mr SO but got no reply and Mr SO's wife opened up her house and also asked after her husband. At that point the Embassy doorbell rang again and the declarant was able to make contact with his colleagues who are students at Nebrija University. He told them to call the Police and to jump over the Embassy fence in order to help them, which they did. After the students arrived they heard Mr SO calling for help, at which point they went down to the basement and after helping him, they all left through the garage door which had been left open as a result of the attackers' escape in the three Embassy vehicles: Mercedes Viano with registration plate CD416003, Audi A8 with registration plate CD416001 and Toyota RAV4 with registration plate CD416002.

--- Once they were on the public highway they went towards some police officers who were nearby, to whom they explained everything that had happened, and the declarant returned to the house with one of the students, Kwang Hyok PAE, to look for Mrs JO (JANG's wife), whom they later discovered had escaped via one of the terraces. At that point CHOE and PAE noticed a box of hinged handcuffs in the hall of the house and the declarant took the opportunity to take some keys and free himself.

--- A significant detail that Mr CHOE wishes to highlight is that when they returned with the Police after giving them written authorisation to enter the premises, they noticed a Democratic People's Republic of Korea pin thrown on the floor along with the boxes of hinged handcuffs mentioned above.

--- When asked about the approximate value of the stolen vehicles, CHOE answers that the Audi A8 may be worth approximately 70,000 euros, the Toyota RAV4 approximately 40,000 euros and the Mercedes Viano approximately 25,000 euros.

--- When asked what the declarant thinks about the motive for the attack on the Embassy, CHOE replies that he thinks that most of the individuals were from South Korea and that one or two of them may be foreigners who spoke perfect English, probably British, and he believes that the main reason for the attack was not robbery or money, but rather they were attempting to obstruct the relationship between South Korea and North Korea, which is improving of late, and to divert attention with this action from the Summit that North Korea and the United States are going to hold shortly in Vietnam, and that the motive was purely political.

--- When asked to say if he would recognise any of the assailants if he saw them again, he replies that he could undoubtedly recognise two of them and he is not sure about the other one.

-- He has nothing more to state, and, having read this document, he signs it to show his conformity along with the Presiding Officer, which I, the Secretary, **CERTIFY**.

ADMINISTRACIÓN
DE JUSTICIA

# RECORD OF STATEMENT

**Full Name: Hak Rim JU**
**NIE [Foreign resident ID]:[redacted]617-D**
**Place of birth: North Korea**
**Date:[redacted]1990**
**Son/daughter of: Sung Hyok JU and Song Ok SIN**
**Address: Calle Darío Aparicio, 43, Madrid**
**Telephone: 91 307 87 76**

--- Issued in Madrid, at the station of the Provincial Intelligence Services, on 24 April 2019 at 16:50 by the above-mentioned officers assigned to the aforementioned Provincial Intelligence Services, who are acting as the Presiding Officer and Secretary, respectively, for the purposes of this record and with regard to the events that gave rise thereto:

-- Under the provisions of Article 284 of the Law of Criminal Procedure and Article 6 of Law 4/2015 of 27 April on the Statute of Victims of Crime, he is informed that if the perpetrator is not identified within seventy-two hours, these proceedings shall not be sent to the judicial authority, without prejudice to your right to reiterate the complaint before the State Prosecutor's Office or the investigating court.

--- During this act he is informed of his rights, under the provisions of Law 4/2015 and the Law of Criminal Procedure (Articles 109, 109 bis, 110 and 771.1).

--- He appears at this station freely and voluntarily after having been summonsed to do so, accompanied by Yun SOK SO (hereinafter SO), NIE [redacted]359-M, born in North Korea on [redacted]1979, son of So Jae MYONG and Ju Yong SUKM, address Calle Darío Aparicio número 43, Madrid and contact telephone number 91 307 87 76, whom the declarant designates to act as interpreter as he prefers to make his statement in his mother tongue, in order to provide new information regarding the events that gave rise to these proceedings, he states that:

--- His job at the North Korean Embassy is that of administrative officer.

--- On 22 February 2019 he was engaged in cleaning work in the garden and outside the Embassy from approximately 16:00 onwards, along with his compatriot Song Guk JANG. At approximately 16:40 he saw a man dressed in a suit and tie and with long hair tied in a bun, approximately 35 to 40 years old, on the Embassy premises, waiting to be attended to.

--- Moments later, when his colleague and he were close to the garage area, he heard the sound of people running and, without realising what was happening, two male approached him unexpectedly and began to hit him in the stomach and on the neck, then threw him to the ground, tied his hands and feet with cable ties and placed a cloth bag over his head.

--- While the two males were approaching him, first he saw another unknown male approach Mr JANG, then moments later a fourth male joined him to hit and throw Mr JANG to the floor in a similar manner. He noticed that one of the males who were attacking Mr JANG was holding a pistol in his hand.

ADMINISTRACIÓN DE JUSTICIA

--- He noticed that all of the males had Asian features and dark hair and were young men aged between 20 and 30, they were wearing gloves, some were wearing clear glasses and as they were running towards him and Mr JANG, they were covering their faces by pulling a scarf up over their noses and at least one of them was wearing a small video camera on his chest. One of the attackers who hit and restrained the declarant had long hair that covered his forehead.

--- As the assailants who tied up the declarant pulled the cable ties very tight, he felt a lot of pain and shouted out and his hand began to suffer from circulation difficulties. The assailants became aware of this problem as the declarant could hear them saying in English via earphones and transmission devices that he had a circulation problem and they needed to remove his cable ties. A few moments later, one of the attackers cut cable ties from his hands and replaced them with metal hinged handcuffs.

--- After a few minutes, when the declarant was still outside the building, guarded by the attackers, he heard a siren but could not distinguish whether it was a police vehicle or an emergency vehicle. At that point he heard the assailants talking in English. One said "it's the police" and another answered "Are you sure?" Then the attackers moved the declarant to the grass area of the Embassy.

--- Minutes later, although he cannot say exactly how long, two assailants stood the declarant up and took him inside the building to a room on the first floor where the rest of his compatriots from the Embassy were, including Mr SO. The declarant still had the bag over his head, with his hands cuffed behind his back and with cable ties on his feet. All the Embassy employees were being watched by attackers.

--- When his compatriots and the declarant attempted to communicate, the assailants threatened them, telling them that they could not speak and if they continued to do so, they would gag them.

--- Some time later, although he cannot say exactly how long, a number of attackers took Mr SO from the room where the declarant was.

--- The declarant remained in the aforementioned room with the rest of the employees until the end of the attack. They were watched at all times by the assailants. At one point he heard two of the attackers speaking English and he thought that one of them asked "How many of us are there?" and another answered "There are eleven of us".

--- Subsequently, after more time had passed, although he cannot say exactly how much, suddenly he could not hear the assailants talking, so he guessed that they had left the building and because his compatriot Mr JANG was able to remove the bag from his head and the tape from his feet, he approached the declarant and took off the cloth bag he also had over his head and cut the cable ties on his feet.

--- At that point the declarant noticed that Mr SO and his wife and son were not in the room. His wife and son appeared moments later.

--- Mr CHOE and Mr SO's wife went down to the basement to look for Mr SO while the declarant remained with the rest of the employees in the hall of the building. It was then that the three North Korean students who are habitually in contact with them arrived to assist them and help them to leave.

ADMINISTRACIÓN DE JUSTICIA

--- Once Mr CHOE, Mr SO and his wife came up from the basement, they left the Embassy through the main door. As they were exiting they noticed some police officers whom they approached and who helped the declarant to remove the hinged handcuffs he had on behind his back. Moments later a number of police patrol vehicles arrived along with an Ambulance and the declarant was treated by medical professionals.

-- He has nothing more to state, and, having read this document, he signs it to show his conformity along with the Presiding Officer, which I, the Secretary, **CERTIFY**.

ADMINISTRACIÓN DE JUSTICIA

# RECORD OF STATEMENT

**Full Name: Ok Gyong JANG**
**NIE [Foreign resident ID]: [redacted]779-T**
**Place of Birth: North Korea**
**Date: [redacted]1983**
**Daughter of: Jae Yong JANG and Kyong Hwa YUN**
**Address: Calle Darío Aparicio, 43, Madrid**
**Telephone: 91 307 87 76**

--- Issued in Madrid, at the station of the Provincial Intelligence Services, on 25 April 2019 at 11:25 by the above-mentioned officers assigned to the aforementioned Provincial Intelligence Services, who are acting as the Presiding Officer and Secretary, respectively, for the purposes of this record and with regard to the events that gave rise thereto:

-- Under the provisions of Article 284 of the Law of Criminal Procedure and Article 6 of Law 4/2015 of 27 April on the Statute of Victims of Crime, she is informed that if the perpetrator is not identified within seventy-two hours, these proceedings shall not be sent to the judicial authority, without prejudice to her right to reiterate the complaint before the State Prosecutor's Office or the investigating court.

-- During this act she is informed of her rights, under the provisions of Law 4/2015 and the Law of Criminal Procedure (Articles 109, 109 bis, 110 and 771.1).

--- She appears at this station freely and voluntarily after having been summonsed to do so, accompanied by Yun Sok SO (hereinafter SO), NIE [redacted]359-M, born in North Korea on [redacted]1979, son/daughter of Jae Myong SO and Yong Suk JU, address Calle Darío Aparicio número 43, Madrid and contact telephone number 913078776, whom the declarant designates to act as interpreter as she prefers to make her statement in her mother tongue, in order to provide information regarding the events that gave rise to these proceedings, she states that:

--- She is the wife of Mr SO, who is the Chargé d´affaires at the North Korean Embassy.

--- On 22 February 2019 at approximately 16:30 or 16:40 she was with her minor son in her room watching the television and talking to him when she suddenly heard a loud noise coming from the hall.

--- Consequently she opened the door to her room which is next to the hall and she saw two males hitting and attempting to restrain another Embassy employee called Mr CHOE on the floor, such that she was frightened and locked the door to her room from the inside and drew the bolt on the door.

--- Given the speed at which events were unfolding and the fact that they were fighting she was unable to notice the physical characteristics of the persons, except that they had Asian features and one of them had slightly long hair at the back of his head.

--- After she had managed to lock herself in her room, an individual outside began to strike the door hard and tell the declarant in Korean to open the door and that nothing would happen to her. At this point the

ADMINISTRACIÓN DE JUSTICIA

declarant and her son began to get dressed and she attempted to telephone her husband. She cannot remember whether there was a tone but she was not able to contact Mr SO at all. At the same time she could hear loud noises and shouting from outside the building so she leant out the window and saw two or three individuals hitting another Embassy employee called Mr JANG on the ground and holding his face firmly against the ground. Suddenly, someone outside managed to break the lock on the door and open the door.

--- At that point a tall male entered the room. He had Asian features, long hair tied in a bun and a beard and was wearing a suit, a white shirt and a tie with a pin representing the Head of State of North Korea in the lapel of his jacket. The declarant was frightened and held her son so that he could not see this person, who was explaining to the declarant that she should not be afraid and that they had come to help them.

--- This individual in a suit spent approximately ten minutes telling the declarant that they were there to help them and that she should not be afraid, as she was holding her son to her throughout in an attempt to calm him given the violent circumstances. At one point this person explained to the declarant that someone had informed him that her son was approximately 11 or 12 years old, but when he saw him he realised that he was 7 or 8, which made the declarant think that before the attack somebody had been watching them and passing information to this individual.

--- Then another male with Asian features, also with a beard and long hair tied in a pigtail, but shorter than the first individual, entered the room. He remained and watched the declarant and her son, as the individual wearing a suit left the room.

--- At one point this person told the declarant that they knew that the action they were carrying out was very dangerous and that they were also taking a risk.

--- They remained in these circumstances for approximately twenty minutes until the second male was relieved of his task of watching the declarant and her son by a third man.

--- This person was a male who was younger that the previous two, also with Asian features, approximately 25 years old, with short dark hair, and she thought his eyelids sagged a little. She remembers that at the time she thought that based on the shape of his head and the intonation of his accent, this person could have been born in North Korea and subsequently defected to South Korea.

--- Some time later, although she does not know exactly how long, another individual joined the aforementioned third male to guard the declarant and her son. Then the declarant asked the assailants if she could see her husband. They answered that it would not be possible for the time being.

--- Because the declarant was afraid that something bad might happen to her or the attackers might take her away from that place, she even thought of committing suicide by cutting her veins with something, but there was no object within reach. As such she asked the two individuals who were guarding her if she could go to the bathroom where she knew there were razor blades.

ADMINISTRACIÓN DE JUSTICIA

--- Thereupon one of the males asked something in English via a transmission microphone and earphone that he was using and subsequently they allowed the declarant to go to the bathroom. Her son remained in the room.

--- In the bathroom the declarant was still being watched by one of the assailants and she was unable to access the razor blade so she went back to the room next to her son.

--- Moments later a siren could be heard outside the house, a circumstance which led one of the guards, the one with the long hair tied in a ponytail and a beard, but not wearing a suit, to go outside the building.

--- Some time later, while she was still being held in her room with her son and watched by a guard, she heard people shouting and thought that they were beating and torturing her husband, and she asked again to be allowed to see him but was refused.

--- Later, although she cannot say exactly how much time had passed, the attackers handed over guard duties again, this time to a male who had covered his face with a kind of black scarf worn over above his nose so she could not see his physical characteristics properly. However, she thought he had Asian features, was approximately 30 years old, with light skin, dark hair, tall and thin. This person had a video camera on his chest and occasionally showed the declarant a pistol he was wearing on his waist in a holster, in order to intimidate and threaten her.

--- While the declarant was being guarded by this individual she asked to go to the bathroom again. The guard passed on the request via his wireless microphone and allowed the declarant to go to the bathroom, where she was able to obtain a razor blade. When she was back in the room she attempted to cut herself on her wrist but desisted because of the pain she felt.

--- An hour or two later, by which time it was night, her son was very frightened because it was dark and they asked the assailants to turn on the light, which they did but first they lowered the blind so nothing could be seen from outside.

--- The declarant and her son decided to lie on the bed and cover themselves with a blanket and, because of the panic she felt at the idea that they may be taken from the Embassy to another location, she decided again to kill herself with the razor blade. When she was ready, the male who was guarding them suddenly left the room. One or two minutes later no more noise could be heard and the house was in silence, so the declarant decided to get up. She went to the kitchen to get a fruit knife and went out into the hall.

--- There she found Mr CHOE, whose hands were immobilised behind his back with metal hinged handcuffs and his feet were tied with cable ties, which she was able to cut with the knife.

--- She also found Mr JANG and Mr JU, embassy employees, with their hands tied with plastic cable ties, which she helped to cut with the knife.

--- Then three North Korean students who are habitually in contact with the Embassy entered the hall of the house and also helped them to get free. They all started to shout to find out where Mr SO was and the

ADMINISTRACIÓN DE JUSTICIA

declarant and Mr CHOE went down to the basement after hearing his voice.

--- After they were able to free Mr SO from his cable ties, they returned to the hall of the building and went outside. The declarant left via the garage door.

--- When they were on the public highway they found some police officers and moments later more police patrol vehicles and medical personnel arrived to help them.

--- She remembers that her husband, Mr JANG and Mr JU had a number of wounds on their faces and hands.

--- During this act she was shown photo arrays of males with similar characteristics to the persons described by the declarant and a record of photographic identification was made, separate to this record.

-- She has nothing more to state, and, having read this document, she signs it to show her conformity along with the Presiding Officer, which I, the Secretary, **CERTIFY**.

ADMINISTRACION DE JUSTICIA

# RECORD OF STATEMENT

**Full Name: Ok Gyong JANG**
**NIE [Foreign resident ID]: [redacted]779-T**
**Place of Birth: North Korea**
**Date: [redacted]983**
**Daughter of: Jae Yong JANG and Kyong Hwa YUN**
**Address: Calle Darío Aparicio, 43, Madrid**
**Telephone: 91 307 87 76**

**RECORD OF PHOTOGRAPHIC IDENTIFICATION.**

Issued in Madrid, at the station of the Madrid Provincial Intelligence Services, at **12:50** on 25 April 2019 by the above-mentioned National Police Force officers assigned to the Madrid Provincial Intelligence Services, who are acting as the Presiding Officer and Secretary, respectively, who for the purposes of this record and with regard to the events under investigation hereby **RECORD:**

That appears in this Station, after having been summonsed to do so, **Ok Gyong JANG,** NIE number [redacted]779-T, accompanied by Yun Sok **SO**, NIE [redacted]359-M, Commercial Attaché of the Democratic People's Republic of Korea, whom the declarant designates to act as interpreter in her interview the officers.

That the declarant was the victim of the events that occurred at the aforementioned Embassy on 22 February 2019, which led to the opening of Preliminary Proceedings [Diligencias Previas] number 1396/19 by Central Court of Investigation number 5.

During this act, after being shown the document "Annex 1", attached hereto, which includes nine still shots of nine males of Asian origin, numbered 1 to 9, **SHE RECOGNISES WITHOUT DOUBT** the male who appears in still shot number 2 as the person who entered in her room dressed with a formal suit, shirt and tie, and who had affixed a pin bearing the face of the leader of the Democratic People's Republic of Korea to the lapel of his jacket during the assault to the Embassy, after that somebody broke the lock of the door and opened it, and the declarant signs on the aforementioned still shots as proof thereof

Specifically this person was the first person that entered in her room when she was locked inside, just after somebody from outside broke the lock and opened it.
He has nothing more to state, and, having read this document, he signs it to show his conformity along with the Presiding Officer, which I, the Secretary, **CERTIFY.**

1034

MINISTERIO DEL INTERIOR

DIRECCI
DE LA

CUERPO NAC
Jefatura S
c
Brigada Provinci

ADM
D:



1



2



3



4



5



6







1035

ADMINISTRACION
DE JUSTICIA

# RECORD OF STATEMENT

**Full Name: Song Guk JANG**
**NIE [Foreign resident ID]: [redacted]628-T**
**Place of birth: North Korea**
**Date: [redacted]1960**
**Son/daughter of: Yong Sung JANG and Chol Kum RI**
**Address: Calle Darío Aparicio, 43, Madrid**
**Telephone: 91 307 87 76**

--- Issued in Madrid, at the station of the Provincial Intelligence Services, on 24 April 2019 at 18:10 by the above-mentioned officers assigned to the aforementioned Provincial Intelligence Services, who are acting as the Presiding Officer and Secretary, respectively, for the purposes of this record and with regard to the events that gave rise thereto:

-- Under the provisions of Article 284 of the Law of Criminal Procedure and Article 6 of Law 4/2015 of 27 April on the Statute of Victims of Crime, he is informed that if the perpetrator is not identified within seventy-two hours, these proceedings shall not be sent to the judicial authority, without prejudice to his right to reiterate the complaint before the State Prosecutor's Office or the investigating court.

--- During this act he is informed of his rights, under the provisions of Law 4/2015 and the Law of Criminal Procedure (Articles 109, 109 bis, 110 and 771.1).

--- He appears at this station freely and voluntarily after having been summonsed to do so, accompanied by Yun SOK SO (hereinafter SO), NIE [redacted]359-M, born in North Korea on [redacted]1979, son of So Jae MYONG and Ju Yong SUKM, address Calle Darío Aparicio número 43, Madrid and contact telephone number 91 307 87 76, whom the declarant designates to act as interpreter as he prefers to make his statement in his mother tongue, in order to provide new information regarding the events that gave rise to these proceedings, he states that:

--- His job at the North Korean Embassy is that of administrative officer.

--- At approximately 16:00 on 22 February 2019 he was carrying out cleaning work at the embassy, specifically sweeping the courtyard next to the area near the garage, along with another employee called Hak Rim JU. At approximately 16:30 he saw a person, who he noticed had long hair tied in a bun, inside the Embassy premises near the pedestrian entrance next to another Embassy employee, Mr CHOE.

--- A few minutes later, while he was still engaged in his cleaning work, he saw four or five males appear suddenly and unexpectedly. They ran towards his colleague JU and towards him. At first he thought they were journalists as he could not have imagined that they were assailants.

--- When these individuals approached Mr JU and the declarant, he realised they were attacking them and two of the males quickly pinned his arms behind his back, using physical force. The declarant attempted vigorously to resist but was unable to do so. The declarant asked them why they were doing this and who they were, but received no answer from these persons.

ADMINISTRACIÓN DE JUSTICIA

--- Because of the speed at which events unfolded, he can only remember that one of the individuals was young, under 30, with Asian features, dark hair, normal build and about 1.70 m tall.
--- When the declarant attempted to resist one of them put a pistol near his face in order to intimidate and threaten him.

--- The declarant stopped resisting because of this threat and the assailants violently forced him to the ground and hit his face against the ground.
--- When the declarant was on the ground and restrained by the attackers, they pinned his hands to his back and put cable ties on his hands and feet and placed a bag over his head. He remembers that the male who was trying to put them on did not know how to do it correctly and the other assailant told him in Korean how to put them on. Then one of the individuals told him to be still.
--- Thereupon, after approximately five or ten minutes the declarant heard a siren and the assailants immediately stood him up and took him to an area at the back of the Embassy, hidden from the wall and the main street, so that he could not be seen.
--- Subsequently, some time later, although he cannot say how long, two attackers stood the declarant up and took him inside the building to a room on the ground floor, near the hall. There he saw that there were more Embassy employees who were attempting to communicate with each other, which was not permitted by the attackers who were constantly watching over them and threatening them to stop them talking to each other.
--- After some time in these circumstances he heard a number of assailants take Mr SO to another room and then the declarant attempted to address the other individuals, asking them who they were and telling them that they were making a mistake, that it was an Embassy and attacking it in this way was an act of war, but he received no reply of any kind. However, one of the assailants threatened to take him to another room if he did not stop talking.
--- He remembers that at one point one of the assailants turned out the light, leaving them in the dark.
--- Some time later he heard two of the assailants talking very cautiously, which led him to think that they wanted to escape soon.
--- Moments later the attackers who were watching them exited the room, so the declarant thought that they had left. At that point Mr CHOE shouted out asking Mr SO where he was and suddenly an assailant came back into the room and told him to be quiet, then left immediately.
--- Minutes later the declarant heard silence again, a sign that the assailants were no longer inside the building. The declarant wishes to state that throughout the time he was being held in the room they kept him with his hands and feet tied with cable ties, a bag over his head and, for a considerable amount of time, lying face down on the floor and subsequently sitting on the sofa.
--- When the declarant and the rest of his compatriots could no longer hear the assailants, they tried to free themselves and the declarant was

ADMINISTRACIÓN DE JUSTICIA

able to remove the bag from his head by rubbing his head against the sofa. Then Mr CHOE was able to break the cable ties on the declarant's feet by kicking between his feet, but he was not yet able to remove the ties from his hands.

--- Next, along with the other Embassy employees, they went out into the hall of the building and found three North Korean students who had come to help them and one of them cut the cable ties that were holding his hands behind his back with a cutter.

--- When all of his compatriots were in the hall, they all went outside the premises together. The declarant exited to the street via the pedestrian entrance. There they found a police patrol unit who assisted them and moments later more police and medical vehicles appeared.

--- The declarant needed medical attention, consisting of two stitches to his face because of the pressure the assailants used to push him against the ground and an inflamed wrist caused by the cable ties. He also remembers that a number of his compatriots were also injured, specifically: Mr SO's face was injured, and he knows that Mr CHOE was also attended by SAMUR but he does not currently remember the nature of his injuries.

-- He has nothing more to state, and, having read this document, he signs it to show his conformity along with the Presiding Officer, which I, the Secretary, **CERTIFY**

ADMINISTRACION DE JUSTICIA

# RECORD OF STATEMENT

**CHO SUN HI**

| | |
|---|---|
| Place and date | **In the City of Madrid, on 20 March 2019.** |
| Given name | **CHO SUN** |
| Surnames | **HI** |
| Diplomatic identity card | [redacted]**53W** |

Before the Investigating Judge and myself, the Judicial Administration Clerk and the State Prosecutor, the aforementioned individual appears in order to make a statement as the affected party in these proceedings.

The Judge has informed her of her obligation to state the truth in response to any questions she is asked and the sanctions with which the Penal Code punishes the crime of giving false testimony in criminal proceedings.

Subsequently, the witness swears/promises to truthfully relate everything she knows with regards to the questions put to her.

With regards to her name and personal circumstances, SHE STATES: That they are those indicated above.

**STATEMENT**

The declarant is first informed by the judge of the rights to which she is entitled as the affected party/victim, along with the acts that have given rise to these proceedings.

She is assisted in the taking of the statement by the following individual who acts as Korean interpreter: MR YUN SOK SO, the embassy's commercial attaché.

To questions by the judge, regarding the events:

ADMINISTRACIÓN
DE JUSTICIA

She states that what happened on the day of the events, she doesn't remember the exact time, but believes it was around 5 p.m., she was at home, on the first floor of the embassy, and heard some blows, fighting between people, thuds on the floor. She thought it strange as she had not heard this sound before, and it was the first time she had heard "death fights between people" [*sic*].

At that time she wanted to intervene in the fight, to see what was happening in the hall, but then heard a South Korean accent.

She is 56 years old and it was the first time she heard the accent, and observed very clearly that although similar, the accent is different.

She is very familiar with her husband's voice but it wasn't his voice, amongst the very savage and cutting noises, one of her colleagues shouted out Mr SO's name.

She knew something was happening, she perceived it.

She locked the door of her apartment with the key.

She then immediately picked up her mobile phone to call two colleagues, but there was no reception. The people who live in the embassy were captured, which is why she wanted to call the residents who were outside the embassy, such as the students at the university of Nebrija.

She found out that those who were inside the embassy were captured, which is why she thought that she was the only one alive, and gathered her shoes. She then opened the window to the terrace and went out, looking down to jump, but thought that if she jumped onto the concrete it would be worse, which is why she jumped onto the earth. She decided to jump and clung to the small terrace wall with her hands, and used her right leg to push off and clear the building.

On falling she lost balance and hit her head on the corner of a tile, which she didn't notice at the time, but then her head felt hot and when she touched it she saw the blood.

When she was on the terrace getting ready to jump she heard the thump on the door.

She heard the noise from the door, not like the door opening, rather like it being kicked.

When she fell she was nervous, and when she covered the blood on her head she started to walk to the main door, but changed direction because otherwise she would have been seen and captured.

ADMINISTRACIÓN DE JUSTICIA

She knew of an exit unknown to others, and because of this she escaped through it and jumped over the wall.

When she jumped over the wall she noticed someone on the terrace, and upon looking saw a man with black hair, his face covered with black fabric and a black jacket, and he was running towards the other side. She thought he was looking for her because she had escaped from the room

She saw then that she had made a good decision, because from his appearance the man looked South Korean.

This is why she wanted to move despite her leg hurting a lot, and her head bleeding, which is why she crawled on all fours to the road in front of the embassy.

When she got to the road she saw a black car that changed direction towards the embassy, using the roundabout to do so.

As her head was bleeding profusely, and her face and hands were covered in blood, the driver of the car was very startled when he saw her. She thought the driver was 35-40 and Spanish.

The driver stopped the car, and she immediately opened the door and got in. As she didn't speak Spanish, she gesticulated, and the driver drove to where she indicated.

150 metres from the embassy there is a clinic, where the driver stopped, and then the car went towards a gym that was next to the embassy. When the car stopped, two older people came out dressed in white hospital clothes.

It was then that she wanted to take action, which is why she called the police when she saw these two people, who calmed her down, and attended to her head wound.

She was unable to thank the driver.

10 minutes later an ambulance arrived with doctors dressed in blue, to help her. The doctors lay her down and treated her wounds and general state, taking her pulse, etc.

The doctors asked her if she was from China or the Philippines. She merely replied "No problem", sometimes speaking French.

She didn't want to say she was from North Korea, because at that moment she didn't believe anyone. This is why she said she was Chinese. She thought that if she said she was North Korean, the doctors would take her to the nearby embassy.

ADMINISTRACIÓN DE JUSTICIA

As there was no colleague she could turn to, she called the Chinese embassy in Madrid and thought that simply by greeting them in their language they would come and help her.

The doctors realised she wasn't Chinese, and someone called the South Korean embassy, and the declarant shouted that she didn't want to speak to them.

As she was anxious to call the police, she told the doctors to do so.

15 minutes later the police arrived and she calmed down, because she saw their uniforms. She told the police she was from North Korea.

A doctor used an instant translation app with his mobile phone, which on translating what she said showed that South Korean attackers had assaulted the embassy and 6 people had been captured and their hands tied there, and she asked them to urgently go to their rescue, and explained how she escaped.

When they heard this, they didn't appear to believe her.

She said she saw a man with black hair and his faced covered with material, and a black jacket, and a doctor asked if they were South Korean spies. She said they were. Then the doctors and police officers were astonished.

She asked if they would help her, and the doctors told her that they had understood her, that the police would do what they had to and that she would be medically attended to.

<u>In response to questions put by the State Prosecutor:</u>

On being asked if she saw the embassy staff tied up, she said she didn't see it, but heard someone shout KEEP STILL, which seemed like someone wanted to tie them up.

When she jumped onto the terrace she realised that this was the first time something like this had happened in the embassy and that the staff fought the bandits.

<u>Questions from the judge</u>

She had her leg operated on last week

She claims for the injuries she suffered

ADMINISTRACIÓN
DE JUSTICIA

The declarant wishes to add that before the police alighted from the ambulance, they asked her if she could call the embassy, and she told them that no-one would answer the phone because the staff had been captured.

Having read this statement and consented to its content, the declaration signs it along with the other parties present in this act, to which I, the Judicial Administration Clerk, bear witness.

[Illegible signatures]

ADMINISTRACIÓN DE JUSTICIA

**ANNEX 3**

**WITNESS STATEMENTS**

# RECORD OF STATEMENT

**Full Name: Chol Hak KIM**
**NIE [Foreign resident ID]:[redacted]554-P**
**Place of birth: North Korea**
**Date: [redacted]1984**
**Son/daughter of: Ri Sop KIM and Jin Suk KANG**
**Address: Calle Darío Aparicio, 43, Madrid**
**Telephone: 91 307 87 76**

--- Issued in Madrid, at the station of the Provincial Intelligence Services, on 23 April 2019 at 16:45 by the above-mentioned officers assigned to the aforementioned Provincial Intelligence Services, who are acting as the Presiding Officer and Secretary, respectively, for the purposes of this record and with regard to the events that gave rise thereto:
--- He has been informed of the legal obligation to state the truth (Art. 433 of the Law of Criminal Procedure) and of the criminal responsibility he might incur in the event of a false accusation or false imputation to an individual of a criminal offence or showing flagrant disregard for the truth (Art. 456 of the Penal Code); of pretending to be the perpetrator or victim of a criminal offence (Art. 457 of the Penal Code); or of giving false testimony (Art. 458 of the Penal Code).
--- He appears at this station freely and voluntarily after having been summonsed to do so, accompanied by Yun SOK SO (hereinafter SO), NIE [redacted]359-M, born in North Korea on [redacted]979, son of So Jae MYONG and Ju Yong SUKM, address Calle Darío Aparicio número 43, Madrid and contact telephone number 91 307 87 76, whom the declarant designates to act as interpreter to help with anything that the declarant cannot explain in Spanish, in order to provide new information regarding the events that gave rise to these proceedings, he states that:
--- The declarant is currently an architecture student at Nebrija University and keeps in regular contact with his country's Embassy.
--- On 22/02/2019, along with two other students from his country, called Mr PAE and Mr JONG, with whom he shares a residence, he went to the door of the Embassy after he had received a call from a North Korean employee at an International Body who also lives in Madrid, called Hyol Chol KANG, who had received another telephone call informing him that an Embassy employee had been injured. For that reason, KANG urged the declarant to go to the Embassy building to see what was happening.

ADMINISTRACIÓN DE JUSTICIA

--- When the declarant and his compatriots arrived at the Embassy, at approximately 21:40, they saw that the vehicle entrance was open and they went to the pedestrian entrance to the Embassy. There they found two stationary vehicles, one of them with its hazard lights on directly outside the pedestrian entrance, and the other on the other side of the street. Both were black. The second vehicle drove off when the declarant and his two friends reached the pedestrian entrance. Moreover, a police vehicle was parked at the end of the wall outside the Embassy.

--- A young male wearing a suit was leaning against the first vehicle. The declarant approached him and asked who he was. This person answered that he had received a message from someone to pick up a person at this location.

--- At the very same moment his colleague JONG rang the Embassy doorbell and Mr CHOE answered from inside and told him to enter the building urgently. However, he was unable to open the pedestrian entrance.

--- Consequently the declarant and JONG entered the Embassy premises via the vehicle entrance which was open, while his colleague PAE jumped over the fence to get inside.

--- As they were going through the vehicle entrance they sensed that something was happening so they went to the main entrance to the building where they found their compatriots in the hall of the house. The declarant saw Mr CHOE, who was handcuffed with his hands behind his back, Mr JANG (he does not remember whether his hands were tied or not), Mr JU who was also handcuffed with his hands behind his back - Mr JANG and Mr JU were both injured and had blood on their faces - and Mr SO's wife (Mrs JANG) and their son.

--- At this point his colleague Mr JONG, Mr CHOE and Mr SO's wife (Mrs JANG) went down to the basement to free Mr SO while the declarant remained in the hall with the rest of his compatriots.

--- A few moments later these three people came back up to the hall with Mr SO, who was also injured and had blood on his face. Then the whole group decided to leave via the garage door, which was open. The group went to the police unit that was in the street and explained to them what had happened.

--- The police officers asked them for identification and a few minutes later several other police patrol vehicles arrived.

-- He has nothing more to state, and, having read this document, he signs it to show his conformity along with the Presiding Officer, which I, the Secretary, **CERTIFY**

ADMINISTRACIÓN DE JUSTICIA

# RECORD OF STATEMENT

**Full Name: Kwang Hyok PAE**
**NIE [Foreign resident ID]: [redacted]521-K**
**Place of birth: North Korea**
**Date: [redacted]1987**
**Son/daughter of: Chang Sun PAE and Man Ok JONG**
**Address: Calle Darío Aparicio, 43, Madrid**
**Telephone: 91 307 87 76**

--- Issued in Madrid, at the station of the Provincial Intelligence Services, on 23 April 2019 at 17:50 by the above-mentioned officers assigned to the aforementioned Provincial Intelligence Services, who are acting as the Presiding Officer and Secretary, respectively, for the purposes of this record and with regard to the events that gave rise thereto:

--- He has been informed of the legal obligation to state the truth (Art. 433 of the Law of Criminal Procedure) and of the criminal responsibility he might incur in the event of a false accusation or false imputation to an individual of a criminal offence or showing flagrant disregard for the truth (Art. 456 of the Penal Code); of pretending to be the perpetrator or victim of a criminal offence (Art. 457 of the Penal Code); or of giving false testimony (Art. 458 of the Penal Code).

--- He appears at this station freely and voluntarily after having been summonsed to do so, accompanied by Yun SOK SO (hereinafter SO), NIE [redacted]359-M, born in North Korea on [redacted]1979, son of So Jae MYONG and Ju Yong SUKM, address Calle Darío Aparicio número 43, Madrid and contact telephone number 91 307 87 76, whom the declarant designates to act as interpreter to help with anything that the declarant cannot explain in Spanish, in order to provide new information regarding the events that gave rise to these proceedings, he states that:

--- The declarant is currently an architecture student at Nebrija University and keeps in regular contact with his country's Embassy.

--- On 22/02/2019 another student from his country, called Chol Hak KIM, told him that his compatriots at the Embassy were not answering the telephone and they should go and see what was happening, so he, KIM and another colleague who is also from their country, called Myong Nam JONG, went there. At that time the declarant and his two colleagues were sharing a residence.

--- When the declarant and his compatriots arrived at the Embassy, at approximately 21:30 or 21:40, they saw that the vehicle entrance was open and they went to the pedestrian entrance to the Embassy. There they found two stationary vehicles, one was a police car at the end of the road and the other was directly outside the pedestrian entrance, with its hazard lights on. It was a black Mercedes Benz. A male dressed in a white shirt and suit trousers was next to the latter vehicle.

--- His two colleagues KIM and JONG spoke to this male and asked him who he was. They did not understand his answer very well.

--- Then his colleague JONG rang the Embassy doorbell and Mr CHOE answered via the screen and told them to enter quickly. Consequently

ADMINISTRACIÓN DE JUSTICIA

the declarant decided to jump over the fence outside the premises and his two colleagues entered via the garage entrance. At that point, when the three of them entered the hall of the house they found their compatriots, some of whom were bleeding and had their hands tied, specifically:

--- Mr JU was handcuffed with his hands behind his back. He is not sure whether his feet were tied.
--- Mr CHOE was also handcuffed with his hands behind his back and he had wounds and blood on his face. He is not sure whether his feet were tied either.
--- Mr JANG was also handcuffed with his hands behind his back and he had wounds on his face. He is not sure whether his feet were tied either.
--- Mrs JANG (Mr SO's wife), who was agitated, and their minor son.
--- The declarant then began to look for objects to free his compatriots. He therefore thinks that their feet were also tied.
--- Meanwhile his colleague JONG, Mr SO's wife (Mrs JANG) and Mr CHOE went downstairs to look for Mr SO and came back up with him minutes later. The declarant noticed that his face was injured.
--- When the declarant realised that Mrs JO (Mr JANG's wife) was not there, he set to looking for her all over the building with Mr CHOE, who was still handcuffed. During the search he found some boxes of hinged handcuffs in the hall of the house and took some keys to free Mr CHOE. At that point Mr CHOE went outside and the declarant continued looking for Mrs JO without success and left the building a few minutes later.
--- When he went outside he found the rest of his compatriots and several police officers who asked him to identify himself.
-- He has nothing more to state, and, having read this document, he signs it to show his conformity along with the Presiding Officer, which I, the Secretary, **CERTIFY**

ADMINISTRACION DE JUSTICIA

# RECORD OF STATEMENT

**Full Name: Myong Nam JONG**
**NIE [Foreign resident ID]: [redacted]544-K**
**Place of birth: North Korea**
**Date: [redacted]1993**
**Son/daughter of: Gi Yong JONG and Hye Yong JANG**
**Address: Calle Darío Aparicio, 43, Madrid**
**Telephone: 91 307 87 76**

--- Issued in Madrid, at the station of the Provincial Intelligence Services, on 23 April 2019 at 18:30 by the above-mentioned officers assigned to the aforementioned Provincial Intelligence Services, who are acting as the Presiding Officer and Secretary, respectively, for the purposes of this record and with regard to the events that gave rise thereto:

--- He has been informed of the legal obligation to state the truth (Art. 433 of the Law of Criminal Procedure) and of the criminal responsibility he might incur in the event of a false accusation or false imputation to an individual of a criminal offence or showing flagrant disregard for the truth (Art. 456 of the Penal Code); of pretending to be the perpetrator or victim of a criminal offence (Art. 457 of the Penal Code); or of giving false testimony (Art. 458 of the Penal Code).

--- He appears at this station freely and voluntarily after having been summonsed to do so, accompanied by Yun SOK SO (hereinafter SO), NIE [redacted]359-M, born in North Korea on [redacted]1979, son of So Jae MYONG and Ju Yong SUKM, address Calle Darío Aparicio número 43, Madrid and contact telephone number 91 307 87 76, whom the declarant designates to act as interpreter as he prefers to make his statement in his mother tongue, in order to provide new information regarding the events that gave rise to these proceedings, he states that:

--- The declarant is currently an architecture student at Nebrija University and keeps in regular contact with his country's Embassy.

--- This regular contact consists of routine telephone calls and on 22/02/2019 they were unable to contact the Embassy.

--- In addition, a North Korean compatriot who also lives in Madrid, called Hyol Chol KANG, who works at an International Body, called his colleague Chol Hak KIM and told him that an Embassy employee was injured and in hospital. During the same conversation Mr KANG also told his colleague KIM that nobody was answering the telephone at the Embassy.

--- Consequently, his colleague KIM, another student colleague called Kwang Kyok PAE and the declarant himself, who were sharing a residence, decided to go to the Embassy to find out what was happening.

--- When the three individuals arrived, they found the garage entrance open and they walked to the pedestrian entrance, where they saw a vehicle directly outside the door. He remembers that it was black and its hazard lights were on. There was a young man wearing a white shirt next to the vehicle.

ADMINISTRACIÓN DE JUSTICIA

--- As they were not sure what was happening, they looked around and saw a police vehicle at the end of the Embassy wall and another vehicle that was similar to the first one he has described.
--- Then his colleague KIM addressed the driver of the dark vehicle who was right next to the embassy entrance, asking him what he was doing there. He answered that he was waiting for "the call", but he did not know what he was referring to.

--- At the same time the declarant managed to contact Mr CHOE via the intercom. He asked them to jump over the embassy fence quickly and go inside.
--- The declarant and his colleague KIM entered the Embassy premises via the garage entrance, which was open, and his colleague PAE jumped over the fence.
--- When the declarant and his two colleagues were inside the premises, the three of them went to the hall of the building and found their compatriots as follows:
--- Mrs JANG (Mr SO's wife) and their son were very frightened.
---Mr CHOE was handcuffed with his hands behind his back and he had injuries on his face. He cannot say whether his feet were tied.
--- Mr JANG was also handcuffed. He cannot say whether his hands were in front of him or behind his back or whether his feet were tied. He also had injuries on his face.
--- Mr JU was also handcuffed. He cannot say whether his hands were in front of him or behind his back or whether his feet were tied. He saw that he had injuries on his face.
--- At that point Mr SO's wife (Mrs JANG) told them that they could not find Mr SO, such that she, together with Mr CHOE and the declarant, began to look for him and discovered that he was shouting from the basement of the building, so the three of them went down to help him.
--- They found Mr SO with his hands and feet tied with tape, with his hands behind him, and a hood over his head. After they had freed him and seen that he had injuries on his face, the four of them returned to the hall to join the rest of the group.
--- Once the whole group was gathered in the hall they went outside, exiting the premises by the main entrance.
--- When he got outside, the declarant saw that the black vehicle with the hazard lights on, which he had seen before he went in was no longer there.
--- At that point they encountered several Police patrol units, who proceeded to identify him.
-- He has nothing more to state, and, having read this document, he signs it to show his conformity along with the Presiding Officer, which I, the Secretary, **CERTIFY**

ADMINISTRACION DE JUSTICIA

## ANNEX 4

**1. PHOTOGRAPH OF CHRISTOPHER AHN AT THE DOOR OF THE EMBASSY ON 22/02/2019**



**2. PHOTOGRAPHS OF CHRISTOPHER AHN AT THE DOOR OF THE EMBASSY ON 22/02/2019**



ADMINISTRACION
DE JUSTICIA





ADMINISTRACIÓN
DE JUSTICIA

## ANNEX 5

## PHOTOGRAPHS OF PURCHASES MADE AND PRODUCTS BOUGHT BY HONG CHANG AT SHOKE AND BY SAM RYU AT FERRETERÍA DELICIAS HARDWARE STORE AND OF DAMAGE CAUSED AT THE EMBASSY

List of items bought at SHOKE

- 5 fast-draw pistol holsters.
- 4 combat knives
- 6 HK imitation pistols (PVC)
- 1 shoulder holster
- 4 pairs of shooting glasses
- 5 tactical flashlights
- 4 elastic balaclavas
- 5 pairs of hinged handcuffs (two different types)

Receipt for purchase made by Adrian **HONG CHANG** at SHOKE


SHOKE
DEFENSA Y SEGURIDAD

LA BOUTIQUE DEL POLICIA
Juan de Urbieta, 22
28007 Madrid
NIF: 05354134-X
Telf.: 91 552 43 57
www.tiendashoke.es

TICKET
B01900493
Fecha: 22/02/2019 10:56 VEN.: JAVS

| PRODUCTO | UD. | I/U | SUMA |
|---|---|---|---|
| FUNDA CORDURA EXTR. RAPIDA | 5 | 16,00 | 70,00 |
| CUCHILLO COMBATE MILTEC | 4 | 29,95 | 119,80 |
| PISTOLA UMAREX H&K USP COMPACT | 6 | 26.00 | 156,00 |
| SOBAQUERA VERTICAL CORDURA SIN | 1 | 59,95 | 59,95 |
| GAFA DOBLE COBRA INCOLORA | 4 | 10.60 | 42,40 |
| LINTERNA TACTICA SHOKE XML 70R | 5 | 51,95 | 259,75 |
| Oferta - Precio anterior 58,95 | | | |
| BALACLAVA MILTEC ELASTICA 3 | 4 | 9.95 | 39,80 |
| GRILLETE DE CADENA ESTANDAR CON | 2 | 12.80 | 25,60 |
| Oferta - Precio anterior 13.50 | | | |
| GRILLETE DE BISAGRA SHOKE DOBLE | 3 | 19,95 | 59,85 |
| Oferta - Precio anterior 22.61 | | | |
| | 0 | 0,00 | 0,00 |

Total s/Descuento 833,15

TOTAL 833,15 EUR

COBRADO 833,15

IMPORTE A DEVOLVER 0,00

ADMINISTRACION
DE JUSTICIA

Adrian **HONG CHANG** entering "SHOKE"




Adrian **HONG CHANG** waiting to be served



ADMINISTRACION
DE JUSTICIA

Adrian **HONG CHANG** exiting SHOKE with the purchases




**List of items purchased at "Ferretería DELICIAS" hardware store:**

- 20/02/2019
  - 3 Rolls of double-sided tape
  - 2 Rolls of black electrical tape
  - 1 Pair of Leatherman pliers
  - 1 Roll of black cloth tape
  - 1 Crowbar
  - 1 Pair of bolt cutters

- 22/02/2019
  - Crowbar
  - 4 Rolls of black electrical tape
  - 9 Pry bars
  - 5 pairs of clear safety glasses
  - Telescopic ladder.

ADMINISTRACION DE JUSTICIA

## Receipts for purchases made at Ferretería DELICIAS hardware store

FERRETERÍA DELICIAS
www.ferreteriadelicias.com

VILLAR CORCES S.L.
Pº DE LAS DELICIAS, 46
28045 MADRID - MADRID
C.I.F: B87474094
FECHA: 20/02/2019 Factura Nº: 216.605

| Artículo | Unidades | Precio | % Dto | Importe |
|---|---|---|---|---|
| CINTA DE DOBLE CARA PARA MOQUETAS REMOVIBLE 20 M X 50 MM | 3 | 10,04 | 0,00 | 30,12 |
| CINTA AISLANTE NEGRO TEMPLEX 15( 19 MM X 20 M | 2 | 0,85 | 0,00 | 1,70 |
| LEATHERMAN WINGMAN FUNDA NYLC | 1 | 50,00 | 0,00 | 50,00 |
| CINTA ADHESIVA DE TELA 1900 50 MM 50 M NEGRA | 3 | 4,11 | 0,00 | 12,33 |
| DESENCOFRADOR 5982-18X500 5982-18X500 | 1 | 13,99 | 0,00 | 13,99 |
| CORTAVARILLAS DE 14 | 1 | 16,67 | 0,00 | 16,67 |

IVA 21,00% 26,21 €
TOTAL (I.V.A. In cluido) 151,02 €

FERRETERÍA DELICIAS
www.ferreteriadelicias.com

VILLAR CORCES S.L.
Pº DE LAS DELICIAS, 46
28045 MADRID - MADRID
C.I.F: B87474094
FECHA: 22/02/2019 Factura Nº: 217.295

| Artículo | Unidades | Precio | % Dto | Importe |
|---|---|---|---|---|
| DESENCOFRADOR 5982-18X500 5982-18X500 | 1 | 13,99 | 0,00 | 13,99 |
| CINTA AISLANTE NEGRO TEMPLEX 15( 19 MM X 20 M | 4 | 0,85 | 0,00 | 3,40 |
| BARRA DE DESENCOFRAR FATMAX DI 350MM | 9 | 11,66 | 0,00 | 104,94 |
| GAFA 2750 STYLISH PC- INCOLORA AF AE | 5 | 10,12 | 0,00 | 50,60 |
| ESCALERA TELESCOPICA 1 TRAMO XTEND 3.80M LINEA AZUL | 1 | 211,50 | 0,00 | 211,50 |

IVA 21,00% 80,73 €
TOTAL (I.V.A. In cluido) 465,16 €

CON PURCHASE DATE: 20/02/2019

COI PURCHASE DATE: 22/02/2019

## Images of Sam **RYU** entering the hardware store 20/02/2019



ADMINISTRACION
DE JUSTICIA




The Group paying for the purchases



ADMINISTRACION
DE JUSTICIA

Sam **RYU** entering the establishment 22/02/2019




Sam **RYU** with another member of the Group



ADMINISTRACION DE JUSTICIA

Boot of the white SEAT Alhambra 4824KMT






ADMINISTRACION
DE JUSTICIA

Detail of the telescopic ladder bought at Ferretería Delicias hardware store



ADMINISTRACION DE JUSTICIA

Cables ties used to tie the victims' hands






ADMINISTRACION
DE JUSTICIA

Box of hinged handcuffs (4), tactical flashlight (10), gloves (8 and 9) and bag from Ferretería Delicias hardware store (7)




Shoulder holster (12) purchased at SHOKE by Adrian **HONG CHANG**

ADMINISTRACION
DE JUSTICIA




Hinged handcuffs (13 to 17) used to restrain the victims' hands



ADMINISTRACION
DE JUSTICIA

Balaclavas (22 and 24) used by the assailants to hide their identity






ADMINISTRACION DE JUSTICIA

Defence spray (35) and stylish clear shooting safety glasses used by the assailants (36 and 37)









ADMINISTRACION DE JUSTICIA

Broken cable tie (40) and black electrical tape (45)









ADMINISTRACION
DE JUSTICIA

Boxes of hinged handcuffs from SHOKE police supply store (47 and 48)









ADMINISTRACION
DE JUSTICIA

Photos of damage caused at the Embassy





ADMINISTRACION
DE JUSTICIA

Pliers found at the Embassy




Damage caused

ADMINISTRACION
DE JUSTICIA







Bolt cutter tool found in the Embassy garden

ADMINISTRACION
DE JUSTICIA




Knives and pair of scissors found inside the Embassy premises rubbish bin (83 to 85)



ADMINISTRACION
DE JUSTICIA






ADMINISTRACION
DE JUSTICIA




Combat knives, cable ties and personal defence spray

ADMINISTRACION DE JUSTICIA




HK imitation pistol (PVC)



ADMINISTRACION
DE JUSTICIA

Cable ties (2)




Personal defence spray (8 and 9)



ADMINISTRACION
DE JUSTICIA

HK imitation pistol (PVC)




HK imitation pistol (PVC)



ADMINISTRACIÓN DE JUSTICIA

**ANNEX 6**

**RULING ORDERING PROVISIONAL CUSTODY OF CHRISTOPHER PHILIP AHN**

**CASE:** **PRELIMINARY PROCEEDINGS [DILIGENCIAS PREVIAS]**
**Number** **:** **1396/2019**

**CENTRAL COURT OF INVESTIGATION [JUZGADO CENTRAL DE INSTRUCCIÓN]**
**NO. 5**
**NATIONAL HIGH COURT [AUDIENCIA NACIONAL]**
**MADRID**

**RULING**

In the City of Madrid, on 11 April 2019.

**BACKGROUND TO THE FACTS**

**ONE.** On 04/04/2019, this Court received an official communication from the National Police Intelligence Services in Madrid with the same date and registry number 1542/19, reporting the identification of a new suspect and providing photographic identification.

On the basis of the available evidence, the case was passed to the State Prosecutor's Office in order for a report to be prepared on the propriety of ordering provisional custody and issuing an International Arrest Warrant for Christopher Philip **AHN**.

The State Prosecutor's Office delivered a report on 09/04/2019, requesting a ruling ordering the provisional custody, communicated and without bail of Christopher Philip **AHN**.

**LEGAL GROUNDS**

ADMINISTRACIÓN DE JUSTICIA

**ONE.** Article 311 of the Law of Criminal Procedure provides that: "The Judge examining the proceedings will implement the measures proposed by the State Prosecutor's Office or any other of the parties appearing, where they are not considered needless or prejudicial".

In this regard, Article 777 of the Law of Criminal Procedure [LECr] stipulates that "the judge shall either order the Judicial Police to carry out, or shall carry out him or herself, the necessary steps to determine the nature and circumstances of the crime, the individuals who have taken part in it and the competent body to bring it to trial (...)".

**TWO.** In the case under investigation, there is rational circumstantial evidence pointing to the perpetration of the following acts, notwithstanding any subsequent conclusions drawn from the investigation:

Christopher Philip **AHN** arrived at Adolfo Suarez-Madrid-Barajas Airport on 22/02/2019 at 8:10 on American Airlines flight 94 from JFK airport in New York (USA), that is, on the morning of the attack on the North Korean embassy. Later on the same day, a group of individuals, led by Adrian **HONG CHANG,** and including Sam **RYU** and Woo Ran **LEE** and **AHN** himself, entered the seat of the Embassy of the Democratic People's Republic of North Korea in Madrid by force, using firearms, machetes and knives. They then kidnapped all of the staff, hitting them and causing injuries to one or more individuals, among them the Commercial Attaché. They then proceeded to search the entire building, subsequently fleeing with three diplomatic vehicles belonging to the North Korean Embassy, specifically, a Mercedes Viano CD 416003, a Toyota Rav-4 CD 416002 and an Audi A8 CD 416001, which were recovered some hours later.

The events occurred as follows:

The Embassy of the Democratic People's Republic of Korea is located in calle Darío Aparicio 43, in Madrid.

There were seven people inside the Embassy: Jang OK **GYONG**, K[redacted] J[redacted] S[redacted] Song Guk **JANG**, Song Jin **CHOE**, Hak Rim **JU**, Cho Sun **HI** and Yun Sok **SO**

ADMINISTRACIÓN DE JUSTICIA

(the latter being the Commercial Attaché of the Democratic People's Republic of Korea).

On the afternoon of 22/02/2019 at 17:00, **CHOE** was carrying out gardening work in the Embassy's garden together with Hak Rim **JU** and Song Guk **JANG.**

At 16:34, **HONG CHANG**, together with another person, travelled from calle Río Adaja 13 to Calle Darío Aparicio 26 in Madrid (arriving at 16:48), seat of the Embassy, in order to carry out the attack.

At 17:00, **HONG CHANG** called at the door asking to see Yun Sok **SO,** the Embassy's Commercial Attaché.

Meanwhile, his companion remained waiting on the first roundabout in close proximity to the Embassy.

Song Jin **CHOE** opened the door and, hearing the request of **HONG CHANG**, granted him access and allowed him to enter the Embassy's premises, telling him to wait on a bench in the patio whilst he went to find **SO**.

Minutes prior to this, a white SEAT ALHAMBRA with registration plate 4824-KMT, had parked on the second roundabout located in Calle Viñas de Pardo. Five people got out of the car and walked towards the door of the Embassy, where they joined the person who was waiting nearby, and together they headed to the door of the Embassy.

Adrian **HONG CHANG**, taking advantage of a momentary oversight by **CHOE**, opened the door of the Embassy, granting access to the individuals who were positioned outside, including Woo Ran **LEE**, Sam **RYU** and Christopher Philip **AHN.**

There are images from the security cameras of the North Korean embassy, in particular from the security camera that covers the entry door to the embassy, in which Christopher Philip **AHN** appears clearly, being one of the people in the group that attacked the embassy.

They immediately entered the Embassy building carrying machetes, knives, iron bars and handguns (imitation), and started to violently hit those inside, until they managed to restrain them and immobilise them using hinged handcuffs and cable ties.

Thus, they attacked **CHOE**, they hit him, tied him up with cable ties and placed a bag over his head.

They also tied up and hit Hak Rim **JU** and Song Guk **JANG**, moving the three of them to the Embassy's meeting room.

Several of the attackers, including Christopher Philip **AHN**, also attacked **SO**, hitting him and causing different injuries and forcibly took him to one of the bathrooms. **SO** resisted this and started to struggle with his attackers, until he was restrained and his arms were tied behind his back with cable ties. They covered his head with a bag whilst threatening him with iron bars and what appeared to be firearms pointed at the back of his neck.

The Embassy's commercial attaché, **SO**, carried out a photographic identification, unequivocally identifying Christopher Philip AHN as one of the people who attacked the embassy.

In his statement, the Embassy's commercial attaché, **SO**, states that this person, specifically, was one of the 4 or 5 people who, at the start of the attack, hit him in the entrance of the property until they managed to restrain him, assaulting him and hitting him, in order to immobilise him.

Approximately 30 minutes later the attackers took **SO** to the Embassy's meeting room, and they also took **CHOE**, **JU** and **JANG** to the same location.

Whilst the attack was underway, the wife of **SO**, Jang Ok **GYONG** and her son, K[redacted]J[redacted]S[redacted] were in a bedroom with the door locked shut, although

ADMINISTRACIÓN DE JUSTICIA

the attackers were able to force it open and enter the room to reach her and the child.

They did not restrain them or tie them up, but one of the attackers stayed guarding them so that they could not leave.

In addition, Cho Sun **HI**, wife of **JANG**, was on the top floor of the Embassy, and when she heard everything that was happening she went into a room, locking it shut, until the attackers started hammering on the door in order to gain access.

Before they managed to do this, **HI** attempted to escape via the room's terrace. She ended up falling to the ground, sustaining various injuries but was able to escape and left the Embassy's premises via the Paddle tennis court, which has an exit directly out onto the street. There she was seen by a citizen, Oscar SANTIAGO PERALES, who helped her and requested medical and police assistance.

A medical team from *SAMUR*, the Municipal Emergency Assistance and Rescue Service in Madrid, went immediately to the scene of the events and started to treat her. She was seriously injured.

A police unit also immediately attended the scene and was informed by the victim that various people had attacked the Embassy.

After establishing a security perimeter, the police officers with professional identity numbers 122.334, 122.271 and 115.581, moved to the door of the Embassy and called at the door. The person who opened the door was Adrian **HONG CHANG**, who had affixed a pin bearing the face of the president of the Democratic People's Republic of Korea to the lapel of his jacket, presenting himself as a representative or person in authority at the Embassy and told them that there was no problem. He further stated that if a person of North Korean nationality had been injured then the police officers must inform the Consulate officially.

ADMINISTRACIÓN DE JUSTICIA

After approximately 60 minutes in the Meeting room, three of the attackers took **SO** to one of the rooms in the basement. There, two of the attackers urged him to leave North Korea, identifying themselves as members of a human rights association or movement for the liberation of North Korea.

When **SO** told them that he would not betray his country and would not defect, the two attackers who engaged with him left the room, leaving **SO** guarded by the third attacker. 15 minutes passed and various attackers entered. They tied him up again and once more placed a black bag over his head.

The assailants held the people who were in the Embassy for several hours, keeping them immobilised with hinged handcuffs and cable ties at all times and hitting them.

During this time they proceeded to systematically search different offices in the Embassy, taking possession of a couple of pen drives, two computers, two hard drives (one of them used for storing images from the security cameras) and an Huawei Honor mobile telephone with commercial number 645.659.070 and IMEI numbers: 861201038670115 and 861201038491702.

They then took possession of three vehicles belonging to the Embassy, and the majority of the attacking group proceeded to leave the Embassy in these three vehicles at approximately 21:40, leaving the people who they had detained inside the embassy immobilised with cable ties and hinged handcuffs.

The vehicles were a Mercedes Viano CD 416003, a Toyota RAC-4 CD 416002 and an Audi CD 416001. The three vehicles were recovered and returned to their owners. The leader of the group of assailants, Adrian **HONG CHANG** and one of the members of the group remained inside the Embassy until the three vehicles had left.

ADMINISTRACIÓN DE JUSTICIA

At 21.30, a Mercedes E220 1953-KCJ, from UBER, was parked outside the Embassy. It had been booked by Adrian **HONG CHANG** for a journey from the door of the North Korean Embassy to Toledo.

Adrian **HONG CHANG,** proceeded to cancel this service at 21:40, possibly because it was clear that he could not leave the Embassy by the front, as there were different police units at the scene.

Immediately afterwards, **HONG CHANG**, always using the false identity of the UBER user Oswaldo **TRUMP**, proceeded to book a new UBER service, for 21:46, on this occasion to Avenida de Valdemarín nº 56, which is precisely the rear of the North Korean Embassy.

At this point, **HONG CHANG** and the other attacker left the Embassy by the rear, crossing an area of wasteland where they threw away an Italian identity card in the name of Matthew **CHAO** and some of the items they had used for attacking the Embassy (imitation pistols and machetes), and then fled the scene. The following day they left for New York (United States of America) on a flight departing from Lisbon.

Matthew **CHAO** is another of the identities used by Adrian **HONG CHANG**. The Visual Inspection carried out by the police on 27/02/2019 resulted in the seizure of an Italian driving licence in the name of Matthew **CHAO**, a US citizen born on [redacted]1979. The photograph on the licence shows an individual with similar features to the individual with the ponytail identified with this identity on 07/02/2019 (ultimately, Adrian **HONG CHANG**).

This official Italian document is a complete forgery (according to report no. 19-166682, of the Document Examination Group of the Provincial Brigade of the forensic police in Madrid, adjoined with official police communication 1.383/19, of 22/03/2019).

ADMINISTRACIÓN DE JUSTICIA

At 21:50 three North Korean students, Kwang Hyok **PAE**, Myong Nam **JONG** and Chol Hak **KIM**, approached the Embassy

One of them called at the Embassy door and as he did not receive a response, he proceeded to jump over the Embassy's fence in order to assist the victims.

Immediately afterwards, they opened the Embassy door from the inside and the victims started to leave, still tied up. They received immediate assistance from the police.

At 22:35, **SO**, in his capacity as Commercial Attaché of the Embassy, issued written authority to the police unit for them to proceed "to enter the diplomatic legation for the purposes of conducting a search and determining whether all was in order and checking that there is no one inside who was not from the diplomatic legation".

Furthermore, **SO** issued a new written authorisation to the police unit for them to enter the diplomatic legation "in order for the forensic police to carry out the corresponding visual inspection and collect any items that may have been handled by the attackers".

The Mercedes Viano CD 416003 was found abandoned shortly afterwards, with the doors open and the engine running, on calle Galileo, 57, in Madrid.

The Toyota RAV 4 CD-416002 was found shortly afterwards, at approximately 23:10, on Avenida de Europa number 7, in Pozuelo de Alarcón. The AUDI A8 CD416001, was located at approximately 04:30 on Avenida Monforte de Lemos nº 93, open and with the keys inside.

Information from the FBI (note of 15/03/2019), shows that on 27/02/2019, from New York, Adrian **HONG CHANG** made contact with the FBI, with the purpose of providing information relating to the incident at the Embassy. At the same time he handed over to the FBI items obtained during the attack.

ADMINISTRACIÓN DE JUSTICIA

**HONG CHANG** stated that, of his own volition, he carried out the attack on the North Korean Embassy together with a group of unidentified individuals, giving superficial details about how the attack and seizure of the building was carried out. After this, the Criminal Group proceeded to search the Embassy looking for weapons and "other items".

He also indicated that the attacking group were carrying knives and Airsoft pistol although none of them were displayed. It would appear that prior to the attack, **HONG CHANG** had made contact with an unidentified individual at the Embassy who was open to "defecting".

After the operation, the team split up into four groups and headed to Portugal, **HONG CHANG** flying from Lisbon to New York. All the members of the group were outside Spain at this time.

**HONG CHANG**, also paid for the hotel rooms in New York when they arrived in the United States after the incident, of Sam **RYU**, Woo Ran **LEE**, Siyoung **PARK** and Chung Su **LIM** . These individuals had a similar journey pattern to **HONG CHANG**.

**THREE.** The available evidence connecting Christopher Philip **AHN**; with the following identification details: born on [redacted]1981 and United States of America passport [redacted]1236; to the acts is as follows:

1. Christopher Philip **AHN** was in Italy in October 2018 (coinciding with the stay of **HONG CHANG** and Sam **RYU** in the same country).

   He was with Sam **RYU** in the Annia Hotel in Venice, Italy, the night of 23/10/2018 to 24/10/2018, according to a document with registry number 2072, in which the Italian Polizia Di Stato [one of the national police forces in Italy] provided information in relation to the suspects Adrián **HONG CHANG** (born [redacted]1984 and holder of Mexican passport [redacted]7079) and Sam **RYU** (born on [redacted]1990).

ADMINISTRACIÓN DE JUSTICIA

He presented the following identification details: born on [redacted]1981 in Sao Tome e Principe [Democratic Republic of Saint Thomas and Prince], passport [redacted]236 issued by Sao Tome e Principe.

2. Christopher Philip **AHN,** born on [redacted]1981 and holder of United States of American passport [redacted]1236, arrived at Adolfo Suarez-Madrid-Barajas Airport on 22/02/2019 at 8:10 on American Airlines flight 94 from JFK airport in New York (USA), that is, on the morning of the attack on the North Korean embassy.

There is a record of the photograph extracted from the passport of AHN, by passport control at Adolfo Suarez-Madrid-Barajas Airport corresponding to that flight.

In the LinkedIn social network a profile Christopher Philip **AHN,** corresponds without doubt to the physical characteristics of the suspect, profile URL https://www.linkedin.com/in/hellochristopherahn/.

3. There are images from the security cameras of the North Korean embassy, in particular from the security camera that covers the entry door to the embassy in which Christopher Philip **AHN** appears clearly, being one of the people in the group that attacked the embassy.

4. The Embassy's commercial attaché, **SO,** has carried out a photographic identification of **AHN**'s Linkedin profile unequivocally identifying him as one of the people who attacked the Embassy.

5. In his statement, the Embassy's commercial attaché, **SO,** states that this person, specifically, was one of the 4 or 5 people who, at the start of the attack, hit him in the entrance of the property until managing to restrain him, assaulting him and hitting him, in order to then immobilise him.

6. **HONG CHANG**, in a statement made before FBI special agents in Los Angeles (California, United States) in February 2019, stated that one of the people who participated in the attack on the Embassy was Christopher Philip **AHN**, aged approximately 37 and a former United

ADMINISTRACIÓN DE JUSTICIA

States Marine. He affirmed that **AHN** is from Chino (California) and lives close to Koreatown, in Los Angeles.

**FOUR.** In view of the above and the new evidence incorporated into the proceedings, the acts under investigation bear the characteristics, always circumstantially and subject to subsequent clarification and classification, notwithstanding what may arise as a result of the investigation, of the following crimes:

- Crime of causing injuries (art. 147 of the Penal Code): three months' to three years' imprisonment.
- Crime of illegal restraint (arts 163 and 165 of the Penal Code): two to four years' imprisonment for each crime.
- Crime of threats (arts. 169 and 171 of the Penal Code): six months to two years' imprisonment.
- Crime of breaking and entering (arts. (arts. 202 and 203 of the Penal Code): six months to two years' imprisonment.
- Crime of robbery with violence and intimidation (arts. 237, 241 and 242 of the Penal Code): six months to two years' imprisonment.
- Crime of criminal organisation (arts. 570 bis of the Penal Code): four to eight years' imprisonment.

As can be seen, these crimes can carry very heavy sentences that could reach more than 10 years' imprisonment. Therefore, the legal requisites outlined in the Law of Criminal Procedure concur, and his preventative detention may be ordered in accordance with the provisions of arts. 503 et seq. Law of Criminal Procedure [LECrim]

**FIVE.** There is no possibility whatsoever of Christopher Philip **AHN** voluntarily presenting himself before Spanish justice, in view of his immediate flight from Spain the moment he completed his attack in the Embassy.

In view of the cited articles and others of a general nature that prove applicable, we issue the following

ADMINISTRACIÓN DE JUSTICIA

**OPERATIVE PROVISIONS**

**I ORDER:**

**The provisional custody, communicated and without bail of:**

- Christopher Philip **AHN**, born on [redacted]1981 and holder of United States of America passport [redacted]1236.

For crimes of causing injuries (art. 147 of the Penal Code); illegal restraint (arts. 163 and 165 of the Penal Code) crime of threats (arts. 169 and 171 of the Penal Code) crime of breaking and entering (arts. 202 and 203 of the Penal Code) crime of robbery with violence and intimidation (arts. 237, 241 and 242 of the Penal Code); and crime of criminal organisation (arts. 570 bis of the Penal Code).

Serve notice to the appearing parties and to the Spanish State Prosecutor's Office.

An amendment remedy [recurso de reforma] may be lodged against this ruling within three days before this Central Court of Investigation, and/or, where applicable, an appeal remedy [recurso de apelación], before the Criminal Chamber of the National High Court, without causing the proceedings to be suspended, in application of articles 507 and 766 of the Law of Criminal Procedure.

It has thus been ordered, issued and signed by Mr José de la Mata Amaya, Judge of Central Court of Investigation number 5, I bear witness.

ADMINISTRACIÓN DE JUSTICIA

## ANNEX 7

## ARTICLES FROM THE ORGANIC LAW ON THE JUDICIARY AND THE PENAL CODE

### 1. JURISDICTION

Article 23 of the Organic Law on the Judiciary

1. Within criminal law, the hearing of proceedings relating to crimes and misdemeanours perpetrated on Spanish territory or on board Spanish vessels or aircraft falls within Spanish jurisdiction, subject to the provisions of international treaties to which Spain is a signatory.

### 2. TYPES OF CRIMINAL OFFENCES

**OFFENCE OF CAUSING INJURIES [LESIONES]**

Article 147

1. Individuals who, via any means or procedure, cause another individual an injury that impairs his or her bodily, physical or mental integrity, shall be sanctioned, as perpetrators of a crime of causing injuries, with a prison term of between three months and three years or a fine of between six and twelve months, where the injury, to objectively heal, in addition to first aid, requires medical treatment and/or surgery. The simple vigilance or medical monitoring of the progress of the injury shall not be considered medical treatment.
2. Whoever, by any means or procedure, causes an injury not included in the preceding paragraph, shall be punished with a fine of one to three months.
3. Whoever hits or causes minor bodily harm to another without causing injury, shall be punished with a fine of one to two months.
4. The crimes described in the two preceding paragraphs are only subject to prosecution if the injured party or their legal representative files a formal complaint.

**OFFENCE OF ILLEGAL RESTRAINT [DETENCIÓN ILEGAL] AND KIDNAPPING [SECUESTROS]**

Article 163

ADMINISTRACIÓN DE JUSTICIA

1. Individuals who lock up or detain others, depriving them of their freedom, shall be punished with a prison sentence of between four and six years.

2. If the perpetrator frees the victim within the first three days following the latter's confinement, having not achieved his/her original aim, a lesser sentence shall be given.

Article 165

The upper grade of the sanctions outlined in the preceding articles shall be imposed in the corresponding cases if the illegal restraint or kidnapping involved a simulation of public authority or functions, or if the victim is a minor or disabled or a public official in the exercise of his or her functions.

**OFFENCE OF THREATS [AMENAZAS]**

Article 169

Individuals who threaten others with causing them, their family or other persons with whom they are intimately related detriment entailing homicide, injuries, abortion, offences against liberty, torture and offences against moral integrity, sexual freedom, privacy, honour, property and the social-economic order, shall be sanctioned:

1. With a prison term of between one and five years, if he has made the threat demanding a sum or imposing any other condition, even though not unlawful, and the offender has achieved what he intended. Where he has not achieved his ends, he will be sanctioned with a prison term of between six months and three years.

2. With a prison term of between six months and two years, where the threat is not conditional.

Article 171

1. The threat to carry out a misdeed that does not constitute a criminal offence shall be sanctioned with a prison sentence of between three months and one year and a fine of between six and 24 months, depending on the gravity and circumstances of the act, providing the threat was conditional and the condition did not constitute proper conduct. Where the offender achieved his purpose, the upper half of the punishment shall be imposed.

**OFFENCE OF BREAKING AND ENTERING [ALLANAMIENTO DE MORADA]**

ADMINISTRACIÓN DE JUSTICIA

Article 202

1. Individuals who, not residing therein, enter the dwelling of another or remain there against the will of the resident, shall be sanctioned with a prison term of six months to two years.

2. If the act is perpetrated with violence or intimidation, the sanction shall be a prison term of one to four years and a fine of six to twelve months.

Article 203

1. Individuals who enter the seat of a public or private legal person, professional firm or office, a trading establishment or premises open the public after opening hours against the will of the owner thereof shall be sanctioned with a prison term of six months to one year and a fine of six to ten months.

**OFFENCE OF ROBBERY WITH VIOLENCE OR INTIMIDATION [ROBO CON VIOLENCIA O INTIMIDACIÓN]**

Article 237

Individuals who, for profit, seize the movable property of another person, using force in order to gain access to or leave the place where this is located, or violence or intimidation towards individuals, either when committing the offence, to ensure their escape, or towards those who come to the aid of the victim or who may pursue them, are guilty of the offence of theft.

Article 241

1. A robbery committed in an occupied house, building or premises open to the public, or in any of their installations, is punishable by imprisonment for a period of between two and five years.

If the acts were committed in an establishment open to the public, or in any of its installations, outside of opening hours, a penalty of imprisonment of between one and five years shall be imposed.

2. An occupied house is taken to mean any dwelling that constitutes the abode of one or more individuals, even where they are not at home when the robbery takes place.

ADMINISTRACIÓN DE JUSTICIA

3. The installations of an occupied house, building or premises open to the public are taken to mean their patios, garages and other sections or enclosed areas lying contiguous to the building and communicating with its interior, with which they are physically connected.

Article 242

1. The culprit of robbery with violence or intimidation against individuals shall be sanctioned with a prison sentence of two to five years, without prejudice to the sanction that may be incurred as a result of any acts of physical violence that he or she carries out.

2. Where the robbery is committed in an inhabited dwelling, a building or premises that are open to the public or in any of their installations, a prison sentence of between three years six months and five years shall be imposed.

3. The upper range of the sentences indicated in the preceding paragraphs shall be imposed where the culprit uses weapons or other equally dangerous means, whether to commit the offence or to enable escape, or where he attacks those who appear to aid the victim or those who pursue him.

**OFFENCE OF CRIMINAL ORGANISATION**

Article 570 bis

1. Those who promote, constitute, organise, coordinate or oversee a criminal organisation shall be sanctioned with a prison term of between four and eight years where the organisation is dedicated to the commission of serious crimes, and with a prison term of between three and six years in all other cases; those who actively participate in the organisation, form a part of it or cooperate with it, economically or in any other manner, shall be sanctioned with a prison term of between two and five years, where the organisation is dedicated to the commission of serious crimes, and with a prison term of between one and three years in all other cases.

For the purposes of this Code, a criminal organisation is understood to refer to a group formed of more than two people that is stable in nature and operates for an indefinite period, which, in an arranged and coordinated manner, assigns various tasks or functions with the aim of committing crimes.

Number 1 of Article 570 bis inserted by number two hundred and fifty-three of the single article of Organic Law 1/2015 of 30 June, amending Organic

ADMINISTRACIÓN DE JUSTICIA

Law 10/1995 of 23 November, on the Penal Code (Official State Gazette [B.O.E.] of 31 March). In force: 1 July 2015

2. The sanctions envisaged in the preceding paragraph shall be imposed in their upper half when the organisation:

a) is formed of a large number of individuals.

b) possesses dangerous arms or instruments.

c) possesses advanced technological communication or transport resources whose specifications are particularly suited to facilitating the commission of crimes or the culprits' impunity.

Where two or more of these circumstances apply, sanctions of a higher level shall be imposed.

3. The upper half of the sentencing range of the sanctions outlined in this article shall be imposed where the crimes involve attacks on the life or integrity of a person, or on freedom and sexual liberty and indemnity, or where the crimes involve human trafficking.

## 3. <u>PARTICIPATION</u>

Article 27

Those criminally responsible for crimes and misdemeanours are the principals and their accessories.

Article 28

Those criminally responsible for crimes and misdemeanours are the principals and their accessories.

The following shall also be deemed principals:

a) Whoever directly induces another or others to commit a crime.

b) Whoever cooperates in the commission thereof by an act without which a crime could not have been committed.

## 4. <u>STATUTE OF LIMITATIONS FOR OFFENCES</u>

Article 131

1. Crimes have a statute of limitations of:

20 years, where the maximum sanction indicated for the crime is a prison sentence of 15 years or more.

ADMINISTRACIÓN DE JUSTICIA

15 years, where the maximum sanction indicated by the law is disqualification for more than 10 years, or a prison sentence of more than 10 years and less than 15 years.

10 years, where the maximum sanction indicated by the law is a prison sentence or disqualification for more than 5 years and less than 10.

5 years, for all other crimes, except for minor crimes and the crimes of defamation and slander, which have a statute of limitations of one year.

2. Where the sanction indicated by the Law is a combined one, the sanction that requires the longest statute of limitations shall be observed when applying the rules included in this Article.

3. Crimes against humanity and of genocide and crimes against protected persons and property in the event of armed conflict, except for those in Article 614, shall not have a statute of limitations.

If they caused the death of a person, terrorist crimes shall not have a statute of limitations either.

4. In cases of concurrent or contingent crimes, the statute of limitations shall correspond to the most serious crime.

Article 132

1. The terms outlined in the previous Article shall be calculated from the day when the punishable offence was committed.