1   Naeun Rim – State Bar No. 263558
      nrim@manatt.com
2   MANATT, PHELPS & PHILLIPS, LLP
    2049 Century Park East, Suite 1700
3   Los Angeles, CA 90067
    Telephone: (310) 312-4380
4   Facsimile: (310) 312-4224

5   Ekwan E. Rhow - State Bar No. 174604
      erhow@birdmarella.com
6   Christopher Jumin Lee - State Bar No. 322140
      clee@birdmarella.com
7   BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
    DROOKS, LINCENBERG & RHOW, P.C.
8   1875 Century Park East, 23rd Floor
    Los Angeles, California 90067-2561
9   Telephone: (310) 201-2100
    Facsimile: (310) 201-2110

10

11  Attorneys for Petitioner
    Christopher Philip Ahn

12

13              **UNITED STATES DISTRICT COURT**

14      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

15

16  UNITED STATES,                    CASE NO. 2:22-CV-04320 FLA

              Plaintiff,              **REVISED[1] MEMORANDUM OF**
17                                    **POINTS AND AUTHORITIES IN**
                                      **SUPPORT OF RELATOR**
       v.                             **CHRISTOPHER AHN'S**
18                                    **AMENDED PETITION FOR**
                                      **WRIT OF HABEAS CORPUS BY**
19  CHRISTOPHER PHILIP AHN,           **PERSON IN FEDERAL**
                                      **CUSTODY**
              Respondent.
20
                                      Hon. Fernando L. Aenlle-Rocha
21                                    First Street Courthouse, 6B

22

23

24

25

26

27

28  ――――――――――――――――
    [1] This Memorandum is identical to the document filed as Dkt. 12 to this action
    except that it includes a Table of Authorities.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION .................................................................................9

II.     LEGAL STANDARD .......................................................................13

        A.      Habeas Corpus Jurisdiction.................................................13

        B.      Extradition Law ....................................................................14

        C.      Standard of Review ..............................................................18

III.    SUMMARY OF THE EVIDENCE ................................................18

IV.     FACTUAL BACKGROUND ...........................................................21

        A.      The United States Has No Diplomatic Relations with North Korea, A Totalitarian Regime Whose Human Rights Atrocities Have Been Denounced By All Branches of Our Government. .........21

        B.      Christopher Ahn's History of North Korean Human Rights Work Makes Him a Prime Target for Assassination by North Korea. ....................................................................................26

        C.      The Madrid Incident Was a Defection Attempt Staged As a Kidnapping At the Request of North Koreans. .....................29

        D.      The FBI Has Warned Mr. Ahn That North Korea Has Targeted Him for Assassination And Advised Him to Stay In the Country......34

V.      PROCEDURAL HISTORY .............................................................35

        A.      The Department of Justice Initiates Public Extradition Proceedings Against Mr. Ahn.............................................35

        B.      Mr. Ahn Exhausts Efforts to Resolve This Matter Safely Through the Executive Branch. ............................................37

        C.      The Court Issues Its Reluctant Certification.........................39

VI.     LEGAL DISCUSSION ....................................................................42

        A.      The Extradition of Mr. Ahn Would Violate His Fifth Amendment Right to Substantive Due Process and Must Be Enjoined under the Humanitarian Exception.........................42

        B.      The Admitted Evidence Was Insufficient to Find Probable Cause. ...................................................................................52

        C.      The Magistrate Judge Erred in Finding Dual Criminality .....57

        D.      The Magistrate judge Erred in Finding that Ms. Cho's Coerced Testimony was Competent.....................................60

        E.      The Magistrate Judge Abused Its Discretion in Excluding Mr. Ahn's Declaration and Medical Records. ............................62

        F.      The Extradition Court Erred in Denying Discovery of Brady Materials................................................................................64

VII.    CONCLUSION ................................................................................68

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ahmad v. Wigen*, 726 F. Supp. 389 (E.D.N.Y. 1989),
   *aff'd*, 910 F.2d 1063 (2d Cir. 1990) ...................................................... 22, 50, 69

*Arnbjornsdottir–Mendler v. U.S.*,
   721 F.2d 679 (9th Cir. 1983) ................................................................ 19, 45, 46

*Ashcraft v. Tennessee*,
   322 U.S. 143 (1944) ................................................................................... 61

*Barapind v. Enomoto*,
   400 F.3d 744 (9th Cir. 2005) ................................................................ 17, 53, 64

*Barr v. U.S.*,
   819 F.2d 25 (2nd Cir. 1987) ...................................................................... 50

*Boumediene v. Bush*,
   553 U.S. 723 (2008) ............................................................................. 15, 20, 69

*Brady v. Maryland*,
   373 U.S. 83 (1963) ............................................................................... 65, 67, 68

*Brinegar v. U.S.*,
   338 U.S. 160 (1949) ................................................................................... 53

*Canada v. Schmidt*,
   [1987] 1 S.C.R. 500 (Can.) .......................................................................... 53

*Clarey v. Gregg*,
   138 F.3d 764 (9th Cir. 1998) .................................................................... 58, 61

*Crowe v. County of San Diego*,
   608 F.3d 406 (9th Cir. 2010) ...................................................................... 61

*Demjanjuk v. Petrovsky*,
   10 F.3d 338 (6th Cir. 1993) ................................................................... passim

*Elkins v. U.S.*,
   364 U.S. 206 (1960) ................................................................................... 68

*Emami v. U.S. Dist. Ct. for N. Dist. of California*,
   834 F.2d 1444 (9th Cir. 1987) ........................................................ 13, 19, 45, 46

*Gallina v. Fraser*,
   278 F.2d 77 (2d Cir. 1960) .................................................................. 12, 44, 45

# TABLE OF AUTHORITIES
## (continued)

1

2

**Page**

3

*Giordenello v. U.S.*,
    357 U.S. 480 (1958) ...................................................................17

4

*Glucksman v. Henkel*,
    221 U.S. 508 (1911) ..................................................................45

5

6

*Han Kim v. D.P.R.K.*,
    774 F.3d 1044 (D.C. Cir. 2014) ....................................10, 24, 25

7

8

*In re Extradition of Berri*,
    2008 WL 4239170 (E.D.N.Y. Sept. 11, 2008)...........................64

9

*In re Extradition of Luna-Ruiz*,
    No. CV 13-5059 VAP (AJW), 2014 WL 1089134 (C.D. Cal. Mar. 19,
    2014)...........................................................................................64

10

11

*Jencks v. U.S.*,
    353 U.S. 657 (1957) ...................................................................68

12

13

*Li v. Holder*,
    559 F.3d 1096 (9th Cir. 2009).....................................................23

14

*Lopez-Smith v. Hood*,
    121 F.3d 1322 (9th Cir.1997).........................................19, 45, 46

15

16

*Mainero v. Gregg*,
    164 f.3d 1199 (9th Cir. 1999)..............................................passim

17

18

*Man-Seok Choe v. Torres*,
    525 F.3d 733,738 (9th Cir. 2008) ...............................................17

19

*Manta v. Chertoff*,
    518 F.3d 1134 (9th Cir. 2008).....................................................58

20

21

*Martin v. Warden, Atlanta Pen*,
    993 F.2d 824 (11th Cir. 1993).............................................18, 45

22

23

*Massie v. D.P.R.K.*,
    592 F.Supp.2d 57 (D.D.C. 2008) ................................................25

24

*Matter of Burt*,
    737 F.2d 1477 (7th Cir. 1984).....................................................46

25

26

*Matter of the Extradition of Ahn*,
    19-MJ-01523, Dkt. 1 (C.D.Cal. April 12, 2019)........................35

27

28

*Matter of the Extradition of Ahn ("Ahn Duty Proceedings")*,
    19-MJ-01523, Dkt. 23 ..........................................................36, 37

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Matter of Extradition of Mainero,*
  990 F.Supp. 1208 (S.D. Cal. 1997) .................................................... 63

*Merino v. U.S. Marshal,*
  326 F.2d 5(9th Cir. 1963) ................................................................. 68

*Munaf v. Geren,*
  553 U.S. 674 (2008) (Souter, J., concurring) ............................... passim

*Neely v. Henkel,*
  180 U.S. 109 (1901) ......................................................................... 45

*Novelty Textile, Inc. v. Windsor Fashion, Inc.,*
  No. CV 12–05602 DDP, 2013 WL 1164065 (C.D. Cal., Mar. 20, 2013).......... 63

*Ocasio v. U.S. v. Wallace,*
  136 S. Ct. 1423 (2016) ..................................................................... 59

*Ornelas v. U.S.,*
  517 U.S. 690 (1996) ......................................................................... 53

*People v. Mayberry,*
  15 Cal.3d 143 (Cal. 1975) ................................................................ 59

*People v. Rivera,*
  157 Cal. App. 3d 736 (Cal. App. 1984) ............................................ 59

*Prasoprat v. Benov,*
  421 F.3d 1009 (9th Cir. 2005)...................................................... passim

*Quinn v. Robinson,*
  783 F.2d 776 (9th Cir. 1986)......................................... 16, 17, 19, 43

*Rasul v. Bush,*
  542 U.S. 466 (2004) ..................................................... 14, 15, 46, 47

*Reis v. U.S. Marshal,*
  192 F.Supp. 79 (E.D. Pa. 1961)........................................................ 54

*Rochin v. California,*
  342 U.S. 165 (1952) ......................................................................... 47

*Sainez v. Venables,*
  588 F.3d 713 (9th Cir. 2009) ........................................................... 17

*Sandhu v. Bransom,*
  932 F.Supp. 822 (N.D. Tex. 1996)................................................... 18

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

-5-

**TABLE OF AUTHORITIES**
(continued)

Page

*Santos v. Thomas*,
   830 F.3d 987 (9th Cir. 2016) ........................................................................passim

*Soering v. United Kingdom*,
   161 Eur. Ct. H.R ...................................................................................................52

*Tang Yee-Chun v. Immundi*,
   686 F.Supp. 1004 (S.D.N.Y. 1987) .....................................................................58

*Trinidad y Garcia v. Thomas*,
   683 F.3d 952 (9th Cir. 2012) (Thomas, J., concurring) .....................................15

*U.S. v. Ahn*,
   2:19-CV-5397-FLA (JPR) ....................................................................................20

*U.S. v. Burrows*,
   36 F.3d 875 (9th Cir. 1994) .................................................................................59

*U.S. v. Chadwick*,
   532 F.2d 773 (1st Cir. 1976) ...............................................................................54

*U.S. v. Juan*,
   776 F.2d 256 (11th Cir. 1985) .............................................................................60

*U.S. v. Lui Kin-Hong*,
   110 F.3d 103 (1st Cir. 1997) ...............................................................................61

*U.S. v. Martinez-Hernandez*,
   932 F.3d 1198 (9th Cir. 2019) .............................................................................59

*U.S. v. Smith*,
   831 F.3d 1207 (9th Cir. 2016) .............................................................................59

*U.S. v. Soyland*,
   3 F.3d 1312 (9th Cir.1993) ............................................................................54, 56

*U.S. v. Tingle*,
   658 F.2d 1332 (9th Cir. 1981) .............................................................................61

*U.S. v. Wilson*,
   1990 WL 113112 (9th Cir. 1990) .........................................................................54

*United States v. Cruz-Zamora*,
   318 F.Supp.3d 1264 (D. Kansas 2018) ...............................................................63

*United States v. McConney*,
   728 F.2d 1195 (9th Cir.) (en banc) ......................................................................19

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Vo v. Benov,*
  447 F.3d 1235 (9th Cir. 2006)........................................................14, 16, 18, 19

*Wang v. Reno,*
  81 F.3d 808 (9th Cir. 1996)...........................................................18, 47, 48, 67

*Warmbier, v. Democratic People's Republic of Korea,*
  356 F.Supp.3d 30 (D.D.C. 2018) ................................................................24, 26

*Williams v. Kaiser,*
  323 U.S. 471 (1945) ..............................................................................................15

*Ybarra v. Illinois,*
  444 U.S. 85 (1979) ................................................................................................54

*Zanazanian v. U.S.,*
  729 F.2d 624 (9th Cir.1984) ...............................................................................18

## STATUTES

U.S. Const. Amend. V .................................................................................................18

U.S. Const. art. I, § 9, cl. 2 ................................................................................13, 15

18 U.S.C. §§ 3181-96 .................................................................................................15

18 U.S.C. § 3184..................................................................................................15, 16

22 U.S.C. § 7801(1) ....................................................................................................23

22 U.S.C. § 7801(5) ....................................................................................................23

22 U.S.C. §§ 7801 *et seq.* .........................................................................................23

28 U.S.C. § 1781 .........................................................................................................68

28 U.S.C. §§ 2241(a) and (c)(3) ........................................................................14, 47

28 U.S.C. § 2241(c)(3) .......................................................................................13, 18

Judiciary Act of 1789..................................................................................................14

North Korean Human Rights Act of 2004 ..............................................................23

North Korean Human Rights Reauthorization Act of 2022 ..................................24

Public Law 108–333 ...................................................................................................23

Spanish Pen............................................................................................................passim

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**OTHER AUTHORITIES**

John Quigley, *The Rule of Non-Inquiry and Human Rights Treaties*, 45 Cath.
    Univ. L. Rev. 1213, 1226-28 (1996) ...............................................................52

John T. Parry, *Int'l Extradition, the Rule of Non-Inquiry, and the Problem of
    Sovereignty,90* Bos. Univ. L. Rev. 1973, 2009 (Oct. 2010) .........................52, 53

North Korean Human Rights Reauthorization Act of 2022, H.R. 2061, 115th ......24

Wolfgang Saxon, *Michele Sindona, Jailed Italian Financier, Dies of Cyanide
    Poisoning at 65: At the Center of Scandals*, N.Y. TIMES (March 23, 1986)......51

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

REVISED MEMO OF P & A ISO CHRISTOPHER AHN'S PETITION FOR WRIT OF HABEAS CORPUS

## I.   INTRODUCTION

In the words of the extradition judge, "this case is like no other." **Ex A**[2] at 47:15-16. The United States government ("Government") is allowing North Korea—a country found by American courts to have committed human rights atrocities against Americans, including kidnappings and extrajudicial killings[3]—to use the Spanish government as a tool to extradite Petitioner Christopher Ahn, an American-born veteran and a long-time advocate for North Korean human rights. Mr. Ahn stands accused of a host of crimes by Spain for his attempt to help certain people inside the North Korean embassy in Madrid escape the regime. The tyranny and brutality of the North Korean regime are not in dispute. Neither is the fact that North Korea, a nuclear power with the vast resources of a totalitarian, communist surveillance-state and a unique capacity for violence, has targeted Mr. Ahn for assassination due to the public nature of these proceedings and Mr. Ahn's prior assistance with other prominent North Korean defections. **Ex. W**. Mr. Ahn has been put on notice of the danger to his life by none other than the Executive Branch of the United States. The FBI, a law enforcement agency of the Department of Justice, warned Mr. Ahn and his counsel that there were credible threats to his life from North Korean agents, and he should not leave the country as a matter of safety. **Ex. E ¶ 3**. It goes without saying that the FBI would not issue such a warning to a civilian without concrete proof of the threat. Yet while one part of the Executive Branch has told Mr. Ahn he will be killed if he leaves the country, another part has been aggressively seeking to deliver him to Spain, directly into the waiting arms North Korean regime, whose agents in Spain have stated they will "wait for the

---

[2] Unless otherwise specified, all citations to Exhibits refer to those submitted with the concurrently filed "Declaration of Naeun Rim in Support of Christopher Ahn's Petition for Writ of Habeas Corpus." Page numbers to Exhibits refer to the page number in blue reflected on the bottom left corner of each page.
[3] *See, e.g., Han Kim v. D.P.R.K.*, 774 F.3d 1044, 1045-46 (D.C. Cir. 2014) (evidence satisfactory to show North Korea kidnapped a reverend, who was known for providing humanitarian and religious services to defectors, while he was in China and murdered him outside of the normal legal process).

1    result [of these proceedings] in patience." **Ex. A** at 43:20-22.

2         The Executive Branch is continuing to pursue extradition proceedings against

3    Mr. Ahn knowing that doing so endangers his life, even though the Extradition

4    Treaty does not require the United States to extradite its own citizens, **Ex. N** at 4

5    (Art. IV); even though the bulk of the evidence comes from self-interested officials

6    of North Korea, a country whose practices are so draconian that the Legislative and

7    Executive Branches of our nation have declined to engage with it in *any* bilateral

8    relations; and even though a common sense review of the evidence makes clear that

9    Mr. Ahn believed he was helping those inside the North Korean embassy stand up

10   to their own tyrannical government, at their request. It is a tragedy that the North

11   Korean government's notorious vengeance against relatives of known defectors was

12   so terrifying to certain of the North Koreans embassy diplomats that they felt the

13   need to ask a human rights group to stage their departure as a kidnapping; it is an

14   even greater tragedy that unexpected events took place causing the North Koreans

15   to lose their courage and change their minds. But the greatest tragedy of all is that

16   the Executive Branch, acting through the Department of Justice and the Department

17   of State, has decided to offer up Mr. Ahn, a Marine who served this country

18   honorably for six years and defended American values in the Iraq war, as a

19   sacrificial lamb by sending him to Spain in the name of foreign policy, despite

20   undisputed evidence that the North Korean government wishes to murder him and

21   can do so more easily on Spanish soil. **Ex. A** at 31:9-13. Mr. Ahn vehemently

22   disputes the false narrative the North Koreans have been forced to concoct to

23   protect their own lives; but as Judge Jean P. Rosenbluth (hereafter the "extradition

24   court" or "magistrate judge") noted, even if their account were true, "Ahn surely

25   does not deserve to die for the offense with which he is charged." *Id.* at 39:28-40:1.

26        The injustice of the quandary that is now before this Court was not lost on

27   Judge Rosenbluth, who presided over the extradition proceeding and deliberately

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

REVISED MEMO OF P & A ISO CHRISTOPHER AHN'S PETITION FOR WRIT OF HABEAS CORPUS

titled her decision to certify Mr. Ahn's extradition a "Reluctant Certification of Extraditability" (hereafter "Reluctant Certification"). In a thorough, 52-page opinion, Judge Rosenbluth made clear that while she believed the Government's evidence met the "very low probable-cause standard" (which Mr. Ahn disputes), *id*. at 42:12-13, she also believed "extraditing Ahn to Spain would be 'antipathetic' to our common 'sense of decency,' the standard first set out for a humanitarian exception to extradition.'" **Ex. A** at 34:11-35:2 (quoting *Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir. 1960). She reached this conclusion after considering, among other things, the expert testimony of Professor Sung-Yoon Lee, who opined, "[T]here should be no doubt that Christopher Ahn is at risk of being killed if he is extradited outside the United States" because North Korea "is in fact a model terrorist state whose murderous reach is global, whose resources for carrying out acts of international terrorism are vast, and whose will to assassinate high-value targets is indefatigable." **Ex. A** at 39:21-24 (internal quotations removed). Without mincing words, Judge Rosenbluth invited a higher court to reverse her even as she committed Mr. Ahn to the custody of the U.S. Marshals, stating plainly, "Although I conclude that the law requires me to certify, I do not think it's the right result, and I hope that a higher court will either tell me I'm wrong or itself block the extradition." *Id*. at 2:6-9.

This Court has the power to honor Judge Rosenbluth's request and either tell her she is "wrong or itself block his extradition." While Judge Rosenbluth believed she was constrained to consider only whether the extradition was within the bounds of the treaty and doubted her own authority to deny certification on humanitarian or constitutional grounds, she expressly noted, "[A] district judge may not be so constrained." *Id*. at 35, fn.20. Indeed, there is no question that *this* Court is expressly imbued by statute, as well as the Suspension Clause of the Constitution, with the authority to consider whether the Executive Branch's extradition

1  proceedings against Mr. Ahn violate *either* the Constitution *or* the Extradition

2  Treaty. *See* 28 U.S.C. § 2241(c)(3) (district courts may hear challenges to executive

3  detention "in violation of the Constitution or laws or treaties of the United States");

4  U.S. Const. art. I, § 9, cl. 2. Although a habeas court's consideration of

5  humanitarian concerns in extradition cases is limited by a judge-made doctrine

6  called the rule of non-inquiry, which counsels courts not to inquire into the justice

7  system of the requesting country, the Ninth Circuit has consistently recognized that

8  extreme circumstances may call for a "humanitarian exception in a case where facts

9  warranted it." *See, e.g., Emami v. U.S. Dist. Ct. for N. Dist. of California*, 834 F.2d

10  1444, 1453 (9th Cir. 1987). This is just such a case. As Judge Rosenbluth put it,

11  "[S]hipping Ahn off to Spain, where his life will be in grave danger from a force

12  our government recognizes as evil, to await a trial that will likely never happen is

13  inhumane and may well violate due process. . . . I — or some judge or judges —

14  should be able to stop it." **Ex. A** at 42:17-24.

15      This Court should grant Mr. Ahn's petition and either enjoin his extradition

16  or remand the proceedings with instructions for the magistrate judge to do so.

17  Transferring Mr. Ahn to Spain violates his Fifth Amendment right to substantive

18  due process where the Executive Branch has conceded that North Korea has

19  targeted him for assassination and that he should not leave the country for his own

20  safety. Accordingly, it also violates the Extradition Treaty, which requires the

21  extradition determination to be "made in accordance . . . with the law of the

22  requested Party." **Ex. N.** at 6 (Art. IX). The rule of non-inquiry does not prevent the

23  Judicial Branch from considering the threat posed by North Korea, a non-treaty

24  partner, nor does it prevent a court from finding that the United States itself has

25  acted unconstitutionally. The Executive Branch's willingness to allow North Korea,

26  a state sponsor of terrorism, to use Spain's diplomatic relations with the United

27  States to gain access to an American veteran whom North Korea wishes to murder

28

for his human rights work shocks the conscience and violates other due process liberty interests. These facts empower this Court to either remand the case or to itself apply the humanitarian exception on habeas review.

In addition, certification of Mr. Ahn's extradition violates the Extradition Treaty because the magistrate judge erred in finding probable cause and the existence of dual criminality. While Judge Rosenbluth correctly excluded the statements of most of the North Korean witnesses as being involuntary statements that could not be considered competent evidence, she improperly relied on the "statement" of one North Korean witness, as recounted by Spanish police officers using Google Translate, that suffered from at least the same defects as the others. Judge Rosenbluth also erred in declining to consider explanatory evidence introduced by Mr. Ahn that further obliterated probable cause and in refusing to compel the Government to produce exculpatory evidence in its possession.

## II.  LEGAL STANDARD

### A.  Habeas Corpus Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. §§ 2241(a) and (c)(3) and the Suspension Clause of the Constitution. An extraditing court's decision to certify an extradition is not a final order subject to direct appeal; thus, "a habeas petition is the only available avenue to challenge an extradition order." *Santos v. Thomas*, 830 F.3d 987, 1037 (9th Cir. 2016); *Vo v. Benov*, 447 F.3d 1235, 1240 (9th Cir. 2006); *see Mainero v. Gregg*, 164 f.3d 1199, 1201-02 (9th Cir. 1999).

Federal district courts have jurisdiction to hear petitions for writ of habeas corpus when a person is held in custody "in violation of the Constitution, or other laws and treaties of the United States." *Rasul v. Bush*, 542 U.S. 466, 473 (2004); 28 U.S.C. §§ 2241(a) and (c)(3). Although habeas corpus was codified by statute as part of the Judiciary Act of 1789—the act that first created federal-court jurisdiction, *Rasul*, 542 U.S. at 473—the writ itself predated statutory codification,

-13-

"throwing its root deep into the genius of our common law." *Williams v. Kaiser*, 323 U.S. 471, 484, n.2 (1945) (internal quotation marks omitted). The Framers considered the common law habeas writ so "vital [an] instrument for the protection of individual liberty" that they expressly limited Congress's ability to suspend the writ in the Suspension Clause of the Constitution, which states: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." *Rasul*, 553 U.S. at 743 (2008); U.S. Const. Art. I, § 9, cl. 2. Accordingly, even when Congress has attempted to repeal statutory habeas jurisdiction for certain petitioners, "the Supreme Court has repeatedly rebuffed arguments that these statutes foreclosed habeas corpus relief" based on the constitutional right to habeas corpus. *Trinidad y Garcia v. Thomas*, 683 F.3d 952, 960 (9th Cir. 2012) (Thomas, J., concurring) (citing Supreme Court cases).

The writ of habeas corpus goes to the heart of our constitution's separation-of-powers structure, enshrining the power and obligation of the Judicial Branch to check and balance the actions of the Executive and Legislative Branches. *See Boumediene v. Bush*, 553 U.S. 723, 765 (2008) ("the writ of habeas corpus is itself an indispensable mechanism for monitoring the separation of powers"). "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *Rasul*, 542 U.S. at 474.

## B.  Extradition Law

Extradition law is based on a "combination of treaty law, federal statutes, and judicial doctrines." *Santos*, 830 F.3d at 990; *see* 18 U.S.C. §§ 3181-96. Unlike this Court, the jurisdiction of the magistrate judge in an extradition proceeding stems from the relevant treaty and extradition statutes. *See* 18 U.S.C. § 3184. The right of a foreign nation to demand and obtain extradition is purely a creature of treaty—

"[i]n the absence of a treaty there is no duty to extradite. . . and no branch of the United States government has any authority to surrender an accused to a foreign government except as provided for by statute or treaty." *Quinn v. Robinson*, 783 F.2d 776, 782 (9th Cir. 1986) (citations omitted).

The extradition process begins when a foreign country that has an extradition treaty with the United States makes a request for the extradition of an accused person, also known as the relator, with the Department of State. *Santos*, 830 F.3d at 991. If the State Department decides to proceed, the Department of Justice files a complaint through the applicable U.S. Attorney's office and seeks a warrant in the federal district court of the district in which the relator is located. *Id*.; 18 U.S.C. § 3184. Once the warrant is issued, a federal judge, which may include a magistrate judge, conducts an extradition hearing to determine whether there is "evidence sufficient to sustain the charge under the provisions of the proper treaty or convention," *id.*, or, "in other words, whether there is probable cause." *Vo*, 447 F.3d at 1237. If the magistrate judge finds probable cause, she must certify the individual as extraditable to the Secretary of State. *Santos*, 830 F.3d at 992. The Secretary of State "ultimately decides whether to surrender the individual to the requesting state." *Santos*, 830 F.3d at 993. The extradition court's certification order can be challenged in the courts via a writ of habeas corpus. *Id.*

As with all extradition treaties, the Spanish Treaty incorporates the probable cause standard by reference by requiring the country requesting extradition to provide "such information as would justify the committal for trial of the person if the offense had been committed in the requested State." **Ex. N** at 14 (Art. X(D)). The Spanish Treaty does not make extradition mandatory—it states, "Neither of the Contracting Parties shall be bound to deliver up its own nationals" and affords each country to do so only at their discretion, "unless prohibited by their domestic legislation." *Id.* at 4 (Art. IV). If the *sole* reason for denial is on the basis of

nationality, "the requested Party shall, at the request of the requesting Party, submit the case to its authorities for prosecution." *Id*. The Spanish Treaty expressly requires extradition decisions to be "made in accordance with this Treaty and ***with the law of the requested Party***." *Id*. at 6 (Art. IX) (emphasis added). "The person whose extradition is sought ***shall have the right to use such remedies and recourses as are provided by such law***." *Id*. at 6 (emphasis added).

In an extradition proceeding, the government bears the burden of providing sufficient evidence to establish probable cause. *See Quinn*, 783 F.2d at 783; *Barapind v. Enomoto*, 400 F.3d 744, 747 (9th Cir. 2005) ("Certification of extradition is lawful only when the requesting nation has demonstrated probable cause to believe the accused person is guilty of committing the charged crimes.") While a determination of probable cause is not a ruling on innocence or guilt, *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009), that does not render the probable cause inquiry a mere rubber stamp. *Santos*, 830 F.3d at 1006. The magistrate judge must conduct an independent review of the evidence proffered, and not "accept without question the complainant's mere conclusion that the person whose arrest is sought has committed a crime." *Giordenello v. U.S.*, 357 U.S. 480, 486 (1958); *see also Man-Seok Choe v. Torres*, 525 F.3d 733,738 (9th Cir. 2008) ("Though the extradition papers accuse Choe of doing [illegal] things, accusations are not evidence").

In determining whether to certify an extradition request pursuant to treaty, an extradition court must find that: (1) it has jurisdiction; (2) a valid treaty exists; (3) provisions of the treaty, including dual criminality,[4] have been satisfied; and (4)

---

[4] The doctrine of dual criminality provides that extradition is only available if the underlying offense is "considered criminal by the jurisprudence or under the laws of both the requesting and requested nations." *Quinn*, 783 F.2d at 783; *see also* **Ex. N** at 3 (Art. II.A) (extraditable offenses must be punishable by more than one year imprisonment under the laws of both the United States and Spain).

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

there is competent evidence sufficient to support probable cause. *See Zanazanian v. U.S.,* 729 F.2d 624, 625–26 (9th Cir.1984).  The district court may review each of these requirements on habeas review of a magistrate judge's certification. *Vo*, 447 F.3d 1235, 1240 (9th Cir. 2006).

While the scope of a habeas court's review of an extradition proceeding has been described as limited, courts have recognized that the "constitutional rights of individuals, including the right to due process, are superior to the government's treaty obligations." *Martin v. Warden, Atlanta Pen*, 993 F.2d 824, 829 (11th Cir. 1993). Accordingly, district courts on habeas review have the authority to consider whether the United States itself has acted unconstitutionally in extradition cases. *See, e.g.*, *Demjanjuk v. Petrovsky*, 10 F.3d 338, 353 (6th Cir. 1993) (finding United States violated substantive due process in extradition proceeding by withholding *Brady* and reversing habeas court) (cited with approval in *Wang v. Reno*, 81 F.3d 808, 821 (9th Cir. 1996)); *Martin*, 993 F.2d at 829 ("The United States' actions in reviewing a request for extradition are, of course, subject to the constraints of the Constitution"); *Sandhu v. Bransom*, 932 F.Supp. 822, 827 (N.D. Tex. 1996) (habeas authority encompasses defects in the extradition process that are of "constitutional magnitude"); *see also* 28 U.S.C. § 2241(c)(3).

Whether an extradition should be denied on humanitarian grounds boils down to a question of substantive due process. *See Munaf v. Geren*, 553 U.S. 674, 706 (2008) (Souter, J., concurring) ("if the political branches did favor transfer it would be in order to ask whether substantive due process bars the Government from consigning its own people to torture"); U.S. Const. Amend. V. While the Ninth Circuit has never found a set of circumstances warranting the application of a humanitarian exception, it has never foreclosed the existence of a humanitarian exception entirely and has often recognized that that a habeas court might someday

be confronted with a set of circumstances where such an exception was warranted. *See Mainero v. Gregg*, 164 F.3d 1199, 1210 (9th Cir. 1999); *Lopez-Smith v. Hood*, 121 F.3d 1322, 1326–27 (9th Cir.1997); *Arnbjornsdottir–Mendler v. U.S.,* 721 F.2d 679, 683 (9th Cir. 1983); *Emami v. U.S. Dist. Court. for Northern Dist. of California,* 834 F.2d 1444, 1452-53 (9th Cir. 1987).

### C.    Standard of Review

On habeas review of an extradition order, the standard of review for questions of law is *de novo*. *Quinn*, 783 F.2d at 791. The extradition court's purely factual findings, however, may not be disturbed unless clearly erroneous. *Id.* at 791-92. Mixed questions of law and fact are reviewed *de novo*. *Vo*, 447 F.3d at 1240. The underlying factual findings of mixed questions are still held to the clearly erroneous standard; but as to questions of "legal concepts in the mix of fact and law" that require a court to "to exercise judgment about values that animate legal principles," such mixed determinations are reviewed *de novo*. *Quinn*, 783 F.2d at 791 (quoting *United States v. McConney*, 728 F.2d 1195 (9th Cir.) (en banc). The magistrate judge's probable cause finding is not a finding of fact because it has not weighed the evidence and resolved disputed factual issues; thus, it must be upheld if there is any competent evidence in the record to support it. *Quinn*, 783 F.2d at 791. The extradition court's denial of a discovery request is reviewed for an abuse of discretion." *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005).

## III.   SUMMARY OF THE EVIDENCE

Mr. Ahn has concurrently submitted the Declaration of Naeun Rim attaching the following Exhibits: (I) the relevant orders and transcripts from the extradition proceeding (Exs. A-C); (II) exhibits that were submitted by Mr. Ahn in the extradition proceedings (Exs. D-L); (III) exhibits that were submitted by the Government (Exs. M-O);[5] and (IV) additional exhibits Mr. Ahn submits for this

---

[5] Mr. Ahn has included only the English translation of Spanish documents.

-18-

1  Court's consideration (Exs. P-W).[6] The table below describes the Exhibits and

2  summarizes the extradition court's evidentiary rulings (where applicable). Unless

3  otherwise noted, docket numbers ("Dkt.") in this brief refer to the filings in *U.S. v.*

4  *Ahn*, 2:19-CV-5397-FLA (JPR) (hereafter "*Ahn Extradition Proceeding*").

5

| Ex. | Description | Dkt. | Evidentiary Ruling |
|-----|-------------|------|--------------------|
| **I. Court Orders and Proceedings** | | | |
| A | Reluctant Certification of Extraditability | 233 | N/A |
| B | Transcript of 05/25/21 Extradition Hrg | 231 | N/A |
| C | Order Denying Motion for Discovery | 154 | N/A |
| D | Transcript of 10/23/20 Discovery Hrg | 165 | N/A |
| **II. Christopher Ahn's Evidence** | | | |
| E | 2014 U.N. Human Rights Council Report | 175-3 | Admitted (Ex. A at 19) |
| F | Declaration of Naeun Rim | 153-3 | Admitted (Ex. A at 19) |
| G | Expert Report of Dr. Sung Yoon Lee | 197-1 | Admitted (Ex. A at 12) |
| H | Support Letters for Bail Motion | 174-4 | Considered (Ex. A at 19) |
| I | Expert Report of Robert Collins | 175-3 | Not admitted |
| J | Expert Report of Dr. Sandra Fahy | 197-3 | Not admitted |
| K | Expert Report of Greg Scarlatoiu | 197-2 | Not admitted |
| L | Declaration of Christopher Ahn (Redacted)[7] | 175-1 | Not admitted |
| M | Ahn Medical Records (Redacted) | 225-1 | Not admitted |
| **III. Government's Evidence** | | | |
| N | Spain Extradition Treaty | 226-1 | N/A |
| O | 05/14/19 Statement of Spanish Judge | 226-3 | (see below) |
| | Annex 1 – Passport Photo of C. Ahn | Ex. O at 13 | Admitted |
| | Annex 2 – North Korean Embassy Witness Statements | Ex. O at 14 | Held Incompetent (Ex. A at 18) |
| | Annex 3 – North Korean Student Witness Statements | Ex. O at 42 | Held Incompetent (Ex. A at 18) |
| | Annex 4 – Surveillance Photos of Ahn | Ex. O at 48 | Questioned (Ex. A at 20 fn.13) |

---

[6] For the writ of habeas corpus "to function as an effective and proper remedy," the court that conducts the habeas proceeding "must have the authority to admit and consider relevant exculpatory evidence that was not introduced during the earlier proceeding." *Boumediene v. Bush*, 553 U.S. 723, 786 (2008).

[7]      An unredacted copy of Mr. Ahn's Declaration will be filed under seal as **Sealed Ex. L.**

Manatt, Phelps & Phillips, LLP
Attorneys at Law
Los Angeles

-19-

| Ex. | Description | Dkt. | Evidentiary Ruling |
|---|---|---|---|
| | Annex 5 – Photos of Weapons Purchase | Ex. O at 50 | Admitted |
| | Annex 6 – 04/11/19 Spanish Arrest Warrant | Ex. O at 74 | N/A |
| | Annex 7 – Spanish Penal Code | Ex. O at 86 | N/A |
| P | 09/12/19 Supplementary Statement of Spanish Judge | 118-1 | (see below) |
| | Annex 1 – Cho Sun Hi Medical Report[8] | Ex. P at 3 | Admitted |
| | Annex 2 – Yun Sok So Medical Report | Ex. P at 5 | Admitted |
| | Annex 3 – Police Statement 22334 | Ex. P at 7 | Admitted |
| | Annex 4 – Police Statement 22271 | Ex. P at 22 | Admitted |
| | Annex 5 - Oscar Perales Statement | Ex. P at 30 | Admitted |
| | Annex 6 – Lynn Gayero Dayao Statement | Ex. P at 35 | Admitted |
| | Annex 7 – Teofila Villrroel Orozco Statement | Ex. P at 46 | Admitted |
| | Annex 8 – Surveillance Photos | Ex. P at 54 | Questioned (Ex. A at 20 fn.13) |
| **IV. Christopher Ahn's Supplemental Evidence** | | | |
| Q | 2021 State Department DPRK Human Rights Report | N/A | N/A |
| R | 07/09/20 DOJ Letter to C. Lee | N/A | N/A |
| S | 07/10/20 N. Rim Letter to DOJ | N/A | N/A |
| T | 07/13/20 DOJ Letter to N. Rim | N/A | N/A |
| U | 09/09/20 N. Rim Letter to DOJ | N/A | N/A |
| V | Additional Support Letters | N/A | N/A |
| W | Relevant News Articles | N/A | N/A |
| X | Declaration of Fred Warmbier | N/A | N/A |
| Y | Declaration of Ian Brekke | N/A | N/A |
| **V. Government's Sealed Exhibits** | | | |
| Z | Unredacted Medical Records of Cho Sun Hi and Yun Sok So | N/A | N/A |

---

[8]    The medical reports of Cho Sun Hi and Yun Sok So were originally filed in fully-redacted form. An unredacted copy of these exhibits will be filed under seal as **Sealed Ex. Z**.

Manatt, Phelps & Phillips, LLP
Attorneys at Law
Los Angeles

REVISED MEMO OF P & A ISO CHRISTOPHER AHN'S PETITION FOR WRIT OF HABEAS CORPUS

## IV.  FACTUAL BACKGROUND

### A.  The United States Has No Diplomatic Relations with North Korea, A Totalitarian Regime Whose Human Rights Atrocities Have Been Denounced By All Branches of Our Government.

The facts before this Court are unprecedented. Although the extradition request at issue comes from Spain, the underlying allegations are driven by a false narrative engineered by the Democratic People's Republic of Korea ("North Korea" or "DPRK"), a totalitarian state that has a long history of murdering defectors and those who assist them without due process. The United States has virtually no diplomatic relations and lacks an extradition treaty with North Korea, with good reason— "Congress and the executive branch do not enter into extradition treaties with countries in whose criminal justice system they lack confidence." *Ahmad v. Wigen*, 726 F. Supp. 389, 411 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990).

In 2014, the United Nations Human Rights Council issued a damning report regarding the "gravity, scale and nature" of North Korea's human rights violations and condemned the authoritarian regime as being "a State that does not have any parallel in the contemporary world." **Ex. E** at 15, ¶ 80. The findings of the 2014 U.N. Report were not limited to atrocities committed on North Korean soil but also included "violations that involve extraterritorial action originating from [North Korea], such as abductions from other countries." *Id*. at 4, ¶ 8. North Korea was found to have routinely "disappeared" people to prison camps without a trial and with no notice to their families. *Id*. at 13, ¶ 66. Inmates in North Korean political prison camps have been "gradually eliminated through deliberate starvation, forced labour, executions, torture, rape and the denial of reproductive rights enforced through punishment, forced abortion and infanticide." *Id*. at 12, ¶ 60. Hundreds of thousands of political prisoners are thought to have died in these camps in the past five decades. *Id*. These violations are particularly pronounced against dissidents and others who

dare speak out against the regime. North Korean authorities regularly commit "gross human rights violations in order to create a climate of fear that pre-empts any challenge to the current system of government[,]" including "detention, executions, and disappearances." *Id.* at 11, ¶ 57.

Consistent with the findings of the U.N. Human Rights Council, the United States has long regarded North Korea as an outcast nation. Through countless administrations, each branch of the United States government has consistently denounced the crimes the North Korean regime has committed against its own people and beyond. During the Presidency of George W. Bush, Congress passed the North Korean Human Rights Act of 2004 ("Act"), which codified this country's policy of promoting the human rights and freedoms of North Korean refugees. *Li v. Holder*, 559 F.3d 1096, 1112 (9th Cir. 2009); Public Law 108–333; 22 U.S.C. §§ 7801 *et seq.* The Act included multiple Congressional findings regarding North Korea, many attributed to the Executive Branch's Department of State, and decried North Korea as "a dictatorship" that "continues to commit numerous, serious human rights abuses" with no regard for due process. *See* 22 U.S.C. § 7801(1). (Congress quoting findings of the State Department). In particular, the Act recognized North Korea's inhumane treatment of defectors and those who assist defectors, describing the North Korean Penal Code as "[d]raconian, stipulating capital punishment and confiscation of assets for a wide variety of 'crimes against the revolution,' including defection, attempted defection, [and] slander of the policies of the Party or State." 22 U.S.C. § 7801(5). The Act acknowledged that "North Korea executes political prisoners, opponents of the regime, [and] some repatriated defectors," uses prisoners as "sources of slave labor" and as "experimental victims in the testing of chemical and biological poisons," and enforces "forced abortion and the killing of newborn babies" as "standard prison practices." *Id.* §§ 7801(6), (8) and (9). The Act has been reauthorized over the years under numerous administrations and always enjoyed

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

bipartisan support. Most recently, Senators Marco Rubio (R-FL) and Tim Kaine (D-VA) have introduced the North Korean Human Rights Reauthorization Act of 2022, which would extend the Act for another five years.[9]

The Department of State periodically publishes its own report on North Korea's human rights practices. In its most recent report, the State Department found that North Korea's "significant human rights issues included credible reports" of "unlawful or arbitrary killings by the government" and "torture and cruel, inhuman, and degrading treatment and punishment by government authorities." **Ex. Q** at 1 (Department of State, *Democratic People's Republic of Korea: 2021 Human Rights Report*).[10] The 2021 State Department Report found that North Korea considers those "attempting to defect" or "defacing photographs of the Kims" to be "political criminals" who were often "detained without substantive reason compatible with international law." *Id*. at 16. Those incarcerated for a political crime were detained "in most cases for life and in many cases *included three generations of the prisoner's family*." *Id*. at 15 (emphasis added).

Our federal courts are no strangers to the North Korean regime's atrocities. American courts have recognized that political prisoners in North Korea – particularly those involved in assisting defectors – would be invariably singled out for "exceptionally painful, brutal, and outrageous treatment" potentially including "starvation, brutal beatings," and various methods of torture including "kneeling motionless for hours on end, water torture, pigeon torture with arms pinned behind the back and attached to cell bars in ways that made it impossible either to stand up or sit down[.]" *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d at 1049-50 (D.C. Cir. 2014) (internal quotations omitted); *see also Warmbier, v.*

---

[9] North Korean Human Rights Reauthorization Act of 2022, H.R. 2061, 115th Cong. (2022). *available at* https://www.kaine.senate.gov/imo/media/doc/north_korean_human_rights_reauthorization_act_of_2022_bill_text.pdf.
[10] Also available at https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/north-korea/.

*Democratic People's Republic of Korea*, 356 F.Supp.3d 30, 52 (D.D.C. 2018) (finding satisfactory evidence to prove North Korean officials arbitrarily detained and tortured Otto Warmbier – an American college student – for seventeen months for allegedly attempted to take a poster, causing severe brain damage and eventually resulting in his death).[11] Courts have also confirmed that North Korea routinely uses hostage-taking as an instrument of policy. *Massie v. D.P.R.K.,* 592 F.Supp.2d 57, 75-77 (D.D.C. 2008) (finding that North Korea had kidnapped, detained, and tortured crew of U.S.S. Pueblo for eleven months in order to gain leverage against United States). Of course, no North Korean witness has ever testified in an American court, causing the D.C. Circuit to observe that "direct evidence of subsequent torture and execution will, by definition, almost always be unavailable, even though indirect evidence may be overwhelming." *Han Kim*, 774 F.3d at 1048. Accordingly, evidence of North Korean crimes against humanity often turns on expert reports and judicially noticeable facts acknowledged by our own government. *See id*. at 1049-50.

Critically, both our government and the United Nations have long recognized that North Korea's brutal practices transcend geographic boundaries. The State Department's 2021 Report cited credible evidence of North Korea's "politically motivated reprisals against individuals in another country." **Ex. Q** at 2. The 2021 Report also included a section on extraterritorial killing and kidnappings, noting that 42 North Korean defectors had gone mysteriously missing in the last five years. *Id*. at 16. The 2014 UN Report documented instances of North Korean abductions of people from countries all across "Europe, the Middle East, and Asia." (**Ex. E** at 13  ¶ 67.) Just within the past two decades, North Korea has kidnapped, tortured, and killed a pastor and U.S. permanent resident who was assisting defectors in China, *see Han Kim,* 774 F.3d at 1045; kidnapped, tortured, and killed an American

---

[11]     The late Otto Warmbier's parents appeared on their own initiative at Mr. Ahn's extradition hearing, and Cindy Warmbier provided unsworn testimony on his behalf. **Ex. B** at 155:2-156:10. Fred Warmbier, Otto Warmbier's father, has submitted an additional declaration in support of Mr. Ahn's habeas petition. **Ex. X**.

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

college student briefly visiting North Korea for tampering with a propaganda poster, *see Warmbier*, 365 F.Supp.3d at 36-37; assassinated Kim Jong-Un's half-brother using a chemical agent in a crowded international airport in Malaysia, **Ex. A** at 38:2-6; and kidnapped the daughter of a high-profile defector in broad daylight on the streets of Rome. *Id* at 38:6-12.

North Korea's well-documented track record of imprisoning, torturing, and even killing people without regard for due process has prompted the United States to stand firm on its decision to refrain from engaging in any diplomatic relations. In contrast, Spain has chosen a different route – the route of countries like China, Italy, and Malaysia, where many of the most recent high-profile killings and kidnappings have occurred – and not only established diplomatic relations with North Korea but also allowed North Korea to maintain an embassy within its borders. This disparity between the United States and Spain in foreign policy has allowed North Korea, a designated state sponsor of terrorism[12] and known enemy of the United States, to use Spain in these proceedings to effectively execute an "extradition by proxy"—to exploit the bilateral relations that exist between Spain and the United States to gain access to an American citizen, despite not having itself an extradition treaty with the United States. Spain in particular has a strong North Korean presence due to collaboration between the North Korean Embassy and Alejandro Cao de Benos – a Spanish national well known for liaising with criminal elements in Europe and beyond to assist the North Korean regime in evading international sanctions and engaging in illegal arms and drugs sales. **Ex. G** at 6-7. Earlier this year, a federal arrest warrant was issued against Mr. De Benos for conspiring to violate the International Emergency Powers Act.[13]

---

[12] https://www.state.gov/state-sponsors-of-terrorism/.
[13] https://www.fbi.gov/wanted/counterintelligence/alejandro-cao-de-benos/@@download.pdf.

**B.     Christopher Ahn's History of North Korean Human Rights Work Makes Him a Prime Target for Assassination by North Korea.**

Christopher Ahn is an American-born citizen with no criminal history. **Ex. A** at 1:20-22. As the son of a United States Air Force veteran, and the grandson of a woman who was rescued by American soldiers during the Korean War, Mr. Ahn was raised to always be grateful for the opportunities that America gave his family. **Ex. V** at 15. Although Mr. Ahn's family immigrated to the United States from South Korea in the 1970s, their connection to this country began decades earlier. In 1950, the Korean war broke out when the Soviet-backed North invaded the U.S.-backed South, and the United States led a United Nations military force to defend South Korea from the invasion. Mr. Ahn grew up hearing stories of the war from his grandmother, who often spoke of an American soldier saving her baby daughter from being trampled to death by people fleeing from their homes. *Id*. Mr. Ahn's own history would later inspire him to enlist in the Marines and step into the shoes of that American soldier himself, finding his family's story coming full circle. He spent six years honorably serving his country, including a deployment in Iraq, where he primarily held a desk job working in intelligence. *Id*. at 1.

Prior to Mr. Ahn's arrest, he lived a life of relative anonymity as a private entrepreneur. To his friends and family, he was best known for his patriotism and desire to give back to the community. Judge Rosenbluth considered numerous letters of support written by those close to Mr. Ahn, including a letter from David Bellavia, a recipient of the Medal of Honor in 2019, who wrote:

> Chris always prided his service in the United States Marine Corps on saving lives. There was a difference and he always made a point of sharing that with his peers. Not all service at war was that of the trigger pulling class. Chris was an intellectual Marine. He solved problems with his mind. Ahn worked to help the people of Iraq and he took great pride in what he was able to accomplish. He is not and never has been a violent person. Christopher is and always will be a faithful and dutiful

Marine. His life is predicated on honor and duty.

**Ex. H** at 23; **Ex. A** at 48:5-7. Since the Reluctant Certification was issued, supporters have submitted additional letters echoing Mr. Bellavia's sentiments, including several Sheriff Deputies with the Los Angeles County Sheriff's Department and a former Deputy General Counsel with the Department of Homeland Security. **Ex. V**.

Given his personal family history and altruistic character, it is no surprise that Mr. Ahn became interested in the cause of North Korean human rights. In particular, Mr. Ahn began assisting North Korean defectors, seeing his own family's story in their desire to escape violence and build a better life for their families. For years, Mr. Ahn assisted with efforts to help North Koreans escape safely to countries where they could relocate and seek asylum, and he did this work without fanfare, using aliases and seeking neither recognition nor compensation as a reward. Given North Korea's unforgiving cruelty toward defectors and those who assist them, Mr. Ahn's obscurity was crucial not only for the safety of the North Korean refugees but also for his own safety and that of his family.

In 2019, all of that changed. Since his arrest in this case, it has become widely known that Mr. Ahn aided refugees fleeing North Korea with Free Joseon, a human rights organization that is known to assist North Korean defectors. **Ex. A** at 1-2, fn.1. Free Joseon is led by Adrian Hong Chang, a TED fellow who is well-regarded in academic circles as a longtime activist against North Korea's authoritarian regime. *Id*. at 3:1-4, 13:6. According to expert witness Professor Sung-Yoon Lee, Free Joseon is "the first ever anti-DPRK resistance group known to the world," and anyone known to associate with it would be considered "an enemy of the DPRK that must be destroyed." **Ex. G** at 10. Although Mr. Ahn only occasionally volunteered his services with Free Joseon in his spare time, by virtue

of this case, he is now known for his connection to the group, putting him directly in the crosshairs of North Korea's merciless quest for vengeance against groups that support defectors.

The danger to Mr. Ahn is even more heightened because the defections he has helped facilitate are among the most high profile in recent memory. In February 2017, Mr. Ahn assisted Free Joseon with the defection of Kim Han Sol, the nephew of North Korean dictator Kim Jong Un. **Ex. A** at 37:6-15. The significance of this revelation cannot be overstated: Kim Han Sol is the son of Kim Jong Nam, the now-deceased older half-brother of the current dictator. As the eldest son to the former dictator Kim Jong Il, Kim Jong Nam was once assumed to be the heir apparent. While Kim Jong *Un* ultimately assumed the "throne," his older brother Kim Jong Nam's existence remained a constant threat to his legitimacy. In 2017, Kim Jong Un decided to remove the threat once and for all, and orchestrated the brazen murder of Kim Jong Nam in broad daylight at a busy Malaysian airport. *Id*.; **Ex. G** at 4-6. The United States government has since concluded that North Korea was responsible for the assassination.[14] After Kim Jong Nam's death, his eldest son Kim Han Sol became an obvious target, being next-in-line in the myth of bloodline succession and, correspondingly, to the waitlist for assassination. But rather than making headlines for being murdered by the regime, Kim Han Sol and his mother and sister managed instead to "disappear" and escape the clutches of North Korea with the help of Mr. Ahn and Free Joseon (then known as Cheollima Civil Defense). **Ex. A** at 37:6-15.

Mr. Ahn was also publicly linked in Spanish court documents to the defection of Jo Sung-Gil, North Korea's acting ambassador to Italy. In November of 2018 – just three months prior to the Madrid Incident – Jo Sung-Gil defected by walking out of the embassy in Rome and disappearing, ultimately resurfacing in

---

[14]   https://2017-2021.state.gov/imposition-of-chemical-and-biological-weapons-control-and-warfare-elimination-act-sanctions-on-north-korea/index.html.

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

South Korea. **Ex. A** at 38, n.23. The Spanish arrest warrant for Mr. Ahn revealed that he had been in Italy in October 2018, at the same time as Mr. Hong Chang. **Ex. O** at 82. While Mr. Jo and his wife successfully escaped, North Korean agents in Rome quickly caught onto the defection and managed to abduct Mr. Jo's seventeen-year-old daughter just four days later.[15] **Ex. A** at 38, n.23. She was repatriated to North Korea, and has not been heard from since.

Mr. Ahn's connection to these defectors – people within the highest ranks of North Korean society – makes him one of the most sought-after targets for execution to the North Korean regime. As Professor Lee opined, "[T]here should be no doubt that Christopher Ahn is at risk of being killed if he is extradited outside the United States. The DPRK is a terrorist tale that will go to the ends of the world to assassinate enemies of the state foreign officials and civilians alike, and especially those known to have helped North Korean defectors." **Ex. G** at 3.

### C. The Madrid Incident Was a Defection Attempt Staged As a Kidnapping At the Request of North Koreans.

The Madrid Incident took place on February 22, 2019, shortly after news of the defection of North Korea's Italian ambassador and the subsequent kidnapping of his teenage daughter had spread throughout the international community. At 8:10 a.m. that morning, Mr. Ahn arrived in Madrid at the request of Mr. Hong Chang. **Ex. O** at 2. As was often the case when Mr. Hong Chang asked Mr. Ahn to help with a North Korean defection, Mr. Ahn did not know what specific task he would be asked to help with until he was on the ground. **Exh. L** ¶ 8. Upon landing, Mr. Ahn was told that certain individuals inside the North Korean embassy had asked Mr. Hong Chang to stage their departure as a kidnapping to protect against retaliation. *Id.* ¶ 9. Mr. Ahn was aware that defectors, especially diplomats, are terrified that their actions will result in retaliation against their family in North

---

[15] https://www.reuters.com/article/us-northkorea-italy/italy-confirms-daughter-of-missing-north-korea-diplomat-returned-home-idUSKCN1Q91VM.

Korea. *Id.* In the context of recent events, with the stakes of defection higher than ever, it was entirely plausible to Mr. Ahn that the would-be defectors would ask Mr. Hong Chang to stage their departure as an involuntary kidnapping to keep their families safe for as long as possible. Based on prior experience, Mr. Ahn had no reason to believe Mr. Hong Chang would try to force anyone to defect or physically harm anyone against their will. *Id.*.

At around 4:40 p.m., Mr. Hong Chang, Mr. Ahn, and others arrived at the North Korean embassy in various groups. **Ex. P** at 56-61. Mr. Ahn personally did not carry any weapons, but understood that the purpose of the others having these items such as fake guns was to make the "kidnapping" look real to outside observers, not hurt anyone. **Ex. L** ¶ 11. Mr. Hong Chang was allowed inside the embassy by one of the North Korean officials, and the door was left slightly open. *Id.* ¶ 12. Mr. Ahn believed this had been done on purpose to allow the group to enter. *Id.* The group then entered the embassy, and once inside, several members went through the motions of tying people up. *Id.* Mr. Ahn, whose right hand was fractured, did not participate in any restraining, and indeed, there is no competent evidence that any witness saw otherwise. **Ex. M**. He did not hit anyone or commit any violence. **Ex. L** ¶ 12. Based on his observations, the others appeared to be taking great pains to make the restraining look real without actually hurting anyone. *Id.* He believed the entire process was consensual and that any resistance from the North Korean officials was being performed for the benefit of possible North Korean surveillance. *Id.*

The mission fell apart when the wife of one of the North Korean officials, Cho Sun Hi, unexpectedly jumped out of the window as the group entered, which the group was unaware of until the Spanish police arrived at the embassy about an hour later. *Id.* ¶13. It is impossible to know the reason Ms. Cho left—perhaps the group had been misled and Ms. Cho had not been informed of the events, or

-30-

1   perhaps she had been informed but feared getting caught too much to go through

2   with it and wanted to prove her loyalty to the regime. Whatever the reason, the brief

3   visit from the Spanish police alarmed the North Koreans inside the embassy. Even

4   though the police left the embassy within just a few minutes of speaking to Mr.

5   Hong Chang, the North Koreans were firmly convinced that their government knew

6   what was going on, and they grew too afraid to go through with their plan. *Id*. ¶¶

7   13-15.

8          The group had no choice but to leave the embassy and leave traces of a

9   burglary of some kind behind so that the North Koreans would have an explanation

10  to provide to their government as to why the group had entered. Mr. So offered to

11  let the group use the embassy cars so they could depart safely. *Id*. ¶ 16; **Ex. O** at 18.

12  On the group's way out, they took with them pen drives, computers, hard drives,

13  and a mobile telephone – all of which Mr. Hong Chang would later promptly turn

14  over to the FBI upon his return to the United States. The group left behind

15  evidence, including cable ties, handcuffs, flashlights, and fake guns, for the Spanish

16  police to find at the scene, in the hopes that the North Korean government would

17  not suspect that anyone inside had wanted to defect. Mr. Hong Chang stayed behind

18  a little longer than the others and took an Uber out of the embassy.

19         While the extradition court concluded it could not consider Mr. Ahn's

20  explanatory declaration regarding the events of the day, the admissible evidence

21  was entirely consistent with his account.[16] The admissible evidence showed

22  members of the group purchasing supplies for a staged kidnapping, including fake

---

[16] The extradition court correctly excluded the statements of the North Korean witnesses on the basis that they were coerced and could not be considered competent. **Ex. A** at 16:12-14. Thus, the evidence was limited to the statements of two Spanish police officers (Officers 22334 and 22271), the statements of three civilian witness (Oscar Santiago Perales, Lynn Gayero Dayao, and Teofila Villarroel Orozco), surveillance footage from the embassy and evidence photos taken by the police (the integrity of which the extradition court questioned, **Ex. A** at 20, fn.3, surveillance footage and receipts from a weapons shop, and the medical records of two North Koreans (Cho Sun Hi and So Yon Suk, the embassy's commercial attaché and acting North Korean ambassador).

-31-

guns, prior to the Madrid Incident. **Ex. O** at 50 ("imitation pistols"). When the group entered the embassy around 5 p.m., nearby civilians reported seeing events that would be consistent with what a staged kidnapping would look like to a third party observer. Lynn Gayero Dayao and Teofila Villarroel Orozco, who happened to be at a bus stop near the embassy when the group entered, recounted hearing screams from inside the embassy and seeing a man being restrained on the embassy grounds. **Ex. P** at 43. Ms. Dayao saw one of the men holding a gun, which the police would later discover was fake. *Id*; **Ex. O** at 50. Ms. Dayao also testified that a student who was watching the events from the same spot as her remarked that the people inside looked like they were "practising." **Ex. P** at 43.

Meanwhile, Ms. Cho had left the embassy and flagged down Oscar Santiago Perales, a passerby who was driving to work. Mr. Perales did not witness anything at the embassy and simply recounted trying to help Ms. Cho get first-aid because she was bleeding. When the police arrived to tend to Ms. Cho, they were unable to communicate with her because there was no interpreter present. **Ex. P** at 12-13. The two officers used Google Translate to try to speak to her, and the translation indicated that Ms. Cho was claiming "some individuals had entered the Embassy and they were killing people, they were eating people and there were children there." *Id*. at 12.

The officers recounted going to the embassy at around 5:30 to 5:50 p.m. to see what was going on. **Ex. P** at 10. Mr. Hong Chang answered the door and spoke to them, impersonating a North Korean by putting a North Korean pin on his suit.[17] The police informed Mr. Hong Chang that a woman from the embassy had been

---

[17] While the extradition court indicated that Mr. Hong Chang's impersonation suggested he did not trust the North Koreans inside to speak to the officers themselves, that inference ignores the fact that this was supposed to be a staged kidnapping, and no one in the embassy knew at the time why the police had shown up. The North Koreans could hardly pretend they were involuntary captured if they were on camera casually speaking to the Spanish police after Free Joseon had entered.

injured and asked if there was a disturbance at the embassy. **Ex. P** at 14. Mr. Hong Chang denied that anything unusual was happening in the embassy, and the officers left without incident. *Id*.

The officers stayed at the scene observing the embassy for several hours. At around 9:11 p.m., members of the group begin to leave in the embassy cars. **Ex. P** at 73. Soon after, the three North Korean "students" arrived at the embassy. At least one of them apparently noticed the Spanish police were there, but they did not ask the police for help at that time. *Id*. at 17. ("He went up and down again . . . like he knew we were there"). The officers saw the Uber arrive for Mr. Hong Chang, and one of them observed him speaking briefly to one or more of North Korean students before he left.[18] *Id*. at 18. After Mr. Hong Chang departed the scene, the police watched the students enter the embassy, at least one of them doing so by climbing over the wall. *Id*.

Approximately twenty minutes later, the North Koreans began emerging from the embassy. *Id*. Some were in handcuffs and showed their restraints to the Spanish police. But later, when they were interviewed by the police, other North Koreans claimed they had helped free those same handcuffed people from their restraints while still inside the embassy, suggesting some may have handcuffed themselves deliberately to show the Spanish police and make their story seem more convincing. **Ex. O** at 30.

The police were not able to enter the embassy immediately after the North Koreans emerged, and did not conduct a search until "[m]uch, much later." **Ex. P** at 29. The police took photos of the evidence and later received the embassy surveillance footage from the North Koreans. The extradition court declined to give the photos and footage much weight, noting that the significant time that had elapsed prior to police entry into the Embassy may have allowed the North Koreans

---

[18] The North Korean student witnesses also stated they spoke to Mr. Hong Chang before he left. **Ex. O** at 43.

Manatt, Phelps & Phillips, LLP
Attorneys at Law
Los Angeles

to tamper with the physical evidence and security footage. **Ex. A** at 20, n.13.

### D.    The FBI Has Warned Mr. Ahn That North Korea Has Targeted Him for Assassination And Advised Him to Stay In the Country.

After leaving Madrid, Mr. Ahn returned to his home in Southern California. **Ex. A** at 49:3-10. Meanwhile, on February 27, 2019, Mr. Hong Chang met with the FBI in New York, where he turned over the items that had been taken from the embassy and informed the agents of the unsuccessful defection attempt. *Matter of the Extradition of Ahn*, 19-MJ-01523, Dkt. 1 at 6-7 (C.D.Cal. April 12, 2019). On March 14, 2019, Mr. Hong Chang met with the FBI again, this time in Los Angeles. **Ex. O** at 10. During the March 14 meeting, he told the FBI that Mr. Ahn had been present during the Madrid Incident, information that was known to no one else at the time. *Id.* at 10-11. On or about that same day, the FBI visited Mr. Ahn at his home. **Ex. L** ¶ 18. He invited them in and spoke to them voluntarily about what had happed in Madrid. *Id.* ¶ 18. Mr. Ahn's primary concern at the time was for the safety of the North Koreans in the embassy.

Spanish court documents show that on March 15, 2019, the FBI transmitted the information it had received from Mr. Hong Chang, including Mr. Ahn's identity, to Spain. **Ex. O** at 81 (referencing a note from the FBI on 15/03/19). Despite the clear need to handle a matter surrounding a North Korean defection attempt with sensitivity and caution, there is no indication that the FBI or the Department of State asked Spain to investigate the matter confidentially or consider the implications of revealing Mr. Ahn's identity to the North Korean government. Just a few days after visiting Mr. Ahn, the FBI called him on his phone. This time, they called to warned him that there were "credible threats" of death against him from North Korean agents, and that he should take precautions. **Ex. L** ¶ 18.

Mr. Ahn was baffled as to how North Korea had learned of his identity, given that no one involved in the Madrid Incident except for Mr. Hong Chang knew his

name, and the only other people he had informed of his presence in Madrid that day were the FBI agents he had spoken with. Even after learning that he was a target of North Korean assassination, however, Mr. Ahn did not flee, unlike every other individual who had accompanied Mr. Hong Chang into the North Korean embassy. Nor did he flee after Spain announced to the media that it was investigating individuals involved in the Madrid Incident.[19] Instead, he continued to live with his wife at their home and care for his mother and grandmother, going about his day-to-day routine. Ironically, this is why he is the only person charged in this incident whose extradition has been certified today.

Months later, after the extradition proceedings were underway, in July 2019, the FBI reached out separately to the undersigned counsel and reiterated that there were credible threats to Mr. Ahn's life from North Korean agents. The FBI expressly informed counsel for Mr. Ahn that he "should not leave the United States as a matter of safety." **Ex. F ¶ 3.**

## V.    PROCEDURAL HISTORY

### A.    The Department of Justice Initiates Public Extradition Proceedings Against Mr. Ahn

On March 26, 2019, the Spanish court unsealed its investigation of the Madrid Incident. *Matter of the Extradition of Ahn* (*"Ahn Duty Proceedings"*), 19-MJ-01523, Dkt. 23 at ECF p. 8 (C.D.Cal. April 26, 2019). The media immediately picked up the story, and Free Joseon issued a statement in response a few hours later denying that the Madrid Incident was an "attack" but remaining vague on the details.[20] North Korea issued a statement demanding that the "terrorists and their wire-pullers" be brought to justice, noting that it would "wait for the result in

---

[19] *See, e.g.*, https://english.elpais.com/elpais/2019/03/13/inenglish/1552464196_279320.html and https://www.cnn.com/2019/03/19/politics/north-korea-embassy-madrid-intl/index.html.

[20] http://www.cheollimacivildefense.org/post/2019-3-26_FactsAboutMadridInformaci%C3%B3nSobreMadrid_34286/.

1  patience." **Ex. A** at 43:20-23.[21]

2       On April 12, 2019, the Spanish court issued an arrest warrant naming Mr.

3  Ahn. That same day, the DOJ filed a complaint in the Central District of California

4  seeking Mr. Ahn's provisional arrest with a view towards extradition. Mr. Ahn was

5  arrested on April 18, 2019, and detained at the Metropolitan Detention Center.

6  International headlines bearing Mr. Ahn's photo and name were plastered all over

7  the media, forever destroying his anonymity.

8       The Government is fully capable of sealing proceedings that may jeopardize

9  the safety of a party. In this case, not only did the Government decline to take such

10  precautions, it filed a 12-page brief arguing why the press and the public should

11  have access to the extradition proceedings. *Ahn Duty Proceedings*, 19-MJ-01523,

12  Dkt. 23 (C.D. Cal. April 26, 2019).

13       On June 28, 2019, the Government filed documents supporting Spain's

14  formal request for extradition. (Dkt. 55.)[22] Spain sought the extradition of Mr. Ahn

15  based on six charges: (1) causing injuries (Spanish Pen. Code Art. 147); (2) illegal

16  restraint (Art. 163); (3) threats (Arts. 169, 171, 202, 203); (4) robbery with violence

17  or intimidation (Arts. 237, 241, 242); (5) breaking and entering (Arts. 202, 203);

18  and (6) criminal organization (Art. 570 bis) (Dkt.. 226-3 at 86-91).

19       Mr. Ahn remained in custody for three months until he was released on bail

20  on July 9, 2019. In her order granting bail, the magistrate judge held that a special

21  circumstance arose in this case due to "the fact that much of the evidence . . . comes

22  from diplomatic officials of the North Korean government, a country with which

23  the United States does not have diplomatic relations in part because its justice

24  system, including specifically pretrial investigations, is not trustworthy and does

25  

26    [21] *See also* https://www.theguardian.com/world/2019/mar/31/grave-terrorist-attack-north-korea-condemns-raid-on-itsmadrid-embassy and

27  https://www.reuters.com/article/us-spain-northkorea/north-korea-says-embassy-raid-in-spain-was-a-grave-terrorist-attack-idUSKCN1RC03F.

28    [22] The Government later filed a revised version of this document as Dkt. 226.

not comply with due process." Dkt. No. 58 at 2.

In the nearly three years since his initial release on bail, Mr. Ahn has not attempted to flee and has remained in compliance with all of his conditions. **Ex. A** at 48:18-24.

## B.    Mr. Ahn Exhausts Efforts to Resolve This Matter Safely Through the Executive Branch.

The extradition proceeding forced Mr. Ahn to make a Hobson's choice. To speak in his own defense and explain what had happened in Madrid had the potential to further endanger the lives of the North Koreans in the embassy who had sought help. To say nothing and accept extradition to Spain would put his own life in jeopardy in light of the FBI's warning. In an effort to avoid having to publicly litigate against the narrative, Mr. Ahn made numerous efforts to engage with the Executive Branch and find an alternative solution.

On January 24, 2020, Mr. Ahn's defense team met with DOJ officials in Washington, D.C., proffered what had actually taken place that day in the Madrid embassy, and sought DOJ's assistance in negotiating a resolution with the Spanish authorities directly. While the DOJ did not agree to assist Mr. Ahn in negotiations, it agreed to continue the extradition hearing to allow the discussions with the Spanish to run their course.

In March of 2020, Mr. Ahn was able to retain *pro bono* counsel in Spain to engage with the Spanish prosecutor—but that same month, the global pandemic effectively shut down court and government operations in Madrid. Mr. Ahn's Spanish counsel encountered significant delays in obtaining the court records necessary to have a meaningful discussion with the Spanish prosecutor. Nonetheless, she was able to initiate discussions and reported back favorably to the undersigned. Mr. Ahn's Spanish counsel indicated that involving the United States government in the discussions with the Spanish prosecutor was likely to impact the

negotiations negatively and advised against it. In early July of 2020, Mr. Ahn's Spanish counsel reported back that discussions were still positive, but a meeting with the Spanish prosecutor had been delayed, and the prosecutor would not be able to meet again until September due to vacation plans in August, a common holiday month for the country of Spain. In light of this development, counsel for Mr. Ahn sought another continuance of the extradition hearing from the Government.

Shockingly, on July 9, 2020, the Government responded that after receiving Mr. Ahn's continuance request, the United States had itself reached out to the Spanish prosecutor to check in on the negotiations. **Ex. R** (07/09/20 Letter from DOJ). Contrary to what had been communicated to Mr. Ahn's Spanish counsel, DOJ reported that the Spanish was not considering any negotiations with Mr. Ahn, or as the Government put it, "[D]iscussions with Mr. Ahn's Spanish counsel have not progressed such that further delays would be warranted." *Id*. The DOJ had no valid explanation for why it had reached out to the Spanish prosecutor without informing counsel for Mr. Ahn, even though the undersigned had conveyed to the Government that local counsel had recommended not involving the United States at this stage. **Ex. S** (07/10/20 Letter to DOJ) and **Ex. T** (07/13/20 Letter from DOJ).

Despite the setback, Mr. Ahn's Spanish counsel pushed ahead with the September meeting. In September, Mr. Ahn's Spanish counsel had a final discussion with the Spanish prosecutor, who indicated he had received a call from the DOJ earlier in the summer and was aware that the United States knew of their negotiations in Spain. **Ex. U** (09/09/20 Letter to DOJ). Ultimately, no resolution was reached in Spain.

Separately, Mr. Ahn contacted the Department of State and sought a meeting to discuss Mr. Ahn's case. Counsel for Mr. Ahn was told that the State Department would not engage in discussions until the court extradition proceedings had come to a conclusion.

1    In December of 2020, counsel for Mr. Ahn had meetings with senior officials
2    of the Department of Homeland Security regarding Mr. Ahn's case. While these
3    discussions were initially promising, ultimately, DHS informed counsel for Mr.
4    Ahn that they were unable to achieve a resolution.

5    **C.    The Court Issues Its Reluctant Certification.**

6    Mr. Ahn's extradition hearing was held on May 25, 2021. Although the
7    hearing took place while the pandemic was still ongoing and vaccines had only
8    recently been made available to the public, supporters of Mr. Ahn traveled from
9    across the country to attend. Among the attendees included Professor Sung Yoon
10   Lee from the Fletcher School of Law and Diplomacy at Tufts University, who
11   voluntarily submitted an expert opinion to the Court in which he concluded that Mr.
12   Ahn was likely to be killed if sent to Spain and that the statements of the North
13   Korean witnesses had been coerced. **Ex. G**. Also in attendance were Cindy and
14   Fred Warmbier, the parents of the late Otto Warmbier.

15   Expert reports were also submitted by three experts who were not able to
16   attend the hearing: Robert Collins, whom the magistrate recognized as "a widely
17   recognized expert on North Korea," **Ex. A** at 13:17-19; Greg Scarlatoiu, the
18   executive director of the U.S. Committee for Human Rights in North Korea
19   ("HRNK"); and Dr. Sandra Fahy, the program director for the Bachelor of Global
20   and International Studies at Carleton University who has extensive expertise in
21   North Korean refugee communities. **Exs. I**, **J**, and **K**. These experts reached similar
22   conclusions to those of Professor Lee—that due to North Korea's deadly reprisal
23   against defectors and those who assist them, the statements of the North Korean
24   witnesses could not have been voluntary, and sending Mr. Ahn to Spain would be
25   tantamount to a death sentence. *Id.* Because the experts were unable to attend the
26   hearing in person and were not available to testify, the Court did not admit their
27   opinions.
28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Professor Lee, however, was available to testify, and the extradition court

2   subsequently admitted both his report and his testimony. **Ex. G**. Regarding the

3   statements of the North Korean witnesses, Professor Lee explained that a North

4   Korean would never be able to admit that he or she wanted to defect without facing

5   punishment by death. **Ex. B** at 43:20-44:4 (Transcript of 05/25/22 Extradition

6   Hearing). As an example of the enormity of the consequences, he told the story of

7   one North Korean defector who "had 5,000 of his friends, relatives, distant

8   relatives, colleagues, all killed" by the North Korean government once his defection

9   was discovered. *Id*. at 58:6-12.

10    Professor Lee also reaffirmed his opinion that Mr. Ahn was uniquely at risk

11   of being killed by North Korea if he was sent to Spain, stating:

12
> North Korea's terrorist arm extends way beyond the Asia Pacific, and
13   there are many precedents of North Korea engaging in such terrorist
     activities -- abduction, kidnapping, and assassination in Europe,
14   including the U.K. We know that most European nations have
     normalized diplomatic relations with North Korea around the year 2000
15   and 2001, as has Spain.
16   . . .
17   [W]e tend to underestimate North Korea. But when it comes to terrorist
     acts and the regime's resolved act through its mission of wiping out
18   what it calls state enemies -- and I would argue that Mr. Ahn would
     squarely fall under that definition -- that North Korea's rule is
19   indefatigable. It will never, never rest.
20
21   **Ex. B** at 42:7-43:4.

22    The court also heard a statement from Mrs. Warmbier, who spoke of her own

23   personal experience losing a loved one to the North Korean regime while the State

24   Department passively stood by. **Ex. B** at 155:2-156:10.

25    On May 9, 2022 – nearly a year after the extradition hearing – the extradition

26   court issued its Reluctant Certification order. The court found that probable cause

27   existed as to four charges: causing injuries, illegal restraint, threats, and breaking

28

and entering.  The court found that probable cause did not exist for the robbery and criminal organization charges and did not certify extradition as to those crimes. (**Ex. A** at 50:18-23).

As to evidentiary matters, the court held that each of the North Korean witnesses' testimony – with the sole exception of Ms. Cho's "statements" to Spanish police via Google Translate – were coerced and therefore inadmissible. **Ex. A** at 16:12-17:14.  In making this decision, the court relied on Professor Lee's opinion that these statements were "inherently unreliable" because North Korean diplomats were "captives of the state whose loved ones and associates back home are held hostage against their actions abroad," **Ex. A** at 13:27-14:3, along with the findings of all three branches of our own government regarding the North Korean regime's absolute control of information and speech, and their tendency to "intimidate . . . potential witnesses." *Id*. at 15:12-16:11.

Most strikingly, the extradition court addressed the humanitarian exception at length. While the court ultimately concluded that *Prasoprat v. Benov*, 421 F.3d 1009 (9th Cir. 2005) precluded a magistrate judge from applying the humanitarian exception in an extradition proceeding, the court also laid out "the reasons why I wish I could invoke the humanitarian exception to keep Ahn in the United States, and I humbly ask the Ninth Circuit to clarify that it didn't mean to rule the exception out categorically." **Ex. A** at 35:6-12. The extradition court then made several factual findings that would have supported its finding of a humanitarian exception had the law so permitted. First, the court found that Mr. Ahn would be in danger of being killed by North Korea if sent to Spain. *Id*. at 36:2-40:9. Second, the court concluded that extradition would be particularly "inhumane and may well violate due process" because Spain was not likely to be able to bring Mr. Ahn to trial. *Id*. at 40:10-42:24. Third, the court noted "the State Department, for whatever reason, is unlikely not to turn Ahn over to Spain," citing several foreign policy

reasons that might be driving the Executive Branch's decision-making process at the expense of an individual's life and safety. *Id*. at 42:25-47:26. Finally, the court found that extradition would be particularly unjust because Mr. Ahn was "by all accounts a good person" who was known to all as "an exceptional person of virtuous character." *Id*. at 47:27-49:27.

Even as it found that "extraditing Ahn to Spain would be 'antipathetic to our common 'sense of decency,'" *id*. at 34:11-35:1, the extradition court lamented its inability to apply to humanitarian exception, stating, "It can't be right or fair that in the extraordinary circumstances presented here, a judge has no discretion not to send a U.S. citizen off to his likely assassination by a state sponsor of terrorism." *Id*. at 47:16-19. The extradition court invited the district court to find otherwise, explicitly noting, "[A]lthough the Ninth Circuit law seems clear that a magistrate judge may not invoke the humanitarian exception, ***a district judge may not be so constrained***." *Id*. at 35:24-25, fn.20 (emphasis added).

## VI.   LEGAL DISCUSSION

### A.   The Extradition of Mr. Ahn Would Violate His Fifth Amendment Right to Substantive Due Process and Must Be Enjoined under the Humanitarian Exception.

As a preliminary matter, while this Court may review the extradition court's legal conclusions *de novo*, it is bound by the extradition court's factual findings unless the Court finds clear error. *See Quinn*, 783 F.2d at 791-92. Although the extradition court in this case concluded as a matter of *law* that a magistrate judge could not apply the humanitarian exception, it also made findings of *fact* by which this Court is bound if it ultimately concludes that a court can invoke the humanitarian exception. Those findings include the danger North Korea poses to Mr. Ahn's life should he be sent to Spain, the futility of the Spanish proceedings because of the likely unavailability of the North Korean witnesses, the Executive

Branch's refusal to engage with Mr. Ahn, and Mr. Ahn's good character. *See supra*. Thus, if the Court finds that the humanitarian exception can be invoked, it must grant this writ and bar Mr. Ahn's extradition absent a finding of clear error on these fact determinations.

### 1.   Courts Have the Authority to Apply the Humanitarian Exception Where the Conduct Challenged Is That of the United States and North Korea.

The question this Court must decide is whether a judge may invoke a "humanitarian exception" and block an extradition where, as here, the extradition court has found the facts of a case to be so inhumane as to warrant it. The "humanitarian exception" is often traced back to *Gallina v. Fraser*, 278 F.2d 77 (2d Cir. 1960), *cert. denied*, 364 U.S. 851 (1960), which held that federal courts were not authorized to "inquire into the procedures which await the relator upon extradition" to the requestion nation, but nonetheless observed, "We can imagine situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination of the principle set out above." *Id*. at 78-79.[23] A long line of cases in the Ninth Circuit have relied on *Gallina* to acknowledge the existence of a possible humanitarian exception to extradition, but none have yet found that the exception was warranted based on the applicable facts. *See, e.g., Prasoprat*, 421 F.3d at 1016 ("We have, on occasion, cited the possibility of a humanitarian exception to extradition; however, we have never actually relied on it to create such an exception") (citation and quotation omitted); *Mainero*, 164 F.3d at 1210 (9th Cir. 1999) (assuming existence of humanitarian exception but declining to invoke based

---

[23] While not an extradition case, in *Munaf*, the Supreme Court echoed a similar sentiment to *Gallina*, noting, "The Executive Branch may, of course, decline to surrender a detainee for many reasons, including humanitarian ones. Petitioners here allege only the possibility of mistreatment in a prison facility; this is not a more extreme case in which the Executive has determined that a detainee is likely to be tortured but decides to transfer him anyway." 553 U.S. at 702.

REVISED MEMO OF P & A ISO CHRISTOPHER AHN'S PETITION FOR WRIT OF HABEAS CORPUS

1   on facts); *Lopez-Smith*, 121 F.3d at 1326–27 (9th Cir.1997) (same); *Emami,*

2   834 F.2d at 1453 (9th Cir. 1987); (noting "the possibility that the considerations

3   expressed in [*Gallina*] might someday cause us to develop a humanitarian

4   exception in a case where the facts warranted it"); *Arnbjornsdottir-Mendler*, 721

5   F.2d at 683 (same).

6       The reluctance to apply a humanitarian exception is rooted in the so-called

7   "rule of non-inquiry," which requires federal courts to refrain from inquiring into

8   "the procedures or treatment which await a surrendered fugitive in the requesting

9   country because such determinations are to be made solely by the executive

10  branch." *Mainero*, 164 F.3d at 1210 (quotations and citation omitted). The rule

11  assumes it is the "role of the Secretary of State, not the courts, to determine whether

12  extradition should be denied on humanitarian grounds or on account of the

13  treatment that the fugitive is likely to receive upon his return to the requesting

14  state." *Prasoprat*, 421 F.3d at 1016. Its essence lies in the assumption that the

15  Executive would not have entered into – and Congress would not have ratified – an

16  extradition treaty with any nation whose justice system was plainly inadequate. *See*

17  *Glucksman v. Henkel*, 221 U.S. 508, 512 (1911) ("We are bound by the existence of

18  an extradition treaty to assume that the trial will be fair"); *Neely v. Henkel*, 180 U.S.

19  109, 123 (1901) ("[i]n the judgment of Congress these provisions were deemed

20  adequate to the ends of justice").

21      While few courts have articulated the basis for the humanitarian exception, at

22  its core, it is a recognition that separation of powers works both ways—although

23  courts are to defer to the political branches in matters of foreign policy, in extreme

24  circumstances, there is a limit to the amount of deference owed. That limit is

25  certainly reached when the actions of the Executive Branch in an extradition

26  proceeding exceed the bounds of the Constitution. *See Martin v. Warden*, 993 F.2d

27  824, 829 (11th Cir. 1993) ("constitutional rights of individuals, including the right

28

to due process, are superior to the government's treaty obligations"). The rule of non-inquiry may preclude courts from holding *other countries* to our nation's constitutional standards, but it does not preclude courts from so holding with our own Executive Branch—in fact, the ability of the Judiciary to hold our Executive Branch accountable to the Constitution is at the very heart of habeas. *See Rasul*, 542 U.S. at 474 ("At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest"). Accordingly, federal courts have authority "to consider not only procedural defects in the extradition procedures that are of constitutional dimension, but also the **substantive conduct of the United States** in undertaking its decision to extradite if such conduct violates constitutional rights." *Matter of Burt*, 737 F.2d 1477, 1484 (7th Cir. 1984) (emphasis added); *see also Santos*, 830 F.3d at 1007 fn.9 (9th Cir. 2016) ("the rule of noninquiry is inapplicable" where the question to be addressed is whether there is probable cause to extradite, even where evidence at issue involves unconstitutional torture practices of the requesting nation). Thus, where a court applies the humanitarian exception to an extradition due to the unconstitutional conduct of the United States, as opposed to that of the requesting country, the rule of non-inquiry is no bar. *Burt*, 737 F.2d at 1484.[24]

The basis of Mr. Ahn's humanitarian exception claim is that the *United States*, not Spain, is violating his constitutional rights by proceeding with this extradition, as discussed further below. There is little doubt that, as the magistrate

---

[24] Indeed, past cases where the Ninth Circuit declined to invoke the humanitarian exception based on the rule of non-inquiry invariably involved arguments on the purported deficiencies with the *requesting nation*'s justice system.  *See, e.g., Prasoprat*, 421 F.3d at 1012-13 (existence of death penalty for drug crimes in Thailand); *Mainero*, 164 F.3d at 1210 (possibility of interrogation by torture in Mexico); *Arnbjornsdottir–Mendler*, 721 F.2d at 683 (possibility of solitary confinement in Iceland); *Emami*, 834 F.2d at 1453 (speculation that length of investigation in Germany may have adverse effect on relator's health); *Lopez-Smith*, 121 F.3d at 1327 (extortion by Mexican authorities).

judge suspected, **Ex. A** at 35, fn.20, *this* Court has the authority on habeas review to consider whether the Executive Branch's custody of Mr. Ahn in these extradition proceedings is unconstitutional. *See Rasul*, 542 U.S. at 473; 28 U.S.C. §§ 2241(a) and (c)(3). Mr. Ahn also contends that because the rule of non-inquiry does not apply to claims of due process against the United States, *Prasoprat* did not bar the magistrate judge from considering the humanitarian except in this case. Moreover, unlike the Thailand treaty at issue in *Prasoprat*, the Spanish Extradition Treaty expressly requires that extradition determinations be made in accordance "with the law of the requested Party," and that the relator "shall have the right to use such remedies and recourses as are provided by such law." **Ex. N** at 6 (Art. IX). These distinctions permitted the extradition court to distinguish *Prasoprat* and apply the humanitarian exception under the circumstances here. Regardless, whether the humanitarian exception is to be applied by the magistrate judge or this Court, the outcome should be the same. As the extradition court put it, either this Court or the magistrate judge "or some judge or judges — should be able to stop it." **Ex. A** at 42:23-24.

### 2. The Executive Branch's Aggressive Efforts to Extradite Mr. Ahn to a Country Where It Acknowledges North Korea Is More Likely to Assassinate Him Violates Due Process.

The Executive Branch violates an individual's right to due process where its conduct "shocks the conscience" and violates the "decencies of civilized conduct," *Rochin v. California*, 342 U.S. 165, 172-73 (1952), or when it violates a person's "liberty interest in personal security," *Wang*, 81 F.3d at 819. Moreover, once the Government "takes a person into its custody and holds him there against his will," a special relationship is created, and "the substantive component of the Due Process Clause obligates the government to provide for that person's basic needs and to protect him from deprivations of liberty." *Wang*, 81 F.3d at 818. The Government

also owes a "constitutional duty to protect a person . . . .when it affirmatively places that person in danger." *Id*. Where the Executive Branch favors transfer of an American citizen to a foreign sovereign knowing that it is consigning that person to torture, that creates a substantive due process concern. *See Munaf*, 553 U.S. at 706 (Souter, J., concurring).

These standards are easily met in this case. Based on the evidence, the extradition court has already found, "Shipping Ahn off to Spain, where his life will be in grave danger from a force our government recognizes as evil, to await a trial that will likely never happen is inhumane and may well violate due process." **Ex. A** at 42. Indeed, unlike in most cases involving the humanitarian exception, there can no doubt that the Executive Branch is fully aware of the threat to Mr. Ahn's life if he is sent to Spain: "[T]he FBI has conceded that North Korea wants to kill Ahn and that that threat is easier to carry out in Spain than here in the United States." *Id*. at 31. Beyond the warnings from the FBI, our State Department is intimately familiar with the danger North Korea poses to those who assist defectors and the "politically motivated reprisals" North Korea takes against "individuals in another country." **Ex. Q a**t 2. The 2014 U.N. Report flatly concludes that North Korea's crimes "shock the conscience of humanity." **Ex. E** at 16, ¶ 86. For the Executive Branch to continue with these extradition proceedings despite knowing it is subjecting Mr. Ahn to these heinous risks is "antipathetic" to our "common sense of decency." **Ex. A** at 34:11-35:3.

The Executive Branch's conduct is even more egregious because its own actions increased the danger to Mr. Ahn. First, Spanish court documents suggest on March 15, 2019, the FBI informed Spain about Mr. Ahn's identity, having just learned this information from Mr. Hong Chang.  **Ex. O** at 10, 81. Given the Executive Branch's knowledge of the sensitivity of a defection attempt and North Korea's ruthlessness, efforts should have been made to try to persuade Spain to

Manatt, Phelps & Phillips, LLP
Attorneys at Law
Los Angeles

investigate or prosecute this case confidentially. At minimum, when the extradition proceedings started in the United States, the Executive Branch could have agreed to keep the case sealed so that Mr. Ahn's defense would not become further known to the world. Instead, DOJ fought to give the media access to this case. Mr. Ahn has had no choice but to defend his name in the public.

That the Executive Branch would refuse to attempt to find an alternative solution to extradition in a case like this is astonishing. Throughout the three years since Mr. Ahn's arrest, Mr. Ahn's legal team has reached out repeatedly to representatives from both the Department of Justice, Department of State, and the Department of Homeland Security in an effort to find a compromise that would allow Mr. Ahn to answer for his conduct without traveling to Spain and risking his life, only to be shut down at every turn. Worse, DOJ appears to have negatively interfered with Mr. Ahn's negotiations with the Spanish prosecutor in the summer of 2020. **Exs. R-U.** While Mr. Ahn can never know what might have come of the negotiations had DOJ not interrupted the discussions, it is unconscionable that the Executive Branch did not first try to coordinate with Mr. Ahn's counsel before inserting itself into such a sensitive situation. If diplomacy was really the only issue driving DOJ's decisions, it should have jumped at the chance to work with Mr. Ahn to find a workable resolution that would ensure his safety while meeting Spain's concerns. Throughout this case, the Government has not acted as reluctant enforcer of an extradition treaty in an unfortunate situation—it has acted as an advocate, aggressively seeking supplemental evidence from Spain to ensure that Mr. Ahn will be sent there to be killed.

The Government's repeated representations that Spain will be able to ensure Mr. Ahn's safety ring hollow – or, as the magistrate judge put them, "aren't worth a roll of pennies."  **Ex. A** at 31:25-32:21. "As North Korea's assassinations and kidnappings on European and other nations' (but not the United States's) soil

reveal . . . it doesn't care about angering those like Spain who partner with it in some way or another." *Id*. at 32:3-7.

Mr. Ahn will not speculate on why the Government seems so intent on acting as an accomplice to North Korea to bring Mr. Ahn to Spain, even as they openly acknowledge that he is at risk of being kidnapped, tortured, and perhaps even killed by North Korean agents. **Ex. A** at 43:20-44:7 (discussing potential political motivations for the government's conduct). What is clear, however, is that this is precisely the situation Justice Souter cautioned of in his concurring opinion to *Munaf*: an "extreme case" where "the Executive has determined that [Mr. Ahn] is likely to be tortured ***but decides to transfer him anyway.***" 553 U.S. at 706 (Souter, J., concurring) (emphasis added). As Justice Souter noted, in these circumstances, "[I]t would be in order to ask whether substantive due process bars the Government from consigning its own people to torture."

### 3. Failure to Invoke the Humanitarian Exception Where Appropriate Has Led to Fatal Consequences

At various times, the Government has sought to downplay the danger to Mr. Ahn from North Korea if sent to Spain and will no doubt do so again. But decisions from other federal courts provide cautionary tales that demonstrate what can happen when a court "blind[s] [itself] to the foreseeable and probable results of the exercise of [its] jurisdiction," *Ahmad*, 726 F.Supp. at 410, and reflexively dismisses the humanitarian exception without giving proper consideration. *See also Barr v. U.S.*, 819 F.2d 25, 27 n. 2 (2nd Cir. 1987) ("regardless of the degree of American government involvement in the conduct of a foreign sovereign, the federal courts will not allow themselves to be placed in the position of putting their imprimatur on unconscionable conduct").

In *Extradition of Singh*, 170 F. Supp. 2d 982, 1038 (E.D. Cal. 2001), relator Kulvir Singh Barapind argued that the court should invoke the humanitarian

exception, on the basis that he would be tortured by local police if returned to India. The court dismissed Barapind's entreaties out of hand, determining that they are "not cognizable in the extradition proceeding." *Id.* at 1039.  Barapind was extradited to India in 2006, and unfortunately, his words proved prophetic: Indian police tortured him with electric shocks, beatings, and humiliation. **Ex. A** at 46:22-47:14).

Similarly, in *Sindona*, 619 F.2d at 174-75 the Second Circuit refused to consider humanitarian concerns raised by relator Michele Sindona, who argued that he would be assassinated if returned to Italy.  Sindona was extradited to in 1984. Two years later, he died of cyanide poisoning in Italian prison.[25]

In addition to these examples, Ian Brekke, the former Acting General Counsel of the Department of Homeland Security, has recently submitted a declaration reaffirming the threat against Mr. Ahn remains. He states, "Given what I know about the threat from North Korea and the fact that Spain has diplomatic relations with North Korea, I firmly believe that Mr. Ahn would be in significantly greater danger of violence by North Korea if he were to be extradited to Spain. Though I cannot speak for every country, I believe there is no place safer in the world for Mr. Ahn than the United States." **Ex. Y ¶** 4. He goes on to say,

> I am signing this declaration because I feel morally compelled to do so. When I joined DHS, I took an oath to defend the Constitution, just as Mr. Ahn did when he enlisted with the Marines. From what I have learned of Mr. Ahn's life from media reports, he appears to be someone who has remained faithful and committed to our Constitution, his morals, and the cause of freedom, despite tremendous personal cost. As an officer of the court and a former federal official, I feel a sense of injustice when the laws of our country, and the Constitution itself, are not available to protect our citizens from a terrorist regime—laws that

---

[25]  Wolfgang Saxon, *Michele Sindona, Jailed Italian Financier, Dies of Cyanide Poisoning at 65: At the Center of Scandals*, N.Y. TIMES (March 23, 1986), https://www.nytimes.com/1986/03/23/world/michele-sindona-jailed-italian-financier-dies-cyanide-poisoning-65-center.html

I saw employed to provide more favorable treatment to non-citizen convicted terrorists. For these reasons, I support Mr. Ahn and believe he should not be extradited to Spain.

*Id.* ¶ 5.

### 4. Courts In Other Countries Deny Extraditions on Humanitarian Grounds

The Government's refrain about the high stakes of diplomatic reciprocity is unconvincing given that Spanish Courts, for their part, do not have qualms about denying American extradition requests – yet despite this the bilateral relationship has survived.[26]  Indeed, many other countries allow courts to review evidence of human rights abuses when making extradition determinations. *See* John T. Parry, *Int'l Extradition, the Rule of Non-Inquiry, and the Problem of Sovereignty*, 90 Bos. Univ. L. Rev. 1973, 2009 (Oct. 2010) ("Canada, Germany, Ireland, the Netherlands, and the United Kingdom, allow inquiry in certain circumstances, such as when the extraditee's human rights are at risk."). Foreign courts have refused to extradite a relator when they anticipate conditions that violate their understanding of basic fairness or subject a relator to inhumane treatment. *See* John Quigley, The Rule of Non-Inquiry and Human Rights Treaties, 45 Cath. Univ. L. Rev. 1213, 1226-28 (1996).

The European Court of Human Rights, for example, has forbidden members of the European Convention from extraditing a party if "there are substantial grounds for believing he or she would be subjected to torture or to cruel, inhuman or degrading treatment." *Soering v. United Kingdom*, 161 Eur. Ct. H.R. (ser. A) at 91 (1989). Similarly, the Canadian Supreme Court has held that "in some circumstances the manner in which the foreign state will deal with the fugitive on surrender . . . may be such that it would violate the principles of fundamental justice

---

[26]  https://www.reuters.com/article/us-spain-venezuela-extradition-idUSKCN20M2NZ.

to surrender an accused." *Canada v. Schmidt*, [1987] 1 S.C.R. 500, 522 (Can.). The court explained that judicial intervention is appropriate in "cases of real substance." *Id.* at 523. While the court ultimately concluded that no human rights concerns warranted intervention in this case, it explained that intervention would be clearly appropriate in a case "where it was established that prosecution in the requesting country might involve the infliction of torture." *Id.* at 522. The court did not limit judicial intervention to instances of torture—rather it found that intervention may be warranted where the process in the requesting country "sufficiently shocks the conscience" so as to breach the "principles of fundamental justice." *Id.* There is no reason why the Court should not apply a similar standard here.

### B.     The Admitted Evidence Was Insufficient to Find Probable Cause.

Independently of the humanitarian exception, this Court must also find that the Reluctant Certification violates the Extradition Treaty because the admitted evidence of was insufficient to amount to probably cause. "Certification of extradition is lawful only when the requesting nation has demonstrated probable cause to believe the accused person is guilty of committing the charged crimes." *Barapind*, 400 F.3d at 747.  Under federal law, probable cause is a flexible standard:

> Articulating precisely what "reasonable suspicion" and "probable cause" mean is not possible. They are commonsense, nontechnical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. As such, the standards are not readily, or even usefully, reduced to a neat set of legal rules … They are instead fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed.

*Ornelas v. U.S.*, 517 U.S. 690, 695-96 (1996) (quotations and citations omitted).  A determination of probable cause, therefore, requires a flexible, case-specific approach that is "accordingly correlative to what must be proved."  *Brinegar v. U.S.*, 338 U.S. 160, 175 (1949).

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

There is no competent evidence tying Mr. Ahn to any criminal act apart from his mere presence at the embassy that day. Mere presence in proximity to "others independently suspected of criminal activity does not, without more, give rise to probable cause." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979); *see also U.S. v. Soyland*, 3 F.3d 1312, 1314 (9th Cir.1993) (mere presence in vehicle containing drugs does not support probable cause for drug possession); *Reis v. U.S. Marshal*, 192 F.Supp. 79, 82 (E.D. Pa. 1961) ("Probable cause means more than [the] opportunity to commit crime or presence in a particular place. ***It must be more than surmise or suspicion***") (emphasis added).  In addition to presence, probable cause also requires "additional circumstances from which it is reasonable to infer participation in the criminal enterprise." *U.S. v. Wilson*, 1990 WL 113112, at *1, (9th Cir. 1990). Such additional circumstances are absent here. Mr. Ahn is photographed entering the embassy with nothing but sunglasses in his hands. There is no Spanish witness or documentary evidence suggesting that Mr. Ahn restrained, harmed, or threatened anyone. There is no evidence of his extensive planning or organizing with others—in fact, just the opposite. The undisputed evidence shows that while *others* went to shop for weapons and *others* had been in Madrid for several days or weeks, Mr. Ahn flew in just that morning.

Mr. Ahn's situation is analogous that of the defendant in *U.S. v. Chadwick*, 532 F.2d 773 (1st Cir. 1976). Federal agents witnessed Chadwick meeting two other individuals at South Station in Boston, where he helped them load a foot locker full of marijuana into a rental car. *Id.* at 7786. The First Circuit held that *w*hile the agents may have observed Mr. Chadwick being present at the scene of a crime and acting in concert with others, probable cause to arrest him without a warrant was still lacking, because he could have just as easily been an innocent "friend or relative who knew nothing of the contents of the footlocker." *Id.* at 784. Similarly here, all the competent evidence shows is that Mr. Ahn entered the North

-53-

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

Korean embassy alongside Mr. Hong Chang and others. There is no evidence supporting probable cause that Mr. Ahn had a criminal state of mind when he did so – indeed, the explanatory evidence offered by the Ahn Declaration should lead the court to the opposite conclusion.

Thus, probable cause is generally lacking for all of the charges brought by Spain because there is no evidence that proves that Mr. Ahn did anything other than be present at the embassy while crimes were allegedly taking place. As to specific reasons why probable cause is lacking for the four charges upon which the magistrate judge certified extradition – we address each in turn below:

### 1.  Breaking and Entering

Article 202 of the Spanish Penal Code states that an individual is guilty of breaking and entering when they "enter into the dwelling of another or remain there against the will of the resident[.]" **Ex. O** at 87-88. The surveillance photos show a North Korean official opening the door and inviting Adrian Hong into the embassy. **Ex. P** at 55. Later, the rest of the group enters. **Ex. P** at 59. There is no indication that Mr. Ahn or anyone forced their way in. Moreover, Mr. Ahn's declaration explaining away the ambiguities on the matter obliterates probable case.

### 2.  Threats

Article 169 of the Spanish Penal Code states that an individual is guilty of threats when he "threaten[s] others with causing them, their family, or other persons with whom they are intimately related detriment entailing homicide, injuries, abortion, offences against liberty, torture and offences against moral integrity, sexual freedom, privacy, honour, property, and the social-economic order[.]" **Ex. O** at 87.  Spain's evidence for threats is derived entirely from the testimony of North Korean witnesses. Without this testimony, all that remains is the photographs of Mr. Hong Chang and others (not Mr. Ahn) purchasing fake guns and other tools. While one Spanish witness claims that she saw someone inside the embassy (again,

Manatt, Phelps & Phillips, LLP
Attorneys at Law
Los Angeles

not Mr. Ahn) brandishing a fake gun at a North Korean, another witness standing in the same place thought it was apparent that the people were "practising." **Ex. P** at 43. Absent more, the mere existence of these objects and ambiguous testimony of the Spanish witness is insufficient to support probable cause that Mr. Ahn made any kind of threat against the North Korean officials. *See Soyland*, 3 F.3d at 1314.

### 3.    Causing Injuries

Article 147 of the Spanish Criminal Code states that an individual is guilty of causing injuries when he "by any means or procedure, cause[s] another individual an injury that impairs his or her bodily, physical or mental integrity[.]" **Ex. O** at 86. Causing injury is punishable by imprisonment of six months to three years only when "the injury, to objectively heal, in addition to first aid, requires medical treatment and/or surgery." *Id.* Causing an injury for which no "medical treatment and/or surgery" is required is a separate offense, punishable by one to three months imprisonment only. *Id.*. Because the Extradition Treaty only permits extradition for offenses that are subject to a term of imprisonment exceeding one year, the crime of "causing injury" is only extraditable if the Court finds probable cause that an injury requiring medical treatment or surgery occurred. **Ex. N** at 3 (Art. II.B). "The simple vigilance or medical monitoring of the progress of the injury shall not be considered medical treatment." **Ex. O** at 86.

The record indicates that only two individuals suffered injuries that are corroborated by medical records, Mr. So and Ms. Cho. **Sealed Ex. Z**. These medical records obliterate probable cause rather than bolster it. Mr. So's hospital discharge report, written on February 25, 2019 (three days after the Madrid Incident) does not indicate that he received any treatment other than testing at the hospital, and does not recommend any further treatment other than prescription drugs and periodic follow-up by doctors. **Sealed Ex. Z**. A separate examination report compiled on March 15, 2019 states that Mr. So suffered only "basic injury"

-55-

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

with "[n]o aesthetic damage" which would "heal and/or stabilise" within ten days. *Id.* at 19. These records are clear evidence that Mr. So suffered either minor injuries or no injuries at all, not injuries that require "medical treatment and/or surgery" as defined in Article 147 of the Spanish Criminal Code.

As to Ms. Cho, while her medical records show she had a surgery on her leg, the date of the surgery is listed as March 14, 2019, which the notes reflect was "three weeks after the alleged assault." *Id*. at 5. Although the forensic practitioner informed Mr. So, who was accompanying Ms. Cho and interpreting for her, that they could bring whatever medical records they had reflecting treatment from the day of the Madrid Incident, no such contemporaneous records were submitted. *Id*. There is no telling what happened between February 22, 2019, and March 14, 2019 that might have caused Ms. Cho to need a leg surgery.

Thus, even if probable cause existed for Mr. Ahn or anyone else causing injury to Mr. So or Ms. Cho, the evidence was insufficient to show that the injury required medical treatment or surgery. Thus, the applicable crime in Spain would only carry a maximum sentence of three months, falling far short of the Treaty's requirement that extraditable offenses be punishable "by deprivation of liberty for a period of more than one year." **Ex. N** at 3 (Art. II.B).

### 4.    Illegal Restraint

Article 163 of the Spanish Criminal Code states that an individual is guilty of illegal restraint when he "lock[s] up or detains others, depriving them of their freedom[.]" **Ex. O** at 86-87.  There is no evidence that Mr. Ahn personally restrained anyone within the North Korean embassy against their will, or that he knowingly aided and abetted anyone else within the group that did. Moreover, to the extent that any of the North Korean witnesses were restrained, Mr. Ahn's testimony is explanatory evidence that obliterates on probable cause. **Ex. L** ¶ 12.

### C.    The Magistrate Judge Erred in Finding Dual Criminality

Article II of the Treaty contains a requirement of dual criminality.  (Dkt. 55-1 at 10) ("an offense shall be an extraditable offense if it is punishable under the laws in both Contracting Parties by depravation of liberty for a period of more than one year or by a more severe penalty").  Dual criminality requirements in extradition treaties are satisfied "only if the alleged criminal conduct is considered criminal under the laws of **both** the surrendering and requesting nations." *Clarey v. Gregg*, 138 F.3d 764, 765 (9th Cir. 1998) (emphasis added).  In practice, this requires two separate findings by the magistrate judge: (1) that the alleged acts would be crimes under U.S. law; and (2) that those crimes are "substantially analogous" to the crimes listed by the requesting nation.  *Tang Yee-Chun v. Immundi*, 686 F.Supp. 1004, 1010 (S.D.N.Y. 1987); *see also Clarey,* 138 F.3d at 766 ("when the laws of both the requesting and the requested party appear to be directed to the same basic evil . . . the statutes are substantially analogous, and can form the basis of dual criminality.")

When intent is an essential element of the applicable domestic crime, an magistrate judge must consider evidence regarding the relator's intent as part of its dual criminality analysis. *Manta v. Chertoff*, 518 F.3d 1134, 1142 (9th Cir. 2008) (discussing domestic fraud statute's requirement of "specific intent to defraud.") Therefore, if the evidence indicates that had the alleged conduct occurred, it would not be criminal under U.S. law due to lack of intent, the dual criminality requirement is not satisfied.

### 1.    The Dual Criminality Requirement Is Not Satisfied Because Mr. Ahn Believed His Actions Were Consensual

As discussed *supra*, Mr. Ahn believed his actions in Madrid were being carried out at the request of those in the embassy. **Ex. L** ¶ 8-9. Mr. Ahn's belief was consistent with the nature of his previous work assisting Mr. Hong Chang with

defections, all of which had involved voluntary participants who had asked for help. *Id.* at 6. Given that the news had just confirmed North Korea's brazen kidnapping of the former North Korean ambassador's daughter ***while she was in Italy***, it was not hard to imagine that North Korean officials in nearby Spain would want to go to great lengths to protect their families from similar retaliation.

Mr. Ahn's honest belief his actions were consensual negates the *mens rea* for the substantive U.S. crimes which would apply to the alleged conduct. *See, e.g., People v. Mayberry*, 15 Cal.3d 143, 155 (Cal. 1975) (conviction for kidnapping unavailable if defendant "entertains a reasonable and bona fide belief that [the victim] voluntarily consented to accompany him"); *U.S. v. Martinez-Hernandez*, 932 F.3d 1198, 1207 (9th Cir. 2019) (conviction for robbery requires "exercise of control over property ***without consent*** with the criminal intent to deprive the owner of the rights and benefits of ownership); *People v. Rivera*, 157 Cal. App. 3d 736, 742-43 (Cal. App. 1984) (reasonable belief that physical contact was consensual, even if mistake of fact, "negate[s] the element of intent" for assault); *Ocasio v. U.S. v. Wallace*, 136 S. Ct. 1423, 1429 (2016) (formation of criminal conspiracy requires "specific intent that the underlying crime be committed by some member of the conspiracy") (internal quotations omitted). Without being able to establish the requisite criminal intent under U.S. law, the government cannot satisfy dual criminality.

### 2. The Dual Criminality Requirement Is Also Not Satisfied Due to Mr. Ahn's Honest Belief that He Was Acting Under the Direction of the United States government.

Courts have recognized that an individual's honest belief that they are acting under the direction of a government authority may "[negate] the mens rea for the crime[.]" *U.S. v. Burrows*, 36 F.3d 875, 881 (9th Cir. 1994); *see also U.S. v. Smith*, 831 F.3d 1207, 1220 (9th Cir. 2016) (acknowledging that a defendant lacks

-58-

criminal intent when they act in reliance on "orders from superior officers whom they reasonably believed had authority to issue the orders."); *U.S. v. Juan*, 776 F.2d 256, 258 (11th Cir. 1985) (vacating conditional guilty plea on the basis that defendant had not been allowed to present evidence that "he had engaged in a relationship with government agencies the nature of which were such that his belief, [that he was cooperating with the U.S. government] at the time of the charged crime, was reasonable and genuine.")

Here, Mr. Ahn had reason to believe that the Madrid Incident was carried out with the authorization of the highest ranking official in the North Korean embassy on North Korean soil.  **Ex. L** ¶ 8.  Moreover, Mr. Ahn also had reason to believe that the **United States** government had worked in coordination with Mr. Hong Chang on major North Korean defection missions like this one.  This belief was based on Mr. Ahn's previous interactions with government officials while accompanying Mr. Hong Chang, and the intervention of the CIA in Kim Han-Sol's defection.  **Ex. L** at ¶ 7.  The magistrate judge has also cited to media reports suggesting that Ahn and others participating in the Madrid Incident were working in concert with the CIA.  **Ex. A** at 34 n.19.

Mr. Ahn is an ordinary American citizen who is not intimately familiar with the intricacies of international politics.  Having seen government officials speaking to Mr. Hong Chang with approval, and CIA agents suddenly appearing in a foreign country to assist with a sensitive defection, Mr. Ahn formed a genuine belief that Mr. Hong Chang was acting with the authority of the government, and that any work he did with Mr. Hong Chang was therefore on behalf of the United States.  He still had that belief on the day of the Madrid Incident – which outside observers have suggested was likely carried out under the auspices of the CIA.

For purposes of dual criminality, it is irrelevant whether the government has actual authority to ratify facially criminal conduct in a foreign jurisdiction: for

extradition, Mr. Ahn's conduct must be criminal in *both jurisdictions*, *Clarey*, 138 F.3d at 765, and the government would unquestionably have the authority to ratify conduct identical to the Madrid Incident on American soil.

> **D.     The Magistrate judge Erred in Finding that Ms. Cho's Coerced Testimony was Competent.**

Involuntary testimony is incompetent and cannot be introduced under the due process clause of the Fifth Amendment. *Ashcraft v. Tennessee*, 322 U.S. 143, 154-55 (1944).  Based on the same principle, the Ninth Circuit has held that "evidence that the government's evidence was obtained by torture or coercion" is admissible in extradition proceedings, because coerced testimony is incompetent and therefore cannot support probable cause.  *Santos*, 830 F.3d at 1003; *see also U.S. v. Lui Kin-Hong*, 110 F.3d 103, 121 (1st Cir. 1997) ("confession obtained by duress is inherently unreliable and would be given little weight even if the confession were authenticated").

While the *Santos* court was considering the admissibility of testimony obtained by torture, courts have identified other conditions in which testimony given under duress may be incompetent.  *See, e.g.*, *Crowe v. County of San Diego*, 608 F.3d 406, 431-32 (9th Cir. 2010) (finding Fifth Amendment violation for evidentiary use of confession obtained by "psychologically brutal" interrogation of minor that – while absent of physical violence – involved isolation, threats, and pressure by police officers); *U.S. v. Tingle*, 658 F.2d 1332, 1334-36 (9th Cir. 1981) (reversing conviction on basis that Defendant's confession was obtained by FBI agent who told her she would "not see her [two-year-old child] for a while" if she did not cooperate).

The magistrate judge correctly refused to admit the dozens of pages of false testimony from North Korean diplomats propounded by the government, on the basis that they were coerced and therefore incompetent – with one exception: the

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

court chose to admit the statement Ms. Cho provided to Spanish Police through Google Translate, shortly after she had left the embassy. **Ex. A** at 17:5-14. The Spanish police testified that they used Google Translate to communicate with Ms. Cho, and the translating feature indicated she was saying there were people inside the embassy eating people and children. **Ex. P** at 12. The magistrate judge distinguished Ms. Cho's hearsay statement to the police because Mr. So was not there to translate, and she was in a high state of anxiety. But even without Mr. So present to translate, the same reasons that the extradition court relied on to exclude the testimony of the other North Korean witnesses applied to the Google Translate statements of Ms. Cho. As Professor Lee testified, any North Korean stationed abroad is required to leave family members back home to be held hostage – and tortured and killed should the diplomat transgress against the regime. **Ex. B** at 56:24-58:18).  On this basis, Prof. Lee concluded that, as it pertained to an attempted defection, the North Korean witnesses were testifying "in a situation of a matter of a life and death" where "unstated state coercion . . . would have impelled every North Korean to tell falsehoods." **Ex. B** at 52:20-24.  In particular, Professor Lee noted as significant the use of exaggerated expressions such as "eating children", testifying that this was language that "appeared in North Korean textbooks" and was characteristic of decades-long indoctrination coming to the fore. **Ex. B** at 44:5-18.

The evidence indicates that Ms. Cho was still very much under the control of the North Korean regime when she made her statement.  While none of her superiors were physically present, that would not erase the "decades of inculcation and indoctrination" inflicted upon Ms. Cho, nor would it make her numb to the chilling reality that one wrong word could result in the death or torture of her loved ones held hostage in North Korea. **Ex. A** at 17, n.12. Under these extreme conditions, a statement need not be made in the presence of a North Korean

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1    government official to be considered coerced.

2          Moreover, the district courts faced with foreign language translations by

3    mobile applications, such as Google Translate, have held them to be unreliable

4    when "the translation's unreliability is clear on its face" and includes "nonsensical"

5    information. *See Novelty Textile, Inc. v. Windsor Fashion, Inc.,* No. CV 12–05602

6    DDP (MANx), 2013 WL 1164065 at *3 (C.D. Cal., Mar. 20, 2013) (refusing to rely

7    on a google translation of a website because it was clearly unreliable on its face in

8    that it provided information on "nonsensical positions"); *United States v. Cruz-*

9    *Zamora*, 318 F.Supp.3d 1264, 1270 (D. Kansas 2018) (finding Google Translate

10   unreliable as it produced several "literally but nonsensical" translations and "cannot

11   take context into account").

12         **E.      The Magistrate Judge Abused Its Discretion in Excluding Mr.**

13                 **Ahn's Declaration and Medical Records.**

14         The magistrate judge has "wide latitude in admitting" evidence from the

15   relator.  *Matter of Extradition of Mainero*, 990 F.Supp. 1208, 1219 (S.D. Cal. 1997)

16   (citing *Extradition of Kraiselburd*, 786 F.2d 1395, 1399 (9th Cir.1986)).  In

17   particular, the Court may consider "explanatory evidence" from the relator which

18   "explains away or completely obliterates probable cause." *Santos*, 830 F.3d at 992

19   (9th Cir. 2016).  This means that the relator cannot offer evidence regarding alibis,

20   contradictory facts, or affirmative defenses. *Id.* at 993. On the other hand, evidence

21   that is not inconsistent with the facts as put forth by the government's evidence but

22   instead puts them in a light that "explains away or completely obliterates probable

23   cause" is freely admissible.  *Id.* at 992. The relator may also "testify to things which

24   might have explained ambiguities or doubtful elements in the government's case."

25   *Id*. at 993 (quotations and citation omitted).

26         The magistrate judge deemed Mr. Ahn's declaration to be "contradictory"

27   with the government's evidence and therefore inadmissible. **Ex. A** at 9:18.  But Mr.

28

Ahn's declaration does not actually contradict any of the competent evidence. Rather, Mr. Ahn's declaration simply explains that he entered the embassy in order to assist a voluntary defection, and that certain of the North Koreans inside had consented to a staged kidnapping in order to prevent detection by the authorities.

In other words, Mr. Ahn's declaration does not challenge the government's *facts*, but only the ***inferences*** drawn from those facts. *See also In re Extradition of Berri*, 2008 WL 4239170, at *3 (E.D.N.Y. Sept. 11, 2008) (evidence is admissible in an extradition hearing if it seeks "to cast a different light on the proof submitted in support of the extradition request by offering a compelling alternative view of the evidence"). Mr. Ahn's declaration provides supplemental, non-contradictory facts that would allow the court to draw a different inference than the one promoted by the Government: that the entire incident was consensual and staged, and therefore could not give rise to probable cause for any crime alleged by Spain. This is exactly the sort of explanatory evidence that should be admitted under the *Santos* standard as "oblitera[ting] probable cause." 830 F.3d at 992.

The magistrate judge cites to two cases where a witness statement or declaration was not admitted on the basis that it required a credibility determination. **Ex. A** at 8:23-9:6. Unlike here, these cases involved testimony that directly contradicted government evidence. *See Barapind*, 400 F.3d at 749-50 (more recent affidavit from government witness that recanted previous testimony); *In re Extradition of Luna-Ruiz*, No. CV 13-5059 VAP (AJW)., 2014 WL 1089134, at *14 (C.D. Cal. Mar. 19, 2014) (declarations contending that police interviews submitted as evidence by the government had never happened). Neither the affidavit in *Barapind* nor the declarations in *Luna-Ruiz* could co-exist on the record with the government's evidence without the court being forced to discredit one or the other. That is not the case for Mr. Ahn's declaration.

The magistrate judge also holds that Mr. Ahn's declaration inherently

requires a credibility determination because it is explanatory "only to the extent [it is] true." **Ex. A** at 8:20-23.  But the could be said for all explanatory evidence—in *Santos*, the court could only consider evidence of torture to the extent that evidence was true. *Santos*, 830 F.3d at 1003 ("Reliable evidence that the government's evidence was obtained by torture or coercion, however, goes to the competence of the government's evidence").

Mr. Ahn's medical records are similarly explanatory, and therefore admissible.  Nobody disputes that Mr. Ahn had a broken hand when entered the embassy – his hand brace is clearly visible in the surveillance footage provided by Spain. **Ex. O** at 49-50, and the government has offered no evidence demonstrating that Mr. Ahn personally engaged in conduct that would be impossible for a man with a broken hand.  The medical records simply provides additional detail regarding this undisputed injury, further supporting (1) the inference that Mr. Ahn was likely not expecting a violent encounter when he entered the embassy; and (2) the inference that no genuine violence took place, as subsequent examinations of Mr. Ahn's hand showed continued healing less than two weeks after the Madrid Incident. **Ex. M**.  These records contradict nothing, and should have been admitted.

## F. The Extradition Court Erred in Denying Discovery of *Brady* Materials.

On August 27, 2019, Mr. Ahn's counsel sent correspondence to the Government requesting disclosure of exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Demjanjuk v. Petrovsky*, 10 F.3d 338, 373 (6th Cir. 1993) (Dkt. 151-3 at 5-8). The letter requested categories of documents, each of which pertained to one of three issues: (1) whether probable cause to support extradition exists; (2) whether the alleged conduct fails to satisfy the "dual criminality" requirement of the extradition treaty due to lack of *mens rea*; (3) the nature of the specific North Korean threats to Mr. Ahn's safety, which would

support application of the humanitarian exception. The requested categories, sorted by issue, are as follows:

**Probable Cause**

**Category No. 1**: Any statements relating to Christopher Ahn made by Adrian Hong, or any other current or former members of [Free Joseon][27].

**Category No. 10**: Any intercepted communications among North Korean officials relating to the Madrid Incident, including without limitation those that reflect the fact that it was not a forceful incursion or that the North Korean witnesses should alter their testimony.

**Dual Criminality**

**Category No. 2**: Any confidential informant files of any government agency relating to Adrian Hong, or any other current or former member of [Free Joseon].

**Category No. 3**: Any material relating to any government official or agency coordinating, communicating, or working in concert with [Free Joseon].

**Category No. 4**: Any material reflecting statements made by any government official or agency commenting on the activities of Adrian Hong, [Free Joseon].

**Category No. 5**: Any material relating to the knowledge, ratification, approval, or participation of any government official or agency, including without limitation the Federal Bureau of Investigation and the Cenral Intelligence Agency, of any activity of Christopher Ahn, Adrian Hong, [Free Joseon], relating to Han Sol Kim, the nephew of Jong Un Kim.

**Category No. 6**: Any material relating to the knowledge, ratification, approval, or participation of any government official or agency, including without limitation the Federal Bureau of Investigation and the Central Intelligence Agency, of any activity of Christopher Ahn, Adrian Hong, [Free Joseon], relating to the defection of Song Gil Jo, the former acting North Korean Ambassador to Italy.

**Category No. 7**: Any material relating to the knowledge, ratification, approval, or participation of any government official or agency, including without limitation the Federal Bureau of Investigation and

---

[27]    For purposes of these requests, the term "Free Joseon" referred to Free Joseon, Cheollima Civil Defense, Joseon Institute, or Pegasus Strategies LLC, including any predecessor or successor organization.

the Central Intelligence Agency, of any activity of Christopher Ahn, Adrian Hong, [Free Joseon] relating to the Madrid Incident.

**Category No. 8**: Any communications between any government official or agency and any official, agency, or representative of North Korea regarding the Madrid Incident.

**Humanitarian Exception**

**Category No. 9**: Any materials documenting threats against Christopher Ahn's safety by any official, agency, or representative of North Korea.

*Brady*, 373 U.S at 87, confers upon the Government a constitutional duty to produce all "evidence favorable to [the] accused . . . irrespective of the good faith or bad faith of the prosecution." The Ninth Circuit has not directly addressed whether *Brady* applies to extradition proceedings, but the Sixth Circuit has done so. In *Demjanjuk*, the Sixth Circuit ruled that the Government's Brady obligations applied to "extradition cases where the government seeks . . . extradition based on proof of alleged criminal activities[.]" 10 F.3d at 373. Demjanjuk was a U.S. citizen who was denaturalized and extradited to Israel on the basis that he was actually "Ivan the Terrible of Treblinka," an infamous Nazi war criminal. *Id.* at 340. After his extradition, Demjanjuk was acquitted by the Israeli Supreme Court because he was in fact not Ivan the Terrible. *Id.* at 342. Later, it was revealed that the U.S. Government had known about the mistaken identity, but had concealed evidence and extradited Demjanjuk regardless.

While the Ninth Circuit has never directly adopted the holding of *Demjanjuk*, it has discussed the case with approval on at least two occasions. In *Wang v. Reno*, 81 F.3d 808, 821 (9th Cir. 1996), the Ninth Circuit cited to the withholding of *Brady* evidence in *Demjanjuk* as an example of prosecutorial misconduct that violates due process. In *Prasoprat*, 421 F.3d at 1015, the Ninth Circuit refused to compel discovery, but in doing so made a point of distinguishing *Demjanjuk*, noting that the requested evidence in that case dealt with probable cause, an issue that was

1   "within the scope of the magistrate judge's authority to examine."

2         If the Ninth Circuit intended to entirely foreclose *Brady* discovery in

3   extradition proceedings, it had a clear opportunity to do so – yet it did not. Despite

4   this, Magistrate Judge Rosenbluth refused discovery on nine of the ten categories

5   on the basis that she was "bound" by *Merino v. U.S. Marshal*, 326 F.2d 5, 13(9th

6   Cir. 1963)—a case predating both *Demjanjuk* and *Prasporat* which dealt with,

7   among other things, a U.S. Commissioner's ruling that denied a relator the

8   opportunity to depositions of witnesses based in Mexico. *Id.* at 13. (Dkt. 165 at

9   6:25-7:3). *Merino* did not address the question of whether the government must

10  produce exculpatory evidence in extradition proceedings—instead, the court

11  affirmed the Commissioner's decision on the basis that foreign witnesses in

12  extradition proceedings could only be questioned through the letters rogatory

13  process outlined in 28 U.S.C. § 1781. *Id.* Having already made its decision, the

14  court concludes with a short paragraph stating that the laundry list of Supreme

15  Court cases cited to by the relator in his briefing were not applicable.[28] Nowhere in

16  this paragraph – which is clearly dicta – did the Ninth Circuit engage in any

17  analysis of Brady itself or its applicability in the context of the Government's

18  obligation to produce exculpatory evidence in an extradition proceeding.

19        The exculpatory evidence requested by Mr. Ahn here is narrowly tailored.

20  The requests relating to probable cause seek information from Mr. Hong Chang—

21  who spoke to the FBI immediately following the Madrid Incident – or any other

22  information in the Government's possession that would demonstrate that the

23  Madrid Incident was not a forceful incursion but a voluntary defection attempt. The

24  requests relating to dual criminality seeks information relating to Mr. Ahn's

25  genuine belief that he was acting with the approval of the Government. *See* **Ex. A** at

26  24, fn.19 ("I recognize that the government may have information concerning Ahn

---

27  [28]     Aside from *Brady*, 373 U.S. at 83, the relator in *Merino* also relied upon
28  *Elkins v. U.S.*, 364 U.S. 206 (1960), and *Jencks v. U.S.*, 353 U.S. 657 (1957).

that it doesn't wish to share with him or even the Court. For instance, some of the newspaper accounts cited to the Court quoted sources saying that he was or has been a CIA agent (although the Court does not see how, if true, that would weigh in favor of extraditing him)"). And if documents were produced in response to the request regarding specific North Korean threats, that would provide powerful support for application of the humanitarian exception.

The extradition court has the inherent power to order such discovery procedures as law and justice require." *Oen Yin-Choy*, 858 F.2d at 1407. *Merino*'s fifty-nine-year-old dicta did not foreclose the extradition court—and should not foreclose this Court—from exercising its inherent power here. As discussed *supra*, the consequences of extradition for Mr. Ahn grave, and would certainly "exceed those of most criminal convictions." *See Demjanjuk*, 10 F.3d at 354. To extradite him under these circumstances is an injustice in and of itself. But that injustice would be even further magnified if the Government was given carte blanche to consign him to mortal danger while concealing exculpatory evidence.

## VII.   CONCLUSION

Separation of powers often requires the Judiciary to act with caution in the context of extradition. What it does not require is unconditional deference to an Executive that knows that Mr. Ahn will likely be kidnapped, tortured, and killed by North Korea, and yet for whatever reason – whether it be foreign policy, plausible deniability, or sheer inertia –"decides to transfer him anyway." *Munaf*, 553 U.S. at 706. The fact that the Executive chooses to "blind[s] itself to the foreseeable and probable results" of extradition. *Ahmad*, 726 F.Supp. at 410, does not require the Judiciary to do the same. We implore the Court to employ its "indispensable mechanism for monitoring the separation of powers," *Boumediene*, 553 U.S. at 765, and stop the injustice that puts Mr. Ahn's life at risk for no good reason. For the above reasons, the Court should grant Mr. Ahn's Petition.

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1

2     DATED:  July 8, 2022                    Naeun Rim
                                              MANATT, PHELPS & PHILLIPS, LLP
3

4                                             By: _____/s/ Naeun Rim_____

5                                                        Naeun Rim
                                              Attorneys for Petitioner
6                                             Christopher Philip Ahn

7

8     DATED:  July 8, 2022                    Ekwan E. Rhow
                                              Christopher J. Lee
9                                             Bird, Marella, Boxer, Wolpert, Nessim,
                                              Drooks, Lincenberg & Rhow, P.C.
10

11                                            By: _____/s/ Christopher J. Lee_____

12                                                      Christopher J. Lee
                                              Attorneys for Petitioner
13                                            Christopher Philip Ahn

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28