E. MARTIN ESTRADA
United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
JOHN J. LULEJIAN (Cal. Bar No. 186783)
Assistant United States Attorney
 1200 United States Courthouse
 312 North Spring Street
 Los Angeles, California 90012
 Telephone: (213) 894-0721
 Facsimile: (213) 894-0141
 E-mail: John.Lulejian@usdoj.gov

Attorneys for
UNITED STATES OF AMERICA
Acting on Behalf of Respondent
DAVID M. SINGER, U.S. Marshal

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER PHILIP AHN, | No. 2:22-cv-04320-FLA |
| Petitioner, | UNITED STATES' OPPOSITION TO PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS BY PERSON IN FEDERAL CUSTODY; MEMORANDUM OF POINTS AND AUTHORITIES |
| v. | |
| DAVID M. SINGER, U.S. Marshal, | |
| Respondent. | (OVERLENGTH BRIEF PERMITTED BY ORDER DATED 07/01/2022) |

The United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney John J. Lulejian, hereby submits its Opposition to petitioner CHRISTOPHER PHILIP AHN's ("AHN") Petition for Writ of Habeas Corpus by Person in Federal Custody (Docket No. 1).  This opposition is based on the attached Memorandum of Points and Authorities, and the records and files of this case.

For the reasons set forth in detail below, the United States respectfully requests the Court deny AHN's petition.

Dated: September 29, 2022          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division


/s/ John J. Lulejian
JOHN J. LULEJIAN
Assistant United States Attorney

Attorneys for
UNITED STATES OF AMERICA
Acting on Behalf of Respondent
DAVID M. SINGER, U.S. Marshal

1

**TABLE OF CONTENTS**

2

DESCRIPTION                                                           PAGE

3

4      TABLE OF AUTHORITIES..................................................ii

5      MEMORANDUM OF POINTS AND AUTHORITIES..................................1

6      I.    INTRODUCTION....................................................1

7      II.   BACKGROUND.....................................................4

8            A.    Statutory Background.....................................4

9            B.    Factual Background.......................................6

10           C.    Procedural History.....................................12

11     III.  ARGUMENT......................................................15

12           A.    Standard of Review.....................................15

13           B.    The Extradition Court's Probable-Cause Finding More
                   Than Meets the Habeas Standard of Review...............17

14
15                 1.    Spain's Evidence Amply Supports the Extradition
                         Court's Finding of Probable Cause................17

16                 2.    Ms. Cho's Testimony Constitutes Competent
17                       Evidence.........................................29

18           C.    The Crimes for Which AHN's Extradition Is Sought Are
                   Extraditable...........................................33

19                 1.    The Relevant Crimes Are Covered Under the Treaty....33

20                 2.    None of AHN's Defenses to Dual Criminality Have
                         Any Merit........................................35

21
22           D.    The Extradition Court Properly Excluded AHN's
                   Contradictory Evidence.................................40

23           E.    The Extradition Court Properly Ruled on AHN's Requests
24                 for Discovery..........................................43

25           F.    The Court Should Not Be the First to Violate the Rule
                   of Non-Inquiry by Applying a Purported "Humanitarian
26                 Exception."............................................49

27     IV.   CONCLUSION....................................................60

28

i

1

**TABLE OF AUTHORITIES**

2   <u>DESCRIPTION</u>                                                        <u>PAGE</u>

3   <u>FEDERAL CASES</u>

4   <u>Ahmad v. Wigen</u>,

5      910 F.2d 1063 (2d Cir. 1990) ................................. 54

6   <u>Anderson v. City of Bessemer City, N.C.</u>,

7      470 U.S. 564 (1985) ......................................... 16

8   <u>Arias Leiva v. Warden</u>,

9      928 F.3d 1281 (11th Cir. 2019) .......................... <u>passim</u>

10  <u>Barapind v. Enomoto</u>,

11     400 F.3d 744 (9th Cir. 2005) (en banc) ............... 40, 41, 52

12  <u>Barapind v. Enomoto</u>,

13     360 F.3d 1061 (9th Cir. 2004) ............................... 52

14  <u>Basic v. Steck</u>,

15     819 F.3d 897 (6th Cir. 2016) ................................ 19

16  <u>Blaxland v. Commonwealth Dir. of Pub. Prosecutions</u>,

17     323 F.3d 1198 (9th Cir. 2003) ............................... 55

18  <u>Bozilov v. Seifert</u>,

19     983 F.2d 140 (9th Cir. 1992) ................................ 38

20  <u>Brady v. Maryland</u>,

21     373 U.S. 83 (1963) ................................... 3, 46, 47

22  <u>Brown v. Clark</u>,

23     No. 08-cv-5567, 2011 WL 2261536

24     (C.D. Cal. Feb. 7, 2011) .................................... 32

25  <u>Caplan v. Vokes</u>,

26     649 F.2d 1336 (9th Cir. 1981) ............................... 46

27  <u>Charlton v. Kelly</u>,

28     229 U.S. 447 (1913) ..................................... <u>passim</u>

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

Clarey v. Gregg,
  138 F.3d 764 (9th Cir. 1998) ................................. 34

Collins v. Loisel,
  259 U.S. 309 (1922) ................................. 5, 34, 40

Collins v. Loisel,
  262 U.S. 426 (1923) ......................................... 4

Cucuzzella v. Keliikoa,
  638 F.2d 105 (9th Cir. 1981), ........................... 34, 35

Demjanjuk v. Petrovsky,
  10 F.3d 338 (6th Cir. 1993) ..................... 47, 48, 49

Dep't of Navy v. Egan,
  484 U.S. 518 (1988) ........................................ 55

Dixon v. United States,
  548 U.S. 1 (2006) ......................................... 39

Eain v. Wilkes,
  641 F.2d 504 (7th Cir. 1981) ............................... 41

Emami v. U.S. Dist. Ct.,
  834 F.2d 1444 (9th Cir. 1987) .......................... 19, 44

Escobedo v. United States,
  623 F.2d 1098 (5th Cir. 1980) ............................. 52

Factor v. Laubenheimer,
  290 U.S. 276 (1933) ..................................... 4, 35

Fernandez v. Phillips,
  268 U.S. 311 (1925) ....................................... 16

Gallina v. Fraser,
  278 F.2d 77 (2d Cir. 1960) ................................ 53

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

Garcia v. Thomas,
  683 F.3d 952 (2012) (en banc) (per curiam) ............ 50, 53, 57

Garrett v. Madden,
  No. 2:18-cv-09282, 2020 WL 2229497
  (C.D. Cal. Mar. 3, 2020) ..................................... 31

Gill v. Imundi,
  747 F. Supp. 1028 (S.D.N.Y. 1990) ........................... 44

Glucksman v. Henkel,
  221 U.S. 508 (1911) ................................. 46, 51, 55

Grin v. Shine,
  187 U.S. 181 (1902) ..................................... 19, 35

Hilton v. Kerry,
  754 F.3d 79 (1st Cir. 2014) ................................. 54

Hooker v. Klein,
  573 F.2d 1360 (9th Cir. 1978) ............................... 41

Hoxha v. Levi,
  465 F.3d 554 (3d Cir. 2006) ............................. 41, 51

Jauregui v. City of Glendale,
  852 F.2d 1128 (9th Cir. 1988) ............................... 17

In re Extradition of Ahn,
  No. CV 19-5397-FLA (JPR), ___ F. Supp. 3d ____,
  2022 WL 1531749 (C.D. Cal. May 9, 2022) .................. passim

In re Extradition of Al-Nouri,
  No. MJ-20-08033-PHX-MTM, 2022 WL 993781
  (D. Ariz. Apr. 1, 2022) ..................................... 53

iv

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

In re Extradition of Ameen,

    378 F. Supp. 3d 902 (E.D. Cal. 2019) ...................... 46, 49

In re Extradition of Azizi,

    No. 5:14-xr-90282, 2015 WL 1299791

    (N.D. Cal. Mar. 20, 2015) .................................... 41

In re Extradition of Burt

    737 F.2d 1477 (7th Cir. 1984) ............................... 57

In re Extradition of Camelo-Grillo,

    No. 16-cv-9026, 2017 WL 2945715

    (C.D. Cal. July 10, 2017) ................................ 37, 39

In re Extradition of Drayer,

    190 F.3d 410 (6th Cir. 1999) ............................. 47, 48

In re Extradition of Fordham,

    281 F. Supp. 3d 789 (D. Alaska 2017) .................... 37, 39

In re Extradition of Gang-Choon Han,

    No. 11-cv-2059, 2012 WL 33201

    (C.D. Cal. Jan. 6, 2012) .................................... 31

In re Extradition of Handanovic,

    826 F. Supp. 2d 1237 (D. Or. 2011) .......................... 44

In re Extradition of Koskotas,

    127 F.R.D. 13 (D. Mass. 1989) ............................... 47

In re Extradition of Kraiselburd,

    786 F.2d 1395 (9th Cir. 1986) ............................... 44

In re Extradition of Mainero,

    990 F. Supp. 1208 (S.D. Cal. 1997) .......................... 32

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                PAGE

In re Extradition of Manrique,

  442 F. Supp. 3d 1172 (N.D. Cal. 2020) .......................... 5

In re Extradition of Marzook,

  924 F. Supp. 565 (S.D.N.Y. 1996) ............................. 55

In re Extradition of Powell,

  4 F. Supp. 2d 945 (S.D. Cal. 1998) ........................ 44, 45

In re Extradition of Singh,

  123 F.R.D. 108 (D.N.J. 1987) ................................. 47

In re Extradition of Singh,

  170 F. Supp. 2d 982 (E.D. Cal. 2001) ......................... 56

In re Extradition of Zhenly Ye Gon,

  613 F. Supp. 2d 92 (D.D.C. 2009) ............................. 43

In re Extradition of Zhenly Ye Gon,

  No. 08-596 (JMF), 2010 WL 169468

  (D.D.C. Jan. 8, 2010) ....................................... 48

In re Kaine,

  55 U.S. 103 (1852) ........................................... 6

In re Lincoln,

  228 F. 70 (E.D.N.Y. 1915) .................................... 52

In re Requested Extradition of Kirby,

  106 F.3d 855 (9th Cir. 1996) ................................. 5

In re Requested Extradition of Sindona,

  450 F. Supp. 672 (S.D.N.Y. 1978) ............................. 48

Kelly v. Griffin,

  241 U.S. 6 (1916) ........................................... 33

vi

<u>**TABLE OF AUTHORITIES (CONTINUED)**</u>

<u>DESCRIPTION</u>                                                                <u>PAGE</u>

<u>MacKenzie v. Cal. Att'y Gen.</u>,
  No. SACV 12-432 VBF (JC), 2016 WL 5334479
  (C.D. Cal. Apr. 11, 2016) ...................................... 46

<u>Mainero v. Gregg</u>,
  164 F.3d 1199 (9th Cir. 1999) ) ............................. 54

<u>Manta v. Chertoff</u>,
  518 F.3d 1134 (9th Cir. 2008) ......................... 5, 36, 39

<u>Martinez v. United States</u>,
  828 F.3d 451 (6th Cir. 2016) (en banc) ....................... 35

<u>McElvy v. Civiletti</u>,
  523 F. Supp. 42 (S.D. Fla. 1981) ............................. 34

<u>Merino v. United States Marshal</u>,
  326 F.2d 5 (9th Cir. 1963) ................................... 46

<u>Meza v. U.S. Atty. Gen.</u>,
  693 F.3d 1350 (11th Cir. 2012) ............................... 50

<u>Montemayor Seguy v. United States</u>,
  329 F. Supp. 2d 883 (S.D. Tex. 2004) ......................... 47

<u>Munaf v. Geren</u>,
  553 U.S. 674 (2008) .................................. 51, 56, 57

<u>Neely v. Henkel</u>,
  180 U.S. 109 (1901) ...................................... 46, 51

<u>Noeller v. Wojdylo</u>,
  922 F.3d 797 (7th Cir. 2019) ......................... 19, 32, 52

<u>Oen Yin-Choy v. Robinson</u>,
  858 F.2d 1400 (9th Cir. 1988) ............................. 43, 44

vii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

Peroff v. Hylton,
  542 F.2d 1247 (4th Cir. 1976) ................................. 57

Peryea v. United States,
  782 F. Supp. 937 (D. Vt. 1991) ................................ 44

Prasoprat v. Benov,
  294 F. Supp. 2d 1165 (C.D. Cal. 2003) ......................... 53

Prasoprat v. Benov,
  421 F.3d 1009 (9th Cir. 2005) ............................. passim

Quinn v. Robinson,
  783 F.2d 776 (9th Cir. 1986) .................... 41, 44, 45, 52

Sacirbey v. Guccione,
  No. 05 CV. 2949 BSJ FM, 2006 WL 2585561
  (S.D.N.Y. Sept. 7, 2006) ...................................... 47

Sainez v. Venables,
  588 F.3d 713 (9th Cir. 2009) .................................. 19

Sandhu v. Burke,
  No. 97-cv-4608, 2000 WL 191707
  (S.D.N.Y. Feb. 10, 2000) ...................................... 31

Santos v. Thomas,
  830 F.3d 987 (9th Cir. 2016) (en banc) ................... passim

Sindona v. Grant,
  619 F.2d 167 (2d Cir. 1980) .............................. 54, 56

Skaftouros v. United States,
  667 F.3d 144 (2d Cir. 2011) .............................. 16, 19

Spatola v. United States,
  741 F. Supp. 362 (E.D.N.Y. 1990) ............................. 56

viii

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                        <u>PAGE</u>

<u>United States v. Chemical Found.</u>,

  272 U.S. 1 (1926) .......................................... 57

<u>United States v. Doe</u>,

  705 F.3d 1134 (9th Cir. 2013) ................................ 39

<u>United States v. Fulcher</u>,

  250 F.3d 244 (4th Cir. 2001) ................................. 38

<u>United States v. Harkness</u>,

  No. EDCV 22-85-SVW (KK), 2022 WL 3928372

  (C.D. Cal. Aug. 31, 2022) ................................ <u>passim</u>

<u>United States v. Hinkson</u>,

  585 F.3d 1247 (9th Cir. 2009) (en banc) ...................... 16

<u>United States v. Jumah</u>,

  493 F.3d 868 (7th Cir. 2007) ................................. 39

<u>United States v. Kin-Hong</u>,

  110 F.3d 103 (1st Cir. 1997) ..................... 50, 55, 56, 60

<u>United States v. Knotek</u>,

  925 F.3d 1118 (9th Cir. 2019) ............................. 4, 33

<u>United States v. Lamott</u>,

  831 F.3d 1153 (9th Cir. 2016) ................................ 36

<u>United States v. Mack</u>,

  164 F.3d 467 (9th Cir. 1999) ................................. 38

<u>United States v. Moussaoui</u>,

  591 F.3d 263 (4th Cir. 2010) ................................. 47

<u>United States v. Risner</u>,

  No. 3:18-mj-765, 2019 WL 6118377

  (N.D. Tex. Nov. 18, 2019) .................................... 32

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                        PAGE

United States v. Theunick,
   651 F.3d 578 (6th Cir. 2011) ................................. 39

Venckiene v. United States,
   929 F.3d 843 (7th Cir. 2019) ................................. 56

Vo v. Benov,
   447 F.3d 1235 (9th Cir. 2006) ................................ 16

Walker v. Johnston,
   312 U.S. 275 (1941) .......................................... 16

Wang v. Reno,
   81 F.3d 808 (9th Cir. 1996) .................................. 49

Yoo v. United States,
   43 F.4th 64 (2d Cir. 2022) ................................... 16


STATE CASES

People v. Samuels,
   250 Cal. App. 2d 501 (1st. Dist. 1967) ...................... 37

People v. Sargent,
   970 P.2d 409 (Cal. 1999) ..................................... 36


FEDERAL STATUTES

18 U.S.C. § 970(a) ............................................... 58

18 U.S.C. § 3184 ...................................... 4, 6, 16, 50

18 U.S.C. § 3186 ......................................... 5, 50

28 U.S.C. § 2241 ................................................ 15

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                    PAGE

FEDERAL RULES

Fed. R. Evid. 1101(d)(3) ........................................  5

Fed. R. Crim. P. 1(a)(5)(A) .................................... 43

Fed. R. Crim. P. 5.1 ...........................................  5


FEDERAL REGULATIONS

22 C.F.R. § 95.3(b) ............................................ 60


STATE STATUTES

Cal. Penal Code § 242 ......................................... 36


FOREIGN STATUTES

C.P., art. 27 ............................................. 19, 25

C.P., art. 28 ............................................. 19, 20

C.P., art. 29 ............................................. 19, 20

C.P., art. 147 ........................................ 12, 26, 27

C.P., art. 163 ................................................ 28

C.P., art. 165 ............................................ 12, 28

C.P., art. 171 ................................................ 12

C.P., art. 202 ............................................ 21, 23

C.P., art. 203 ................................................ 21

C.P., art. 237 ................................................ 12

C.P., art. 241 ................................................ 12

C.P., art. 242 ................................................ 12

C.P., art. 570 bis. ........................................... 12

xi

1

**TABLE OF AUTHORITIES (CONTINUED)**

2

<u>DESCRIPTION</u>                                                    <u>PAGE</u>

3

<u>TREATY</u>

4   Treaty of Extradition Between the United States of America

5         and Spain, U.S.-Spain, May 29, 1970, 22 U.S.T. 737;

6         Supplementary Treaty Amending the Treaty of May 29, 1970,

7         U.S.-Spain, Jan. 25, 1975, 29 U.S.T. 2283; Second

8         Supplementary Extradition Treaty Between the United States

9         of America and the Kingdom of Spain, U.S.-Spain, Feb. 9,

10        1988, S. Treaty Doc. No. 102-24 (1992); Third Supplementary

11        Extradition Treaty Between the United States of America and

12        the Kingdom of Spain, U.S.-Spain, Mar. 12, 1996, S. Treaty

13        Doc. No. 105-15 (1997); and  Instrument as contemplated by

14        Article 3(2) of the Agreement on Extradition Between the

15        United States of America and the European Union signed

16        25 June 2003, as to the application of the Treaty on

17        Extradition Between the United States of America and

18        Spain signed 29 May 1970, and the Supplementary Treaties

19        on Extradition signed 25 January 1975, 9 February 1988 and

20        12 March 1996, U.S.-Spain, Dec. 17, 2004, S. Treaty Doc.

21        No. 109-14 (2006)........................................ <u>passim</u>

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3       This case arises out of the request by the Kingdom of Spain

4   ("Spain"), one of the longest-standing allies of the United States,

5   for the extradition of petitioner CHRISTOPHER PHILIP AHN ("AHN").

6   According to the Government of Spain, on February 22, 2019, AHN and

7   others attacked the Embassy of the Democratic People's Republic of

8   Korea in Madrid, Spain (the "Embassy"), breaking down doors, seizing

9   electronic items, physically assaulting and restraining diplomats,[1]

10  and holding them and their families hostage for approximately four-

11  and-a-half hours.  AHN fled immediately thereafter to the

12  United States.  Under international law, host countries have an

13  obligation to take all appropriate steps to prevent attacks on

14  diplomatic agents and to protect the premises of diplomatic missions

15  within their borders.[2]  Accordingly, Spain seeks AHN's extradition

16  pursuant to its extradition treaty with the United States (the

17  "Treaty")[3] so that it may prosecute him for his role in the attack on

18  the Embassy.

19

20       [1] Throughout this brief, the United States uses the terms
    "diplomats" or "victims" to include all members of the North Korean
21  mission, whether or not they were accredited by Spain and held
    diplomatic immunity, such as the Chargé d'affaires.

22       [2] See, e.g., Vienna Convention on Diplomatic Relations, art. 29,
    Apr. 24, 1964, 500 U.N.T.S. 95, 23 U.S.T. 3227; id. art. 22(2).
23

24       [3] Treaty of Extradition Between the United States of America and
    Spain, U.S.-Spain, May 29, 1970, 22 U.S.T. 737; Supplementary Treaty
25  Amending the Treaty of May 29, 1970, U.S.-Spain, Jan. 25, 1975, 29
    U.S.T. 2283; Second Supplementary Extradition Treaty Between the
26  United States of America and the Kingdom of Spain, U.S.-Spain, Feb.
    9, 1988, S. Treaty Doc. No. 102-24 (1992); Third Supplementary
27  Extradition Treaty Between the United States of America and the
    Kingdom of Spain, U.S.-Spain, Mar. 12, 1996, S. Treaty Doc. No. 105-
28  15 (1997); and  Instrument as contemplated by Article 3(2) of the
    *(footnote cont'd on next page)*

On May 9, 2022, U.S. Magistrate Judge Jean P. Rosenbluth (the "Extradition Court") issued an order certifying that AHN is extraditable to Spain on four of the offenses for which he is sought. In re Extradition of Ahn, No. CV 19-5397-FLA (JPR), ___ F. Supp. 3d ____, 2022 WL 1531749 (C.D. Cal. May 9, 2022). AHN now seeks to re-litigate a litany of claims that the Extradition Court already considered and rejected. As discussed herein, these claims have even less merit now, in a habeas proceeding, than they did when AHN originally raised them before the Extradition Court.

First, AHN contends that Spain's evidence, which includes eyewitness statements and images from video surveillance, fails to establish probable cause that he committed the crimes for which his extradition is sought. In so doing, he misconstrues the relevant evidence, disregards the Extradition Court's careful analysis, and ignores the deferential habeas standard of review applicable to the Extradition Court's probable-cause finding.

Second, without any support in the record and instead based purely on his own self-serving statements, AHN contends that the offenses for which he is sought are non-extraditable because he lacks the requisite intent. Even with proper support, this contention would fail. Adopting it would have required the Extradition Court to exceed its narrow role by impermissibly engaging in credibility

---

Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Treaty on Extradition Between the United States of America and Spain signed 29 May 1970, and the Supplementary Treaties on Extradition signed 25 January 1975, 9 February 1988 and 12 March 1996, U.S.-Spain, Dec. 17, 2004, S. Treaty Doc. No. 109-14 (2006) (collectively, the "Treaty"). (ER 55-1 at 1-10).

determinations and considering affirmative defenses to the alleged crimes.

Third, AHN contends that the Extradition Court improperly excluded certain evidence he sought to offer. Such evidence contradicted that provided by Spain and was therefore inadmissible. But even if it had been admissible, Supreme Court precedent makes clear that its exclusion from the proceedings would not entitle AHN to habeas relief.

Fourth, AHN contends that the Extradition Court improperly declined to compel the United States to disclose purported exculpatory evidence pursuant to Brady v. Maryland, 373 U.S. 83 (1963), despite the fact that extradition proceedings are not criminal proceedings, and courts including the Ninth Circuit have declined to extend Brady rights to fugitives pending extradition. And regardless, the Extradition Court ordered discovery on the core issue raised by AHN, and the United States complied with that order.

Fifth, AHN raises issues relating to the danger he might face if returned to Spain, which, although relevant considerations for the Secretary of State prior to extradition, have no bearing on this Court's review of his extraditability.

To be clear, the United States does not condone North Korea's human rights abuses. But contrary to AHN's claims, that is not the subject of the extradition request which is before the Court. AHN was part of group that planned and executed an invasion of an embassy on foreign soil, where diplomats, spouses, and even a child were living, and engaged in violent acts against those individuals. The nationality of the victims has no bearing on whether Spain submitted

3

a valid extradition request, much less is it relevant to deciding AHN's request for <u>habeas</u> relief.

Accordingly, AHN's claims are unavailing, and his <u>habeas</u> petition should be denied.

**II.   BACKGROUND**

**A.   Statutory Background**

Extradition is a means by which a fugitive such as AHN is returned to a foreign country, typically pursuant to a treaty, to face criminal charges or to serve a sentence of imprisonment.[4]   In the United States, it is primarily an executive function, with a "limited" role carved out for a judge pursuant to the federal extradition statute, 18 U.S.C. § 3184.  <u>See</u> <u>United States v. Knotek</u>, 925 F.3d 1118, 1124 (9th Cir. 2019) (citation omitted); <u>United States v. Harkness</u>, No. EDCV 22-85-SVW (KK), 2022 WL 3928372, *3 (C.D. Cal. Aug. 31, 2022).  That statute requires a judge to hold a hearing to consider the evidence of criminality presented by the foreign country and to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention."  18 U.S.C. § 3184.  If the judge finds that the evidence is sufficient as required under Section 3184, he or she "shall certify [his or her findings] . . . to the Secretary of State."  <u>Id.</u>

An extradition hearing is neither a criminal nor a civil proceeding, but rather entails "only a preliminary assessment of the merits of the foreign prosecution."  <u>In re Extradition of Manrique</u>,

---

[4] It is common to refer to a person for whom an international extradition request has been made as a "fugitive."  <u>See generally</u>, <u>e.g.</u>, <u>Factor v. Laubenheimer</u>, 290 U.S. 276 (1933); <u>Collins v. Loisel</u>, 262 U.S. 426 (1923); <u>Santos v. Thomas</u>, 830 F.3d 987 (9th Cir. 2016) (en banc).

4

442 F. Supp. 3d 1172, 1174 (N.D. Cal. 2020); see also Santos v. Thomas, 830 F.3d 987, 991 (9th Cir. 2016) (en banc) (extradition hearing is "akin to a grand jury investigation or a preliminary hearing under Federal Rule of Criminal Procedure 5.1"); In re Requested Extradition of Kirby, 106 F.3d 855, 857 n.1 (9th Cir. 1996) (extradition case is "neither a civil case nor a criminal case"); Fed. R. Evid. 1101(d)(3), Notes of Advisory Committee on [1972] Proposed Rules, Note to Subdivision (d) (West 1984) (extradition proceedings are "essentially administrative in character").  The extradition judge is neither required nor authorized to determine whether the evidence is sufficient to justify conviction, as that determination will be made by the foreign court that handles the case.  See Collins v. Loisel, 259 U.S. 309, 316 (1922); Santos, 830 F.3d at 991-92.  Rather, an extradition judge must certify an extradition when the following five requirements are met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which extradition is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge.  See Manta v. Chertoff, 518 F.3d 1134, 1140 (9th Cir. 2008); Harkness, 2022 WL 3928372, at *4.

If the judge certifies an extradition, the Secretary of State ultimately decides whether or not to surrender the fugitive to the foreign country.  18 U.S.C. § 3186; see also Prasoprat v. Benov, 421 F.3d 1009, 1012 (9th Cir. 2005).  While the judge's role is highly circumscribed, the Secretary, when making a decision on surrender, has the sole authority to take into account humanitarian

considerations and applicable statutes, treaties, or policies regarding appropriate treatment in the foreign country.  See, e.g., Prasoprat, 421 F.3d at 1016.  This is consistent with the long-held understanding that surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State" within the executive's powers to conduct foreign affairs.  See In re Kaine, 55 U.S. 103, 110 (1852).

An extradition judge's certification order pursuant to Section 3184 is not subject to direct appeal; however, as discussed further herein, "limited" collateral review is available by way of a petition for a writ of habeas corpus.  See Santos, 830 F.3d at 1001 (citations omitted).

### B.   Factual Background

According to the information provided by Spain, on February 22, 2019, ADRIAN HONG CHANG ("HONG CHANG") rang the door of the Embassy, claiming that he needed to see Yun Sok So, the Commercial Attaché. (ER 55-3 at 5, 15, 23, 77; 118-1 at 114-15.)[5]  While Song Jin Choe went into the chancery to get Mr. So, HONG CHANG opened the front door and allowed AHN and other men, two of whom were armed with pistols and one of whom was carrying a crowbar, into the Embassy.[6] (ER 55-3 at 5, 15, 23, 26, 35, 77-78; 118-1 at 115-22.)  The assailants ran into the Embassy and physically assaulted the

---

[5] "ER" refers to the Clerk's Record in United States v. Ahn, Case No. 2:19-cv-05397-FLA-JPR, the case before the Extradition Court, and "HR" refers to the Clerk's Record in the instant habeas case, Ahn v. Singer, Case No. 2:22-cv-04320-FLA; all such references are followed by the docket number and the applicable page.

[6] Witness Lynn Gayero Dayao, who was sitting across the street waiting for a bus, stated that she saw a person with a ponytail close to the Embassy door with a pistol.  (ER 118-1 at 77-78.)

diplomats (Mr. So, Mr. Choe, Hak Rim Ju, and Song Guk Jang), hitting and throwing them to the ground; restrained their hands and feet with cable ties, hinged handcuffs, and adhesive tape; covered their heads with cloth bags; and moved them to a meeting room inside the chancery.[7]  (Id. at 5-7, 15, 23, 26, 35.)  When two of the diplomats tried to resist, the assailants retaliated.[8]  (ER 55-3 at 7, 15-16, 23-24, 26-27, 35-36, 77-78; 118-1 at 123-27.)  The assailants guarded the diplomats and ordered them to keep silent, threatening to gag or move them to another room if they spoke with one another.  (ER 55-3 at 16, 24, 26, 36.)

After the assailants entered the chancery, HONG CHANG broke into the locked bedroom of Jang Ok Gyong (Mr. So's wife) and her minor son.[9]  (Id. at 7, 16, 29-30, 78-79.)  Even though HONG CHANG claimed that they were there to help them, he left Ms. Gyong and her son

---

[7] Ms. Dayao stated that she heard screams coming from inside the Embassy and saw a person on the ground with two or three others above the person.  (ER 118-1 at 77-78, 80-81.)  Another witness, Teofila Villarroel Orozco, who also was waiting for the bus, heard screams coming from inside the Embassy.  (Id. at 100-01.)  She said that she saw a man crouching low, next to a man in black who was standing, as well as three people grabbing a person lying on the floor.  (Id. at 102.)

[8] One of the assailants put a pistol near Mr. Jang's face in order to intimidate and threaten him.  (ER 55-3 at 35-36.)  Other assailants forced Mr. So into a bathroom and threatened him with iron bars and a firearm pointed at the back of his neck.  (Id. at 16.)  The assailants kept Mr. So in the bathroom for approximately 30 minutes before putting him in the same room as the other restrained diplomats.  (Id. at 7, 16, 78.)  On April 3, 2019, Mr. So identified AHN as one of the men who hit him.  (Id. at 21.)

[9] Ms. Gyong told Spanish authorities that she heard a loud noise coming from the hall, saw two men hitting and attempting to restrain Mr. Choe on the floor, and saw two or three men hitting Jang and holding his face firmly against the ground.  (ER 55-3 at 29-30.)  On April 25, 2019, Ms. Gyong positively identified HONG CHANG as the man who broke into her room.  (Id. at 33-34.)

1  guarded by the assailants, including one who showed her a pistol in

2  an effort to intimidate and threaten her.  (Id. at 7, 16, 30, 79.)

3  The assailants also refused her requests to see Mr. So.  (See id. at

4  30, 31.)

5      The assailants also tried to break into the locked room of Cho

6  Sun Hi (Mr. Jang's wife).[10]  (Id. at 7, 16-17, 39, 79.)  However,

7  after hearing loud noises and fighting between people, Ms. Cho

8  escaped from her room by jumping from the terrace outside of her

9  window to the ground, in the process, losing her balance, falling,

10  and hitting her head on a tile.  (Id. at 7-8, 17, 39, 79.)  Even

11  though she felt pain in her leg and was bleeding from her head, she

12  managed to escape to the public roadway, where she flagged down Oscar

13  Santiago Perales, a passing motorist.[11]  (Id. at 8, 39-40, 79; ER 118-

14  1 at 65.)  Mr. Perales helped her obtain emergency medical

15  treatment.[12]  (ER 55-3 at 8, 40; 118-1 at 65-66.)  Ms. Cho, through

16  Google Translate, told the police about the attack on the Embassy and

17  urged them to rescue the victims.[13]  (ER 55-3 at 8, 40, 79; 118-1 at

18  18-19, 48.)

19

20      [10] Although the United States referred to Cho Sun Hi as "Ms. Hi"
    in its prior filings, it will refer to her as "Ms. Cho," so as to be
21  consistent with the Extradition Court's certification order.

22      [11] Mr. Perales initially thought that Ms. Cho had survived a rape
    or assault because she was in great distress and her face was
23  completely covered in blood.  (ER 118-1 at 65.)  The police officers
    also observed that Ms. Cho's face was covered in blood.  (Id. at 66.)

24      [12] Mr. Perales observed that Ms. Cho had difficulty getting out
25  of his vehicle, that she was leaning to one side as she walked
    lopsidedly with some difficulty, and that she needed help from the
26  paramedics.  (ER 118-1 at 66.)  He also saw that her back was covered
    with remnants of grass, twigs, and soil.  (Id.)

27      [13] The medical personnel told the police that despite her injury
28  (a contused lacerated wound), Ms. Cho was more concerned about what
    *(footnote cont'd on next page)*

8

Believing what Ms. Cho told them, the police went to the Embassy and rang the intercom. (ER 55-3 at 8, 79; 118-1 at 21, 49, 129.) After a few minutes, HONG CHANG, masquerading as a North Korean diplomat, opened the door, assured the police that everything was fine, and demanded that the police report any issues involving North Korean citizens. (ER 55-3 at 8, 79; 118-1 at 21, 49, 129.)

Approximately one hour after holding Mr. So captive in the meeting room with the other diplomats, the assailants carried him to a room in the basement of the Embassy and threw him face down to the ground. (ER 55-3 at 9, 18, 80.) Later, the captors allowed him to sit in a chair and untied his hands and removed the bag over his head.[14] (Id.) Although the men, who claimed to be associated with a human rights organization, urged Mr. So to defect, he steadfastly refused. (Id. at 9-10, 18, 80.) Concerned about his wife and colleagues, Mr. So assured his captors that if they left, there would be no reprisals and they would be safe. (Id. at 18.) When the captors asked about Embassy vehicles, Mr. So, who was under guard and in the basement, agreed to let the captors take the vehicles. (Id. at 18-19.) The captors retied Mr. So's hands and covered his head with a black bag. (Id. at 9, 19, 80.)

After destroying furniture and pictures of political leaders, and stealing computers, hard drives, memory sticks, and a mobile telephone, the assailants fled in three Embassy vehicles and an Uber,

---

was happening inside the Embassy than her physical well-being. (ER 118-1 at 19.) Ultimately, Ms. Cho needed surgery to repair the damage she sustained to her leg during the escape. (ER 55-3 at 40; 112-1 at 11-23 (under seal).)

[14] Mr. So told Spanish authorities that his captors included HONG CHANG and another man who was wearing a balaclava and carrying a pistol. (ER 55-3 at 16.)

leaving the victims bound and restrained.[15]   (Id. at 9-10, 19-20, 25, 80-81; ER 118-1 at 130-32.)

Once their captors fled, Messrs. Choe, Jang, and Ju were able to remove the bags over their heads and some of their bonds.  (ER 55-3 at 25, 27, 36-37.)  As the diplomats were freeing themselves, three North Korean architecture students (Chol Hak Kim, Kwang Hyok Pae, and Myong Nam Jong) rang the intercom after learning that something had happened at the Embassy.  (Id. at 9, 44-45, 47-48, 82.)  After speaking with Mr. Choe, the students entered the Embassy by climbing the fence and through the open vehicle entrance.  (Id. at 9, 44-46, 82.)  Once inside, the students discovered Messrs. Choe, Ju, and Jang, handcuffed and injured with blood on some of their faces, and Ms. Gyong and her son, agitated and frightened.  (Id. at 44, 46, 48.) They also discovered Mr. So calling for help from the basement, his hands and feet bound with tape, a hood over his head, and injuries and blood on his face.[16]   (Id. at 31, 44, 46, 48.)  The diplomats (some of whom still were handcuffed), Ms. Gyong and her son, and the students left the Embassy, and met with the police officers and medical personnel.[17]   (Id. at 11, 31, 44, 46, 48, 82.)  Several of the diplomats told the responding police officers that people with South

---

[15] Spanish authorities later found the vehicles abandoned in Madrid.  (ER 55-3 at 11, 80.)

[16] Medical and hospital reports detail the injuries to Mr. So's face and hands as a result of the Embassy attack.  (ER 112-1 at 41-45 (under seal).)

[17] The Spanish police officers reported that a number of the victims were restrained with hinged handcuffs and cable ties, and observed injuries, including bruises, consistent with blows to the face and head.  (ER 118-1 at 25-26, 52.)  The Embassy security cameras showed Messrs. Choe and Ju in handcuffs as they left the chancery.  (Id. at 133-35.)

Korean accents had entered the Embassy with weapons, bound them, hit them, placed bags over their heads, and left in Embassy vehicles. (ER 118-1 at 25, 27.)

Following the attack, Spanish law enforcement entered the Embassy and took photographs of the items that the assailants left behind, including cable ties, a box of hinged handcuffs, a tactical flashlight, gloves, pliers, bolt cutter tools, balaclavas, knives, defense spray, imitation pistols, and a shoulder holster.[18]  (ER 55-3 at 59-65, 67, 69-74.)  The police also documented damage to internal doors in the Embassy.  (Id. at 66-68.)  In addition, Spanish authorities took formal statements from the diplomats, family members, and the architectural students.  (ER 55-3 at 15-42.)  During these interviews, Mr. So was present and served as interpreter.[19]

---

[18] Spanish law enforcement obtained the receipt reflecting purchases that HONG CHANG made at Shoke, a police supply store, less than six hours before the attack.  (ER 55-3 at 51.)  The purchased items include five fast-draw pistol holsters, four combat knives, six imitation pistols, a shoulder holster, four pairs of shooting glasses, five tactical flashlights, four elastic balaclavas, and five pairs of hinged handcuffs.  (Id.)  Shoke's security cameras show HONG CHANG at the store.  (Id. at 51-53.)

Spanish law enforcement also obtained receipts of purchases that other assailants made at the Ferreteria Delicas hardware store on the day of the attack, as well as on February 20, 2019.  (Id. at 53-54.)  The purchased items include two crowbars, nine pry bars, a pair of bolt cutters, pliers, six rolls of electrical tape, three rolls of double-sided tape, a cloth tape, and a telescopic ladder.  (Id.)  Ferreteria Delicas's security camera shows some of the assailants at the store.  (Id. at 54-56.)  Law enforcement discovered the telescopic ladder inside the trunk of the vehicle that the assailants drove to the Embassy.  (Id. at 57-58.)

[19] Contrary to AHN's suggestion otherwise and the Extradition Court's concerns, Mr. So's presence and assistance was simply "due to practical reasons, in light of the logical difficulties in finding interpreters of such a minority dialect as North Korean language," as Santiago Pedraz Gómez, Magistrate Judge of Spain's Central Examining Court No. 5, explained.  (ER 187-1 at 4.)  Further, "Mr. So was

*(footnote cont'd on next page)*

11

AHN fled immediately after committing the attack on the Embassy, evading police in either an official vehicle stolen from the Embassy or with HONG CHANG in an Uber, using a fraudulent account registered under one of HONG CHANG's aliases.  (ER 1 at ¶¶ 6(j)-(k); 55-3 at 9-10, 80-81.)

## C.   Procedural History

On April 12, 2019, Judge Jose de la Mata Amaya of the Central Court of Investigation No. 5, National High Court, in Madrid, Spain, issued a warrant for AHN's arrest on the following charges (1) illegal restraint, in violation of Spanish Penal Code ("C.P."), arts. 163 & 165; (2) breaking and entering, in violation of C.P., arts. 202 & 203; (3) causing injuries, in violation of C.P., art. 147; (4) threats, in violation of C.P., arts. 169 & 171; (5) robbery with violence and intimidation, in violation of C.P., arts. 237, 241, & 242; and (6) criminal organization in violation of C.P., art. 570 bis.  The same day, Spain submitted to the United States a request for AHN's provisional arrest with a view towards his extradition pursuant to the Treaty.  Also on April 12, 2019, in accordance with its obligations under the Treaty, the United States filed a complaint in this District seeking a warrant for AHN's arrest on the basis of Spain's request.  (ER 1.)  U.S. Magistrate Judge Jacqueline Chooljian issued the warrant, and AHN was arrested on April 18, 2022, in Los Angeles, California, when he arrived at the residence of HONG CHANG. (ER 6.)  Although the Court initially detained AHN pending extradition, it later released him on bond.  (ER 11, 58.)

---

perfectly fluent in Spanish and North Korean and was therefore in a position to make a proper translation of his compatriots' statements, which is not in contravention with any legal provision."  (Id.)

12

On May 21, 2019, Spain submitted its formal request for AHN's extradition.  (ER 55-1, 55-2, 55-3.)  On September 12, 2019, Spain provided additional information in support of its request.  (ER 112-1 (unredacted and under seal); 118-1 (redacted).)  Spain's supplemental information included medical reports for Ms. Cho and Mr. So documenting their injuries (ER 112-1 at 11-23, 41-45 (under seal); police and witness statements (ER 118-1 at 14-111); and surveillance photographs of Embassy attack and aftermath (id. at 113-60).  On March 18, 2021, Spain provided additional information to address claims raised by AHN in his brief in opposition to extradition.  (ER 187-1 at 3-6.)

The Extradition Court held AHN's extradition hearing on May 25, 2021, and the parties submitted post-hearing briefing.  (ER 201; 200, 202, 203.)  In addition to entertaining lengthy argument from both parties, the Extradition Court, over the United States' objections, allowed AHN to present a letter and testimony from Sung-Yoon Lee, a professor from Tufts University, who opined that the North Koreans who had provided statements in this case were inherently unreliable, given North Korea's history of mistreating its diplomats and the fact that Mr. So was present and served as the interpreter for the victims' interviews with Spanish authorities.[20]  (ER 231 at 36, 39-59.)  On cross-examination, Prof. Lee admitted that he had never met nor spoken with any of the North Korean diplomats or their family members.  (Id. at 47.)  He also acknowledged that while he was interested in the case, he did "not hav[e] particular specific

---

[20] However, when questioned about the presence of Mr. So at the interviews, Prof. Lee acknowledged that it was not unusual for someone from a diplomatic mission to be present, and even to serve as a translator, during questioning by foreign police.  (ER 231 at 49.)

knowledge of [it] . . . ." (Id. at 51.) In short, Prof. Lee admitted that he had no proof for his opinion, and that it was merely "speculation." (Id. at 54.) Moreover, he admitted that he had met HONG CHANG, admired him, and that their relationship was "relevant to his views on this case . . . ." (Id. at 52, 55.) Nonetheless, the Court overruled the United States' objections and admitted Prof. Lee's testimony and letter. Ahn, 2022 WL 1531749, at *4.

On May 9, 2022, the Extradition Court issued its order certifying AHN's extradition on the charges of illegal restraint, breaking and entering, causing injuries, and threats, finding that all five of the relevant requirements had been met for those charges.[21] See Ahn, 2022 WL 1531749, at *20. In so doing, the Extradition Court declined to admit a self-serving declaration by AHN providing his version of what happened on February 22, 2019, because it "is akin simply to a defense he would offer at any trial" and would require a "credibility determination," which falls outside the purview of an extradition judge. Id. at *3-4. Similarly, the Court declined to consider medical records provided by AHN for the purpose of demonstrating that he could not have engaged in the criminal conduct alleged by Spain due to a fractured hand. Id. at *4. In addition, although the Extradition Court admitted the initial statement Ms. Cho gave to police, it declined to consider any other statements by the North Korean witnesses, relying on Prof. Lee's testimony that statements by North Korean government witnesses in general are "'inherently unreliable.'" Id. at *4-7.

---

[21] The Extradition Court denied extradition on robbery and criminal organization based on its conclusion that probable cause as to those charges was lacking. See Ahn, 2022 WL 1531749, at *2, 10.

14

With respect to probable cause that AHN committed the four offenses, the Extradition Court determined that the evidence provided by Spain – including the surveillance footage from the Embassy; witnesses outside the Embassy who heard screams from within and saw three people tackling another on the ground; Spanish police and a bystander who encountered Ms. Cho after she fled; and Spanish police who were greeted by HONG CHANG when they went to investigate at the Embassy, saw the assailants speed away from the Embassy, and noted items taken from and left behind at the Embassy following the attack – "is enough."  Id. at 19-28.  The Court rejected all of AHN's claims to the contrary.  It also rejected AHN's claim that the Court should apply a "theoretical . . . 'humanitarian exception' that would allow [it] to refuse to certify extradition when extraordinary circumstances make extradition unjust," while discussing it at some length, based on "unequivocal language" from the Ninth Circuit.  Id. at 28-49.

On June 23, 2022, AHN filed the instant habeas petition pursuant to 28 U.S.C. § 2241 challenging the Extradition Court's certification.  He filed a memorandum in support thereof on July 7, 2022, and a revised memorandum on July 8, 2022 (HR 12, 14).

## III. ARGUMENT

### A.   Standard of Review

"A writ of habeas corpus cannot be used as a writ of error." Charlton v. Kelly, 229 U.S. 447, 456-57 (1913).  In order to obtain habeas relief, the petitioner must prove that he is being held in custody in violation of the Constitution or laws or treaties of the United States, "which, in [the extradition] context, will typically mean in violation of the federal extradition statute, 18 U.S.C. §

15

1    3184, or the applicable extradition treaty." <u>Yoo v. United States</u>,

2    43 F.4th 64, 71 (2d Cir. 2022) (quoting <u>Skaftouros v. United States</u>,

3    667 F.3d 144, 157 (2d Cir. 2011)).  With respect to "habeas review of

4    an extradition order," a district court is limited to considering

5    only "whether: (1) the extradition magistrate had jurisdiction over

6    the individual sought, (2) the treaty was in force and the accused's

7    alleged offense fell within the treaty's terms, and (3) there is 'any

8    competent evidence' supporting the probable cause determination of

9    the magistrate." <u>Santos</u>, 830 F.3d at 1001 (quotation omitted); <u>see</u>

10   <u>Fernandez v. Phillips</u>, 268 U.S. 311, 312 (1925).

11        "<u>Habeas corpus</u>, it is well known, is not a neutral proceeding in

12   which the petitioner and the State stand on an equal footing.

13   Rather, it is an asymmetrical enterprise in which [the petitioner]

14   seeks to overturn a presumptively valid judgment." <u>Skaftouros</u>, 667

15   F.3d at 158 (internal quotation marks and citations omitted); <u>see</u>

16   <u>also</u> <u>Fernandez</u>, 268 U.S. at 312.  Accordingly, the burden is on the

17   petitioner to demonstrate by a preponderance of evidence that he is

18   entitled to relief.  <u>See</u> <u>Walker v. Johnston</u>, 312 U.S. 275, 286

19   (1941); <u>Skaftouros</u>, 667 F.3d at 158.

20        The Court should review questions of law <u>de novo</u> and questions

21   of fact for clear error.[22]  <u>Vo v. Benov</u>, 447 F.3d 1235, 1240 (9th Cir.

22

23        [22] A finding is clearly erroneous only if it is illogical,
     implausible, or without support in inferences that may be drawn from
24   the record.  <u>United States v. Hinkson</u>, 585 F.3d 1247, 1262-63 (9th
     Cir. 2009) (en banc) ("we will affirm a district court's factual
25   finding unless that finding is illogical, implausible, or without
     support in inferences that may be drawn from the record") (footnotes
26   omitted).  "This standard plainly does not entitle a reviewing court
     to reverse the finding of the trier of fact simply because it is
27   convinced that it would have decided the case differently." <u>Anderson</u>
     <u>v. City of Bessemer City, N.C.</u>, 470 U.S. 564, 573 (1985).  Nor does
28   the standard allow a reviewing court to "ransack the record,
                                      <i>(footnote cont'd on next page)</i>
                                   16

1  2006).  It should review an extradition court's denial of a discovery

2  request for an abuse of discretion.  <u>Prasoprat</u>, 421 F.3d at 1014-16.

3  **B.   The Extradition Court's Probable-Cause Finding More Than**
   **Meets the <u>Habeas</u> Standard of Review.**

4

5  1.   <u>Spain's Evidence Amply Supports the Extradition</u>
       <u>Court's Finding of Probable Cause.</u>

6  The record before the Extradition Court contained ample evidence

7  supporting its finding that there was reasonable ground to believe

8  that AHN committed the offenses of breaking and entering, illegal

9  restraint, causing injuries, and threats.  To demonstrate probable

10  cause, the United States offered, and the Extradition Court admitted,

11  witness and police officer statements, one of the victim's

12  statements, photographs of the attack and its aftermath from the

13  Embassy's surveillance camera, medical and forensic reports of two of

14  the victims, purchase receipts for materials used in the attack, and

15  other documents.  Although AHN recognizes the deferential standard of

16  review afforded to the Extradition Court's determination of probable

17  cause, he fails to identify how it is not satisfied in this case.

18  Indeed, during the extradition proceeding, AHN himself admitted

19  that on February 22, 2019, he was part of the group that entered the

20  Embassy where he and others committed "facially criminal conduct in a

21  foreign jurisdiction."  (ER 175 at 32-33; 175-1 at 5, ¶ 12.)  AHN

22  further admitted that (i) he was specifically selected for the

23  mission because of his expertise in "high intensity situations";

24  (ii) certain members of his group carried weapons into the Embassy

25  and tied up its residents; and (iii) he and other members of the

26  group left the Embassy in vehicles belonging to the Embassy.  (ER

27

28  searching for mistakes."  <u>Jauregui v. City of Glendale</u>, 852 F.2d
    1128, 1132 (9th Cir. 1988).

17

175-1 at 4-6, ¶¶ 10-12, 16.)   AHN also did not contest the veracity of the eyewitness statements given by Spanish police officers of the physical injuries sustained by the North Korean diplomats and family members, and the supporting medical records documenting injuries suffered by two of the victims.  Nor did he contest the authenticity of the photographs of the crime scene evidencing the extensive damage to the Embassy, as well as the various types of weapons that were left behind by the group.

AHN's assertion that his purported "mere presence" at the crime scene is insufficient to establish his criminal culpability (HR 14 at 53-54) is misplaced.[23]  As an initial matter, it rests on the flawed suggestion that AHN was an innocent bystander.  AHN himself admitted that HONG CHANG specifically asked him to participate in the mission because of his specialized skillset.  (ER 175-1 at 4, ¶ 10.)  AHN then flew to Spain and invaded the Embassy with the other assailants, some of whom were carrying weapons.  Moreover, although the Extradition Court deemed the testimony inadmissible based on AHN's unfounded claims of coercion, Mr. So identified AHN as one of the persons who assaulted him.  (ER 55-3 at 21-22.)[24]

The Extradition Court properly relied on Spain's interpretation of its law as imputing criminal responsibility to AHN for any misconduct committed by those who invaded the Embassy with him.  Ahn, 2022 WL 1531749, at *7.  In particular, as the Government of Spain

---

[23] AHN's citation to U.S. case law regarding criminal liability is immaterial to the issue of whether there is probable cause that AHN committed violations of Spanish law.

[24] While AHN avoids any mention of what he personally did during the four-and-a-half hours that he was inside the Embassy, it strains credulity to believe that he would have flown all the way from the United States to Madrid simply to be a casual observer of events.

explained, AHN "could be criminally liable [in Spain] for the crimes charged either as the perpetrator or as an accomplice."  (ER 187-1 at 4.)  Pursuant to controlling Supreme Court and Ninth Circuit precedent, this Court should defer to Spain's interpretation of its own laws.[25]

Indeed, Article 27 of the Spanish Penal Code provides that "[t]hose criminally responsible for crimes and [misdemeanors] are the principals and their accessories."  (ER 55-3 at 91.)  Article 28 clarifies that a person is deemed a principal, even if he does not personally commit the offending act, if he "cooperates in the commission thereof by an act without which a crime could not have been committed."  (Id.)  And under Article 29, a person can also be held criminally responsible as an accessory if he "co-operate[s] in the perpetration of the criminal offence with prior or simultaneous deeds."  (ER 187 at 53.)

Here, under Article 27, AHN is criminally responsible for his own acts, including entering and remaining inside the Embassy against

---

[25] See, e.g., Grin, 187 U.S. at 190 ("It can hardly be expected of us that we should become conversant with the criminal laws of [the country seeking extradition]."); Sainez v. Venables, 588 F.3d 713, 717 (9th Cir. 2009) ("adhering to our established approach of giving credence to foreign proceedings") (internal quotation marks and citation omitted); Emami v. U.S. Dist. Ct., 834 F.2d 1444, 1449 (9th Cir. 1987) ("refrain[ing] from interpreting the requirements of German criminal procedure"); Noeller v. Wojdylo, 922 F.3d 797, 806 (7th Cir. 2019) ("United States courts hearing extradition requests have consistently expressed an unwillingness to interpret foreign law to invalidate arrest warrants."); Basic v. Steck, 819 F.3d 897, 901 (6th Cir. 2016) (stating that "[w]e will not second guess th[e] determination" by the Government of Bosnia that a "[d]irective to find and arrest" the fugitive constituted the "arrest warrant" required under the applicable extradition treaty); Skaftouros, 667 F.3d at 160 (stating that "the question of whether an arrest warrant is in technical compliance with the law of the demanding country is not to be decided by U.S. courts"); see also Harkness, 2022 WL 3928372, at *8 (citing additional authority).

the will of its residents, as well as his assault on Mr. So.  (See
e.g., ER 55-3 at 21-22.).  In addition, under Article 28, AHN is
liable as a principal for the acts of his co-conspirators.

But even if AHN were not deemed liable as a principal for the
acts of his co-conspirators, under Article 29, he could still be held
criminally responsible as an accessory.  As discussed above, all that
is required to be deemed an accessory is that the person "co-operate
in the perpetration of the criminal offense with prior or
simultaneous deeds."  (ER 187 at 53.)  In this case, AHN's
simultaneous deeds include entering, and then remaining, inside the
Embassy against the will of its residents, and fleeing in an Embassy
vehicle or an Uber.  (See generally ER 55-3.)  Accordingly, AHN may
be held criminally responsible for both his own acts and those of his
co-conspirators, and his "mere presence" defense fails.

Further, the evidence Spain submitted in support of extradition
demonstrates not just AHN's presence but also his intent to
participate in the Embassy attack.  For example, AHN's passport
photograph corresponding to a flight between New York to Madrid
extracted from passport control, establish that he arrived at Adolfo
Suarez-Madrid Barajas Airport on the morning of the Embassy attack.
(ER 55-3 at 84.)  Surveillance photographs from the Embassy show AHN
standing outside of the Embassy actively conducting surveillance of
the street moments before he and the other assailants entered front
door and ran onto the grounds of the diplomatic mission.  (ER 118-1
at 116-19; 202-1 at 5-9; 231 at 102:4-103:10.)  Further, in February
2019, HONG CHANG told the FBI that AHN was one of the individuals who
attacked the Embassy.  (ER 55-3 at 84-85.)  Moreover, AHN remained
inside the Embassy during the entire four-and-a-half-hour attack and

fled with the HONG CHANG and the other assailants in Embassy vehicles or an Uber.  (ER 1 at ¶¶ 6(j)-(k); 55-3 at 9-10; 118-1 at 77-78, 80-81, 100-02.)[26]

As discussed further below, the Extradition Court's finding of probable cause that AHN committed the four offenses for which his extradition has been certified more than satisfies the "any competent evidence" standard.

### a.  Breaking and Entering

As the Extradition Court properly found, Spain's evidence demonstrates probable cause to believe that AHN entered the Embassy, and remained there, against the will of its occupants in violation of C.P., art. 202 and 203.[27]  Ahn, 2022 WL 1531749, at *9.  This evidence

---

[26] In addition, evidence the Court excluded also demonstrates AHN's intent to participate in the Embassy attack, including Mr. So's identification of AHN as one of the persons who assaulted him.  (ER 55-3 at 21-22.)  Further, AHN himself has never denied participating in the attack, acknowledging that he traveled to Spain at HONG CHANG's request, and entered the Embassy with individuals he knew carried weapons, during which time diplomats were tied up and offered resistance.  (ER 175-1 at 3-5, ¶¶ 8, 11-12.)

[27] C.P., art. 202 provides that,

1.    Individuals who, not residing therein, enter the dwelling of another or remain there against the will of the resident, shall be sanctioned with a prison term of six months to two years.

2.    If the act is perpetrated with violence or intimidation, the sanction shall be a prison term of one to four years and a fine of six to twelve months.

(ER 55-3 at 88-89.)  Further, C.P., art. 203 provides that,

1.    Individuals who enter the seat of a public or private legal person, professional firm or office, a trading establishment or premises open to the public after opening hours against the will of the owner thereof shall be sanctioned with a prison term of six months to one year and a fine of six to ten months.

(Id. at 89.)

1   includes photographs taken from the Embassy's external security

2   camera, which show HONG CHANG entering the Embassy, and then

3   reappearing outside the Embassy door less than two minutes later, by

4   which point other assailants, including AHN, had begun to gather

5   there.[28]  (ER 118-1 at 114-15; 202-1 at 3-4; 231 at 101:18-102:3.)  As

6   the Extradition Court noted, at least one of the photographs appears

7   to "depict one of the members of the group holding his foot in the

8   door to keep it open after [HONG CHANG], masquerading as someone

9   else, was allowed in."  Ahn, 2022 WL 1531749, at *9 (citing ER 202-1

10  at 3, 5.)  In addition, the photographs show AHN and another

11  assailant conducting surveillance moments before AHN and the

12  assailants, some of whom were carrying black rucksacks, broached the

13  door and charged onto the Embassy grounds.  (ER 118-1 at 116-19; 202-

14  1 at 5-9; 231 at 102:4-103:10.)  Also, surveillance photographs show

15  the assailants racing across the Embassy grounds to the chancery.

16  (ER 118-1 at 123-24; 202-1 at 10-11; 231 at 103:11-104:2.)

17       The Extradition Court also noted that once AHN and the

18  assailants were inside the Embassy grounds, they physically attacked

19  the diplomats and restrained them.  See Ahn, 2022 WL 1531749, at *9.

20  To support of this finding, the Court identified photographic

21  evidence of such conduct (ER 118-1 at 125-27; 202-1 at 10-11; 231 at

22  105:21-106:11), as well the testimonies of two eyewitnesses, Lynn

23  Gayero Dayao and Teofila Villarroel Orozco, who saw people restrained

24

25  _____

26       [28] Although the Extradition Court did not admit them, the
    statements of the diplomats and residents of the Embassy are
    consistent with the photographs in that they describe how HONG CHANG
27  entered the Embassy under the false pretense that he wanted to meet
    with Mr. So, and that when Mr. Choe went to find Mr. So, HONG CHANG
28  used the opportunity to open the Embassy door and let in AHN and his
    co-conspirators.  (ER 55-3 at 15, 23.)

1    on the ground and an attacker displaying a gun.  (ER 118-1 at 74-83,

2    98-103; 231 at 104:3-105:17).  See Ahn, 2022 WL 1531749, at *9.

3        The Extradition Court further observed that HONG CHANG,

4    masquerading as a North Korean diplomat, greeted the police when they

5    came to investigate what has happening in the Embassy.  See id.  This

6    observation was based on photographic evidence and the statements of

7    two Spanish police officers (ER 118-1 at 16-28, 47-52, 128-29; 202-1

8    at 24; 231 at 108:7-109:6).  Based on this evidence, the Court

9    concluded that because HONG CHANG, "and not one of the embassy's

10   occupants, came to the door . . . the real North Koreans were

11   restrained or unwilling to tell the police that everything was okay

12   because [AHN] and the group had in fact entered without permission or

13   under false pretenses."  Ahn, 2022 WL 1531749, at *9.  As noted

14   above, the Court's factual findings are subject to clear-error

15   review.

16       AHN's claim that there is "no indication that [he] or anyone

17   else forced their way in" (HR 14 at 54) the Embassy is immaterial.

18   As a matter of law, neither C.P., art. 202 nor 203 requires force as

19   an element of the crime.  (ER 55-3 at 88-89.)  Instead, the evidence

20   simply must establish – as it does – that the assailants entered (or

21   remained in) the Embassy against the will of the persons residing

22   there.  (Id.)  Further, because the Extradition Court correctly

23   rejected AHN's self-serving affidavit, his claim that it obliterates

24   probable cause fails.

25           b.   Threats

26       As the Extradition Court properly found, Spain's evidence

27   demonstrates probable cause to believe that AHN committed threats, in

28

violation of C.P., art. 169.[29]  Contrary to AHN's claim (ER 14 at 54),
this includes evidence that is not derived entirely from North Korean
witnesses.[30]  See Ahn, 2022 WL 1531749, at *9.  As the Extradition
Court correctly noted, "at least one civilian witness saw one of the
embassy entrants wielding a gun at the occupants, and another saw a
person being held down on the ground."  Id.  Specifically, Ms. Dayao
told authorities that that she saw a person with a ponytail close to
the Embassy door with a pistol.  (ER 118-1 at 77-78; 231 at 104:9-
16.)  Ms. Orozco told authorities that she saw a man crouching low,
next to a man in black who was standing, as well as three people
grabbing a person lying on the floor.  (ER 118-1 at 102; 231 at
104:23-105:10.)  Both witnesses also told authorities that they heard

---

[29] C.P., art. 169 provides that,

Individuals who threaten others with causing them, their
family or other persons with whom he is intimately related
detriment entailing homicide, injuries, bodily harm,
abortion, offences against liberty, torture and offenses
against moral integrity, sexual freedom, privacy, honour,
property and the social-economic order, shall be
sanctioned:

1.  With a prison term of between one to five years,
if he has made the threat demanding a sum or imposing any
other condition, even though not unlawful, and the offender
has achieved what he intended.  Where he has not achieved
his ends, he will be sanctioned with a prison term of
between six months to three years.

2.  With a prison term of between six months and two
years, where the threat is not conditional.

(ER 55-3 at 88.)

[30] Mr. So told Spanish authorities that when he tried to resist
the assault, the assailants threatened him with iron bars and covered
his head with a bag.  (ER 55-3 at 15.)  Messrs. Choe, Ju, and Jang
described how the assailants threatened to gag them if they tried to
speak with one another.  (Id. at 24, 27, 36.)  In addition, Mr. Jang
told Spanish authorities that one of the assailants put a pistol near
his face in order to intimidate and threaten him.  (Id. at 35-36.)
Ms. Gyong stated that one of her guards displayed a pistol to
threaten and intimidate her.  (Id. at 31.)

1   screams coming from inside the Embassy.  (ER 118-1 at 80-81, 100-01;
2   231 at 104:18-20, 105:8-10.)

3        In addition to the eyewitness testimony, the Extradition Court
4   also noted that Spain submitted "receipts showing that [HONG CHANG]
5   and the others purchased replica guns and other tools of a force
6   break-in." Ahn, 2022 WL 1531749, at *9.  In addition, these receipts
7   reveal that purchases by HONG CHANG and the other assailants on the
8   day of the attack included five fast-draw pistol holsters, four
9   combat knives, six imitation pistols, a shoulder holster, four pairs
10  of shooting glasses, five tactical flashlights, four elastic
11  balaclavas, and five pairs of hinged handcuffs from a police supply
12  store and two crowbars, nine pry bars, a pair of bolt cutters,
13  pliers, six rolls of electrical tape, three rolls of double-sided
14  tape, a cloth tape, and a telescopic ladder.[31]  (ER 55-3 at 51, 53-54;
15  202-1 at 49-51; 231 at 112:11-113:19.)  Spain's physical evidence
16  also includes crime-scene photographs showing the handcuffs,
17  holsters, imitation pistols, and knives that the assailants left
18  behind.  (ER 55-3 at 61, 65, 69-70, 72, 74; 2; 202-1 at 38-47; 231 at
19  111:14-112:10.)

20       Notwithstanding the fact that the witness statements, receipts,
21  and photographs satisfy the "any" evidence standard necessary to
22  establish probable cause, AHN claims that there is no evidence that
23  he purchased or wielded weapons nor an eyewitness who positively
24  identified him as threatening anyone.  (HR 14 at 55.)  This claim
25  fails because, as detailed above, AHN at a minimum, is liable under
26  Spanish law as an accomplice.  See C.P., art. 27.

27  _____

28       [31] Spain also provided surveillance photographs of HONG CHANG and
     his accomplices purchasing these items.  (ER 55-3 at 52-56.)

1

### c.   Causing Injuries

2       As the Extradition Court properly found, Spain's evidence

3  demonstrates probable cause to believe that AHN caused injuries, in

4  violation of C.P., art. 147.[32]  _Ahn_, 2022 WL 1531749, at *9.  With

5  respect to Ms. Cho, the Extradition Court recognized that she

6  suffered a serious injury when she jumped from a terrace in fear of

7  her life after AHN and his co-conspirators entered the Embassy.  _Id._

8  The evidence submitted by Spain supports this finding.  The police

9  officers and the motorist who stopped to help Ms. Cho noted that she

10 was covered in blood and had difficulty walking.  (ER 118-1 at 18,

11 65.)  In fact, one of the police officers reported that when he

12 encountered Ms. Cho, she was suffering from a contused lacerated

13 wound.  (_Id._ at 19.)  Medical reports document the extent of Ms.

14 Cho's injuries and the surgery required to address her injuries.[33]

15

16      [32] C.P., art., 147 provides in relevant part that,

17      1.    Individuals who, via any means or procedure, cause
        another individual an injury that impairs his or her
18      bodily, physical, or mental integrity, shall be sanctioned,
        as perpetrators of a crime of causing injuries, with a
19      prison term of between three months to three years or a
        fine of between six to twelve months, where the injury, to
20      objectively heal, in addition to first aid, requires
        medical treatment and/or surgery.  The simple vigilance or
21      medical monitoring of the progress of the injury shall not
        be considered medical treatment.

22      2.    Whoever, by any means or procedure, causes an injury
        not included in the preceding paragraph, shall be punished
23      with a fine of one to three months.

24      3.    Whoever hits or causes minor bodily harm to another
        without causing injury, shall be punished with a fine of
25      one to two months.

26 (ER 55-3 at 87.)

27      [33] The Extradition Court correctly accepted the competent
   evidence regarding Ms. Cho's injuries offered by Spain, including the
28 real-time observations of the witnesses that Ms. Cho was suffering
                                        _(footnote cont'd on next page)_

26

(ER 112-1 at 11-23 (under seal).)  As such, Ms. Cho's injuries, resulting from the attack on the Embassy, satisfy the requirements of C.P., art. 147(1).

As the Extradition Court recognized, "those who entered the embassy could have expected that anyone present who was not 'in' on any staged kidnapping might have reacted as she did in an attempt to escape." Ahn, 2022 WL 1531749, at *9.  The Court's conclusion is supported by Ms. Cho's statements to the Spanish police officers that the Embassy had been attacked and that she injured herself trying to flee the Embassy.[34]  (ER 55-3 at 40; 118-1 at 18-19, 48.)  Thus, AHN's claim that he could not have foreseen her injuries is unavailing.

In addition, the Extradition Court properly found that Mr. So's injuries satisfied the requirements of C.P., arts. 147(2) and 147(3).[35]  Ahn, 2022 WL 1531749, at *9.  In doing so, the Extradition Court rejected AHN's claim, which he raises again in the instant petition, that he cannot be extradited because the facts do not support the imposition of a term of imprisonment exceeding one year, as authorized by the Treaty.  AHN's claim is misplaced because the Treaty permits extradition for offenses that carry a penalty of less than one-year imprisonment so long as there is at least one other offense that is punishable by more than one-year imprisonment.  See

---

from an injury.  See Santos, 830 F.3d at 1001 (quotation omitted).  AHN's baseless speculation, that something could have happened to Ms. Cho between the date of the attack and the date of her medical evaluation, neither undermines this evidence nor negates a finding of probable cause.

[34] Ms. Cho elaborated on her escape from the Embassy in a subsequent victim statement to Spanish authorities.  (ER 55-3 at 40.)

[35] Mr. So's statements that he was injured during the course of the attack are corroborated by, among other things, the medical reports.  (ER 112-1 at 41-48 (under seal).)

1   Treaty, art. II(D).[36]  In this case, AHN has been found extraditable

2   for three other offenses.  Thus, even disregarding the serious

3   injuries caused to Ms. Cho in violation of C.P., art. 147(1), AHN is

4   extraditable for the causing injuries offense.[37]

5                 *d.   Illegal Restraint*

6        Finally, as the Extradition Court properly found, Spain's

7   evidence supports a finding of probable cause to believe that AHN

8   illegally restrained persons inside of the Embassy, in violation of

9   C.P., arts. 163 & 165.[38]  In making this finding, the Extradition

10   Court did not admit AHN's self-serving declaration and instead noted

11   that that "several uncontested facts show probable cause to believe

12   that the group restrained the North Koreans."  _Ahn_, 2022 WL 1531749,

13   at *9.  For example, the evidence submitted by Spain includes

14   (i) images from the Embassy's security cameras showing individuals in

15   handcuffs (ER 118-1 at 133-36); (ii) statements from two Spanish

16   police officers who said that they saw persons exit the Embassy,

17   restrained by handcuffs and cable ties (_id._ at 25, 52); (iii) a

18

19      [36] Moreover, whether an offense is extraditable under the Treaty

20   is an entirely separate inquiry from whether there is probable cause
that AHN committed the offense.

21      [37] In addition to Ms. Cho and Mr. So, Spain's evidence reveals
that Mr. Jang also was injured during the Embassy attack and that he

22   required stitches.  (ER 55-3 at 36; 118-1 at 25-26, 52.)

23      [38] C.P., art. 163 provides, in relevant part, that "[i]ndividuals
who lock up or detain others, depriving them of their freedom, shall

24   be punished with a prison sentence of between four and six years."
(ER 55-3 at 87-88.)  Further, C.P., art. 165 provides that,

25        The upper grade of the sanctions outlined in the preceding
        articles shall be imposed in the corresponding cases if the

26        illegal restraint or kidnapping involved a simulation of
        public authority or function, or if the victim is a minor

27        or disabled or a public official in the exercise of his or
        functions.

28

(_Id._ at 88.)

witness who saw three people grabbing a person lying on the floor inside the Embassy (id. at 102); (iv) receipts from stores where AHN's co-conspirators purchased handcuffs (as well as other items in preparation for the attack) (ER 55-3 at 51, 53-54); and (v) crime-scene photographs showing cable ties, handcuffs, and other items that the assailants left at the Embassy (id. at 59-65, 67, 69-71).[39]

Although AHN asserts that there is no evidence that he personally restrained anyone, that assertion fails to defeat probable cause.  AHN conducted surveillance before the assailants entered the Embassy and remained present for nearly the entire time of the attack, entering when HONG CHANG opened the door and fleeing with HONG CHANG and the rest of the assailants in Embassy vehicles or an Uber.  By agreeing to participate in the attack, AHN is subject, at least, to accomplice liability under Spanish law.

2.   Ms. Cho's Testimony Constitutes Competent Evidence.

As detailed above, during the Embassy attack, after hearing loud noises and fighting between people, Ms. Cho escaped from her locked room by jumping from the terrace outside of her window to the ground, in the process of which she lost her balance, fell, and hit her head on a tile.  (ER 55-3 at 7-8, 17, 39, 79.)  With the help of a passing

---

[39] Although the Extradition Court did not consider the statements of the North Korean diplomats and family members, their accounts are consistent with them being restrained.  Messrs. Choe, Jang, Ju, and So each told authorities that the assailants bound them with cable ties and/or hinged handcuffs and held them captive in various rooms within the Embassy.  (ER 55-3 at 16, 19, 24, 26-27, 36.)  Ms. Gyong said that she saw two men hitting and attempting to restrain Mr. Choe on the floor, and two or three men hitting Mr. Jang and holding his face firmly against the ground.  (Id. at 29-30.)  She also said that one of the assailants who guarded her was armed with a pistol.  (Id. at 31.)  In addition, several North Korean students told authorities that they saw the Embassy employees restrained when they entered the Embassy.  (Id. at 44, 46, 48.)

1  motorist, she obtained medical treatment from paramedics, and through
2  Google Translate, told the police and paramedics about the attack on
3  the Embassy.  (ER 55-3 at 8, 40, 79; 118-1 at 18-19, 48.)  The
4  medical personnel related to the police that despite her serious
5  injury, Ms. Cho was primarily concerned with ensuring that those
6  still inside the Embassy were rescued.  (ER 118-1 at 19.)  The
7  Extradition Court properly admitted her testimony, concluding that it
8  was competent evidence given that it was "the equivalent to excited
9  utterances to the police."  Ahn, 2022 WL 1531749, at *6 & n.12.

10      AHN disagrees, claiming, in essence, that Ms. Cho (as well as
11 all of the North Korean victims) were incapable of providing any
12 competent testimony regarding the attack simply because they were, in
13 his view, "under the control of the North Korean regime."  HR 14 at
14 61.  In support of this argument, he offers no specific evidence
15 regarding the victims in this case.  Rather, he claims broadly that
16 North Korean stationed abroad generally have left family members
17 behind "to be held hostage" and have endured "decades-long
18 indoctrination."  Id.  This claim is not sufficient to demonstrate
19 that Ms. Cho's testimony was incompetent.

20      The Ninth Circuit in Santos v. Thomas recognized that statements
21 "obtained by coercion in violation of the principles in the Due
22 Process Clause of the Fifth Amendment . . . are not competent," but
23 this exclusion applies only when there is "reliable evidence" that
24 the statements at issue were obtained by coercion.  See 830 F.3d at
25 1003-04.  In Santos, the fugitive offered statements given to a
26 Mexican judge by two of his co-conspirators in which they recanted
27 prior statements incriminating the fugitive, claiming that they had
28 given those statements only after the police had tortured them and

made death threats against them and their family.  See id. at 997-98.
Based on those specific facts, the Court held that such evidence that
a statement was "obtained by coercion may be treated as 'explanatory'
evidence that is admissible in an extradition hearing."  Id. at 1008.

However, the Court cautioned that its holding was "limited,
and . . . should not be taken as a license to engage in mini-trials
on the question of coercion or torture."  Id. at 1007.  It explained
that an "[w]here an extradition court first considers evidence that a
statement was improperly obtained, but concludes that it is
impossible to determine the credibility of the allegations without
exceeding the scope of an extradition court's limited review, the
court has fulfilled its obligations . . . .  Probable cause is not
undermined, and the court must certify the extradition."  Id.  The
Court remanded the case for consideration of the fugitive's evidence
and clarified that its "decision does not foreclose a finding by the
extradition court that the allegations of coercion are unreliable or
insufficient to undermine probable cause or that [the fugitive] is,
in fact, extraditable."  Id. at 1009.

Here, AHN's speculation that Ms. Cho's testimony was coerced
based on general assumptions about North Korean diplomats falls well
short of the type of reliable evidence that might undermine probable
cause under Santos.[40]  To the contrary, after extensive investigation,

_____

[40] See, e.g., In re Extradition of Gang-Choon Han, No. 11-cv-
2059, 2012 WL 33201, at *1, at n.2 (C.D. Cal. Jan. 6, 2012) ("To the
extent the [fugitive] also seeks to offer an expert opinion regarding
factual issues, this opinion lacks foundation"); Sandhu v. Burke, No.
97-cv-4608, 2000 WL 191707, at *12 (S.D.N.Y. Feb. 10, 2000)
(rejecting fugitive's attempt to introduce testimony of witness who
had no personal knowledge of instant case, but who instead sought to
opine on Indian police corruption generally); cf., e.g., Garrett v.
Madden, No. 2:18-cv-09282, 2020 WL 2229497, at *20 (C.D. Cal. Mar. 3,
*(footnote cont'd on next page)*

31

AHN uncovered no specific evidence that any statements were coerced, and, following the Extradition Court's discovery order (ER 154), the FBI confirmed that it had found no information in its files indicating that the North Korean v were coerced.  (ER 159.)  As the Extradition Court noted (Ahn, 2022 WL 1531749, at *6 n.12), the fact that Ms. Cho gave her statements in a state of agitation, without any other North Koreans present, further supports its determination that her statement was not coerced.

Accordingly, this Court should reject AHN's claim that Ms. Cho's testimony is incompetent.  See, e.g., In re Extradition of Mainero, 990 F. Supp. 1208, 1226 (S.D. Cal. 1997) ("[B]efore we can indict evidence as tainted by the coercive effect of torture, satisfactory evidence must be presented.  Argument, inference and innuendo is all that has really been presented here."); see also, e.g., Noeller v. Wojdylo, 922 F.3d 797, 807 (7th Cir. 2019) (claim that witness was "subject to undue influence from other family members who are biased against him" was a credibility attack that has "no place in extradition hearings"); United States v. Risner, No. 3:18-mj-765, 2019 WL 6118377, at *20-21 (N.D. Tex. Nov. 18, 2019) (fugitive's argument that the victim's relative exerted undue influence fell "outside the scope of the Court's limited role in an extradition proceeding").  However, even if this Court were to disagree, as discussed above, significant other evidence supports the Extradition

2020) (an expert is not permitted to "supply case-specific facts about which he has no permissible knowledge") (internal quotation marks and citation omitted); Brown v. Clark, No. 08-cv-5567, 2011 WL 2261536, at *6 (C.D. Cal. Feb. 7, 2011)("Using the expert to introduce facts and then explain what those facts meant was improper.").  The same is also true for the testimony of the other North Korean witnesses, which the Extradition Court excluded.  The United States objected to this categorical exclusion of witness testimony.  (See generally ER 187 at 21-27.)

Court's probable-cause finding and more than satisfies the "any" evidence standard.

### C. The Crimes for Which AHN's Extradition Is Sought Are Extraditable.

#### 1. The Relevant Crimes Are Covered Under the Treaty.

Article II of the Treaty states that "[a]n offense shall be an extraditable offense if it is punishable under the laws in both [the United States and Spain] by deprivation of liberty for a period of more than one year or by a more severe penalty." See Treaty, art. II(A).  In other words, there must be dual criminality.  See, e.g., Knotek, 925 F.3d at 1128-29.  The Treaty further provides that "[e]xtradition shall also be granted for participation in any of these offenses . . . when such participation, attempt or conspiracy is subject, under the laws of both Parties, to a term of imprisonment exceeding one year."  Id., art. II(B).  In addition, "[i]f extradition has been granted for an extraditable offense, it shall also be granted for any other offense specified in the request even if the latter offense is punishable by less than one year's deprivation of liberty, provided that all other requirements for extradition are met."  Id., art. II(D).

A requesting country is not obliged to establish that its crimes are identical to ours.  See Kelly v. Griffin, 241 U.S. 6, 15 (1916).  The Supreme Court noted in Collins that dual criminality is not a technical concept involving a comparison of elements of the two countries' offenses:

> The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries.  It is

33

1    enough if the particular act charged is criminal in both
2    jurisdictions.

3    259 U.S. at 312; see also Clarey v. Gregg, 138 F.3d 764, 765 (9th
4    Cir. 1998) ("The primary focus of dual criminality has always been on
5    the conduct charged; the elements of the analogous offenses need not
6    be identical.").

7         Dual criminality is established if the conduct involved in the
8    foreign offense would be criminal under either United States federal
9    law, the law of the state in which the hearing is held, or the law of
10   a preponderance of the states.  See Cucuzzella v. Keliikoa, 638 F.2d
11   105, 107-08 (9th Cir. 1981).  For purposes of conducting such an
12   analysis, the alleged conduct must be "taken as true."  See, e.g.,
13   Arias Leiva v. Warden, 928 F.3d 1281, 1293-94 (11th Cir. 2019)
14   (citation omitted).

15        Here, Spain alleges that AHN was part of a group that invaded a
16   foreign government's embassy; assaulted, restrained, and threatened
17   diplomats and family members; seized electronic devices; and then
18   fled in Embassy vehicles or an Uber.  (See generally ER 55-3.)  Based
19   on such alleged misconduct, Spain seeks AHN's extradition so that he
20   can stand trial for offenses carrying a punishment of more than one-
21   year imprisonment. (Id. at 86-90.)  Such alleged misconduct, if it
22   was committed in the United States, plainly would be punishable under
23   federal and state laws carrying a maximum punishment of more than
24   one-year imprisonment.  (ER 119-2 at 2-3 (citing statutes).)

25        Even if there were any question, the Court should "approach
26   challenges to extradition with a view toward finding the offense
27   within the treaty," McElvy v. Civiletti, 523 F. Supp. 42, 48 (S.D.
28   Fla. 1981), "because extradition treaties should be interpreted with

1   a view to fulfil our just obligations to other powers."  <u>Grin v.</u>

2   <u>Shine</u>, 187 U.S. 181, 184 (1902).  Thus, to prevail on his dual

3   criminality challenge, AHN would have to demonstrate that the

4   offenses for which he is sought are unambiguously non-extraditable.

5   <u>See, e.g.</u>, <u>Factor v. Laubenheimer</u>, 290 U.S. 276, 293-94 (1933);

6   <u>Martinez v. United States</u>, 828 F.3d 451, 463 (6th Cir. 2016) (en

7   banc) (citing cases); <u>Cucuzzella</u>, 638 F.2d at 107 n.3 (noting the

8   principle that "treaties should be construed to enlarge the rights of

9   the parties").  He has failed to do so.

10          2.   <u>None of AHN's Defenses to Dual Criminality Have Any</u>

11               <u>Merit.</u>

12       AHN's only challenges to dual criminality rest on his claims

13  that he lacked sufficient <u>mens rea</u>.  They are meritless.  As an

14  initial matter, they lack any support in the record, as the

15  Extradition Court determined that AHN's declaration, which underpins

16  his <u>mens rea</u> arguments, is inadmissible contradictory evidence.  <u>Ahn</u>,

17  2022 WL 1531749, at *4.  But even with support, his claims would

18  still fail for the reasons set forth below.

19               a.   *AHN's Consent Defense Fails*

20       AHN's unsupported claim that the Embassy attack was a consensual

21  defection gone awry has no bearing on whether the charged offenses

22  are covered by the Treaty and is thus meritless.  As discussed above,

23  for purposes of assessing whether AHN's conduct would be punishable

24  under American law, the Court must accept Spain's allegations as

25  true.  <u>See Arias</u>, 928 F.3d at 1293.  Here, Spain alleges that the

26  attack on the Embassy was not consensual, but rather that AHN and his

27  co-conspirators entered the Embassy against the will of its

28  residents, assaulted, restrained, and threatened the diplomats and

1   their family members, and then only later urged Mr. So to defect,

2   though he refused to do so.  (See ER 55-3 at 8-9, 18, 80.)  AHN's

3   contradictory claim that Mr. So asked HONG CHANG to stage a

4   kidnapping must be reserved for the Spanish courts in connection with

5   a trial on the merits.

6       AHN attempts to circumvent the fact that his consent defense

7   falls outside the scope of an extradition hearing by incorrectly

8   claiming that it is relevant to his mens rea, which must be assessed

9   as part of the dual criminality analysis.  (ER 175 at 10, 30, 32).

10  This claim fails because, as the Ninth Circuit has held, to the

11  extent that the applicable federal or state statute has a specific

12  intent requirement, such intent may be inferred from the conduct

13  alleged by the requesting country.  Manta, 518 F.3d at 1142-43.

14  Neither the Ninth Circuit, nor any other circuit, has held that mens

15  rea is a backdoor by which a fugitive may introduce contradictory

16  evidence that is otherwise inadmissible.  See, e.g., Arias, 928 F.3d

17  at 1294 ("[W]hen assessing dual criminality, we look only at the

18  charges on paper; it is up to the courts of the requesting country to

19  adjudicate their merits.").

20      Further, AHN's conduct would be punishable in the United States

21  under statutes, such as battery (Cal. Penal Code § 242), that lack a

22  specific intent requirement.  See, e.g., United States v. Lamott, 831

23  F.3d 1153, 1157 (9th Cir. 2016) ("[B]attery is a general intent

24  crime."); People v. Sargent, 970 P.2d 409, 418 (Cal. 1999) (same).

25  It is well established that defenses to general intent crimes may not

26  be considered in an extradition proceeding.  See, e.g., Charlton, 229

27  U.S. at 462 (upholding certification where extradition court excluded

28  evidence of insanity); Santos, 830 F.3d at 993 ("evidence in defense"

1    should be excluded); Arias, 928 F.3d at 1294 ("the fact that defenses

2    may be available in the United States . . . does not defeat

3    extradition under the dual criminality principle") (internal

4    quotation marks and citation omitted); In re Extradition of Camelo-

5    Grillo, No. 16-cv-9026, 2017 WL 2945715, at *2 (C.D. Cal. July 10,

6    2017) ("The dual criminality requirement does not consider possible

7    affirmative defenses"); In re Extradition of Fordham, 281 F. Supp. 3d

8    789, 799 (D. Alaska 2017) ("It is settled that the dual criminality

9    requirement does not encompass possible affirmative defenses").[41]

10        Moreover, even if AHN's consent defense were somehow relevant to

11   dual criminality, it still would require a trial on the merits to

12   adjudicate and therefore remains outside the scope of an extradition

13   hearing.  See Santos, 830 F.3d at 1007.

14             b.   AHN'S Defense of Government Ratification Fails

15        AHN's claim that he had an honest belief that he was acting at

16   the direction of the U.S. government is similarly ill-founded.  It is

17   based entirely on his declaration, which was not admitted into

18   evidence.  Even if it were, in it, AHN does not swear to the fact

19   that his actions were at the direction of the U.S. government or

20   provide any corroborating evidence in that regard.  Instead, he

21   simply notes his belief that the United States may have authorized

22   prior defection missions.  (ER 175-1 at 3, ¶ 7.)  Nor does AHN's

23   declaration address what he believed the United States purportedly

24   authorized, assuming he believed the government authorized anything

25   at all in this particular case.  For example, he does not allege that

26

27        [41] Notably, under California law, "consent of the victim is not
     generally a defense to assault or battery, except in a situation
28   involving ordinary physical contact or blows incident to sports."
     People v. Samuels, 250 Cal. App. 2d 501, 513 (1st. Dist. 1967).

he believed the United States authorized assaulting, restraining, and threatening the Embassy residents, damaging the Embassy, and seizing property from the Embassy.

But even if AHN could demonstrate that he honestly believed that the United States had authorized all of the unlawful actions of which he is accused, that would not defeat dual criminality. "While an honest belief that a defendant is acting in cooperation with the government is a necessary element of establishing innocent intent, it is not alone sufficient." United States v. Fulcher, 250 F.3d 244, 252 (4th Cir. 2001). Rather, AHN would also have to show that "the government official or officials upon whose authority the defendant relied possessed actual authority to authorize his otherwise criminal acts." Id. at 253; see also, e.g., United States v. Mack, 164 F.3d 467, 474 (9th Cir. 1999) (court properly refused to instruct jury regarding public-authority defense to federal offenses that relied on authorization by local law enforcement). AHN has not even attempted to make such a showing here. Indeed, if a Spanish citizen traveled to the United States and attacked another country's embassy, the Spanish citizen could be prosecuted here regardless of whether he claimed that Spain had authorized the attack. Cf., e.g., Bozilov v. Seifert, 983 F.2d 140, 143 (9th Cir. 1992) (dual criminality satisfied when fugitive "could have been charged with [an offense] by the United States if the two countries' positions had been reversed").

Regardless, as discussed above, extradition courts examine only the conduct alleged by the requesting country – not the fugitive's alternative narrative in the form of an affirmative defense — in considering whether the alleged offenses would be punishable under

1    U.S. law.  See, e.g., Manta, 518 F.3d at 1142-43; Arias, 928 F.3d at

2    1293-94.  Accordingly, AHN's purported belief that the United States

3    sanctioned the Embassy attack has no bearing on the Court's limited

4    determination.  This fact is reinforced by the Ninth Circuit's

5    holding that a defendant's belief he was working with the government

6    is an affirmative defense rather than a challenge to the government's

7    case in chief.  See United States v. Doe, 705 F.3d 1134, 1146 (9th

8    Cir. 2013); see also United States v. Theunick, 651 F.3d 578, 590

9    (6th Cir. 2011) ("[D]efendant bears the burden of proving the

10   affirmative public authority defense."); United States v. Jumah, 493

11   F.3d 868, 873 (7th Cir. 2007) ("Because the public authority defense

12   is an affirmative defense based on excuse, we must conclude that

13   Congress intended the burden to rest on the defendant to prove the

14   defense . . . .").[42]  As discussed above, affirmative defenses fall

15   outside the scope of an extradition proceeding.  See, e.g., Santos,

16   830 F.3d at 992; Camelo-Grillo, 2017 WL 2945715, at *2; Fordham, 281

17   F. Supp. 3d at 789.

18        In any event, AHN's claim that he believed the U.S. government

19   ratified the attack on the Embassy cannot be adjudicated in the

20   context of this extradition proceeding, but rather would require a

21

22        [42] Specifically, in United States v. Doe, the Ninth Circuit held
     that "Doe's defense . . . that he believed he was working for the
23   FBI" was an affirmative defense that Doe had the burden to prove by a
     preponderance of the evidence.  705 F.3d at 1146.  In so holding, the
24   appellate court rejecting Doe's argument, similar to the one asserted
     by AHN, that his belief that the government had ratified his conduct
25   "negate[d] criminal intent" and was "therefore an element which must
     be disproved by the government beyond a reasonable doubt."  Id.  The
26   Ninth Circuit reasoned that Dixon v. United States, 548 U.S. 1
     (2006), had "changed the legal landscape" such that "crimes requiring
27   that a defendant act 'knowingly' simply require the government to
     prove knowledge of the facts constituting the offense."  Doe, 705
28   F.3d at 1146.

1  trial on the merits.  Accordingly, this Court should reject AHN's

2  unsupported claim that he cannot be extradited because the United

3  States government purportedly authorized his criminal conduct.

4      **D.    The Extradition Court Properly Excluded AHN's Contradictory**
          **Evidence.**

5

6      AHN's claim (HR 14 at 62-64) that the Extradition Court "abused

7  its discretion" in declining to consider certain evidence he offered

8  at his extradition hearing is entirely unavailing.  As the Supreme

9  Court has made clear, the "wrongful exclusion of specific pieces of

10  evidence, however important, does not render [a fugitive's] detention

11  illegal."  Collins, 259 U.S. at 316; see also Charlton, 229 U.S. at

12  456-57 ("Mere errors in the rejection of evidence are not subject to

13  review by a writ of habeas corpus.").  Indeed, the extent to which a

14  fugitive may offer evidence at an extradition hearing is within the

15  discretion of the judge.  See, e.g., Santos, 830 F.3d at 1007-08.

16  Therefore, AHN's claim does not present a cognizable basis for

17  granting habeas relief.

18      And in any event, the Extradition Court correctly concluded that

19  consideration of the excluded evidence would not alter its probable-

20  cause decision.  See Ahn, 2022 WL 1531749, at *4.  As the Extradition

21  Court correctly noted, it is well established that a fugitive may not

22  introduce evidence that contradicts the evidence submitted by the

23  requesting country "[b]ecause extradition courts do not weigh

24  conflicting evidence in making their probable cause determinations."

25  Barapind v. Enomoto, 400 F.3d 744, 749 (9th Cir. 2005) (en banc)

26  (internal quotation marks and citation omitted); see also, e.g.,

27  Charlton, 229 U.S. at 461-62 (upholding magistrate judge's decision

28  to exclude "witnesses produced to contradict the testimony for the

prosecution" because such an "objection . . . should be taken before or at the time of his trial for the crime, and heard by the court having jurisdiction of the crime"); <u>Santos</u>, 830 F.3d at 993 (a fugitive may not "produce witnesses whose testimony contradicts evidence already offered by the government").  In other words, the fugitive cannot offer evidence that would lead to an evidentiary dispute.  <u>See</u> <u>Hooker v. Klein</u>, 573 F.2d 1360, 1368 (9th Cir. 1978); <u>Santos</u>, 830 F.3d at 992; <u>Barapind</u>, 400 F.3d at 749-50.  That is necessarily so because the introduction of such evidence "would convert the extradition into a full-scale trial, which it is not to be."  <u>Eain v. Wilkes</u>, 641 F.2d 504, 511 (7th Cir. 1981); <u>see also</u> <u>Hooker</u>, 573 F.2d at 1368 (a person fighting extradition is "not permitted to introduce evidence on the issue of guilt or innocence"). A fugitive may therefore only introduce evidence explaining the evidence submitted in support of the extradition request.  <u>See</u> <u>Barapind</u>, 400 F.3d at 749.  Such evidence includes only "clear-cut proof" that negates probable cause.  <u>See, e.g.</u>, <u>Hoxha v. Levi</u>, 465 F.3d 554, 561 (3d Cir. 2006).  Hence, the extradition magistrate "does not weigh conflicting evidence and make factual determinations but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense."  <u>Quinn v. Robinson, 783 F.2d 776, 815 (9th Cir. 1986)</u>; <u>see also, e.g.</u>, <u>In re Extradition of Azizi</u>, No. 5:14-xr-90282, 2015 WL 1299791, at *3 (N.D. Cal. Mar. 20, 2015) ("Evidence that does not accept the requesting country's evidence as true [is] considered 'contradictory,' and not 'explanatory,' evidence.").[43]

---

[43] In any event, AHN's claim that the attack on the Embassy was actually a staged kidnaping (ER 175-1 at 3, ¶ 8) carries no indicia

*(footnote cont'd on next page)*

1   In this case, the Extradition Court properly concluded that the
2   narrative established by Spain's evidence, that AHN and others
3   conducted a criminal attack on the Embassy, was not implausible, and
4   that AHN's alternative narrative, that the events were only staged as
5   a cover for Embassy personnel's defection, was "contradictory" and
6   hence inadmissible.  <u>Ahn</u>, 2022 WL 1531749, at *3-4.  Indeed, the two
7   narratives cannot be fully reconciled and thus would require an
8   impermissible credibility determination.  For example, AHN's claim
9   that one of the diplomats left the door open so that he and the other
10  assailants could enter (ER 175-1 at 5, ¶ 12) is directly contrary to
11  the video camera surveillance images.  <u>See Ahn</u>, 2022 WL 1531749, at
12  *9; ER 202-1 at 3, 5.  His broad claim that someone within the
13  Embassy had requested AHN and the assailants' assistance in defecting
14  is contrary to the fact that Ms. Cho attempted to escape when they
15  arrived.  <u>See id.</u> at *3-4, 7.  Further, AHN's assertion that he and
16  the other assailants "went through the motions of tying people up"
17  and "took great pains to make the restraining look real without
18  actually hurting anyone" (ER 175-1 at 5, ¶ 12) is belied by the
19  police observations of Messrs. So and Jang's injuries and Mr. So's
20  medical records.  (ER 118-1 at 25-26; 112-1 at 41-45 (<u>under seal</u>).)

21

22  of reliability.  AHN's sole support for this claim is a conversation
23  that he purportedly had with HONG CHANG just hours before the attack.
    (<u>Id.</u>)  Moreover, even if someone inside the Embassy had agreed to
24  defect, that would not grant AHN and his co-conspirators license to
    restrain, assault, and threaten other members of the diplomatic
25  mission.  The fact that these victims were not aware of the purported
    mass defection plan that AHN alleges is evidenced by the fact that
26  Ms. Cho was so frightened by the attack that she jumped off the
    terrace to her detriment. (ER 55-3 at 7-8, 39-41.)  Thus, even if
27  this Court were to admit AHN's declaration, resolving his consent
    defense would require a trial on the merits, which is not properly
28  accomplished in these extradition proceedings.

42

1    In addition, the Extradition Court properly determined that

2  AHN's medical records indicating an injury to one of his hands, which

3  AHN offered in support of his claim that he did not hit anyone as

4  alleged by Spain, is by definition contradictory.  <u>Ahn</u>, 2022 WL

5  1531749, at *10-11.  Moreover, it is irrelevant because the Court

6  reached its probable-cause determinations without relying on Spain's

7  evidence of AHN hitting a victim and because, as the Court noted,

8  AHN's evidence did not demonstrate that he had no use of his hand,

9  and regardless he still had use of his other hand.  <u>Id.</u> at *11.

10  Accordingly, AHN's claims regarding the exclusion of certain evidence

11  do not provide any basis for <u>habeas</u> relief.

12        **E.    The Extradition Court Properly Ruled on AHN's Requests for**
13            **Discovery.**

14    As an extradition proceeding is not a criminal proceeding, a

15  fugitive has no right to discovery.  <u>See, e.g.</u>, <u>Charlton</u>, 229 U.S. at

16  462; <u>Oen Yin-Choy v. Robinson</u>, 858 F.2d 1400, 1407 (9th Cir. 1988);

17  <u>Merino v. United States Marshal</u>, 326 F.2d 5, 12-13 (9th Cir. 1963);

18  <u>In re Extradition of Zhenly Ye Gon</u>, 613 F. Supp. 2d 92, 101-02

19  (D.D.C. 2009) ("[I]t cannot be suggested that an American defendant

20  is entitled to discovery before a preliminary hearing or before the

21  presentation of evidence against him to a grand jury.  Yet, if a

22  defendant whose extradition is sought gets such discovery, he would

23  be accorded a right that is not available to him under American

24  law.") (internal footnote omitted).[44]

25  _____

26      [44] Because of the limited nature of extradition proceedings,
    there is typically no "discovery" other than the provision of the
    formal extradition request with supporting exhibits from the
27  requesting country.  Federal Rule of Criminal Procedure 1(a)(5)(A)
28  specifically exempts extradition proceedings from the criminal

*(footnote cont'd on next page)*

1    Rather, discovery in extradition proceedings should be "limited
2    and lies exclusively within the discretion of the [extradition]
3    magistrate."  In re Extradition of Kraiselburd, 786 F.2d 1395, 1399
4    (9th Cir. 1986).  The Ninth Circuit has noted that, "[i]n exercising
5    discretion, the magistrate should consider both the well-established
6    rule that extradition proceedings are not to be converted into a
7    dress rehearsal trial, . . . and whether the resolution of the
8    contested issue would be appreciably advanced by the requested
9    discovery."  Quinn, 783 F.2d at 817 n.41 (internal citations and
10   quotation marks omitted); see also In re Extradition of Handanovic,
11   826 F. Supp. 2d 1237, 1239 (D. Or. 2011) ("While the magistrate judge
12   possesses discretionary power to allow discovery in extradition
13   proceedings, this power is confined to discovery related to whether
14   probable cause exists that the fugitive committed an extraditable
15   offense.").  Furthermore, even though a fugitive "may offer what has
16   been called 'explanatory testimony,' the law 'nowhere requires a
17   magistrate to authorize compelled disclosure of sources of such
18   explanatory testimony.'"  Peryea v. United States, 782 F. Supp. 937,
19   939-40 (D. Vt. 1991) (citing Gill v. Imundi, 747 F. Supp. 1028, 1040
20   (S.D.N.Y. 1990)); see also, e.g., Emami v. U.S. Dist. Ct., 834 F.2d
21   1444, 1452 (9th Cir. 1987) (no abuse of discretion where extradition
22   court denied discovery sought to "explain" certain evidence, despite
23   fugitive's argument that "he was entitled to present evidence
24   explaining the charges against him"); In re Extradition of Powell, 4

25   _____

26   discovery rules, and there is no explicit statutory basis for
     ordering discovery in extradition proceedings, Oen Yin-Choy, 858 F.2d
27   at 1407.  There is also nothing in the Treaty that independently
     requires or authorizes general discovery, or that entitles AHN to
28   receive any evidence other than the documents that Spain is required
     to provide under the Treaty.

F. Supp. 2d 945, 960 (S.D. Cal. 1998) (denying request for discovery where fugitive argued only that such discovery "would assist her in explaining the elements in the case against her") (internal quotation marks omitted).  Given the foregoing, this Court reviews the Extradition Court's decision to deny discovery for an abuse of discretion.  <u>See, e.g.</u>, <u>Prasoprat</u>, 421 F.3d at 1014-16; <u>Quinn</u>, 783 F.2d at 817 n.41.

While recognizing this standard (HR 14 at 18), AHN improperly contends that the Extradition Court "erred" in denying the majority of his discovery requests.  Mere error would not entitle him to relief.  But regardless, the Extradition Court neither erred nor abused its discretion.[45]

As an initial matter, as discussed above, the Extradition Court granted discovery on AHN's theory of coercion, and the United States complied with that order.  Indeed, even without a discovery order, the United States Attorney's Office for the Central District of California represented that it was "not in possession of evidence that the North Korean witness statements included in Spain's extradition request are the product of coercion or that AHN believed he was acting as an authorized agent of the United States when he committed the criminal acts alleged by Spain in its request."

---

[45] AHN's argument focuses only the Extradition Court's exclusion of exculpatory materials, and the government likewise responds only to that argument herein.  As the government previously explained, and as the Extradition Court found, AHN's other requests relating to his intent and to his humanitarian claims do not advance any issue for judicial resolution and thus do not provide a proper basis for obtaining discovery.  <u>See</u> ER 153 at 4-7; ER 165 at 7:20-23 & 8:2-7 (AHN's dual criminality claim goes to an affirmative defense, which may not be considered in an extradition proceeding); <u>id.</u> at 23:6-13 (same); <u>id.</u> at 23:20-25 (denying discovery on discretionary issues to be resolved by the Secretary of State).

1    Furthermore, contrary to AHN's suggestion (HR 14 at 66-67), the
2    Ninth Circuit has unequivocally determined that the principles set
3    forth in Brady v. Maryland, 373 U.S. 83, "are not applicable to a
4    preliminary examination in an international extradition case."
5    Merino, 326 F.2d at 13; see also, e.g., In re Extradition of Ameen,
6    378 F. Supp. 3d 902, 910 (E.D. Cal. 2019) ("In [Merino], the Ninth
7    Circuit held that Brady is not applicable to international
8    extradition hearings . . . ."); MacKenzie v. Cal. Att'y Gen., No.
9    SACV 12-432 VBF (JC), 2016 WL 5334479, at *16 n.17 (C.D. Cal. Apr.
10   11, 2016) (citing Merino for proposition that "Brady does not apply
11   to international extradition cases").  The Ninth Circuit later
12   reinforced its decision in Merino by recognizing that a fugitive "has
13   no absolute right to introduce exculpatory evidence and the
14   government has no duty to do so." Caplan v. Vokes, 649 F.2d 1336,
15   1342 n.10 (9th Cir. 1981).[46]

16   The Ninth Circuit's refusal to extend Brady rights to fugitives
17   aligns with well-established Supreme Court precedent holding that
18   fugitives are not entitled to the constitutional protections afforded
19   to criminal defendants in domestic cases.  Glucksman v. Henkel, 221
20   U.S. 508, 512 (1911) (Holmes, J.) ("It is common in extradition cases
21   to attempt to bring to bear all the factitious niceties of a criminal
22   trial at common law.  But it is a waste of time."); see also, e.g.,
23   Neely v. Henkel, 180 U.S. 109, 122 (1901) ("Allusion is here made to
24   the provisions of the Federal Constitution relating to the writ of

25

26

27   [46] AHN incorrectly suggests (HR 14 at 67) that this Court need
     not follow Merino, without addressing Caplan whatsoever.  See Ameen,
     378 F. Supp. 3d at 910, 911 n.15 (noting that "courts have continued
28   to cite Merino" for the proposition that Brady does not apply to
     international extradition hearings).

habeas corpus, bills of attainder, ex post facto laws, trial by jury for crimes, and generally to the fundamental guaranties of life, liberty, and property embodied in that instrument.  The answer to this suggestion is that those provisions have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country.").  Moreover, Brady, by its terms, applies only in the context of criminal trials in which the defendant's guilt or innocence is being adjudicated.  See 373 U.S. at 1197; see also, e.g., United States v. Moussaoui, 591 F.3d 263, 285 (4th Cir. 2010) ("[t]he Brady right . . . is a trial right") (emphasis in original).  It thus does not apply in the context of an extradition proceeding, which does not involve a criminal trial.[47]

AHN's suggestion that the government should have been compelled to produce exculpatory material based on the Sixth Circuit's decision in Demjanjuk v. Petrovsky, 10 F.3d 338, 353 (6th Cir. 1993) – which was subsequently limited by In re Extradition of Drayer, 190 F.3d

---

[47] Other courts have also refused to extend Brady to extradition proceedings.  See, e.g., In re Extradition of Singh, 123 F.R.D. 108, 112 (D.N.J. 1987) ("[A]n extradition proceeding is not a criminal prosecution," and, "since there will not be a trial in the United States, Brady is inapplicable."); Montemayor Seguy v. United States, 329 F. Supp. 2d 883, 888 (S.D. Tex. 2004) ("[A]n extradition is not a criminal prosecution. . . .  The potential trial will occur in Mexico, leaving pretrial discovery issues for the Mexican courts to decide.  The extradition law, the extradition treaty, and the United States Constitution do not require production of exculpatory evidence at an extradition hearing.") (internal citation omitted); In re Extradition of Koskotas, 127 F.R.D. 13, 27 (D. Mass. 1989) ("Courts have expressly held that Brady principles do not pertain to extradition hearings because no determination of guilt or innocence is being made."); Sacirbey v. Guccione, No. 05 CV. 2949 BSJ FM, 2006 WL 2585561, at *14 (S.D.N.Y. Sept. 7, 2006), rev'd on other grounds, 589 F.3d 52 (2d Cir. 2009) (rejecting fugitive's argument that "information he requested should have been produced as exculpatory evidence under the principles articulated in Brady v. Maryland," and noting that "the Court is skeptical that [Brady] does or should [apply in the extradition context]").

47

410, 414 (6th Cir. 1999) - is misplaced.  In those cases, the Sixth
Circuit extended Brady rights to fugitives in the limited context
where "the United States ha[s] conducted its own investigation of the
offense underlying the request for extradition and uncovered
exculpatory material in the course of that effort."  Drayer, 190 F.3d
at 414; see Demjanjuk, 10 F.3d at 353-54.[48]  As an initial matter,
these cases do not apply here, where the United States has not
conducted its own investigation into AHN; the only investigation into
AHN's alleged criminal conduct is Spain's.  Moreover, even if that
were not the case, the Sixth Circuit cases do not afford a broad
right to all exculpatory materials but rather only "exculpatory
materials in [the U.S. government's] possession that would undercut a
finding" of probable cause.  Drayer, 190 F.3d at 415; see In re
Zhenly Ye Gon, No. 08-596(JMF), 2010 WL 169468, at *3-4 (D.D.C. Jan.
8, 2010) (distinguishing between "exculpatory evidence" and "evidence
that would negate probable cause," and ordering the government to
produce "any evidence within its possession that would negate the
showing of probable cause that the Mexican government has offered");
In re Requested Extradition of Sindona, 450 F. Supp. 672, 687
(S.D.N.Y. 1978) (noting that "exculpatory proof" was not admissible
because it did "not negate the probable cause showing of the Italian
government, or in any way indicate that it would be unjust to require
[the fugitive] to respond to criminal charges in Italy").

Regardless, no other circuit court — let alone the Ninth Circuit
— has adopted the Sixth Circuit's reasoning in any subsequent

---

[48] The exculpatory material that the Sixth Circuit determined to
be discoverable related to information in the government's possession
regarding the fugitive's claim that he had been the victim of
misidentification.  Demjanjuk, 10 F.3d at 350-52.

1    extradition case.[49]   Far from an abuse of discretion, the Extradition

2    Court's decision to reject AHN's attempt to extend Brady principles

3    to his extradition proceedings comported with controlling Ninth

4    Circuit authority.[50]

5        **F.   The Court Should Not Be the First to Violate the Rule of
          Non-Inquiry by Applying a Purported "Humanitarian**
6        **Exception."**

7        AHN asks this Court to deny Spain's request for his extradition

8    based on his claims about the danger he would face if he were

9    returned to stand trial there.  (HR 14 at 42-52.)  But doing so would

10   require the Court to exceed its limited role in the extradition

11   process and, moreover, would conflict with well-settled precedent

12   reserving consideration of such claims for the Secretary of State.

13       As detailed above, extradition is a two-step process in which a

14   court first determines whether "there is probable cause to extradite"

15   based on the relevant legal requirements, and then the Secretary of

16   State "decides whether to surrender the individual to the requesting

17

18       [49] AHN is incorrect that the Ninth Circuit has "discussed
     [Demjanjuk] with approval on at least two occasions." See HR 14 at
19   66.  The Ninth Circuit in Prasoprat v. Benov expressly rejected a
     fugitive's attempt to rely on Demjanjuk when seeking review of the
20   denial of his motion for discovery on the use of the death penalty in
     Thailand.  421 F.3d at 1015-16.  In that case, the Court explained
21   that "[t]he evidence sought by Demjanjuk . . . related to whether he
     was in fact the individual who had committed the extraditable offense
22   and thus concerned the probable cause determination." Id.  The Court
     thereby distinguished Demjanjuk, without giving any "indication as to
23   whether the Sixth Circuit's holding ought to have broader
     applicability in this circuit." Ameen, 378 F. Supp. 3d at 911
24   (discussing Prasoprat).  In Wang v. Reno, 81 F.3d 808, 820-21 (9th
     Cir. 1996), which is not an extradition case, the Ninth Circuit "did
25   not discuss, much less announce a formal adoption of Demjanjuk's
     expansion of Brady." Ameen, 378 F. Supp. 3d at 911.

26       [50] The Extradition Court's comments that AHN "was or has been a
     CIA agent" and that the "government may have information concerning
27   [AHN] that it doesn't wish to share with him or even the Court," Ahn,
     2022 WL 1531749, at *14 n.19, are neither true nor relevant to the
28   issues that were before that court.  Accordingly, the United States
     respectfully requests that this Court disregard those remarks.

state." Santos, 830 F.3d at 993. This division is reflected in the statutory framework for extradition, wherein only the Secretary of State, and not the judiciary, may make the discretionary decision of whether the fugitive "may . . . be delivered" to the requesting country. 18 U.S.C. § 3186; see 18 U.S.C. § 3184.

Such discretion is properly placed in the hands of the Secretary given "the Executive's powers to conduct foreign affairs," which include the ability to "make confidential diplomatic inquiries and receive confidential diplomatic assurances about the treatment of an extraditee." Trinidad y Garcia v. Thomas, 683 F.3d 952, 961 (2012) (en banc) (per curiam) (Thomas, J., concurring). Questions about the treatment a fugitive may face upon his return to the requesting country may be considered only by the Secretary in making the discretionary decision regarding surrender. See, e.g., United States v. Kin-Hong, 110 F.3d 103, 108 (1st Cir. 1997) (following the court's certification decision, "[i]t is then within the Secretary of State's sole discretion to determine whether or not the relator should actually be extradited" based on, inter alia, "humanitarian and foreign policy considerations"); cf. Prasoprat, 421 F.3d at 1016 ("The magistrate judge has no discretionary decision to make.") (internal quotation marks and citation omitted).

Such questions are not yet ripe for review by an extradition court or by a habeas court reviewing an extradition certification, as the Secretary of State has not yet decided whether to surrender the fugitive to the requesting country. See, e.g., Meza v. U.S. Atty. Gen., 693 F.3d 1350, 1356 (11th Cir. 2012) ("There is nothing in the record to suggest that the Secretary has decided whether to surrender [the fugitive]. [The fugitive's] claim about torture is not ripe.");

Hoxha, 465 F.3d at 565 (declining to address Albanian fugitive's claim that he would be tortured and possibly killed by Albanian authorities on ripeness grounds).  Indeed, a decision by the Secretary not to surrender the fugitive would moot any concerns about his return to the requesting country.

Regardless, the Supreme Court, the Ninth Circuit, and myriad other courts have established that, under the rule of non-inquiry, questions concerning the treatment a fugitive may face in the requesting country lie beyond the limited purview of the judiciary in extradition matters.  Over a century ago, the Supreme Court explained that U.S. courts "are bound by the existence of an extradition treaty to assume that the trial will be fair."  Glucksman, 221 U.S. at 512. More recently, in Munaf v. Geren, the Supreme Court re-affirmed that it is appropriate for the Secretary of State alone to assess practices in the requesting country and the likelihood of an individual being tortured after his transfer there.  553 U.S. 674, 700-01 (2008) (citing Neely, 180 U.S. at 123).  In that case, which involved a due process challenge to the transfer of U.S. citizens detained by U.S. military officials within Iraq to Iraqi officials for prosecution, the Court specifically rejected the detainees' argument that principles of non-inquiry were overcome by their allegations that they would likely be tortured if transferred to Iraq.  Id. at 700.  "Such allegations are of course matters of serious concern, but . . . that concern is to be addressed by the political branches, not the judiciary."  Id.

According to the Supreme Court, "[t]he Judiciary is not suited to second-guess" determinations by the State Department regarding the likelihood that those transferred to the custody of a foreign

government would be tortured—determinations that "would require federal courts to pass judgment on foreign justice systems and undermine the Government's ability to speak with one voice in this area." Id. at 702.  The Court stressed that, "[i]n contrast, the political branches are well situated to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of an ally, and what to do about it if there is." Id.

The Ninth Circuit, like other courts, has "long adhered to the rule of non-inquiry," concluding that "it is the role of the Secretary of State, not the courts, to determine whether extradition should be denied on humanitarian grounds or on account of the treatment that the fugitive is likely to receive upon his return to the requesting state." Prasoprat, 421 F.3d at 1016.[51]  Indeed, the Ninth Circuit unequivocally held in Prasoprat that a "magistrate judge does not have any discretion" to deny extradition on

---

[51] See also, e.g., Quinn, 783 F.2d at 789-90 (Secretary of State has "sole discretion . . . to refuse extradition on humanitarian grounds because of the procedures or treatment that await a surrendered fugitive"); Barapind v. Enomoto, 360 F.3d 1061, 1077 (9th Cir. 2004) ("The government of the United States, through the Secretary of State, should determine . . . whether diplomatic and treaty relations are being carried out and respected in such a way that it is safe to surrender an alleged criminal under a treaty.") (quoting In re Lincoln, 228 F. 70, 74 (E.D.N.Y. 1915)), on reh'g en banc, 400 F.3d 744 (9th Cir. 2005); Noeller, 922 F.3d at 808 ("Under the settled rule of non-inquiry, the executive branch has sole authority to consider such humanitarian considerations in deciding on extradition requests. . . .  [It] is intended to prevent extradition courts from engaging in improper judgments about other countries' law enforcement and judicial procedures.  More important, the rule serves interests of international comity by relegating to political actors the sensitive foreign policy judgments that are often involved in the question of whether to refuse an extradition request.") (internal quotation marks and citation omitted); Escobedo v. United States, 623 F.2d 1098, 1107 (5th Cir. 1980) ("[T]he degree of risk to [the fugitive's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch.").

1    humanitarian grounds.  <u>Id.</u>  Similarly, a claim that humanitarian

2    concerns bar extradition "is not cognizable on habeas corpus."

3    <u>Prasoprat v. Benov</u>, 294 F. Supp. 2d 1165, 1171 (C.D. Cal. 2003),

4    aff'd, 421 F.3d 1009; <u>see also, e.g.</u>, <u>Trinidad</u>, 683 F.3d at 956-57,

5    (rule of non-inquiry limits "the scope of habeas review") (emphasis

6    omitted).  Rather, once an extradition has been certified, "it is the

7    Secretary of State, representing the executive branch, who determines

8    whether to surrender the fugitive."  <u>Prasoprat</u>, 421 F.3d at 1016.[52]

9         AHN's attempt (HR 14 at 43-46) to circumvent this well-settled

10   precedent is unavailing.  The notion that courts may make an

11   exception to the rule of non-inquiry for particularly egregious

12   humanitarian concerns is based entirely on dictum from a decision by

13   the Second Circuit well over half a century ago — dictum that posits

14   the theoretical possibility of an exception that has never in fact

15   been used to deny extradition, and which the Second Circuit itself

16   has since disavowed.  <u>Compare</u> <u>Gallina v. Fraser</u>, 278 F.2d 77, 79 (2d

17   Cir. 1960) ("We can imagine situations where the relator, upon

18   extradition, would be subject to procedures or punishment so

19   antipathetic to a federal court's sense of decency as to require

20

21   ──────────────────

22   [52] The Extradition Court improperly suggested (<u>Ahn</u>, 2022 WL
     1531749, at *14 n.20) that, while it was constrained by the rule of
23   non-inquiry, the same may not be true of a <u>habeas</u> court.  But such a
     distinction is contrary to the case law.  Rather, courts including
24   the Ninth Circuit have differentiated only between the role of the
     judiciary writ large in the extradition process and the role of the
25   Secretary of State.  <u>See</u> <u>supra</u> II(A) & n.51; <u>see also, e.g.</u>, <u>In re</u>
     <u>Extradition of Al-Nouri</u>, No. MJ-20-08033-PHX-MTM, 2022 WL 993781, at
26   *12 (D. Ariz. Apr. 1, 2022) ("This Court will not deviate from the
     principle—which the Ninth Circuit has consistently re-affirmed—that
27   humanitarian justifications to refuse extradition are for the
     Secretary of State to decide, not the courts."); <u>Harkness</u>, 2022 WL
28   3928372, at *9 ("[T]his Court will abide by the rule of non-inquiry
     and reserve arguments regarding humanitarian concerns for the
     Secretary of State.").

1  reexamination of the principle" that an extraditing court will not

2  inquire into the procedures awaiting a surrendered fugitive in the

3  requesting country), <u>with</u> <u>Sindona v. Grant</u>, 619 F.2d 167, 175 (2d

4  Cir. 1980) ("The fact that <u>Gallina</u> also added the caveat that some

5  situations were imaginable in which a federal court might wish to

6  reexamine the principle of exclusive executive discretion falls well

7  short of a command to do so here.") (citation omitted), <u>and</u> <u>Ahmad v.</u>

8  <u>Wigen</u>, 910 F.2d 1063, 1067 (2d Cir. 1990) ("The interests of

9  international comity are ill-served by requiring a foreign nation

10  such as Israel to satisfy a United States district judge concerning

11  the fairness of its laws and the manner in which they are enforced

12  . . . . It is the function of the Secretary of State to determine

13  whether extradition should be denied on humanitarian grounds."

14  (internal citation omitted)).

15     Notably, the <u>Prasoprat</u> Court highlighted that "we have never

16  actually 'relied on [the posited possibility] to create' such an

17  exception." 421 F.3d at 1016 (rejecting the possibility articulated

18  in <u>Mainero v. Gregg</u>, 164 F.3d 1199, 1210 (9th Cir. 1999), and other

19  cases). The Ninth Circuit is not alone. "No court has yet applied

20  such a theoretical <u>Gallina</u> exception." <u>Hilton v. Kerry</u>, 754 F.3d 79,

21  87 (1st Cir. 2014).

22     Moreover, cogent reasons exist for refusing to implement the

23  theoretical "humanitarian exception." Adopting a "humanitarian

24  exception" would require courts to opine not on the legality of

25  extradition — which is their traditional and exclusive function — but

26  on the wisdom or virtue of it. The exception would also require

27  extensive judicial exploration of the conditions in a foreign

28  country. Neither inquiry is consistent with the narrowly

circumscribed judicial role in extradition matters.  See, e.g., Glucksman, 221 U.S. at 512.  Indeed, the statutory commitment of the surrender decision to the Secretary's discretion reflects a recognition that the decision necessarily involves the application of particular expertise that is not available in the judiciary and sensitive foreign relations considerations that are not amenable to judicial review.  As the Ninth Circuit has recognized, "[u]nwarranted expansion of judicial oversight may interfere with foreign policy and threaten the ethos of the extradition system."  Blaxland v. Commonwealth Dir. of Pub. Prosecutions, 323 F.3d 1198, 1208 (9th Cir. 2003).

The fact that, as AHN claims (HR 14 at 51-52), courts in other countries may consider humanitarian claims does not mean that the U.S. system must work the same way.  Indeed, in the United States, "[i]t is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed."  Kin-Hong, 110 F.3d at 111.  "Were it the other way, an argument could be made that the [extradition] statute improperly assigns foreign affairs powers to the Judiciary."  In re Extradition of Marzook, 924 F. Supp. 565, 571 (S.D.N.Y. 1996); see, e.g., Dep't of Navy v. Egan, 484 U.S. 518, 529 (1988) (foreign policy is the "province and responsibility of the Executive") (citation omitted).

Moreover, U.S. courts themselves recognize that, in general, judicial officers in the United States are not accustomed to considering, and are not well-equipped to consider, claims regarding

55

1   the treatment a fugitive may face in the requesting country.  See,

2   e.g., Munaf, 553 U.S. at 702-03 (noting that "the other branches

3   possess significant diplomatic tools and leverage the judiciary

4   lacks") (citation omitted); Kin-Hong, 110 F.3d at 110 (noting that

5   "extradition proceedings contain legal issues peculiarly suited for

6   judicial resolution, such as questions of the standard of proof,

7   competence of evidence, and treaty construction, yet simultaneously

8   implicate questions of foreign policy, which are better answered by

9   the executive branch"); Spatola v. United States, 741 F. Supp. 362,

10  371 (E.D.N.Y. 1990) ("[S]ince comity—i.e., respect and cooperation

11  between sovereign nations—is at the very heart of extradition, a

12  judicial proceeding in extradition is not the proper vehicle for

13  challenging or questioning the fairness of another country's criminal

14  justice system"), aff'd, 925 F.2d 615 (2d Cir. 1991).[53]

15      AHN's attempt to distinguish his humanitarian claim from all of

16  the other previous ones that have failed to abrogate the rule of non-

17  inquiry is unavailing.  To the contrary, his claim bears factual

18  similarities to some of those previous claims.  See, e.g., Venckiene

19  v. United States, 929 F.3d 843, 864-65 (7th Cir. 2019) ("To the

20  extent [the fugitive] contend[s] that she will be subject to physical

21  harm from sources outside the [requesting country's] government,

22  these are humanitarian arguments that are in the purview of the

23  Secretary of State in extradition proceedings."); Sindona, 619 F.2d

24  at 174 (rejecting claim that extradition should be denied because

25

26  _____

27      [53] There is nothing to suggest that the courts in Sindona, 619
    F.2d at 174, and In re Extradition of Singh, 170 F. Supp. 2d 982,
    1039 (E.D. Cal. 2001), which AHN points to as examples of errant
28  extradition decisions (HR 14 at 49-50), would have denied extradition
    on humanitarian grounds if they had the authority to do so.

"return to Italy would subject [the fugitive] to risk of murder or injury at the hands of political enemies"); Peroff v. Hylton, 542 F.2d 1247, 1249 (4th Cir. 1976) (rejecting claim that extradition should be denied because there were "potential assassins in Swedish prisons").  His articulation of his challenge as being directed specifically to the United States' conduct in deciding to surrender him despite his claims regarding possible treatment in the requesting country is similarly not novel.[54]  See, e.g., Trinidad, 683 F.3d at 955, 957 (due process challenge to "extradition" to the requesting country and specifically the Secretary of State's "extradition decision"); cf. Munaf, 553 U.S. at 692 (due process challenge to United States' transfer of Iraqi detainees).  Contrary to AHN's suggestion (HR 14 at 45-46), no court has held that the rule of non-inquiry is inapplicable in such circumstances.[55]  Also contrary to AHN's suggestion (HR 14 at 46), no court has relied on specific treaty language to determine the applicability of the rule of non-

_____

[54] To the extent AHN challenges only the Secretary's surrender decision in this case, and not the Extradition Court's Certification, as explained above, such a challenge is premature and may be moot if the Secretary declines to grant extradition.  Moreover, it wrongly assumes that the Secretary will extradite him to face certain death, but the courts have long recognized the presumption that the decisions of government officials are made in good faith.  United States v. Chemical Found., 272 U.S. 1, 14-15 (1926).

[55] AHN's citation (HR 14 at 45) to Santos and In re Extradition of Burt, 737 F.2d 1477, 1487 (7th Cir. 1984) is inapposite.  Indeed, the Ninth Circuit in Santos affirmed that the rule of non-inquiry "bars the judiciary from preventing the surrender of a fugitive on the basis of humanitarian considerations once extradition has been certified, reserving that decision to the Secretary of State," when declining to apply the rule to the consideration of evidence relevant to the court's probable-cause decision.  830 F.3d at 1007 n.9.  The Seventh Circuit's decision in Burt stands for the unremarkable conclusion that the United States' surrender decision must not be based on constitutionally impermissible factors, and holds that the United States' actions resulting in significant delay in returning a fugitive for prosecution in Germany did not present a reason for denying extradition.

57

1  inquiry, nor does the language in the U.S-Spain Treaty create any
2  right not otherwise available.[56]

3       Moreover, AHN's accusations regarding the government's conduct
4  in this case are unfounded.  As an initial matter, the United States
5  does not act as an accomplice to North Korea – a country with which
6  the United States does not maintain diplomatic relations, and which
7  the United States regularly condemns for its human rights violations
8  – by complying with its Treaty obligations to Spain.  Spain lacks an
9  extradition treaty with North Korea, and even if it desired to
10 surrender AHN to North Korea, it could not do so without the
11 permission of the United States.  See Treaty, art. XIII.   In
12 suggesting that the United States is complicit with North Korea, AHN
13 ignores the potentially wide-ranging ramifications of his actions.
14 Attacks on diplomatic missions that go unpunished would leave
15 diplomats everywhere vulnerable.  Host countries must therefore seek
16 to protect those missions, and to prosecute criminal intrusions,
17 irrespective of the nationality thereof.  See, e.g., United States v.
18 Wen, CDCA Case No. 2:21-CR-00339-FLA (defendant convicted of damaging
19 property owned by a foreign government, in violation of 18 U.S.C. §
20 970(a), after ramming car into gates of Consulate of People's
21 Republic of China, beating consulate windows with hammer, and prying
22 off consulate sign and throwing it to the ground).  North Korea is
23 not a party to, or a motivating force behind, these extradition
24 proceedings.  Any suggestion to the contrary misconstrues the limited
25
26 ───────────────
27      [56] See Treaty, art. IX ("The determination that extradition based
     upon the request therefor should or should not be granted shall be
     made in accordance with this Treaty and with the law of the requested
28   Party.  The person whose extradition is sought shall have the right
     to use such remedies and recourses as are provided by such law.").

nature and purpose of these proceedings, and overlooks Spain's legitimate interest in prosecuting individuals who attack accredited diplomatic missions on its soil as well as the United States' legitimate interest in seeking to comply with extradition requests for such individuals.

Further, AHN's claim that the United States interfered with his negotiations with Spanish prosecutors rests on factual inaccuracies. As a courtesy, the United States afforded AHN the opportunity to meet with senior officials of the Department of Justice, at which time the United States agreed to give AHN time to negotiate with the Spanish authorities and to provide them with the name of AHN's Spanish counsel. (ER 11-20 at 1.) Later, presumably frustrated by his Spanish counsel's inability to resolve his criminal case with Spanish authorities, AHN accused the United States of interfering with those negotiations. However, in fact, after AHN sought to delay his extradition hearing based on the negotiations, the United States simply communicated with its Spanish counterpart to inquire whether it viewed its discussions with AHN's Spanish counsel as a basis to delay the extradition proceedings further. (Id.) Other than this request for information, the United States neither involved itself nor took action with respect to AHN's settlement negotiations. It similarly has never taken any position with respect to how AHN may or should resolve the criminal case against him.[57] (Id.) Thus, any claim of misconduct by the United States is baseless.

---

[57] To the extent AHN suggests that the United States should have sought AHN's permission to confer with its counterpart about his case, such a suggestion makes no more sense than if AHN had to check with the United States before speaking with counsel for HONG CHANG or one of the other assailants involved in the attack of the Embassy.

In short, AHN has presented no cogent reason, let alone any authority, for this Court to deviate from the rule of non-inquiry. Accordingly, the Court should leave the humanitarian issues AHN raises to be resolved by the Secretary of State, who can draw on his ambassadors and all the other resources of the State Department to best evaluate the risks AHN may face if surrendered to Spain, and who alone has the power to impose conditions on surrender in order to mitigate any such risks.  See 22 C.F.R. § 95.3(b) ("Based on . . . analysis of relevant information, the Secretary may decide to surrender the fugitive to the requesting State, to deny surrender of the fugitive, or to surrender the fugitive subject to conditions."); Kin-Hong, 110 F.3d at 110 (noting that "[t]he State Department alone, and not the judiciary, has the power to attach conditions to an order of extradition" and recognizing that the Secretary "may also elect to use diplomatic methods to obtain fair treatment for the relator").[58]

## IV.  CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny AHN's petition for a writ of habeas corpus.

---

[58] AHN's suggestion (HR 14 at 42-43) that, if the Court were to violate the rule of non-inquiry, it would have to apply clear-error review to the Extradition Court's factual findings related to his humanitarian claim, is incorrect.  The Ninth Circuit has unequivocally established that "[a]n extradition magistrate lacks discretion to inquire into the conditions that might await a fugitive upon return to the requesting country."  Prasoprat, 421 F.3d at 1016 (citation omitted).  Accordingly, any factual findings by the Extradition Court as to the conditions that might await AHN in Spain would have been made ultra vires and should therefore be disregarded.  In any event, even the Extradition Court recognized that the "entire section [in its certification decision regarding the purported humanitarian exception to extradition] is dictum," and it expressly acknowledged that only "'facts'" – not true facts – were contained therein.  Ahn, 2022 WL 1531749, at *14 n.21.