MANATT, PHELPS & PHILLIPS, LLP
NAEUN RIM– State Bar No. 263558
    NRim@manatt.com
2049 Century Park East
Suite 1700
Los Angeles, California  90067
Telephone:   310.312.4000
Facsimile:    310.312.4224

Ekwan E. Rhow - State Bar No. 174604
    erhow@birdmarella.com
Christopher Jumin Lee - State Bar No. 322140
    clee@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS, LINCENBERG &
RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Petitioner
CHRISTOPHER PHILIP AHN

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

UNITED STATES,

               Plaintiff,

        v.

CHRISTOPHER PHILIP AHN,

             Respondent.

No. 2:22-CV-04320 FLA

**RESPONSE BRIEF IN SUPPORT OF PETITIONER CHRISTOPHER PHILIP AHN'S HABEAS PETITION**

*[Concurrently filed with Declaration of Christopher Jumin Lee]*

Hon. Fernando L. Aenlle-Rocha
First Street Courthouse, 6B

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 1 -

RESPONSE ISO HABEAS PETITION
2:22-CV-04320 FLA

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................... 7

II.    HUMANITARIAN EXCEPTION AND DUE PROCESS ............................ 9

    A.   The Executive's Unconstitutional Actions In These Extradition
       Proceedings Are Ripe for Consideration on Habeas Review ............ 10

    B.   The United States Is Violating the Fifth Amendment By
       Knowingly Endangering Mr. Ahn's Life And Relying on
       Coerced Statements from North Korean Officials ............................. 16

    C.   The Rule of Non-Inquiry Does Not Apply to Constitutional
       Challenges to United States Conduct and Does Not Bar the
       Humanitarian Exception ................................................................. 20

III.   LACK OF PROBABLE CAUSE ............................................................... 25

    A.   The Government Concedes That the Admissible Evidence is
       Insufficient to Establish Probable Cause By Relying on
       Excluded North Korean Statements ................................................. 25

    B.   Without the Excluded North Korean Statements, the Remaining
       Evidence is Nonsensical and Insufficient for Probable Cause .......... 26

    C.   The Extradition Court Should have Admitted Mr. Ahn's
       Declaration and Medical Records as  "Explanatory Evidence"
       that "Obliterates Probable Cause" ................................................... 28

IV.    CONCLUSION ........................................................................................ 32

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 2 -

RESPONSE ISO HABEAS PETITION
2:22-CV-04320 FLA

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ahmad v. Wigen*,
   910 F. 2d 1063 (2d. Cir. 1990) .................................................................24

*Barapind v. Enomoto*,
   360 F.3d 1061 (9th Cir. 2004) ................................................................24

*Emami v. U.S. Dist. Ct. for N. Dist. of California*,
   834 F.2d (9th Cir. 1987) .........................................................................21

*Escobedo v. United States*,
   623 F.2d 1098 (5th Cir. 1980) ................................................................24

*Fernandez v. Phillips*,
   268 U.S. 311 (1925) ..........................................................................12, 13

*Gallina v. Fraser*,
   278 F.2d 77 (2d Cir. 1960), cert. denied, 364 U.S. 851 (1960) ..................21, 22

*Giordenello v. U.S.*,
   357 U.S. 480 (1958) ................................................................................28

*Grin v. Shine*,
   187 U.S. 181 (1902) ................................................................................30

*Hilton v. Kerry*,
   754 F.3d 79 (1st Cir. 2014) ....................................................................25

*Hoxha v. Levi*,
   465 F.3d 554 (3d Cir. 2006) ........................................................15, 16, 24

*L.W. v. Grubbs*,
   974 F.2d 119 (9th Cir.1992), *cert. denied*, 508 U.S. 951, 113 S.Ct. 2442,
   124 L.Ed.2d 660 (1993)..........................................................................17

*Mainero v. Gregg*,
   164 F.3d 1199 (9th Cir. 1999) ................................................................24

*Man-Seok Choe v. Torres*,
   525 F.3d 733,738 (9th Cir. 2008) .........................................................8, 26

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803) ..............................................13

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

RESPONSE ISO HABEAS PETITION
2:22-CV-04320 FLA

1

2

**TABLE OF AUTHORITIES**
(continued)

**Page**

3

4

*Martin v. Warden, Atlanta Pen,*
    993 F.2d 824 (11th Cir. 1993) ..................................................................... 12, 22

5

6

*Matter of Burt,*
    737 F.2d 1477 (7th Cir. 1984) ........................................................................ passim

7

*Matter of Extradition of Noeller,*
    No. 17 CR 664, 2018 WL 1027513 (N.D. Ill. Feb. 23, 2018) .......................... 25

8

9

*Meza v. U.S. Atty. Gen.,*
    693 F.3d 1350 (11th Cir. 2012) .............................................................. 15, 16, 24

10

*Mironescu v. Costner,*
    480 F.3d 664 (4th Cir. 2007) ........................................................................... 15

11

12

*Munaf v. Geren,*
    553 U.S. 674 (2008) ................................................................... 17, 21, 22, 24

13

14

*Neely v. Henkel,*
    180 U.S. 109 (1901) ................................................................................ 14, 15

15

*Noeller v. Wojdylo,*
    922 F. 3d 797 (7th Cir. 2019) ............................................................................ 25

16

17

*People v. Mayberry,*
    15 Cal.3d 143 (Cal. 1975) ................................................................................ 30

18

*People v. Rivera,*
    157 Cal. App. 3d 736 (Cal. App. 1984) ............................................................ 30

19

20

*People v. Yoder,*
    100 Cal. App. 3d 333 (Cal. App. 1979) ............................................................ 30

21

*Peroff v. Hylton,*
    542 F.2d 1247 (4th Cir. 1976) ........................................................................... 25

22

23

*Plaster v. United States,*
    720 F.2d 340 (4th Cir. 1983) ........................................................................ passim

24

25

*Plaster v. United States,*
    789 F.2d 289 (4th Cir. 1986) (*Plaster II*) ......................................................... 13

26

*Prasoprat v. Benov,*
    421 F.3d 1009 (9th Cir. 2005) ................................................................... 20, 24

27

28

*Rasul v. Bush,*
    542 U.S. 466 (2004) ......................................................................................... 11

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 4 -

RESPONSE ISO HABEAS PETITION
2:22-CV-04320 FLA

CH

1

2

**TABLE OF AUTHORITIES**
(continued)

**Page**

3

4

*Rochin v. California*,
   342 U.S. 165 ........................................................................................22

5

*Santos v. Thomas*,
   830 F.3d 987 (9th Cir. 2016) (en banc)..........................................14, 15, 29, 30

6

7

*Sindona v. Grant*,
   619 F. 2d 167 (2d Cir. 1980) ..............................................................24

8

9

*Trinidad y Garcia v. Thomas*,
   683 F.3d 952 (9th Cir. 2012) (en banc) (per curiam).............................15, 16, 21

10

*U.S. v. Sayetsitty*,
   107 F.3d 1405 (9th Cir. 1997)..............................................................28

11

12

*United States v. Basurto*,
   497 F.2d 781 (9th Cir. 1974).............................................................22, 23

13

14

*United States v. Harkness*,
   No. EDCV 22-85-SVW (KK), 2022 WL 3928372 (C.D. Cal. Aug. 31,
   2022).......................................................................................................24

15

16

*United States v. Kin-Hong*,
   110 F.3d 103 (1st Cir. 1997) .......................................................passim

17

*Venckiene v. United States*,
   929 F. 3d 843 (7th Cir. 2019)..............................................................24

18

19

*Wang v. Reno*,
   81 F.3d 808 (9th Cir. 1996).......................................................passim

20

*Wood v. Ostrander*,
   879 F.2d 583 (9th Cir.1989)................................................................17

21

**STATUTES**

22

22 U.S.C.A. § 7801................................................................................19

23

8 U.S.C. § 1231 note............................................................................16

24

18 U.S.C. § 2241..................................................................................11

25

18 U.S.C. § 2241(c)(3) ........................................................................15

26

18 U.S.C. § 3184.....................................................................12, 13, 14, 15

27

18 U.S.C §§ 3184 and 3186.................................................................11

28

28 U.S.C. § 2241(a) and (c)(3) ...........................................................11

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 5 -

RESPONSE ISO HABEAS PETITION
2:22-CV-04320 FLA

CH

1

2

**TABLE OF AUTHORITIES**
(continued)

**Page**

3

Administrative Procedure Act (APA) .................................................................. 15, 16

4

Convention Against Torture (CAT) ................................................................... 15, 16

5

FARR Act ........................................................................................................ 15, 16

6

## OTHER AUTHORITIES

7

*Edmond Charles Genet*, 12 September 1793, Founders Online, Nat'l
8
Archives, https://founders.archives.gov/ documents/Jefferson/01-27-02-
0098 ............................................................................................................... 10

9

John F. Decker, *The Mental State Requirement for Accomplice Liability in*
10
*American Criminal Law*, 60 S. C. L. Rev. 239 (2008) ...................................... 28

11

U.S. Const., amend. V ................................................................................ 14, 17, 18

12

## RULES

13

Ninth Circuit Rule 36-3 ......................................................................................... 14

14
Fed. R. Crim. P. 5.1 ............................................................................................. 30

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Manatt, Phelps &
Phillips, LLP
Attorneys at Law
Los Angeles

- 6 -

RESPONSE ISO HABEAS PETITION
2:22-CV-04320 FLA

1   **I.**     **INTRODUCTION**

2           The Government's opposition brief is astonishing both in its continued

3   reliance on statements from North Korean government officials—statements that

4   were held to be incompetent by the extradition court—as well as its

5   mischaracterization of the record and the law.[1] The Government has undertaken a

6   strawman strategy by arguing against a distorted version Petitioner Christopher

7   Ahn's arguments while failing to address or contest facts that set this case apart

8   from any other extradition proceeding. This is not a case where the petitioner is

9   complaining of some vague theoretical risk of receiving poor treatment from the

10  requesting nation. The threat to Petitioner Christopher Ahn's life is specific. It

11  stems from a *non-treaty nation* that all three branches of government have

12  acknowledged as uniquely dangerous. Dkt. 11-1 (**Ex. A**) at 15:12-11. And it has

13  been *confirmed by the Executive Branch of the United States.*

14          Let us not beat around the bush. The Government is aware that North Korea

15  has placed Mr. Ahn on an assassination list as a result of his human rights work

16  assisting North Korean defectors. The FBI has cautioned Mr. Ahn not to leave the

17  country as a matter of safety. Yet the Government continues to aggressively seek

18  his extradition to Spain, where he is in greater danger of being killed. The

19  Government is so focused on winning that it is willing to further violate Mr. Ahn's

20  due process rights in *this* proceeding by impermissibly citing to North Korean

21  witness statements that were excluded as incompetent by the extradition court.[2] The

22  Government attempts to obscure this fact by sometimes citing to Spanish Court

23  documents that summarize the excluded statements, even though the law is clear

---

24  [1] As just one example, the Government accuses Mr. Ahn of seeking to "re-litigate a
    litany of claims that the Extradition Court already considered and rejected," Dkt. 30
25  ("Opp.") at 2. Of course that statement is completely disingenuous in light of the
    extradition court's express invitation to this Court to reverse her, even going so far
26  as to title her order a "Reluctant Certification of Extraditability."
    [2] "Because they were almost certainly coerced, the Court has not considered the
27  North Koreans' statements to the Spanish police and judiciary (except for Cho's
    initial statement) because that evidence is not competent." Dkt. 11-1 (**Ex. A**) at
28  18:23-26.

that such summary allegations from the requesting nation are not evidence. *See*
*Man-Seok Choe v. Torres*, 525 F.3d 733,738 (9th Cir. 2008) ("Though the
extradition papers accuse Choe of doing [illegal] things, accusations are not
evidence.") The Government's liberal citation to the excluded North Korean
witness statements not only raise questions of fundamental fairness, it also
illustrates that absent those statements, there is insufficient evidence to support
probable cause. *See* Declaration of Christopher Jumin Lee ("Lee Decl."), **Ex. AA**
(highlighting references to North Korean statements in red).

The Government has demonstrated that the very real threat to Mr. Ahn's life
stems not just from North Korea but from the United States of America itself.
Between its willingness to extradite Mr. Ahn into mortal peril, its active derailing
of Mr. Ahn's efforts to reach a negotiated settlement with Spain, and its continued
reliance on statements coerced by a despotic regime, the Government's actions in
this case have increased the danger to Mr. Ahn's life, shock the conscience, and
constitute ongoing flagrant violations of his due process rights.

The danger to Mr. Ahn is so evident that in the last week, six legislators from
the Republic of Korea (South Korea) contacted counsel for Mr. Ahn unsolicited and
asked to provide a letter of support. *See* Lee Decl., **Ex. AB**. As stated by the South
Korean National Assembly members, "If Christopher Ahn, who is known to have
personally assisted the defection of Kim Han-sol, the nephew of Kim Jong-un and a
most prominent dissident, leaves the relative safety of the United States, the Kim
Jong-un regime in North Korea will try to harm Christopher Ahn by any means
necessary." *Id*. at 6. This is not a normal extradition, no matter how much the
Government pretends otherwise. The eyes of the world are on this case—not just
out of concern for Mr. Ahn's safety—but also to see whether the United States
Constitution will protects its own citizens from a cruel death based on incompetent
evidence engineered by an evil regime. For their part, the South Korean legislators
believe that the United States will ultimately do the right thing: "We do not believe

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 8 -

RESPONSE BRIEF ISO HABEAS PETITION
2:22-CV-04320 FLA

1  that the Unites States, a country of freedom, would pave the way for such tragic

2  occurrence." *Id*. Pursuant to its authority under the habeas statute and the

3  Constitution, this Court has the opportunity to prove them right.

4  **II.    HUMANITARIAN EXCEPTION AND DUE PROCESS**

5       The Government deliberately misconstrues Mr. Ahn's humanitarian

6  exception arguments so that it can refute points he never made. Among other

7  things, the Government claims Mr. Ahn's arguments are not ripe because the

8  Secretary of State has not yet made a decision on extradition, citing inapposite

9  cases where the petitioners prematurely brought claims against the Secretary of

10  State. Opp. at 64-65.[3] The Government then repeats boilerplate caselaw regarding

11  the rule of non-inquiry. Opp. at 66-74. In making these procedural and technical

12  arguments, the Government barely addresses the arguments Mr. Ahn actually set

13  forth in his Petition. Mr. Ahn is not challenging the Secretary of State's future

14  actions; he is not challenging the fairness, humaneness, and constitutionality of the

15  Spanish criminal justice system. Mr. Ahn is challenging the fairness, humaneness,

16  and the constitutionality of *the past and present actions of the United States* in

17  initiating and pursuing these extradition proceedings and its willing coordination

18  with *non-treaty partner North Korea*. Dkt. 14 ("Petition") at 46-49.

19       The Court must reject the Government's arguments and grant this writ of

20  habeas corpus on the grounds that the extradition proceedings against Mr. Ahn

21  violate due process. First, the caselaw is clear that Courts have jurisdiction to hear

22  constitutional challenges to the conduct of the United States during extradition

23  proceedings on a petition for writ of habeas corpus after a magistrate judge has

24  certified extradition but before the Secretary of State has made a decision to

25  extradite. *See Plaster v. United States*, 720 F.2d 340, 348 (4th Cir. 1983); *Matter of

26  Burt*, 737 F.2d 1477, 1484 (7th Cir. 1984). Second, the actions of the United States

27  in pursuing this extradition have been egregious, inhumane, and violate Mr. Ahn's

28  _____
[3] All page number cites to docket filings are to the ECF page number.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 9 -

RESPONSE BRIEF ISO HABEAS PETITION
2:22-CV-04320 FLA

substantive and procedural due process rights. <u>Third</u>, the rule of non-inquiry does not bar this Court from enjoining extradition in this unique case, where the Executive Branch's knowledge of the threat to Mr. Ahn's life is so beyond dispute that its participation in these extradition proceedings renders the United States itself complicit in Mr. Ahn's mistreatment.[4] These are the very rare circumstances where due process must transcend the policy reasons behind the judge-made doctrine of the rule of non-inquiry. When the evidence of the danger to a petitioner's life resulting from extradition is so undeniable that the *United States* must be said to be participating in creating or increasing the danger, then the rule of non-inquiry is no longer at issue, and the humanitarian exception can be applied. Here, the Executive Branch is knowingly giving a powerful totalitarian dictatorship greater access to an American veteran in spite of irrefutable FBI intelligence confirming that North Korea intends to assassinate him. It is the United States, not the requesting nation, that is violating the Constitution. None of the rule-of-non-inquiry cases cited by the Government address a similar set of circumstances, and they are all distinguishable. The Court must apply the humanitarian exception and grant Mr. Ahn's Petition.

### A.   The Executive's Unconstitutional Actions In These Extradition Proceedings Are Ripe for Consideration on Habeas Review

The Government paints an inaccurate and unduly restrictive portrait of the power of the judiciary in extradition proceedings. According to the Government, the role of the courts in extradition, even on habeas review, is limited to deciding probable cause; otherwise, the Government claims, the Secretary of State is the one who must decide *all other issues* regarding whether to surrender the relator to the requesting nation. Opp. at 64. None of the legal authorities cited by the Government support this contention, and indeed some directly refute it. For example, while the

---

[4] See *From Thomas Jefferson to Edmond Charles Genet*, 12 September 1793, Founders Online, Nat'l Archives, https://founders.archives.gov/documents/Jefferson/01-27-02-0098  (Jefferson observing that to deliver fugitives to countries where they would be mistreated was to become "accomplice" to that mistreatment); **Ex. A** at 52.

1  Government selectively quotes *Kin-Hong* as support for the incorrect assertion that

2  "the treatment a fugitive may face upon his return to the requesting country may be

3  considered only by the Secretary," Opp. at 64, it omits the portion of the *same case*

4  recognizing that, under circumstances "amounting to a violation of constitutional

5  guarantees," it is the *courts*, not the Secretary, that have the independent role of

6  reviewing whether the extradition proceedings comport with due process. *See*

7  *United States v. Kin-Hong*, 110 F.3d 103, 106 (1st Cir. 1997). Moreover, while the

8  Government relies heavily on the extradition statutes, it makes *no mention* of the

9  habeas statute, upon which this proceeding is based, in the entire section opposing

10  the humanitarian exception. Opp. at 63-74. *See* 18 U.S.C §§ 3184 and 3186; 18

11  U.S.C. § 2241. That is because the plain language of the habeas statute clearly

12  confers upon this Court the authority to review claims of unconstitutional Executive

13  action in extradition proceedings, which is what is at issue here. *See Rasul v. Bush*,

14  542 U.S. 466, 473 (2004); 28 U.S.C. § 2241(a) and (c)(3).

15       The Government deliberately ignores the core of Mr. Ahn's due process

16  argument—that the United States is the one violating Mr. Ahn's constitutional

17  rights—so that it can avoid addressing the cases holding that, in addition to

18  probable cause, courts have the jurisdiction to consider constitutional violations

19  committed by the United States on habeas review *before* the Secretary of State has

20  agreed to extradite. Contrary to the Government's assertion, where the challenged

21  conduct is that of the *United States*, as opposed to the requesting nation, courts have

22  consistently recognized that "the judiciary has jurisdiction to ensure that the

23  Executive's power to extradite is not being exercised so as to violate individual

24  constitutional rights." *See Plaster*, 720 F.2d at 348 (holding district court can

25  consider constitutional challenges to Executive conduct in extradition before

26  Secretary of State's decision); *see also Burt*, 737 F.2d at 1484 ("We hold that

27  federal courts undertaking habeas corpus review of extraditions have the authority

28  to consider not only procedural defects in the extradition procedures that are of

- 11 -

constitutional dimension, but also the substantive conduct of the United States in undertaking its decision to extradite if such conduct violates constitutional rights."); *Martin v. Warden, Atlanta Pen*, 993 F.2d 824, 829 (11th Cir. 1993) ("The United States' actions in reviewing a request for extradition are, of course, subject to the constraints of the Constitution"); *see also Kin-Hong*, 110 F.36 at 106 (*supra*).

In *Plaster*, the Fourth Circuit rejected the same arguments the Government makes here. As in this case, Plaster brought a petition for habeas corpus after a magistrate judge certified his extradition but before the Secretary of State decided to surrender him. *Plaster*, 720 F.2d at 345-46. On habeas review, the district court enjoined the extradition, finding that the United States had violated Plaster's due process right to fundamental fairness by pursuing extradition proceedings that violated the terms of an enforceable immunity agreement he had previously entered into with the United States. *Id*. at 346. The United States appealed and made the same claims it does here, arguing that (1) "the extradition power of the United States is *sui generis* and commits the consideration of alleged constitutional violations *solely* to the Secretary of State and the President," and (2) "normal" habeas review of extradition proceedings under § 3184 should be limited to whether there is any competent evidence supporting probable cause in accordance with *Fernandez v. Phillips*, 268 U.S. 311 (1925).[5] *Plaster*, 720 F.2d at 349. The Fourth Circuit soundly rejected both of these arguments, holding:

> Although the power and the discretion of the Executive is undoubtedly great in matters of foreign relations, . . . the exercise of this power is

---

[5] In *Fernandez*, the Supreme Court established that habeas review of extradition proceedings was not a writ of error and was limited to (1) "whether the magistrate judge had jurisdiction," (2) "whether the offense charged is within the treaty," and (3) "whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." 268 U.S. at 313. As *Plaster* observed, however, the petitioner in *Fernandez* was challenging the sufficiency of the evidence—he was not raising "a claim that the actions of the United States government in extraditing the petitioner would violate his constitutional rights." *Plaster*, 720 F.2d at 348. Thus, *Plaster* concluded that while *Fernandez* limited the scope of habeas review of § 3184 proceedings, it did not foreclose the court's additional authority to consider constitutional challenges to Executive conduct.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 12 -

RESPONSE BRIEF ISO HABEAS PETITION
2:22-CV-04320 FLA

> limited by the provisions of the federal constitution. And, ***unquestionably, it is the province of the judiciary to adjudicate claims that governmental conduct is in violation of the Constitution***. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). Thus, although the Secretary of State and the President have the discretion *not* to extradite an individual for any reason whatsoever, including, for instance, a concern as to deficiencies in the judicial process in the requesting country, ***they may not choose to extradite an individual where such extradition would, in the opinion of the judiciary, violate the individual's constitutional rights***.

*Id.* (citations omitted) (emphasis added in bold italics).

*Plaster* expressly held that the district court followed the "proper procedure" by considering the petitioner's constitutional claim in the same habeas proceeding as its limited review of the magistrate's probable cause finding. *Id*. at 349. After briefly remanding the matter to resolve a factual dispute, the Fourth Circuit ultimately affirmed the district court's decision to enjoin the extradition on the basis that the United States had violated due process. *Plaster v. United States*, 789 F.2d 289, 290 (4th Cir. 1986) (*Plaster II*).

In *Burt*, the Seventh Circuit also reviewed a constitutional challenge to the government's conduct at the certification stage, prior to surrender, and held that the habeas court had authority to consider the issue. 737 F.2d at 1482. Again, the Seventh Circuit rejected the government's argument that *Fernandez* restricted habeas review to "the limited issues the magistrate was restricted to addressing under 18 U.S.C. § 3184." *See id*. The court agreed with *Plaster* that the issue of unconstitutional Executive action was simply not before the Supreme Court in *Fernandez* and that the limitation on habeas review of the magistrate judge's certification decision could co-exist with the judiciary's additional habeas authority to review constitutional challenges to Executive action. *Id*. at 1484 (noting "the correctness of this view is readily apparent"). *Burt* also observed that after deciding *Fernandez*, the Supreme Court "substantially redefine[d] the scope of habeas

corpus review . . . to include an evaluation of whether the petitioner is being held in violation of any of his or her constitutional rights." *Id.*

While the Ninth Circuit has not directly addressed the issue of whether a habeas court has authority to consider constitutional challenges to Executive action after a magistrate judge's certification but before the Secretary has decided to extradite,[6] it has assumed and exerted the existence of such authority in its extradition opinions. In *Santos v. Thomas*, 830 F.3d 987, 1004 (9th Cir. 2016) (en banc) the court reversed the district court's denial of habeas corpus and held that statements "obtained by coercion in violation of the principles in the Due Process Clause of the Fifth Amendment" were "not competent" and could not support probable cause in an extradition proceeding. *Santos* stands for the proposition that due process prohibits the United States from seeking certification of extradition based on evidence secured by coercion. *See id*. Although the dissent in *Santos* argued that "the Judiciary has no obligation to ensure that an extradition request or evidence submitted to show probable cause does not violate our Constitution," *id.* at 1046, the majority sitting *en banc* rejected this position and criticized the dissent for "largely ignor[ing]" Supreme Court case law placing the probable cause determination in the "judiciary's hands." *Id.* at 1007. While the majority justified its conclusion by tying it to a probable cause analysis, *Santos* nonetheless assumes that habeas courts (and extradition courts) have the authority to consider questions—and even evidence—surrounding issues of constitutional magnitude.

Likewise, the Supreme Court made the same assumption when it "adjudicated—although it ultimately rejected—an argument, raised on habeas corpus review of a § 3184 hearing, that the petitioner's extradition would violate his constitutional rights." *See Plaster*, 720 F.2d at 349 (citing *Neely v. Henkel*, 180

---

[6] In 1998, the Ninth Circuit cited to *Plaster* and *Burt* with approval and held that constitutional claims may be raised on habeas review after a magistrate's finding of extraditability where the conduct of the United States was at issue, but it did so in an unpublished opinion that cannot be cited pursuant to Ninth Circuit Rule 36-3.

U.S. 109 (1901). In *Neely,* the issue before the Court was whether an extradition was unconstitutional if the requesting nation did not provide the same "rights privileges, and immunities that are guaranteed by the Constitution" for criminal defendants tried in the United States. 180 U.S. at 122.  While the Court concluded that extradition was not unconstitutional, it did so on the merits and did not dismiss the constitutional question for want of jurisdiction. *Neely*, 180 U.S. at 123.

The Government's contention that the constitutional issues raised by Mr. Ahn are not "ripe" are thus wholly unsupported by the wealth of case law cited above. "As to the procedure whereby a person whose extraditability has been certified by the Magistrate may receive an adjudication on his claim that the United States government's act of extraditing him would violate his constitutional rights, we think that habeas corpus review of the § 3184 hearing, pursuant to § 2241(c)(3), is the appropriate device." *Plaster*, 720 F.2d at 349.[7]

The two out-of-circuit cases cited by the Government in its opposition do not support its position. Opp. at 64-65. *See Meza v. U.S. Atty. Gen.*, 693 F.3d 1350, 1353 (11th Cir. 2012); *Hoxha v. Levi*, 465 F.3d 554, 564 (3d Cir. 2006). Some context here is helpful to understand the distinction. *Plaster*, *Burt*, *Santos*, and the cases discussed above involve habeas petitions brought after the magistrate judge's certification ("post-certification habeas"). Other cases involve habeas petitions brought after the Secretary of State has made a decision to surrender the relator to the requesting nation ("post-surrender habeas"). *See*, *e.g.*, *Trinidad y Garcia v. Thomas*, 683 F.3d 952 (9th Cir. 2012) (en banc) (per curiam); *Mironescu v. Costner*, 480 F.3d 664, 670 (4th Cir. 2007). In post-surrender habeas cases, petitioners have relied on due process theories or the Administrative Procedure Act ("APA") to argue that the judiciary can consider whether the Secretary's decision to extradite violated the Convention Against Torture ("CAT") or the FARR Act. *Id.*

---

[7] Alternatively, the Court could find that the extradition court has authority under the extradition statute and Article IX of the Spanish Treaty to decide the due process question and remand the proceedings. *See* Dkt. 14 at 12-13.

The FARR Act is a statute that implements CAT, a United Nations Treaty, and declares it "the policy of the United States not to . . . extradite . . . any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." 8 U.S.C. § 1231 note; *Trinidad y Garcia*, 683 F.3d at 955-56. The FARR Act requires the Department of State to prescribe regulations to implement the United States' CAT obligations. *Id*. Those regulations require the Secretary to make a determination regarding possible torture before signing a surrender warrant in extradition matters. *Id*.

In both *Meza* and *Hoxha*, the petitioners argued that the APA, CAT, the FARR Act, and due process prohibited the Secretary from making a decision to extradite—but they were making these arguments in *post-certification habeas petitions*, before the Secretary had made a surrender decision. It was in this specific context that the Eleventh and Third Circuits held that the petitioners claims were not ripe. *See Meza*, 693 F.3d at 1353 ("Yacaman contends that [CAT] bars his extradition by the Secretary of State . . . . Yacaman's first argument is not ripe because the Secretary of State has not yet determined whether he is likely to be tortured nor decided whether to extradite him"); *Hoxha,* 465 F.3d at 564-65 ("Petitioner contends that the Secretary of State's enforcement of FARR is reviewable by the federal courts under the Administrative Procedure Act (APA) . . . . This debate is premature. The APA provides for review of 'final agency action,' but the Secretary of State has yet to take any action on Petitioner's case, and may ultimately decide not to extradite Petitioner. Thus, Petitioner's claim under the APA is not ripe for review"). These cases do not hold that *all* constitutional challenges to Executive action are not ripe until post-surrender—only those relying on CAT and the FARR Act, which specifically apply to the Secretary of State.

**B.    The United States Is Violating the Fifth Amendment By Knowingly Endangering Mr. Ahn's Life And Relying on Coerced Statements from North Korean Officials**

Tellingly, the Government barely addresses the substance of Mr. Ahn's

argument—that the United States is violating his due process rights. *See* Petition at 42-52. Instead, the Government pretends that Mr. Ahn is making another run-of-the-mill complaint about his expected treatment in the requesting nation so that the Government can fall back on applying the rule of non-inquiry. Opp. at 64. But the situation here could not be more different: Mr. Ahn's due process claim is not a game of semantics—this is not a case where the petitioner is attempting to circumvent the rule of non-inquiry by reframing complaints about the requesting nation as complaints about the United States by virtue of its compliance with its treaty obligations. The Executive Branch in this case has taken unusual, affirmative actions that have gravely endangered Mr. Ahn's life. These actions violate the Fifth Amendment and are not protected by the rule of non-inquiry.

According to the state-created danger doctrine of the due process clause, the United States has a "constitutional duty to protect a person . . . when it affirmatively places that person in danger." *Wang v. Reno*, 81 F.3d 808, 818 (9th Cir. 1996); *see also L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir.1992), *cert. denied*, 508 U.S. 951, 113 S.Ct. 2442 (1993); *Wood v. Ostrander*, 879 F.2d 583, 588-91 (9th Cir.1989). While the Government complains *Wang* is not an extradition case, it is a case about the United States' violation of substantive due process, and there is no reason the Court should not rely upon it here.[8] Wang was arrested in China for his alleged participation in a heroin transaction. *Wang*, 81 F.3d at 811. Politically motivated to prove that the heroin had come from Hong Kong instead of mainland China, Chinese officials tortured Wang and forced him to implicate a man named Leung as having participated in the heroin transaction. *Id*. Meanwhile on this side of the world, the United States was pursuing its own drug trafficking case against Leung. *Id*. The United States arranged to have China transfer Wang into America so that he

---

[8] Moreover, the Government relies heavily on *Munaf v. Geren*, 553 U.S. 674 (2008) to justify the rationale behind the rule of non-inquiry, even though *Munaf* is also not an extradition case. Both *Wang* and *Munaf* involve constitutional challenges to Executive action in the face of a transfer agreement between the United States and a foreign nation, and both provide guidance in extradition cases.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 17 -

RESPONSE BRIEF ISO HABEAS PETITION
2:22-CV-04320 FLA

could be a witness at Leung's trial. *Id*. At trial in the United States, Wang recanted his statement about Leung and testified that Wang had only implicated him because he had been tortured by Chinese officials. *Id.* at 812. Having made himself a target of the Chinese government by telling the truth about this abuse, Wang filed suit in district court seeking declaratory relief and an injunction barring the government from returning him to China. *Id*.

The Ninth Circuit affirmed the district court's decision to grant the permanent injunction and held that the government's actions had violated Wang's "liberty interest in personal security and thus of his due process rights secured by the Fifth Amendment." *Id*. at 819. The court found that the United States was "aware of human rights abuses occurring in the PRC and suspected that Wang might have been tortured when he gave his confession." *Id*. at 811. In light of this, the court found that the United States had put Wang in the impossible position of choosing between risking execution by telling the truth or lying under oath. *Id*. at 814. Evidence of the threat to Wang's life and safety if returned to China was undisputed—even the government's expert testified that China would torture Wang upon return. *Id*. at 819-20. The court rejected the Attorney General's argument that she would not return Wang to China without receiving assurances that he would not be executed, noting, "[T]he United States government cannot guarantee that China, a sovereign nation, will not execute Wang for his decision to testify truthfully." *Id*. at 819. "We find it deplorable that the government, which has placed Wang in his present predicament, is not only not protecting him, but rather is actively trying to return him to a place where he will likely be tortured." *Id*. at 820.

The Government's conduct here is equally deplorable. The United States is well aware that North Korea subjects political enemies to "unlawful or arbitrary killings by the government" and "torture and cruel, inhuman, and degrading treatment and punishment by government authorities," Dkt. 11-17 (**Ex. Q**) at 1, 16. It is also aware that the North Korean government "attempts to control all

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 18 -

RESPONSE BRIEF ISO HABEAS PETITION
2:22-CV-04320 FLA

information" and "strictly curtails freedom of speech" by controlling "access to food, employment, higher education, place of residence, medical facilities, and other resources" and "dividing its population into categories, based on perceived loyalty to the leadership." *See* 22 U.S.C.A. § 7801 (reciting the findings of Congress and the Department of State). Thus, the United States knew there was no way for any of the North Korean witnesses to admit that anyone inside the embassy had requested Free Joseon's help without risking their lives, and the only option they had was to claim they had been attacked to prove their loyalty to the regime. Despite knowing that the North Korean statements could not possibly comport with due process and were likely fabricated, the United States nonetheless chose to rely on those statements to initiate extradition against Mr. Ahn—*and continues to rely on those statements in this proceeding*. *See* Lee Decl., **Ex. AA**.

Like in *Wang*, evidence of the risk to Mr. Ahn's life is undisputed: the United States has credible intelligence that North Korea intends to kill Mr. Ahn because of this case, prompting the FBI twice to warn Mr. Ahn to stay inside the United States. Petition at 34-35; Dkt. 11-12 (**Ex. L**) ¶ 18; Dkt. 11-6 (**Ex. F**) ¶ 3.) On March 30, 2019, about two weeks before the United States arrested Mr. Ahn, North Korea issued a public statement demanding that the "terrorists and their wire-pullers" be brought to justice, noting that it would "wait for the result in patience." Petition at 30; Dkt. 11-1 (**Ex. A**) at 43:20-23. Despite having knowledge of this specific, powerful threat to Mr. Ahn's life, the United States continues to seek Mr. Ahn's extradition to Spain, where North Korea has an established diplomatic presence.

Worse still, the United States itself has participated in creating and increasing the danger to Mr. Ahn's life. After lulling Mr. Ahn into a false sense of security, the FBI persuaded Mr. Ahn into speaking to them about the Madrid incident without letting him know that they intended to pass his identity on to Spain and, indirectly, to North Korea. Even though it was aware of North Korea's record of brutal retribution against those associated with defections, the Government did not seek

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 19 -

RESPONSE BRIEF ISO HABEAS PETITION
2:22-CV-04320 FLA

any assurance from Spain that Mr. Ahn's identity would be kept from the North Koreans or to keep the Spanish proceedings confidential. During the extradition proceedings, the United States argued aggressively to give the media access to this case over Mr. Ahn's objection. The Government later rebuffed all efforts to resolve this case without litigation and even interfered with Mr. Ahn's efforts to negotiate with Spain directly.[9] These unconscionable actions increased the danger to Mr. Ahn's life, and contributed to his being targeted by the North Korean government. As in *Wang*, the Government is "not only not protecting him, but rather is actively trying to return him to a place where he will likely be tortured." 81 F.3d at 820.

## C. The Rule of Non-Inquiry Does Not Apply to Constitutional Challenges to United States Conduct and Does Not Bar the Humanitarian Exception

It is well-established that the rule of non-inquiry is designed to curb judicial inquiry into the systems of the *requesting nations* in extradition proceedings. *See Prasoprat v. Benov*, 421 F.3d 1009, 1016 (9th Cir. 2005) (citing numerous cases). Where the conduct challenged is that of the United States, however, the rule of non-inquiry does not apply. While the Government claims "no court has held that the rule of non-inquiry is inapplicable" in circumstances where the United States is the nation committing the due process violation, Opp. at 71, that premise was necessary to the holdings in *Wang* and *Plaster*, where the Ninth and Fourth Circuits enjoined the Executive Branch from complying with obligations to transfer individuals to foreign nations because of due process violations by the United States.

In addition, no court has held that the rule of non-inquiry *does* prohibit judicial review of unconstitutional United States conduct. The Government's suggestion that *Trinidad y Garcia* implies that conclusion is false. Opp. at ECF 71.

---

[9] While the Government downplays its interference, its refusal to assist Mr. Ahn in negotiations with Spain was unconscionable. Mr. Ahn retained *pro bono* counsel in Spain in March of 2020, just as the global pandemic was starting. The Government gave Mr. Ahn's Spanish counsel only *four months* during a worldwide lockdown to complete this sensitive discussion before deciding it could wait no longer and inserting itself in the process. The message to Spain was that the United States was impatient to extradite. Petition 32-33.

In fact, in *Trinidad y Garcia*, the Ninth Circuit explicitly held that there was a due process liberty interest in strict compliance by the Secretary of State with Department regulations. 683 F.3d at 957. The court did *not* find that the rule of non-inquiry prevented it from considering that constitutional question. What it did find was that the judiciary could not review the substance of the Secretary's decision *regarding the likelihood of being tortured in the requesting nation. Id.* This is no different than any other application of the rule of non-inquiry, which has always been concerned with deferring to the political branches humanitarian considerations about the practices of *treaty partners*.

Courts applying the rule of non-inquiry to extradition proceedings have also been careful to caveat that it is not a limitless "get-out-of-due-process-free" card for the Government. Courts have consistently alluded to the existence of a "humanitarian exception" in circumstances "where the relator, upon extradition would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination" of the rule of non-inquiry. *See Gallina v. Fraser*, 278 F.2d 77 (2d Cir. 1960), *cert. denied,* 364 U.S. 851 (1960). The Government is wrong to claim that *Gallina* has been "since disavowed." Opp. at 67. To the contrary, courts applying the rule of non-inquiry have continued to echo the same sentiment. *See*, *e.g.*, *Emami v. U.S. Dist. Ct. for N. Dist. of California*, 834 F.2d 1444, 1453 (9th Cir. 1987) (leaving "open the possibility that the considerations expressed in the *Gallina* caveat might someday cause us to develop a humanitarian exception in a case where the facts warranted it"). In fact, *Munaf* and *Kin-Hong*, two of the cases most relied upon by the Government, contain a similar caveat. In *Munaf*, the Supreme Court applied the principles of the rule of non-inquiry but noted, "[T]his is not a more extreme case in which the Executive has determined that a detainee is likely to be tortured but decides to transfer him anyway." 553 U.S. at 702. The concurrence in *Munaf* commented that if such a circumstance should arise, "it would be in order to ask whether substantive

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 21 -

RESPONSE BRIEF ISO HABEAS PETITION
2:22-CV-04320 FLA

due process bars the Government from consigning its own people to torture." *Id*. at 706 (Souter, J. concurring). In *Kin-Hong*, the court also applied the rule of non-inquiry but made sure to note the existence of "the ultimate safeguard that extradition proceedings before United States courts comport with the Due Process Clause of the Constitution." 110 F.3d at 106. "Some future case may, on facts amounting to a violation of constitutional guarantees, warrant judicial intervention." *Id*.

Taken together, *Wang*, *Plaster*, *Gallina, Munaf*, and *Kin-Hong* can all be reconciled in support of the proposition that the "humanitarian exception" only applies where transfer of the individual would be so egregious that it would amount to a substantive due process violation committed by the United States, whether under the state-created danger doctrine, the shock-the-conscience test, or principles of fundamental fairness. *See Rochin v. California*, 342 U.S. 165, 209 (1952); *Wang*, 81 F.3d at 819; *United States v. Basurto*, 497 F.2d 781, 785 (9th Cir. 1974). In a sense, the existence of the humanitarian exception is what allows the common law rule of non-inquiry to co-exist with the "ultimate safeguard" of the due process clause. Otherwise, the rule of non-inquiry, a judge-made common law creation, would excuse unconstitutional Executive action, which is inconsistent with the basic premise that the "constitutional rights of individuals, including the right to due process, are superior to the government's treaty obligations." *See Martin*, 993 F.2d at 829. That the humanitarian exception would have to meet the standard of substantive due process explains why it has so rarely been applied and resolves any policy concerns that the judiciary would have license to revise extradition treaties.

As detailed in the previous section, the conduct of the United States more than meets the necessary due process standard here in this disturbing, unusual case. Moreover, while there is certainly a humanitarian component to the relief Mr. Ahn is seeking in light of the undisputed threat to his life, the Government's due process violation goes beyond that—even in this habeas proceeding, the Government

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 22 -

RESPONSE BRIEF ISO HABEAS PETITION
2:22-CV-04320 FLA

continues to rely on fabricated North Korean evidence, knowing that the extradition court has already found it to be incompetent. *See Basurto*, 497 F.2d at 785 (due process violated when government secures indictment based on perjured testimony). As long as this extradition proceeds, the United States is furthering the North Korean government's agenda of using this case as a way to silence and intimidate defectors and those who assist them. *See* Lee Decl., **Ex. AB** (Letter from South Korean Legislators) ("The Kim Jong-un regime is trying show that it can retaliate even against American activists such as Christopher Ahn to flaunt the strength of the regime both at home and abroad."). Moreover, for reasons beyond comprehension, the Government goes further than mere reliance, and ***actively attempts to minimize the violent, coercive conduct of the North Korean regime*** in order to belatedly cast aspersions on the extradition court's evidentiary ruling. Let us be absolutely clear: the fact that North Korea punishes suspected defectors with "banishment to a gulag with their entire family and even execution", Dkt. 11-1 **(Ex. A)** at 14:6-8, corroborated by multiple North Korea experts including Professor Lee, is not an "unfounded claim." Opp at 18:18. North Korea's practice of rendering diplomats "captives of the state whose loved ones and associates back home are held hostage against their actions abroad," Dkt. 11-1 **(Ex. A)** at 14:1-3, is far more than mere "mistreat[ment]." Opp at 13:19. Kim Il Sung, Kim Jong Il, and Kim Jong Un are brutal dictators each responsible for the deaths of tens and thousands, not typical "political leaders," as the Government chooses to describe them. *Id.* at 9:21. And it is simply incredible that the Government persists in arguing that Mr. So was a qualified and impartial translator when the extradition court has already found that his purpose was to "[make] sure the other North Koreans' statements matched his, whether by coercing them to say what he wanted or simply translating them as he liked." Dkt. 11-1 **(Ex. A)** at 18:20-22. The Government did not need to do this: this evidence has already been excluded by the extradition court, and the Government cannot and does not seek to challenge that

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 23 -

RESPONSE BRIEF ISO HABEAS PETITION
2:22-CV-04320 FLA

1   ruling in its opposition. Yet in an effort to bolster the flimsy existing evidence

2   against Mr. Ahn, the Government voluntarily put pen to paper and whitewashed the

3   crimes of a totalitarian regime. Taken as a whole, this conduct from the

4   Government is repugnant, shocks the conscience, and compounds the due process

5   violation arising out of the Government's reckless disregard for Mr. Ahn's life.

6          The cases cited by the Government are all distinguishable from the

7   unprecedented facts of this case. In most cases invoking the humanitarian

8   exception, the alleged mistreatment stems from the requesting nation—the heart of

9   what is prohibited by the rule of non-inquiry.[10] In such cases, it is not surprising

10  that courts would decline to find a humanitarian exception. There are also a handful

11  of out-of-circuit cases cited by the Government where the alleged danger comes

12  from sources other than government actors of the requesting nation. Opp. at 70-71.

13  But in these cases, the courts declined to apply the humanitarian exception because

14  the facts did not warrant it—the alleged dangers were too speculative, general, or

15  lacking in severity to come close to meeting the substantive due process standard.

16  *See Sindona v. Grant*, 619 F. 2d 167, 174 (2d Cir. 1980) (evidence of risk of

17  murder at the hands of political enemies amounted to negative slogans at undated

18  protest); *Venckiene v. United States*, 929 F. 3d 843, 864 (only minimal evidence

19  from biased sources of risk of physical harm from unnamed actors); *Kin-Hong*, 110

20  F. 3d at 111 (fear of mistreatment by China unfounded in light of China's

---

[10] *See, e.g.*, *Munaf*, 553 U.S. at 700 (likelihood of being tortured by officials of requesting nation); *Prasoprat v. Benov*, 421 F. 3d 1009 (9th Cir. 2005) (severity of death penalty sentence in requesting nation); *Barapind v. Enomoto*, 360 F.3d 1061 (9th Cir. 2004) (mistreatment by authorities of requesting nation); *Mainero v. Gregg*, 164 F. 3d 1199 (9th Cir. 1999) (torture by authorities of requesting nation); *Meza v. U.S Atty. Gen*, 693 F. 3d 1350 (11th Cir. 2012) (torture in prison of requesting nation); *Venckiene v. United States*, 929 F. 3d 843 (7th Cir. 2019) (prison conditions in requesting nation); *Hoxha v. Levi*, 465 F. 3d 554 (3d Cir. 2006) (mistreatment by authorities of requesting nation); *Escobedo v. United States*, 623 F. 2d 1098 (5th Cir. 1980) (mistreatment by authorities of requesting nation); *Ahmad v. Wigen*, 910 F. 2d 1063 (2d. Cir. 1990) (unfair trial and mistreatment by authorities of requesting nation); *Extradition of Al-Nouri, No*. MJ-20-08033-PHX-MTM, 2022 WL 993781 (D. Ariz. Apr. 1, 2022) (abusive procedures within criminal justice system); *United States v. Harkness*, No. EDCV 22-85-SVW (KK), 2022 WL 3928372 (C.D. Cal. Aug. 31, 2022) (prison conditions in requesting nation).

RESPONSE BRIEF ISO HABEAS PETITION
2:22-CV-04320 FLA

agreement to maintain Hong-Kong's legal system for the next fifty years); *Noeller v. Wojdylo*, 922 F. 3d 797 (7th Cir. 2019) (vast majority of evidence of retribution by gang came from "necessarily interested defense witnesses"); [11] *Hilton v. Kerry*, 754 F. 3d 79, 81 (1st Cir. 2014) (risk of suicide came from relator himself); *Peroff v. Hylton*, 542 F. 2d 1247, 1249 (4th Cir. 1976) (risk of "potential assassins in Swedish prisons" not sufficient to warrant humanitarian exception). The facts in these cases are not comparable to the facts here. The danger to Mr. Ahn is not a general fear of North Korea—he has been informed that the North Korean government wants to kill him because of this case. [12] Moreover, none of those cases involved facts suggesting that the *United States* itself was committing a due process violation. *See Hilton*, 754 F. 3d at 87 (because United States had taken no actions other than the extradition proceedings, the reason of *Plaster* and *Burt* did not apply). These cases do not prohibit this Court from applying the humanitarian exception here.

## III.   LACK OF PROBABLE CAUSE

### A.   The Government Concedes That the Admissible Evidence is Insufficient to Establish Probable Cause By Relying on Excluded North Korean Statements

The extradition court has deemed all statements of North Korean witnesses – with the exception of Ms. Cho's hearsay statements to the police – to be incompetent and inadmissible. These witnesses had no choice but to tell Spanish authorities that the Madrid incident was a terrorist attack. For them, covering up their defection attempt was a matter of life and death Dkt. 11-2 (**Ex. B**) at 43:20-44:4.

The Government is fully aware of the extraordinary circumstances which gave rise to the false narrative that motivated this extradition, circumstances that it

---

[11] See *Matter of Extradition of Noeller*, No. 17 CR 664, 2018 WL 1027513, at *1 (N.D. Ill. Feb. 23, 2018).
[12] The case most analogous to this one remains *Wang*, where there was strong evidence that China wanted to target the petitioner for torture.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 25 -

RESPONSE BRIEF ISO HABEAS PETITION
2:22-CV-04320 FLA

has never disputed beyond attempting to wave them away as "general assumptions." Opp at 31:20. Despite this, the Government submits an opposition brief with a "Factual Background" section *composed almost entirely of the excluded statements of North Korean witnesses*. Attached as **Exhibit AA** to the Declaration of Christopher Jumin Lee is a copy of this section, with references to the excluded North Korean statements highlighted in red. As the sea of red strewn across these pages demonstrates, only one paragraph and a few footnotes in the government's summary of the "facts" come from admissible evidence. The rest is from the excluded statements, or Spanish court documents summarizing these statements.

In some instances, the Government even attempts to "launder" the excluded statements by misleadingly describing them as evidence, allegations, or information "provided by Spain." (*See, e.g.*, Opp at 6:14). But the coerced statement of a North Korean witness does not transform into "Spain's Evidence" just because it was submitted on the letterhead of the Spanish Ministry of Justice. Opp at 28 n.37 (citing to excluded witness statement of Mr. Jang). And the fact that Spain's extradition papers summarize the excluded statements is immaterial: these are mere accusations, and thus cannot support probable cause.  *See Choe*, 525 F.3d at 738.

### B.    Without the Excluded North Korean Statements, the Remaining Evidence is Nonsensical and Insufficient for Probable Cause

Once the North Korean witness statements and their false accusations of violence are properly excluded, what remains on the record is a panoply of confusing facts that are nonsensical absent further explanation.[13]  On February 22, 2022, Adrian Hong, the leader of a human rights group known to assist high-profile North Korean defectors, rang the doorbell of the North Korean embassy in Madrid. Dkt. 11-16 (**Ex. P**) at 55.  After a North Korean official voluntarily opened the door and let him in, a group of activists were able to stroll into the embassy of perhaps

---

[13] For the Court's convenience, Petitioner provided a chart summarizing which evidence was admitted by the extradition court in both his opening brief and the Declaration of Naeun Rim. Dkts. 11 and 14.

the most dangerous country in the world without force, Dkt. 11-16 (**Ex. P**) at 55-61 armed with nothing but toy guns, knives, and pepper spray. Dkt. 11-15 (**Ex. O**) at 71-73). Spanish passers-bys saw what looked like a struggle inside, but one remarked it looked like they were "practising." Dkt.11-16 (**Ex. P**) at 43.

As all of this was happening, one embassy resident jumped out of a window and told police – through Google Translate – that individuals had entered the embassy and were "eating people and there were children there." Dkt. 11-16 (**Ex. P**) at 19.  When Spanish police went to the embassy to investigate, Mr. Hong answered the door while pretending to be a North Korean official and told them there were no problems in the embassy. *Id.* at 14. Hours later, police officers observed Free Joseon departing the embassy while riding in embassy cars and Ubers. *Id.* at 17.  Shortly thereafter, around 9:22 p.m., *Id.* at 74, those same police officers observed three North Korean "students" arriving at the embassy at 9:22 p.m. *Id.* at 18.  Instead of asking the police outside the embassy for help, the "students" broke into the embassy by climbing over the outer wall. *Id.*

The North Korean officials emerged from the embassy twenty minutes later. Dkt. 11-16 (**Ex. P**) at 18), each displaying restraints despite the fact that many would later provide witness statements saying that they had freed themselves before exiting the embassy. *See* Dkt. 11-7 (**Ex. G**) at 10-12 (summarizing inconsistent testimony regarding restraints). The police were not able to enter into the embassy until "much, much later," Dkt. 11-16 (**Ex. P**) at 29, where they found an eclectic collection of items including toy guns, knives, and children's candy. Dkt. 11-15 (**Ex. O**) at 58-73. Free Joseon made no attempt to cover up their presence, hide the weapons or supplies they had brought inside, or to actually force any of the North Koreans to go with them, despite having had hours and ample opportunity to do any of these things. According to information the FBI provided Spain, immediately upon arriving in the United States, Hong contacted the FBI and voluntarily handed over certain items that had been taken from the embassy. Dkt. 11-15 (**Ex. O**) at 81.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 27 -

RESPONSE BRIEF ISO HABEAS PETITION
2:22-CV-04320 FLA

This convoluted hodgepodge of facts is not sufficient to establish probable cause. Without the excluded North Korean statements, the remaining evidence does not support any coherent narrative. The Government's continued reliance on the excluded statements is tacit acknowledgement of this. The existing record amounts to nothing more than a confusing series of events that requires further explanation.

Further, the Government cannot dispute that there is no admissible evidence whatsoever that Mr. Ahn personally threatened, restrained, or attacked anyone. Therefore, their theory of probable cause rests solely on the argument that Mr. Ahn could be liable as an accomplice under Spanish law.  Opp. at 18:120-19:5. But the Government offers no clarification as to what the requirements for accomplice liability are under Spanish law. This Court is not required to abandon its own probable cause analysis and "accept without question [Spain's] mere conclusions that the person whose arrest is sought has committed a crime." *Giordenello v. U.S.*, 357 U.S. 480, 486 (1958). In the United States, every state requires at least some degree of specific intent to assist in the commission of a crime for an individual to be liable as an accomplice. *See generally* John F. Decker, *The Mental State Requirement for Accomplice Liability in American Criminal Law*, 60 S. C. L. Rev. 239 (2008). In the Ninth Circuit, aiding and abetting liability requires proof of specific intent.  *U.S. v. Sayetsitty*, 107 F.3d 1405, 1412 (9th Cir. 1997) (holding that aiding and abetting requires ***both*** "specific intent to facilitate the commission of a crime by another" and "requisite intent of the underlying substantive offense"). There is no evidence on the record showing that Mr. Ahn knew anyone intended to commit crimes within the embassy, much less that he had specific intent to facilitate the commission of a crime.

### C.    The Extradition Court Should have Admitted Mr. Ahn's Declaration and Medical Records as  "Explanatory Evidence" that "Obliterates Probable Cause"

While a Relator cannot offer evidence regarding alibis, contradictory facts, or affirmative defenses to defeat probable cause, "explanatory evidence" that does not

1  contradict the facts as put forth by the government's evidence but instead puts them

2  in a light that "explains away or completely obliterates probable cause" is freely

3  admissible. *Santos*, 830 F.3d at 992-93. While probable cause is lacking even

4  absent the introduction of Mr. Ahn's Declaration and medical records, their

5  introduction completely obliterates probable cause.

6      Contrary to the Governments' assertions, this evidence does not contradict

7  any of the facts contained within the admissible evidence – it merely points the

8  Court towards an explanation of why the confusing events demonstrated by the

9  record may have occurred. All of the admissible evidence is entirely consistent with

10  Mr. Ahn's explanation that he believed he was there at the request of certain North

11  Koreans inside the embassy to assist them with a voluntary defection attempt. The

12  fact that Ms. Cho decided to jump out of the embassy does not mean Mr. Ahn did

13  not believe that the embassy officials had requested Free Joseon's assistance.[14]

14  *See* Dkt. 11-12 (**Ex. I**) ¶ 8).  The fact that Spanish witnesses observed Free Joseon

15  restraining people from outside the embassy, which they thought was "practising

16  *[sic]*", Dkt.11-16 (**Ex. P**) at 43, does not mean this could not have been done at the

17  request of the North Koreans, solely in order to credibly stage a kidnapping in front

18  of the surveillance cameras.  *See* Dkt. 11-12 (**Ex. I**) ¶ 12.  And nothing contradicts

19  Mr. Ahn's medical records which demonstrate that he had a broken hand, because

20  there is no evidence of Mr. Ahn personally restraining or assaulting anyone.[15]

21      All that this evidence does is explain ***why*** the confusing events observed by

22  the surveillance cameras and the Spanish witnesses occurred, and why – absent the

23  testimony fabricated by North Korea – those events cannot establish probable cause

24  that a crime was committed at the embassy: because Mr. Ahn and Free Joseon had

---

25  [14] In fact, Ms. Cho's conduct does not even preclude the possibility that she herself
26  was part of the group that made the request – her lifelong experience of
    indoctrination and fear of brutal reprisal from the regime could have simply led her
27  to experience cold feet at the last minute, as many others have in similar high-stress
    circumstances.
    [15]  While a North Korean witness falsely testified that Mr. Ahn had hit him, that
28  testimony was properly excluded. Dkt. 11-1 (**Ex. A**) at 18:23-26.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 29 -

RESPONSE BRIEF ISO HABEAS PETITION
2:22-CV-04320 FLA

been invited in by embassy officials who wanted to defect, and had asked them to stage a fake kidnapping so as to avoid potential retribution for their families in North Korea. This explanation "obliterates probable cause" for the crimes of breaking and entering, threats, causing injuries, and illegal restraint, because it obliterates any criminal intent on the part of Mr. Ahn.[16] It also establishes that the underlying conduct was not a crime because it occurred with the "victim's" consent. *See, e.g., People v. Mayberry*, 15 Cal.3d 143, 156 (Cal. 1975) (conviction for kidnapping unavailable if defendant "entertains a reasonable and bona fide belief that [the victim] voluntarily consented to accompany him"); *People v. Rivera*, 157 Cal. App. 3d 736, 742-43 (Cal. App. 1984) (reasonable belief that physical contact was consensual, even if mistake of fact, "negate[s] the element of intent" for assault); *People v. Yoder*, 100 Cal. App. 3d 333, 336 (Cal. App. 1979) (with regards to burglary, "in the absence of the required specific intent [to engage in illegal conduct] the crime is not committed.")[17]

Even if the Court does not consider Mr. Ahn's declaration for probable cause, it should consider it for the separate purpose of conducting the humanitarian exception analysis. There is little doubt that Mr. Ahn's explanation for the events that day is the only one that makes sense—that he and Free Joseon were there at the request of those inside the embassy to help them find a better life and escape the

---

[16] The lack of *mens rea* also negates the dual criminality requirement for extradition, because an individual who believes that he had consent for his actions could not have the requisite *mens rea* to commit a crime. *See* Petition at 57:1-58:20.

[17] The Government argues, *ipse dixit*, that the Court cannot consider *any* U.S. law on probable cause because the applicable standard is probable cause under Spanish law. Opp. at 18 n.23. This argument is contrary to well-established law. *See Santos*, 830 F.3d at 991 (describing the probable cause inquiry in an extradition hearing as "akin to a grand jury investigation or a preliminary hearing under Federal Rule of Criminal Procedure 5.1"). As the Government argues in its own brief, federal courts generally defer to the requesting country on extradition issues that implicate foreign law because they cannot be expected to "become conversant with" foreign criminal law. *Grin v. Shine*, 187 U.S. 181, 190 (1902). If this Court cannot conduct an independent probable cause inquiry based on Spanish law because it must defer to the Spanish Court's interpretation, *and* cannot do so based on U.S. law, then the probable cause requirement for extradition is a nullity: the requesting country need only represent that probable cause exists under their laws, and our federal courts would have no option but to meekly comply.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 30 -

RESPONSE BRIEF ISO HABEAS PETITION
2:22-CV-04320 FLA

oppressive North Korean regime. If that is truly the case, it would be a tragedy indeed to "send a U.S. citizen off to his likely assassination by a state sponsor of terrorism" based on a narrative driven by a North Korean agenda. See Dkt. 11-1 (**Ex. A**) at 42. As the South Korean legislators explained,

> The reason why the Kim Jong-un regime is going as far as fabricating the testimonies of the North Korean Embassy staff members to urge Christopher Ahn's extradition to Spain is to deprive hope from all of our North Korean compatriots who are yearning for freedom. Free Joseon's activities to support defection from North Korea opened paths toward freedom for numerous North Korean compatriots.

> Lee Decl., **Ex. AB** at 5.

That the Government is assisting North Korea in its efforts to deprive hope from those oppressed North Korean citizens who dream some day of living in a free society is deplorable, antipathetic to a federal court's sense of decency, and anti-American. Its willingness to rely on North Korean falsehoods to send an honorable man to his death more than meets the due process standard required for application of the humanitarian exception.

//
//
//
//
//
//
//
//
//
//
//
//

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 31 -

RESPONSE BRIEF ISO HABEAS PETITION
2:22-CV-04320 FLA

## IV.   **CONCLUSION**

For the above reasons, the Court should grant the petition.


Dated:   December 22, 2022                    MANATT, PHELPS & PHILLIPS, LLP


                                             By: */s/ Naeun Rim*
                                                 Naeun Rim
                                                 Attorneys for Petitioner
                                                 Christopher PHILIP AHN


                                             BIRD, MARELLA, BOXER,
                                             WOLPERT, NESSIM, DROOKS,
                                             LINCENBERG & RHOW, P.C


                                             By: */s/ Christopher J. Lee*
                                                 Christopher J. Lee
                                                 Ekwan E. Rhow
                                                 Attorneys for Petitioner


## **ATTESTATION**

Pursuant to L.R. 5-4.3.4, I attest that all other signatories listed, and on whose behalf the filing is submitted, concur in this content and have authorized the filing.

Dated:  December 22, 2022               By: */s/ Naeun Rim*
                                            Naeun Rim


401850402

Manatt, Phelps &
Phillips, LLP
Attorneys at Law
Los Angeles

- 32 -                    RESPONSE BRIEF ISO HABEAS PETITION
                          2:22-CV-04320 FLA