1    E. MARTIN ESTRADA
     United States Attorney
2    ANNAMARTINE SALICK
     Assistant United States Attorney
3    Chief, National Security Division
     JOHN J. LULEJIAN (Cal. Bar No. 186783)
4    Assistant United States Attorney
         1200 United States Courthouse
5        312 North Spring Street
         Los Angeles, California 90012
6        Telephone: (213) 894-0721
         Facsimile: (213) 894-0141
7        E-mail:   John.Lulejian@usdoj.gov

8    Attorneys for
     UNITED STATES OF AMERICA
9    Acting on Behalf of Respondent
     DAVID M. SINGER, U.S. Marshal

10

11                   UNITED STATES DISTRICT COURT

12            FOR THE CENTRAL DISTRICT OF CALIFORNIA

13   CHRISTOPHER PHILIP AHN,          No. 2:22-cv-04320-FLA (JPRx)

14         Petitioner,                RESPONDENT'S RESPONSE TO ORDER TO
                                       SHOW CAUSE RE: WHETHER PROBABLE
15              v.                     CAUSE SUPPORTING EXTRADITION
                                       EXISTS IN LIGHT OF ONGOING
16   DAVID M. SINGER, U.S. Marshal,    HOSTILITIES BETWEEN THE
                                       UNITED STATES AND NORTH KOREA;
17         Respondent.                 MEMORANDUM OF POINTS AND
                                       AUTHORITIES
18

19

20        The United States of America, by and through its counsel of

21   record, the United States Attorney for the Central District of

22   California and Assistant United States Attorney John J. Lulejian,

23   acting on behalf of Respondent David M. Singer, U.S. Marshal, hereby

24   submits Respondent's Response to the Court's Order to Show Cause Re:

25   Whether Probable Cause Supporting Extradition Exists in Light of

26   Ongoing Hostilities Between the United States and North Korea.  This

27   response is based on the attached Memorandum of Points and

28   Authorities and the records and files of this case.

For the reasons set forth in detail below, the United States respectfully requests that the Court find that petitioner CHRISTOPHER PHILIP AHN's ("Petitioner") conduct would be criminal in the United States if it had been committed here, and deny his petition for a writ of habeas corpus ("habeas petition").

Dated: February 8, 2023          Respectfully submitted,

                                 E. MARTIN ESTRADA
                                 United States Attorney

                                 ANNAMARTINE SALICK
                                 Assistant United States Attorney
                                 Chief, National Security Division


                                 */s/ John J. Lulejian*
                                 JOHN J. LULEJIAN
                                 Assistant United States Attorney

                                 Attorneys for
                                 UNITED STATES OF AMERICA
                                 Acting on Behalf of Respondent
                                 DAVID M. SINGER, U.S. Marshal

**TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                    <u>PAGE</u>

TABLE OF AUTHORITIES................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION..................................................1

II.   THE PROBABLE CAUSE AND DUAL CRIMINALITY REQUIREMENTS ARE
      SATISFIED IN THIS CASE.......................................3

      A.    Background.............................................3

      B.    General Principles of Dual Criminality.................6

      C.    Petitioner's Conduct Would Be Criminal Under
            United States Law......................................8

            1.    Dual Criminality Is Established by United States
                  Laws that Apply Irrespective of the Victim's
                  Diplomatic Status or the Location Targeted.......9

            2.    Dual Criminality Is Established by United States
                  Laws that Relate Specifically to the Protection
                  of Diplomats and Property.......................11

            3.    Any Ambiguity Regarding Dual Criminality Must Be
                  Resolved in Favor of Extradition................18

III.  PETITIONER HAS WAIVED ANY DEFENSE RELATED TO THE QUESTION
      PRESENTED BY THE COURT BY FAILING TO ASSERT IT..............19

IV.   CONCLUSION..................................................21

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                  <u>PAGE</u>

<u>FEDERAL CASES</u>

<u>Arbaugh v. Y&H Corp.</u>,
   546 U.S. 500 (2006) ............................................. 21

<u>Arias Leiva v. Warden</u>,
   928 F.3d 1281 (11th Cir. 2019) ......................... 5, 13, 14

<u>Bisram v. Quay</u>,
   No. 17-CV-6730 (KAM), 2018 WL 5624147
   (E.D.N.Y. Oct. 30, 2018) ....................................... 20

<u>Bisram v. United States</u>,
   777 F. App'x 563 (2d Cir. 2019) ............................... 20

<u>Boos v. Barry</u>,
   485 U.S. 312 (1988) ........................................... 18

<u>Cedarbloom v. United States</u>,
   No. 3:17-CV-01436-MO, 2018 WL 2437162
   (D. Or. May 29, 2018) ......................................... 13

<u>Clarey v. Gregg</u>,
   138 F.3d 764 (9th Cir. 1998) ............................ 6, 8, 11

<u>Collins v. Loisel</u>,
   259 U.S. 309 (1922) ............................................ 6

<u>Cucuzzella v. Keliikoa</u>,
   638 F.2d 105 (9th Cir. 1981) ................................... 7

<u>Emami v. U.S. Dist. Ct. for N. Dist. of California</u>,
   834 F.2d 1444 (9th Cir. 1987) .............................. 7, 10

<u>Factor v. Laubenheimer</u>,
   290 U.S. 276 (1933) ....................................... 18, 19

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                              PAGE

Finzer v. Berry,
   798 F.2d 1450 (D.C. Cir. 1986) .................................. 18

In re Extradition of Cheung,
   968 F. Supp. 791 (D. Conn. 1997) ................................. 5

In re Extradition of Lui,
   939 F. Supp. 934 (D. Mass. 1996) ................................. 4

In re Extradition of Tang Yee-Chun,
   674 F. Supp. 1058 (S.D.N.Y. 1987) ............................... 13

In re Solis,
   402 F. Supp. 2d 1128 (C.D. Cal. 2005) ............................ 5

Jhirad v. Ferrandina,
   536 F.2d 478 (2d Cir. 1976) ..................................... 20

Lo Duca v. United States,
   93 F.3d 1100 (2d Cir. 1996) ................................. 19, 20

Ludecke v. U.S. Marshal,
   15 F.3d 496 (5th Cir. 1994) ..................................... 19

Man-Seok Choe v. Torres,
   525 F.3d 733 (9th Cir. 2008) .................................... 11

Manta v. Chertoff,
   518 F.3d 1134 (9th Cir. 2008) .................................... 5

Martinez v. United States,
   828 F.3d 451 (6th Cir. 2016) .................................... 19

Nezirovic v. Holt,
   779 F.3d 233 (4th Cir. 2015) .................................... 19

Ntakirutimana v. Reno,
   184 F.3d 419 (5th Cir. 1999) .................................... 20

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                              PAGE

Oen Yin-Choy v. Robinson,

  858 F.2d 1400 (9th Cir. 1988) .................................. 7

Peters v. Egnor,

  888 F.2d 713 (10th Cir. 1989) ................................. 7

Quinn v. Robinson,

  783 F.2d 776 (9th Cir. 1986) .................................. 5

Santos v. Thomas,

  830 F.3d 987 (9th Cir. 2016) ............................... 3, 5

Seismic Reservoir 2020, Inc. v. Paulsson,

  785 F.3d 330 (9th Cir. 2015) ................................. 20

Theron v. United States Marshal,

  832 F.2d 492 (9th Cir. 1987) .............................. 7, 13

United States ex rel. Sakaguchi v. Kaulukukiu,

  520 F.2d 726 (9th Cir. 1975) ................................. 18

United States v. Grimon,

  923 F.3d 1302 (11th Cir. 2019) ........................... 20, 21

United States v. Kin-Hong,

  110 F.3d 103 (1st Cir. 1997) .............................. 5, 19

United States v. Knotek,

  925 F.3d 1118 (9th Cir. 2019) ........................... 4, 6, 7

United States v. Lewellyn,

  481 F.3d 695 (9th Cir. 2007) ................................. 10

United States v. Soto-Barraza,

  947 F.3d 1111 (9th Cir. 2020) .............................. 6, 7

United States v. Wells,

  519 U.S. 482 (1997) .......................................... 7

iv

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

United States v. Wiebe,

  733 F.2d 549 (8th Cir. 1984) ................................... 19


FEDERAL STATUTES

18 U.S.C. § 11 ................................................ 15

18 U.S.C. § 112 .............................................. 17

18 U.S.C. § 112(a) ................................. 11, 12, 15, 16

18 U.S.C. § 112(b) ........................................... 12

18 U.S.C. § 112(b)(2) ............................... 12, 15, 16

18 U.S.C. § 112(c) ........................................... 14

18 U.S.C. § 113(a)(6) ................................... 9, 10

18 U.S.C. § 970(a) .................................. 12, 15, 16

18 U.S.C. § 970(c) ........................................... 14

18 U.S.C. § 1001 ............................................. 14

18 U.S.C. § 1014 ............................................. 13

18 U.S.C. § 1116(b) .......................................... 14

18 U.S.C. § 1116(b)(2) ....................................... 16

18 U.S.C. § 1116(b)(3) ....................................... 15

18 U.S.C. § 1116(b)(4) ....................................... 17

18 U.S.C. § 1116(b)(4)(B) .................................... 15

18 U.S.C. § 1201(a)(4) .............................. 12, 14, 15

18 U.S.C. § 1201(c) ................................. 12, 17

18 U.S.C. § 2113 ............................................. 13

18 U.S.C. § 2113(b) .......................................... 13

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                              PAGE

STATE STATUTES

Cal. Penal Code § 236 ......................................... 10

Cal. Penal Code § 237 ......................................... 10

Cal. Penal Code § 242 ......................................... 10

Cal. Penal Code § 243(d) ...................................... 10

Cal. Penal Code § 422 ....................................... 10-11

Cal. Penal Code § 422(a) ...................................... 11

Cal. Penal Code § 459 ......................................... 10

Cal. Penal Code § 461 ......................................... 10

Cal. Penal Code § 1170(h) ................................. 10, 11


FOREIGN STATUTES

C.P., art. 147 ................................................. 4

C.P., art. 147(1) .............................................. 8

C.P., art. 163 ............................................... 4, 8

C.P., art. 165 ................................................. 4

C.P., art. 169 ................................................. 4

C.P., art. 169(2) .............................................. 8

C.P., art. 171 ................................................. 4

C.P., art. 202 ................................................. 4

C.P., art. 202(1) .............................................. 8

C.P., art. 203 ................................................. 4

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

LEGISLATIVE MATERIALS

H.R. No. 92-1202 ............................................ 15

S. Rep. No. 92 ............................................. 15

To Provide for the Expanded Protection of Public

       Officials and Foreign Officials: Hearing on

       H.R. 10502 Before the Subcomm. No. 2 of the

       H.R. Comm. on the Judiciary, 92nd Cong. (1972)............... 15


TREATIES AND INTERNATIONAL AGREEMENTS

Convention on the Prevention and Punishment of Crimes Against

       Internationally Protected Persons, Including

       Diplomatic Agents, Dec. 14, 1973, 1035 U.N.T.S. 167,

       28 U.S.T. 1975; TIAS 8532............................... 16, 17

Treaty of Extradition Between the United States of America

       and Spain, U.S.-Spain, May 29, 1970, 22 U.S.T. 737;

       Supplementary Treaty Amending the Treaty of May 29, 1970,

       U.S.-Spain, Jan. 25, 1975, 29 U.S.T. 2283; Second

       Supplementary Extradition Treaty Between the United States

       of America and the Kingdom of Spain, U.S.-Spain, Feb. 9,

       1988, S. Treaty Doc. No. 102-24 (1992); Third Supplementary

       Extradition Treaty Between the United States of America and

       the Kingdom of Spain, U.S.-Spain, Mar. 12, 1996, S. Treaty

       Doc. No. 105-15 (1997); and  Instrument as contemplated by

       Article 3(2) of the Agreement on Extradition Between the

       United States of America and the European Union signed

       25 June 2003, as to the application of the Treaty on

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                    PAGE

Extradition Between the United States of America and

Spain signed 29 May 1970, and the Supplementary Treaties

on Extradition signed 25 January 1975, 9 February 1988 and

12 March 1996, U.S.-Spain, Dec. 17, 2004, S. Treaty Doc.

No. 109-14 (2006)....................................... 3, 4

1

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

**I.    INTRODUCTION**

3       This case involves Petitioner's challenge, via a <u>habeas</u>

4    petition, to his extradition to stand trial in the Kingdom of Spain

5    ("Spain") for crimes relating to an attack on the embassy of the

6    Democratic People's Republic of Korea ("DPRK") in Madrid, Spain.  On

7    January 8, 2023, following the completion of briefing on the <u>habeas</u>

8    petition, the Court issued an Order to Show Cause.  (<u>See</u> HR 36.)[1]  In

9    that Order, the Court observed that, while the Extradition Court

10          found that "probable cause exists to believe that
            [Petitioner] committed the crimes of breaking and entering,
11          illegal restraint, causing injuries, and threats under
            Spanish law," the parties did not address whether
12          Petitioner's conduct is considered criminal in the
            United States, in light of the ongoing hostilities that
13          exist between the United States and North Korea, the lack
            of a peace treaty, and North Korea's sponsorship of
14          terrorism.

15    (<u>Id.</u> at 5 (citation omitted).)  Accordingly, the Court ordered the

16    parties to address the specific issue of "whether probable cause

17    exists that Petitioner . . . committed conduct that would be

18    considered criminal under United States law, in light of the ongoing

19    hostilities and unique circumstances surrounding the relationship

20    between the United States and North Korea."  (<u>Id.</u> at 6.)

21       As detailed below, the relationship between the United States

22    and the DPRK does not negate probable cause that Petitioner committed

23    the criminal conduct alleged by Spain — namely, unlawfully gaining

24    entry to the embassy, breaking down doors, seizing electronic items,

25

26       [1] "ER" refers to the Clerk's Record in <u>United States v. Ahn</u>,
    Case No. 2:19-cv-05397-FLA-JPR, the case before the Extradition
27    Court, and "HR" refers to the Clerk's Record in the instant <u>habeas</u>
    case, <u>Ahn v. Singer</u>, Case No. 2:22-cv-04320-FLA; all such references
28    are followed by the docket number and the applicable page.

physically assaulting and restraining diplomats and other members of
the mission, and holding them and their families hostage for
approximately four-and-a-half hours — nor does it negate the
criminality of such conduct under United States law.  As an initial
matter, probable cause that Petitioner committed crimes in violation
of Spain's laws does not depend on the nature of relations between
the DPRK and a third party, the United States.  Moreover, Spain has
charged Petitioner with general crimes against person and property,
and not crimes specifically against diplomatic personnel and
premises.  Analogously, Petitioner's conduct would amount to general
crimes in the United States, such that dual criminality as required
under the relevant extradition treaty is properly established without
consideration of the nature of United States-DPRK relations.

But even if the Court were to take into account the fact that
Petitioner is alleged to have specifically targeted diplomatic
personnel and premises, dual criminality would still be established.
Under long-standing principles of extradition law, the dual-
criminality inquiry in this case does not require consideration of
the specific victim country, but rather simply whether an attack on a
diplomatic mission within the United States would be criminal.  In
any event, as is evident from the text of the relevant statutes and
their legislative history, United States federal statutes criminalize
conduct involving diplomatic targets, even when the United States
lacks relations, or is engaged in any hostilities, with the relevant
foreign government.  Furthermore, to the extent that there is any
ambiguity, pursuant to Supreme Court precedent, the Court must
approach the dual-criminality analysis with a view toward finding the
offenses extraditable.  And regardless, because Petitioner failed

previously to raise any defense based on the question presented by the Court in its Order, he has waived it, and it does not provide a basis for <u>habeas</u> relief.

Accordingly, the requirements of probable cause and dual criminality have been met in this case, and the Court should deny Petitioner's <u>habeas</u> petition.

## II.  THE PROBABLE CAUSE AND DUAL CRIMINALITY REQUIREMENTS ARE SATISFIED IN THIS CASE.

### A.  Background

As described in the United States' prior filing (HR 30 at 18-20, 30), it is well-established that the purview of an extradition court is narrow.  Such a court's inquiry is "limited" to two main issues: "first, whether the crime of which the person is accused is extraditable, that is, whether it falls within the terms of the extradition treaty between the United States and the requesting state, and second, whether there is probable cause to believe the person committed the crime charged."  <u>Santos v. Thomas</u>, 830 F.3d 987, 991 (9th Cir. 2016).  Likewise, a court reviewing an extradition court's certification order via a petition for a writ of <u>habeas corpus</u> considers "whether . . . the accused's alleged offense fell within the treaty's terms, and [whether] there is 'any competent evidence' supporting the probable cause determination of the [extradition] magistrate."  <u>Id.</u> at 1001 (citation omitted).

In this case, with respect to the first issue, Article II of the extradition treaty between the United States and Spain[2] states that

---

[2] Treaty of Extradition Between the United States of America and Spain, U.S.-Spain, May 29, 1970, 22 U.S.T. 737; Supplementary Treaty Amending the Treaty of May 29, 1970, U.S.-Spain, Jan. 25, 1975, 29

*(footnote cont'd on next page)*

"[a]n offense shall be an extraditable offense if it is punishable under the laws in both [the United States and Spain] by deprivation of liberty for a period of more than one year or by a more severe penalty." See Treaty, art. II(A).[3]  In other words, there must be dual criminality.  See, e.g., United States v. Knotek, 925 F.3d 1118, 1128-31 (9th Cir. 2019).  The crimes at issue in this case are as follows: (1) illegal restraint, in violation of Spanish Penal Code ("C.P."), arts. 163 & 165; (2) breaking and entering, in violation of C.P., arts. 202 & 203; (3) causing injuries, in violation of C.P., art. 147; and (4) threats, in violation of C.P., arts. 169 & 171.

Whether the crimes for which extradition is sought are covered by the applicable treaty and whether there is probable cause of those crimes are two separate issues.  See, e.g., In re Extradition of Lui, 939 F. Supp. 934, 946 (D. Mass. 1996) (while "it might initially appear that the separate probable cause inquiry will always subsume

---

U.S.T. 2283; Second Supplementary Extradition Treaty Between the United States of America and the Kingdom of Spain, U.S.-Spain, Feb. 9, 1988, S. Treaty Doc. No. 102-24 (1992); Third Supplementary Extradition Treaty Between the United States of America and the Kingdom of Spain, U.S.-Spain, Mar. 12, 1996, S. Treaty Doc. No. 105-15 (1997); and  Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Treaty on Extradition Between the United States of America and Spain signed 29 May 1970, and the Supplementary Treaties on Extradition signed 25 January 1975, 9 February 1988 and 12 March 1996, U.S.-Spain, Dec. 17, 2004, S. Treaty Doc. No. 109-14 (2006) (collectively, the "Treaty").

[3] The Treaty further provides that "[e]xtradition shall also be granted for participation in any of these offenses . . . when such participation, attempt or conspiracy is subject, under the laws of both Parties, to a term of imprisonment exceeding one year."  Treaty, art. II(B).  In addition, "[i]f extradition has been granted for an extraditable offense, it shall also be granted for any other offense specified in the request even if the latter offense is punishable by less than one year's deprivation of liberty, provided that all other requirements for extradition are met."  Id., art. II(D).

1    the dual criminality analysis[,] [t]his will not necessarily always

2    be the case"). For purposes of evaluating the former, where, as

3    here, the treaty establishes a requirement of dual criminality, the

4    Court examines whether "the particular act charged, taken as true,

5    would be criminal in both jurisdictions." Arias Leiva v. Warden, 928

6    F.3d 1281, 1293 (11th Cir. 2019) (citation and quotation marks

7    omitted; emphasis altered); see also, e.g., In re Solis, 402 F. Supp.

8    2d 1128, 1131-32 (C.D. Cal. 2005); In re Extradition of Cheung, 968

9    F. Supp. 791, 794 n.6 (D. Conn. 1997). By contrast, for purposes of

10   evaluating probable cause, the Court examines whether there is "any

11   competent evidence to support the belief" that the person sought

12   committed the crimes charged, i.e., the foreign offenses. Quinn v.

13   Robinson, 783 F.2d 776, 815 (9th Cir. 1986); see also, e.g., Manta v.

14   Chertoff, 518 F.3d 1134, 1145 (9th Cir. 2008); United States v. Kin-

15   Hong, 110 F.3d 103, 120 (1st Cir. 1997) ("Inherent in the probable

16   cause standard is the necessity of a determination that the evidence

17   is both sufficiently reliable and of sufficient weight to warrant the

18   conclusion.").[4]

19

20   _____

     [4] In his habeas reply brief, Petitioner contorts the United

21   States' argument that United States case law regarding the extent to
     which criminal liability may be based on mere presence at a crime

22   scene is inapposite for purposes of the probable-cause inquiry,
     broadly — and incorrectly — claiming that "[the] Government argues,

23   ipse dixit, that the Court cannot consider **any** U.S. law on probable
     cause." (HR 35 at 30 n.17 (emphasis in original) (citing ER 30 at 32

24   n.23).) To be clear, an extradition court applies the U.S. standard
     of probable cause when considering whether the requesting country has

25   provided sufficient evidence to establish a belief that the fugitive
     committed crimes in violation of the requesting country's laws. See,

26   e.g., Santos, 830 F.3d at 991. However, United States law does not
     govern what conduct constitutes a violation of those laws. See,

27   e.g., Arias Leiva, 928 F.3d at 1295-96 ("[Extradition] judges do not
     decide the legality of a fugitive's conduct . . . . Indeed, the

28   whole point of extradition is to permit the requesting country . . .
     to make (or enforce) its own determination.").

                                    5

1    Here, the status of relations between United States and the DPRK

2 has no bearing on either dual criminality or probable cause.  In

3 particular, with respect to the latter, whether Spain provided

4 competent evidence to support the belief that Petitioner committed

5 illegal restraint, breaking and entering, causing injuries,

6 and threats in violation of Spanish law does not depend at all on

7 United States-DPRK relations.  With respect to the former, whether

8 the conduct alleged by Spain would be criminal in the United States

9 had it been committed here similarly does not depend on such

10 relations, as explained further below.

11    **B.   General Principles of Dual Criminality**

12    "[T]he principle of 'dual criminality' [is] that 'an accused

13 person can be extradited only if the conduct complained of is

14 considered criminal by the jurisprudence or under the laws of both

15 the requesting and requested nations.'"  United States v. Soto-

16 Barraza, 947 F.3d 1111, 1116 (9th Cir. 2020) (citation omitted);

17 Collins v. Loisel, 259 U.S. 309, 311 (1922) ("an offense is

18 extraditable only if the acts charged are criminal by the laws of

19 both countries").  It is thus "a fact-based inquiry."  Knotek, 925

20 F.3d at 1129; see also, e.g., Clarey v. Gregg, 138 F.3d 764, 765 (9th

21 Cir. 1998) ("The primary focus of dual criminality has always been on

22 the conduct charged; the elements of the analogous offenses need not

23 be identical.").  This requirement dates back over 100 years to the

24 Supreme Court's decision in Collins, and it remains the undisputed

25 standard for interpreting dual-criminality provisions today.[5]  See,

26

27    [5] It is common understanding that a conduct-based test applies
to a dual-criminality provision even when the specific treaty
28 language does not specify that the underlying acts or conduct govern.
*(footnote cont'd on next page)*

6

e.g., United States v. Soto-Barraza, 947 F.3d 1111, 1117 (9th Cir. 2020) (applying conduct-based test to dual-criminality provision).

"[D]ual criminality exists if the 'essential character' of the acts criminalized by the law of each country are the same and if the laws are 'substantially analogous.'" United States v. Oen Yin-Choy v. Robinson, 858 F.2d 1400, 1404 (9th Cir. 1988) (citing Theron v. United States Marshal, 832 F.2d 492, 495 (9th Cir. 1987), cert. denied, 486 U.S. 1059 (1988), abrogated on other grounds by United States v. Wells, 519 U.S. 482 (1997)). "[T]he name by which the crime is described in the two countries need not be the same, nor does the scope of liability for the crime need to be the same." Emami v. U.S. Dist. Ct. for N. Dist. of California, 834 F.2d 1444, 1450 (9th Cir. 1987). Further, "[s]tatutes are substantially analogous when they punish conduct falling within the broad scope of the same generally recognized crime." Peters v. Egnor, 888 F.2d 713, 719 (10th Cir. 1989)(quotations and citations omitted).

Dual criminality may be established if the conduct involved in the foreign offense would be criminal under either United States federal law, the law of the state in which the extradition hearing is held, or the law of a preponderance of the states. See Cucuzzella v. Keliikoa, 638 F.2d 105, 107-08 (9th Cir. 1981).

---

See, e.g., Knotek, 925 F.3d at 1131 (applying conduct-based test where dual-criminality provision in United States-Czech Republic extradition treaty renders offense extraditable if "it is punishable under the laws of the Requesting and Requested States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty").

1

      **C.**    **Petitioner's Conduct Would Be Criminal Under**
                     **United States Law.**

2

3       Because "the laws of both [Spain and the United States] appear

4  to be directed to the same basic evil, the statues are substantially

5  analogous, and can form the basis of dual criminality."  See Clarey,

6  138 F.3d at 765.  As the United States previously detailed (see HR 30

7  at 20-26), Spain alleges that Petitioner and his co-conspirators

8  engaged in the invasion of a foreign government's embassy, during

9  which they assaulted, battered, restrained, injured, and threatened

10  its residents.  Spain charged Petitioner with crimes against persons

11  and property, namely: (1) "lock[ing] up or detain[ing] other,

12  depriving them of their freedom . . ." (illegal restraint);[6] "via any

13  means or procedure, caus[ing] another individual an injury that

14  impairs his or her bodily, physical  or mental integrity . . ."

15  (causing injuries);[7] "threaten[ing] others with causing them, their

16  family or other persons with whom they are intimately related

17  detriment entailing homicide, injuries, . . . offences against

18  liberty, [or] torture . . ." (threats);[8] and "enter[ing] the dwelling

19  of another or remain[ing] there against the will of the

20  resident . . ." (breaking and entering).[9]

21

22

---

23      [6] C.P. art. 163 provides that the maximum penalty for this crime
is four years' imprisonment.  (ER 55-3 at 87-88.)

24      [7] C.P. art. 147(1) provides that the maximum penalty for this

25  crime, given the evidence presented by Spain, is three years'
imprisonment.  (ER 55-3 at 87.)

26      [8] C.P. art. 169(2) provides that the maximum penalty for this
crime, given the evidence presented by Spain, is two years'

27  imprisonment.  (ER 155-3 at 88.)

      [9] C.P. art. 202(1) provides that the maximum penalty for this

28  crime, given the evidence presented by Spain, is two years'
imprisonment.  (ER 155-3 at 88-89.)

1    The Spanish statutes are broad and cover a wide range of

2  conduct.  None of the crimes against person (illegal restraint,

3  causing injuries, and threats) is contingent on the nationality of

4  the victims or their diplomatic status.  Similarly, the charged

5  property crime (breaking and entering) does not require any specific

6  kind of dwelling, let alone one associated with a diplomatic mission.

7  Thus, the "essential character" of the crimes Spain seeks to punish

8  is simply that involving general harm or threatened harm to person

9  and property.

10    If Petitioner committed the conduct alleged by Spain in the

11  United States, he could be charged with a number of crimes in

12  violation of United States law, including those that, like Spain's,

13  do not depend on the identity of the victim or the nature of dwelling

14  targeted, as well as those that are designed specifically to protect

15  foreign officials and related individuals and their property.[10]

16    1.  Dual Criminality Is Established by United States Laws
        that Apply Irrespective of the Victim's Diplomatic
17        Status or the Location Targeted.

18    Taking a broad approach, as with Spain's charges, Petitioner

19  could be prosecuted in the United States under federal and state

20  statutes for breaking and entering into a dwelling that is not his

21  and for restraining, injuring, and threatening the people inside.

22  For example, Petitioner's conduct could run afoul of 18 U.S.C.

23  § 113(a)(6), which proscribes "[a]ssault resulting in serious bodily

24  injury" "within the special maritime and territorial jurisdiction of

25

26

27

28    [10] A list of all such statutes is set forth in Appendix B
     (Revised), attached to the United States' Reply in Support of its
     Request for Certification of Extradition.  (See ER 187-2 at 2-3.)

9

the United States."[11]  See United States v. Lewellyn, 481 F.3d 695, 697 (9th Cir. 2007) (proof of battery supports assault conviction). Petitioner also could be prosecuted for battery under Section 242 of the California Penal Code, which proscribes "any willful and unlawful use of force or violence upon the person of another."[12]  Likewise, he could be prosecuted for false imprisonment under Section 236 of the California Penal Code, which proscribes "the unlawful violation of the personal liberty of another."[13]  He also could be prosecuted for forcible entry and detainer under Section 459 of the California Penal Code, which proscribes "enter[ing] any house, room, apartment . . . with intent to commit . . . any felony . . . ."[14]  Finally, Petitioner could be prosecuted for criminal threats under Section 422 of the California Penal Code, which punishes:

> willfully threaten[ing] to commit a crime which will result
> in death or great bodily injury to another person, with the
> specific intent that the statement, made verbally, in
> writing, or by means of an electronic communication device,
> is to be taken as a threat, even if there is no intent of
> actually carrying it out, which, on its face and under the
> circumstances in which it is made, is so unequivocal,
> unconditional, immediate, and specific as to convey to the
> person threatened, a gravity of purpose and an immediate
> prospect of execution of the threat, and thereby causes
> that person reasonably to be in sustained fear for his or

---

[11] The maximum penalty for this crime is ten years' imprisonment. See 18 U.S.C. § 113(a)(6).  For purposes of the dual criminality analysis, the Court need not consider the jurisdictional element of the United States statute.  See Emami, 834 F.2d at 1450 ("It does not matter that the German statute does not contain the jurisdictional element of a use of the mails.  The substantive conduct each statute punishes is functionally identical.").

[12] The maximum penalty for this crime is four years' imprisonment.  See Cal. Penal §§ 243(d), 1170(h).

[13] The maximum penalty for this crime is three years' imprisonment.  See Cal. Penal §§ 237, 1170(h).

[14] The maximum penalty for this crime is six years' imprisonment. See Cal. Penal § 461.

10

1        her own safety or for his or her immediate family's
2        safety . . . .[15]

3        While the names of these statutes and their elements are not
4    identical to those of the charged Spanish laws, the United States
5    statutes address the same essential character of the acts
6    criminalized by Spain.  See, e.g., Clarey, 138 F.3d at 765-66 (where
7    fugitive was charged with simple homicide based on having caused the
8    death of the victim by beating him during a robbery, dual criminality
9    was established because such conduct would amount to felony murder
10   under United States law); Man-Seok Choe v. Torres, 525 F.3d 733, 738
11   (9th Cir. 2008) ("The fact that the Korean law is broader than ours,
12   and thus punishes conduct that would not be unlawful here, is of no
13   consequence [and does not defeat dual criminality], so long as the
14   particular conduct Choe is charged with is prohibited in both
15   countries.").  Given the broad applicability of these statutes, the
16   nature of the United States-DPRK relations has no effect thereon.
17   Accordingly, dual criminality may be established without regard to
18   such relations.

19            2.   Dual Criminality Is Established by United States Laws
                    that Relate Specifically to the Protection of
20                  Diplomats and Property.

21        Even if dual criminality were not satisfied by the state and
22   federal statutes identified above, it would be satisfied by other
23   federal statutes that specifically protect diplomats, family members,
24   and employees attached to diplomatic missions in the United States,
25   as well as the property of the mission.  For example, 18 U.S.C.
26   § 112(a) punishes

27   _____

28        [15] The maximum penalty for this crime is three years'
     imprisonment.  See Cal. Penal §§ 422(a), 1170(h).

> Whoever assaults, strikes, wounds, imprisons, or offers violence to a foreign official, official guest, or internationally protected person or makes any other violent attack upon the person or liberty of such person, or, if likely to endanger his person or liberty, makes a violent attack upon his official premises, private accommodation, or means of transport or attempts to commit any of the foregoing . . . .[16]

Likewise, 18 U.S.C. § 1201(a)(4) punishes

> Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when--
>
> *     *     *
>
> the person is a foreign official, an internationally protected person, or an official guest . . . .[17]

Further, 18 U.S.C. § 112(b)(2) punishes a person who willfully "attempts to intimidate, coerce, threaten, or harass a foreign official or an official guest or obstruct a foreign official in the performance of his duties."[18]  Finally, 18 U.S.C. § 970(a) punishes "[w]hoever willfully injures, damages, or destroys, or attempts to injure, damage, or destroy, any property, real or personal, located within the United States and belonging to or utilized or occupied by any foreign government or international organization, by a foreign official or official guest . . . ."[19]

For purposes of the dual-criminality analysis, the Court considers whether these statutes would apply if Petitioner had

---

[16] The maximum punishment for this crime is 10 years' imprisonment.  18 U.S.C. § 112(a).

[17] The maximum penalty for this crime is life imprisonment.  See 18 U.S.C. § 1201(c).

[18] While the maximum penalty for this crime is six months' imprisonment, 18 U.S.C. § 112(b), it is extraditable pursuant to article II(D) of the Treaty.

[19] The maximum punishment for this crime is five years' imprisonment.  18 U.S.C. § 970(a).

12

attacked an embassy and its inhabitants in the United States.  It
does not consider specifically whether such statutes would apply if
Petitioner had attacked a DPRK embassy and its inhabitants in the
United States, as doing so would be too granular for the requisite
same "essential character" inquiry.  Indeed, the Ninth Circuit has
adopted a more flexible approach.  For example, in Theron v. U.S.
Marshal, the Ninth Circuit concluded that, where a fugitive was
charged with obtaining and using an overdraft line of credit on his
checking account with a South African bank without disclosing that he
was insolvent, and participating in a check-kiting scheme, dual
criminality was established based on 18 U.S.C. §§ 1014 and 2113(b),
inter alia, even though those statutes apply only in the case of
banks insured by the United States government.  832 F.2d at 496-97.
The Court did not address the statutes' Commerce Clause
jurisdictional requirements, which do not bear on the "essential
character" of the crimes.  See id.; see also, e.g., In re Extradition
of Tang Yee-Chun, 674 F. Supp. 1058, 1067 (S.D.N.Y. 1987) (finding
dual criminality and expressly disregarding the requirements in
18 U.S.C. §§ 1005 and 1006 that the bank involved be federally
insured); Cedarbloom v. United States, No. 3:17-CV-01436-MO, 2018 WL
2437162, at *2 (D. Or. May 29, 2018) (rejecting fugitive's claim that
dual criminality was lacking "because bank robbery under the 18
U.S.C. § 2113 requires that the victim bank be an FDIC-insured
institution, and there is no dispute that [the victim bank in that
case] is not insured by the FDIC").

    The Eleventh Circuit followed a similar approach in Arias Leiva
v. Warden, 928 F.3d at 1292-94.  In that case, Colombia sought the
extradition of a former Colombian Cabinet member in part for the

crime of "conclusion of contract without fulfilling legal requirements," based on the fugitive's false designation of certain government contracts as "scientific and technical," as defined under Colombian regulations, in order to bypass a public bidding process. Id. The appellate court concluded that the treaty's dual-criminality requirement was established based on 18 U.S.C. § 1001's proscription of false statements, and refused to delve into whether in fact the designations at issue were false under Colombian law or United States law. See id. Rather, the court considered simply whether it would be criminal under United States law if the fugitive had made designations that were false in the United States. See id. Along the same lines, the Court in this case need not delve into the nature of relations between the United States and the DPRK when conducting its dual-criminality analysis.

But even if the Court were to consider a DPRK-specific scenario, dual criminality would still be established. All of the above-identified federal statutes establishing dual criminality in this case rely on common definitions vis-à-vis the victims. See 18 U.S.C. § 112(c) (relying on definitions set forth in 18 U.S.C. § 1116(b)); 18 U.S.C. § 970(c) (same); 18 U.S.C. § 1201(a)(4) (same). In particular, the terms "foreign official" and "internationally protected person" in each statute encompass certain representatives of a "foreign government," which is defined as "the government of a foreign country, irrespective of recognition by the United States." 18 U.S.C. § 1116(b).[20] Thus, because the DPRK is unquestionably a

---

[20] The term "foreign official" means

*(footnote cont'd on next page)*

14

foreign country, the plain terms of the statute render 18 U.S.C. §§ 112(a), 112(b)(2), 970(a), and 1201(a)(4) applicable to the persons and property of the DPRK's government, regardless of the nature of its relationship with the United States.

This reading of the statutes is further supported by the relevant legislative history. <u>See</u> H.R. No. 92-1202 at 17 ("Unlike 18 U.S.C. [§] 11, which defines 'foreign government' for other purposes of title 18, it does not restrict the term to nations with which the United States is at peace . . . ."); S. Rep. No. 92-1105 at 17 (same); <u>cf.</u> <u>To Provide for the Expanded Protection of Public Officials and Foreign Officials: Hearing on H.R. 10502 Before the Subcomm. No. 2 of the H.R. Comm. on the Judiciary</u>, 92nd Cong. 37 (1972) (posing question and referring to "the foreign governments, the foreign states with whom we have international relations, and even those with whom we do not since they are included here too") (statement of Rep. George E. Danielson).  Relatedly, there is nothing

---

(A) . . . Ambassador, Foreign Minister, or other officer of Cabinet rank or above of a foreign government . . . and any member of his family, while in the United States; and

(B) any person of a foreign nationality who is duly notified to the United States as an officer or employee of a foreign government . . . , and who is in the United States on official business, and any member of his family whose presence in the United States is in connection with the presence of such officer or employee.

18 U.S.C. § 1116(b)(3).  The term "internationally protected person" has a broader definition and includes

any [] representative, officer, employee, or agent of . . . a foreign government . . . who at the time and place concerned is entitled pursuant to international law to special protection against attack upon his person, freedom, or dignity, and any member of his family then forming part of his household.

18 U.S.C. § 1116(b)(4)(B).

1  to suggest that foreign governments are excluded from the reach of

2  the statutes based on being designated as a state-sponsor of

3  terrorism.  Given this, notwithstanding the lack of diplomatic

4  relations between the United States and the DPRK, and the DPRK's

5  status as a state-sponsor of terrorism, the DPRK's government

6  qualifies as a "foreign government" as defined by 18 U.S.C.

7  § 1116(b)(2), and an attack on its diplomatic premises and personnel

8  in the United States akin to what happened in Madrid would be

9  punishable under 18 U.S.C. §§ 112(a), 112(b)(2), 970(a), and

10  1204(a)(4).

11       While the Government of the DPRK does not have an embassy in the

12  United States, both diplomats and a diplomatic mission from that

13  nation are present in the United States.  The DPRK has been a member

14  of the United Nations since 1991, and it maintains a permanent

15  mission and permanent representative to that international body in

16  New York.[21]  The United States has an obligation under international

17  law to criminalize, <u>inter alia</u>, a "kidnapping or other attack upon

18  the person or liberty of an internationally protected person" and a

19  "violent attack upon the official premises . . . of an

20  internationally protected person likely to endanger his person or

21  liberty."  <u>See</u> Convention on the Prevention and Punishment of Crimes

22  Against Internationally Protected Persons, Including Diplomatic

23  Agents ("IPP Convention"), art. 2(1), Dec. 14, 1973, 1035 U.N.T.S.

24  167, 28 U.S.T. 1975; TIAS 8532, <u>available at</u>

25

26       [21] <u>See</u> United Nations, <u>Member States</u>,
   <u>https://www.un.org/en/about-us/member-states</u> (last visited Feb. 8,
27  2023); United Nations, <u>List of Permanent Representatives and</u>
   <u>Observers to the United Nations in New York</u>,
28  <u>https://www.un.org/dgacm/sites/www.un.org.dgacm/files/Documents_Proto</u>
   <u>col/headsofmissions.pdf</u> (last visited Feb. 8, 2023).

1    https://legal.un.org/ilc/texts/instruments/english/conventions/9_4_19

2    73.pdf (last visited Feb. 8, 2023).[22]  The DPRK's permanent

3    representative and/or the other officers or employees of the DPRK

4    mission qualify as "internationally protected persons."  See

5    18 U.S.C. §§ 1116(b)(4); IPP Convention, art. 1(1) (defining

6    "internationally protected person" substantially the same as in

7    18 U.S.C. §§ 1116(b)(4)).  Accordingly, the United States would not

8    only be able to prosecute crimes such as those committed upon the

9    DPRK officials in Madrid if they had been committed upon such DPRK

10   officials in the United States, but it also has an obligation to

11   cooperate with other countries to support their efforts to prevent,

12   investigate, and prosecute such crimes.  Cf., e.g., United States v.

13   Dizdar, 581 F.2d 1031, 1032, 1033-35 (2d Cir. 1978) (affirming

14   convictions under 18 U.S.C. §§ 112 and 1201(c) of armed "advocates of

15   Croatian independence, [who] forcibly entered the [Yugoslavian

16   Mission to the United Nations] premises, shooting and wounding

17   seriously one member of the Mission staff in the process").

18       The United States condemns DPRK's human-rights record and

19   designates it as a state-sponsor of terrorism.  Nonetheless, those

20   facts are not relevant to the Court's analysis of dual criminality or

21   probable cause.  Neither the North Korean Human Rights Act of 2004

22   nor the North Korean Human Rights Reauthorization Act of 2017 alters

23   either analysis.  While both statutes promote respect and protection

24   of fundamental human rights, support human rights and democracy

25

26       [22] Both the United States and the DPRK are parties to this
     convention.  See United Nations Treaty Collection, 7. Convention on
27   the Prevention and Punishment of Crimes Against Internationally
     Protected Persons, Including Diplomatic Agents,
28   https://treaties.un.org/pages/ViewDetails.aspx?src=IND&mtdsg_no=XVIII
     -7&chapter=18&clang=_en (last visited Feb. 8, 2023).

1  programs in addition to refugees and defectors, and provide for the
2  funding of humanitarian assistance, neither statute advocates,
3  condones, or protects criminal conduct in support of these
4  objectives.  Allowing individuals to attack diplomats and their
5  family members and missions without consequences undermines the
6  statutes' objectives and has wide-ranging ramifications.  See, e.g.,
7  Finzer v. Berry, 798 F.2d 1450, 1455 (D.C. Cir. 1986) (describing
8  "the principle that host states have a special responsibility to
9  ensure that foreign embassies and the personnel inside them are free
10 from threats of violence and intimidation," which is a principle that
11 is "solidly entrenched in the Law of Nations") (internal quotation
12 marks and citation omitted), aff'd in part, rev'd in par sub nom.
13 Boos v. Barry, 485 U.S. 312 (1988).

14          3.   Any Ambiguity Regarding Dual Criminality Must Be
15               Resolved in Favor of Extradition.

16      As demonstrated above, the crimes for which Petitioner's
17 extradition is sought satisfy the dual-criminality requirement.  But
18 even if there were any ambiguity in that regard, the Court should
19 still find that the requirement is met because it is bound by the
20 general canon of interpretation requiring that extradition treaties
21 must be construed liberally in favor of extradition.  As the Supreme
22 Court articulated in Factor v. Laubenheimer, "if a treaty fairly
23 admits of two constructions, one restricting the rights which may be
24 claimed under it, and the other enlarging it, the more liberal
25 construction is to be preferred."  290 U.S. 276, 293-94 (1933); see
26 also United States ex rel. Sakaguchi v. Kaulukukiu, 520 F.2d 726, 731
27 (9th Cir. 1975) ("Extradition treaties must be interpreted
28 liberally.").  At least five United States courts of appeals have

18

observed that <u>Factor</u> demands that ambiguities in an extradition
treaty must be construed in favor of the state signatories — that is,
in favor of surrendering a fugitive to the requesting country.
<u>Martinez v. United States</u>, 828 F.3d 451, 463 (6th Cir. 2016) (en
banc); <u>Nezirovic v. Holt</u>, 779 F.3d 233, 239 (4th Cir. 2015); <u>United
States v. Kin-Hong</u>, 110 F.3d 103, 110 (1st Cir. 1997); <u>Ludecke v.
U.S. Marshal</u>, 15 F.3d 496, 498 (5th Cir. 1994); <u>United States v.
Wiebe</u>, 733 F.2d 549, 554 (8th Cir. 1984).

Thus, in order for Petitioner to defeat extradition based on a
lack of dual criminality, he must demonstrate that his conduct would
unambiguously not be criminal in the United States.  He cannot do so.

## III. PETITIONER HAS WAIVED ANY DEFENSE RELATED TO THE QUESTION PRESENTED BY THE COURT BY FAILING TO ASSERT IT.

Regardless, Petitioner may not obtain <u>habeas</u> relief based on any
challenge to his extraditability related to the above-discussed
issues because he has failed to raise such a challenge to date.  In
the context of extradition, a <u>habeas</u> petition effectively asks the
Court to review the decision of the magistrate judge who certified
that the fugitive is extraditable.  By failing previously to assert a
claim related to the question presented in this Court's Order to Show
Cause, Petitioner has either waived such a claim or forfeited it
through abandonment.

<u>Lo Duca v. United States</u>, 93 F.3d 1100 (2d Cir. 1996), is
instructive.  In that matter, a fugitive sought to raise new claims
in a <u>habeas</u> petition challenging a certification order.  The Second
Circuit rejected his attempt to inject novel issues not presented
before the magistrate judge: "Though [one of the fugitive's claims
was] of arguable merit, [the fugitive] has waived it by failing to

object at his extradition hearing.  'Non-jurisdictional objections must be timely raised or they are waived.'"  Id. at 1111 (quoting Jhirad v. Ferrandina, 536 F.2d 478, 486 (2d Cir. 1976)); see also Ntakirutimana v. Reno, 184 F.3d 419, 428 n.17 (5th Cir. 1999) ("We deem this objection [that substantive criminal allegations were presented solely in an investigator's affidavit] waived, because [the fugitive] did not raise the objection at his extradition hearing."); Bisram v. Quay, No. 17-CV-6730 (KAM), 2018 WL 5624147, at *6 (E.D.N.Y. Oct. 30, 2018) ("To the extent petitioner has a viable argument regarding the legibility of the evidence or the validity of the summaries, he waived the issue by failing to raise it during the extradition hearings."), aff'd sub nom. Bisram v. United States, 777 F. App'x 563 (2d Cir. 2019).

Like the arguments at issue in Lo Duca and Ntakirutimana, claims related to dual criminality are not jurisdictional in nature. Jurisdictional claims consist of a very narrow subset of arguments that call into question the court's power to decide a matter.  See Seismic Reservoir 2020, Inc. v. Paulsson, 785 F.3d 330, 333–34 (9th Cir. 2015) ("Subject matter jurisdiction defines the court's authority to hear a given type of case.  Strictly speaking, subject-matter jurisdiction concerns the courts' statutory or constitutional power to adjudicate cases.") (internal quotation marks and citations omitted); United States v. Grimon, 923 F.3d 1302, 1305 (11th Cir.), cert. denied, 140 S. Ct. 536 (2019) ("Subject matter jurisdiction, which Congress bestows on the lower federal courts by statute, defines the court's authority to hear a given type of case." (internal quotation marks and citation omitted)).  In contrast, arguments that a request does not satisfy the substantive

requirements for extradition are akin to contentions that a party has failed to satisfy the required elements of their claim.  Such contentions are not jurisdictional but rather call for a merits determination.  See, e.g., Arbaugh v. Y&H Corp., 546 U.S. 500, 511 (2006) (explaining "the subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy," and noting that conclusions regarding the latter constitute "merits-based determination[s]" (internal quotation marks omitted)); Grimon, 923 F.3d at 1306-07 (explaining that failure to prove so-called "jurisdictional" interstate nexus element is "merely a non-jurisdictional challenge to the sufficiency of the evidence as to that element of the offense and has no bearing on the district court's power to adjudicate [the] case"). Accordingly, when not raised previously, they would not afford Petitioner habeas relief.

**IV.   CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court find that Spain's extradition request satisfies the requirements of dual criminality and probable cause, and that it deny his habeas petition.