E. MARTIN ESTRADA
United States Attorney
ANNAMARTINE SALICK
Assistant United States Attorney
Chief, National Security Division
JOHN J. LULEJIAN (Cal. Bar No. 186783)
Assistant United States Attorney
      1200 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-0721
      Facsimile: (213) 894-0141
      E-mail:   John.Lulejian@usdoj.gov

Attorneys for
UNITED STATES OF AMERICA
Acting on Behalf of Respondent
DAVID M. SINGER, U.S. Marshal

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER PHILIP AHN,<br><br>          Petitioner,<br><br>          v.<br><br>DAVID M. SINGER, U.S. Marshal,<br><br>          Respondent. | No. 2:22-cv-04320-FLA (JPRx)<br><br>RESPONDENT'S REPLY TO ORDER TO SHOW CAUSE RE: WHETHER PROBABLE CAUSE SUPPORTING EXTRADITION EXISTS IN LIGHT OF ONGOING HOSTILITIES BETWEEN THE UNITED STATES AND NORTH KOREA; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF JOHN J. LULEJIAN; EXHIBITS<br><br>Assigned to the Honorable Fernando L. Aenelle-Rocha |

     The United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney John J. Lulejian, acting on behalf of Respondent David M. Singer, U.S. Marshal, hereby submits Respondent's Reply to the Court's Order to Show Cause Re: Whether Probable Cause Supporting Extradition Exists in Light of Ongoing Hostilities Between the United States and North Korea.  This

1  response is based on the attached Memorandum of Points and

2  Authorities and accompanying declaration and exhibits, and the

3  records and files of this case.

4       For the reasons set forth in detail below and in Respondent's

5  Response to the Court's Order to Show Cause Re: Whether Probable

6  Cause Supporting Extradition Exists in Light of Ongoing Hostilities

7  Between the United States and North Korea, the United States

8  respectfully requests that the Court find that petitioner CHRISTOPHER

9  PHILIP AHN's ("Petitioner") conduct would be criminal in the

10 United States if it had been committed here, and deny his petition

11 for a writ of <u>habeas corpus</u> ("<u>habeas</u> petition").

12  Dated: March 24, 2023          Respectfully submitted,

13                                 E. MARTIN ESTRADA
                                   United States Attorney
14
                                   ANNAMARTINE SALICK
15                                 Assistant United States Attorney
                                   Chief, National Security Division
16

17
                                   */s/ John J. Lulejian*
18                                 JOHN J. LULEJIAN
                                   Assistant United States Attorney
19
                                   Attorneys for
20                                 UNITED STATES OF AMERICA
                                   Acting on Behalf of Respondent
21                                 DAVID M. SINGER, U.S. Marshal

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

DESCRIPTION                                                                    PAGE

TABLE OF AUTHORITIES...............................................ii

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.     INTRODUCTION................................................1

II.    THE DUAL CRIMINALITY REQUIREMENT IS SATISFIED IN THIS CASE.....3

       A.    Petitioner's Assertion that Dual Criminality Turns on
             the Nationality of the Victims is Meritless..............3

       B.    Petitioner's Assertion that the Armistice Agreement is
             Not in Force is Both Factually Erroneous and Legally
             Irrelevant..............................................7

       C.    Even if It Were Relevant, Petitioner's Assertion that
             DPRK Officials in the United States Are Not Protected
             Under United States and International Law is Wrong.......12

III.   PETITIONER CANNOT PREVAIL ON ARGUMENTS HE FAILED TO DEVELOP
       UNTIL NOW..................................................14

IV.    CONCLUSION.................................................16

1

**TABLE OF AUTHORITIES**

2  DESCRIPTION                                                      PAGE

3  FEDERAL CASES

4  Arias Leiva v. Warden,

5     928 F.3d 1281 (11th Cir. 2019) ............................. 6, 9

6  Cedarbloom v. United States,

7     No. 3:17-CV-01436-MO, 2018 WL 2437162

8     (D. Or. May 29, 2018) ..................................... 6

9  Charlton v. Kelly,

10    229 U.S. 447 (1913) ....................................... 10

11 Dames & Moore v. Regan,

12    453 U.S. 654 (1981) ....................................... 10

13 DeGracia v. United States,

14    Nos. 07-CV-2099 W, 94-CR-0371 W, 2008 WL 4601466

15    (S.D. Cal. Oct. 15, 2008) ................................. 16

16 Delgadillo v. Woodford,

17    527 F.3d 919 (9th Cir. 2008) .............................. 16

18 Dep't of Navy v. Egan,

19    484 U.S. 518, 529 (1988) .................................. 9

20 Dzyuba v. United States,

21    Nos. 3:11-cr-00209-JO-01, 3:15-cv-00575-JO, 2016 WL 4367247

22    (D. Or. Aug. 15, 2016) .................................... 16

23 Factor v. Laubenheimer,

24    290 U.S. 276 (1933) ....................................... 7

25 Fairfax's Devisee v. Hunter's Lessee,

26    11 U.S. 603 (1812) ........................................ 12

27 Haig v. Agee,

28    453 U.S. 280 (1981) ....................................... 9

ii

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                          <u>PAGE</u>

<u>Hilao v. Estate of Marcos</u>,

  103 F.3d 767 (9th Cir. 1996) ................................. 15

<u>Hoxha v. Levi</u>,

  465 F.3d 554 (3d Cir. 2006) .................................. 8

<u>In re Extradition of Acevedo</u>,

  No. ED CV 16-1766-R (KS), 2017 WL 3491749

  (C.D. Cal. Aug. 11, 2017) .................................... 4

<u>In re Extradition of Brandao</u>,

  No. 3:09-mj-109, 2009 WL 5100901

  (S.D. Ohio Dec. 17, 2009) .................................... 7

<u>In re Extradition of Camelo-Grillo</u>,

  No. CV 16-9026 JVS (SS), 2017 WL 2945715

  (C.D. Cal. Jul. 10, 2017) .................................... 8

<u>In re Extradition of Fletcher</u>,

  No. 16-00334 KJM, 2017 WL 1034199

  (D. Haw. Feb. 1, 2017) ....................................... 8

<u>In re Extradition of Robertson</u>,

  No. 11-MJ-0310-KLN, 2012 WL 5199152

  (E.D. Cal. Oct. 19, 2012) .................................... 6

<u>In re Extradition of Tang Yee-Chun</u>,

  674 F. Supp. 1058 (S.D.N.Y. 1987) ............................ 6

<u>Indep. Towers of Wash. v. Washington</u>,

  350 F.3d 925 (9th Cir. 2003) ................................ 15

<u>Johnson v. Brazelton</u>,

  No. EDCV 12-2123 SJO(JC), 2015 WL 3405426

  (C.D. Cal. May 21, 2015) .................................... 16

1

**TABLE OF AUTHORITIES (CONTINUED)**

2

DESCRIPTION                                                          PAGE

3

Johnson v. Thirteen Bales, Etc.,

4

   13 F. Cas. 836 (Cir. Ct., D.N.Y. 1814) ........................ 12

5

Kastnerova v. United States,

6

   365 F.3d 980 (11th Cir. 2004) ................................. 9

7

Man-Seok Choe v. Torres,

8

   525 F.3d 733 (9th Cir. 2008) .................................. 4

9

Manta v. Chertoff,

10

   518 F.3d 1134 (9th Cir. 2008) ................................. 3

11

Martinez-Serrano v. I.N.S.,

12

   94 F.3d 1256 (9th Cir. 1996) ................................. 15

13

New York Chinese TV Programs, Inc. v. U.E. Enters., Inc.,

14

   954 F.2d 847 (2d Cir. 1992) ................................... 8

15

The Santa Lucia,

16

   44 F. Supp. 793 (S.D.N.Y. 1942) ............................. 12

17

Then v. Melendez,

18

   92 F.3d 851 (9th Cir. 1996) ................................... 8

19

Theron v. United States Marshal,

20

   832 F.2d 492 (9th Cir. 1987) .................................. 5

21

United States v. Birk,

22

   797 F.2d 199 (5th Cir. 1986) .................................. 5

23

United States v. Curtiss-Wright Export Corp.,

24

   299 U.S. 304 (1936) ......................................... 10

25

United States v. Dunkel,

26

   927 F.2d 955 (7th Cir. 1991) ................................. 15

27

United States v. Kelly,

28

   874 F.3d 1037 (9th Cir. 2017) ................................ 16

iv

1
                    **TABLE OF AUTHORITIES (CONTINUED)**

2    DESCRIPTION                                                    PAGE

3    United States v. Knotek,

4       925 F.3d 1118 (9th Cir. 2019) ................................. 4

5    United States v. Marcano-Garcia,

6       622 F.2d 12 (1st Cir. 1980) .................................. 5

7    United States v. Noel,

8       893 F.3d 1294 (11th Cir. 2018) ............................... 4

9    United States v. Perez-Silvan,

10      861 F.3d 935 (9th Cir. 2017) ................................ 16

11   United States v. Reyes,

12      660 F.3d 454 (9th Cir. 2011) ................................ 15

13   United States v. Sineneng-Smith,

14      140 S. Ct. 1575 (2020) ...................................... 16

15   United States v. Stoterau,

16      524 F.3d 988 (9th Cir. 2008) ................................ 15

17   United States v. Williams,

18      617 F.2d 1063 (5th Cir. 1980) ............................... 10

19   United States v. Williamson,

20      439 F.3d 1125 (9th Cir. 2006) ............................... 15

21

22   FEDERAL STATUTES

23   18 U.S.C. § 401 ............................................. 6-7

24   18 U.S.C. § 112 ............................................... 5

25   18 U.S.C. § 112(a) ........................................... 14

26   18 U.S.C. § 112(b)(2) ........................................ 14

27   18 U.S.C. § 970(a) ........................................... 13

28   18 U.S.C. § 1116(b)(2) ....................................... 14

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                        PAGE

18 U.S.C. § 1116(b)(3)(B) ........................................ 14

18 U.S.C. § 1116(b)(4)(B) ........................................ 14

18 U.S.C. § 1117 .................................................. 5

18 U.S.C. § 1201(a)(4) ........................................... 14


TREATIES AND INTERNATIONAL AGREEMENTS

Agreement Between the Commander-In-Chief, United Nations
    Command, on the One Hand, and the Supreme Commander of
    the Korean People's Army and the Commander of the Chinese
    People's Volunteers, on the Other Hand, Concerning a
    Military Armistice In Korea, July 27, 1953, 4 U.S.T. 234,
    T.I.A.S. 2782 ......................................... passim

Agreement Between the United Nations and the United States of
    America Regarding the Headquarters of the United Nations,
    June 26, 1947, 61 Stat. 3416, T.I.A.S. 1676 ................. 13

Vienna Convention on Diplomatic Relations, Apr. 18, 1961,
    23 U.S.T. 3227, T.I.A.S. No. 7502 ........................... 5

Vienna Convention on the Law of Treaties, May 23, 1969,
    1155 U.N.T.S. 331 .......................................... 10


PUBLICATIONS

Curtis A. Bradley, _Chevron Deference and Foreign Affairs_,
    86 Va. L. Rev. 649 (2000) .................................. 10

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

Office of the Legal Adviser, U.S. Dep't of State,

    Treaties in Force:  A List of Treaties and

    Other International Agreements of the United States

    in Force on January 1, 2020 (2020) ........................... 8

Office of the Legal Adviser, U.S. Dep't of State,

    Treaties in Force:  Supplemental List of Treaties and

    Other International Agreements (2022) ....................... 8

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3

Petitioner's Response to the Court's Order to Show Cause

4  (HR 38)[1] is the latest iteration of his quixotic crusade to transform

5  this case into something it is evidently not.  The extradition

6  request at issue in this case represents the efforts of the Kingdom

7  of Spain ("Spain") to vindicate its legitimate interest (not to

8  mention its legal obligation) in protecting from attack diplomats and

9  diplomatic missions invited onto its soil.  Yet, perhaps because

10 neither the law nor the facts are on his side, Petitioner maintains —

11 without any support — that the Democratic People's Republic of Korea

12 ("DPRK") "was the driving force behind Spain's initiation of criminal

13 charges and the extradition request against him."  (HR 38 at 8.)  In

14 doing so, Petitioner seeks impunity for himself and injustice for the

15 victims of the February 22, 2019, attack in Madrid, simply because of

16 the country of which the victims are nationals.

17 Petitioner's unjustified attempt to focus the spotlight on the

18 DPRK is not his only error.  Indeed, none of the central assertions

19 in his Response are correct.[2]

20 <u>First</u>, Petitioner's assertion that the victims' status as DPRK

21 nationals is relevant to the Court's evaluation of dual criminality

22 (HR 38 at 24-26) is contrary to applicable law.  Petitioner fails to

23

24 [1] "ER" refers to the Clerk's Record in <u>United States v. Ahn</u>,
   Case No. 2:19-cv-05397-FLA-JPR, the case before the Extradition
25 Court, and "HR" refers to the Clerk's Record in the instant <u>habeas</u>
   case, <u>Ahn v. Singer</u>, Case No. 2:22-cv-04320-FLA; all such references
26 are followed by the docket number and the applicable page.

27 [2] Petitioner does not substantively address the United States'
   arguments regarding probable cause set forth in its Response to the
28 Court's Order (HR 37).  Accordingly, this Reply focuses exclusively
   on dual criminality.

explain, nor can he, how the victims' nationality has any bearing on the applicability of the general-crimes statutes relied upon by the government, which focus solely on the defendant's conduct, not the identity of the victim.  Moreover, no case law indicates that the dual criminality analysis is as mechanistic as Petitioner suggests. Properly understood, the applicable authority requires this Court to evaluate generally whether an attack on diplomatic property and persons, such as that which occurred in Madrid, would be criminal in the United States.  Requiring more, such as a specific analysis of whether United States statutes would extend to cases involving victims of one particular nationality, would run afoul of the Supreme Court's prohibition against construing requirements in an extradition treaty restrictively.

Second, while Petitioner postulates that the Armistice Agreement[3] is not in effect, such that DPRK officials and their family members are "enemy aliens" who "have no right to seek the protection of United States law" (HR 38 at 19), the U.S. Department of State says otherwise.  And the Department of State's view as to the force of a treaty is determinative of the issue.

Third, Petitioner's claim that DPRK officials lack diplomatic status in the United States, and cannot avail themselves of United States laws enacted to protect diplomats and internationally protected persons, is both factually and legally flawed.  According to the Department of State, members of the DPRK Permanent Mission to

---

[3] Agreement Between the Commander-In-Chief, United Nations Command, on the One Hand, and the Supreme Commander of the Korean People's Army and the Commander of the Chinese People's Volunteers, on the Other Hand, Concerning a Military Armistice In Korea, July 27, 1953, 4 U.S.T. 234, T.I.A.S. 2782 ("Armistice Agreement"), available at 1953 WL 44316.

1   the United Nations are recognized as officials of the Government of

2   the DPRK who enjoy immunity and protection.  Thus, if Petitioner

3   engaged in the conduct for which he is charged in Spain against any

4   DPRK official or their family member in the United States, he could

5   be prosecuted domestically.

6       Finally, Petitioner has waived any defense based on the question

7   presented by the Court because he failed to develop it at the

8   extradition hearing and in his habeas petition.  Petitioner gave no

9   previous attention to the argument he now espouses in his Response

10  other than in a passing reference in a footnote.  Ninth Circuit

11  precedent provides that such treatment is insufficient to preserve

12  the defense.

13      Accordingly, the Court should reject Petitioner's assertions

14  that the requirements of dual criminality have not been met in this

15  case and should deny his habeas petition.

16  **II.  THE DUAL CRIMINALITY REQUIREMENT IS SATISFIED IN THIS CASE**

17      **A.  Petitioner's Assertion that Dual Criminality Turns on the**
18          **Nationality of the Victims is Meritless**

19      Petitioner's claim (HR 38 at 24) that the Court may not rely on

20  "garden-variety assault, battery, forced imprisonment, [and]

21  burglary" statutes to establish dual criminality in this case misses

22  the mark.  Dual criminality simply "requires that the conduct

23  involved is criminal in both countries." Manta v. Chertoff, 518 F.3d

24  1134, 1142 (9th Cir. 2008) (original emphasis; internal quotations

25  and citations omitted).  Petitioner fails to explain how his alleged

26  conduct would not be criminal under the relevant general-crime

27  statutes in the United States (discussed at HR 37 at 19-21; ER 187-2

28  at 2-3) — nor could he.  None of those statutes depend on, or take

3

into account in any way, the nationality or diplomatic status of the victim.[4]  Cf., e.g., United States v. Noel, 893 F.3d 1294, 1298 (11th Cir. 2018) ("the conduct committed — kidnapping — would be criminal regardless of the nationality of the victim").  They are "substantially analogous" to the crimes charged by Spain, which similarly contain no element relating to the identity of the victim. This is all that is required to establish dual criminality.  See United States v. Knotek, 925 F.3d 1118, 1131-32 (9th Cir. 2019).

In an attempt to circumvent this, Petitioner contorts the requirement that a court consider "'the totality of the conduct alleged,'" In re Extradition of Acevedo, No. ED CV 16-1766-R (KS), 2017 WL 3491749, at *3 (C.D. Cal. Aug. 11, 2017) (quoting Man-Seok Choe v. Torres, 525 F.3d 733, 737 (9th Cir. 2008)), into a requirement that it consider "the identity of involved parties, so long as their identity is material to whether the alleged conduct would be criminal in the United States."  (HR 38 at 24-25.)  As an initial matter, this assertion is based on an incorrect premise because, as explained above, the identity of the involved parties is not material to whether the alleged conduct would be criminal under the relevant United States general-crimes statutes.

In any event, Petitioner's assertion is misplaced.  For purposes of both the general-crimes statutes, as well as the diplomat-specific

---

[4] The statutes cited by the United States for purposes of dual criminality are distinguished from other statutes, such as hate crime statutes where "actual or perceived race, color, religion, or national origin of any person" is a required element of the crime. 18 U.S.C. § 249; see 18 U.S.C. § 247 (punishing "[w]hoever intentionally defaces, damages, or destroys any religious real property because of the race, color, or ethnic characteristics of any individual associated with that religious property, or attempts to do so").

4

1  statutes (discussed at HR 37 at 21-22; ER 187-2 at 2-3), the conduct

2  for which Spain has charged Petitioner involves attacking a

3  diplomatic mission, assaulting and threatening its occupants, and

4  holding them hostage.  (See HR 30 at 20-26.)  The fact that

5  specifically the DPRK's mission and DPRK victims were involved is not

6  part of the relevant conduct.  Indeed, Spain — like the United States

7  — is obligated under international law to "take all appropriate

8  steps" to "protect the premises of [a] mission," and to "prevent any

9  attack" on the "person of [any] diplomatic agent," within its

10 borders, irrespective of nationality.  See Vienna Convention on

11 Diplomatic Relations, arts. 22(2) & 29, Apr. 18, 1961, 23 U.S.T.

12 3227, T.I.A.S. No. 7502.[5]

13     Contrary to Petitioner's suggestion (HR 38 at 23), the cases

14 cited by the government in its Response comport with the general rule

15 that conduct controls the analysis for dual criminality.  For

16 example, the Ninth Circuit in Theron v. United States Marshal did not

17 transplant a South African bank to the United States when considering

18 whether the fraud and theft perpetrated on that bank would be

19 criminal under United States statutes requiring the victim bank be

20 insured by the FDIC.  See 832 F.2d 492, 496-97 (9th Cir. 1987).

21 Rather, the Court considered only whether the fraud and theft at

22 issue, had it been committed on any bank in the United States, would

---

[5] Indeed, the United States has prosecuted such attacks previously.  See, e.g., United States v. Marcano-Garcia, 622 F.2d 12, 15 (1st Cir. 1980) (Chilean Honorary Counsel restrained and held hostage in Chilean Consulate by activists for Puerto Rican independence was "foreign official" and "internationally protected person" in prosecution under 18 U.S.C. § 112); United States v. Birk, 797 F.2d 199, 200, 203-04 (5th Cir. 1986) (Chief Minister of state in India targeted for assassination in United States was "official guest" in prosecution under 18 U.S.C. §§ 1116 & 1117).

be criminal here.  See id.  Likewise, the court in Cedarbloom v. United States disregarded that the victim bank was Canadian and instead considered only whether the robbery at issue, had it been committed on any bank in the United States, would be criminal based on statutes containing an FDIC requirement.  See No. 3:17-CV-01436-MO, 2018 WL 2437162, at *2 (D. Or. May 29, 2018).  And the court in In re Extradition of Tang Yee-Chun considered only that "[i]t is a crime to make false entries in the books of a national bank or savings institution," rather than concerning itself with the nationality of the specific institution at issue.  See 674 F. Supp. 1058, 1067 (S.D.N.Y. 1987).  Finally, the court in Arias Leiva v. Warden refused to delve into the specifics of whether the alleged false statements at issue, which were allegedly false under Colombian law, would also be false in the United States; rather, it considered more generally whether "the knowingly false designation of government contracts . . . would violate our federal law."  See 928 F.3d 1281, 1293 (11th Cir. 2019).  Accordingly, Petitioner's contention that this Court must take into account the specific nationality of the victim mission and officials in this case when conducting its dual criminality analysis is unfounded and contrary to the established practice for analyzing dual criminality.

The cases upon which Petitioner attempts to rely do not warrant a different conclusion.  In In re Extradition of Robertson, the court determined that the fugitive could not be extradited to Canada to answer for violating the terms of his supervised release, not because of any party's identity, but because "it is not apparent that a violation of a condition of supervised release may be prosecuted [in the United States] as contempt of court in violation of [18 U.S.C.]

6

§ 401," and because the fugitive "is not charged in [the requesting country] with violating a court order as required under [that statute]." No. 11-MJ-0310-KLN, 2012 WL 5199152, at *14 (E.D. Cal. Oct. 19, 2012). Likewise, the court in <u>In re Extradition of Brandao</u> found dual criminality lacking for a juvenile fugitive because juvenile offenders were treated differently under domestic law and the laws of the requesting state. No. 3:09-mj-109, 2009 WL 5100901, at *5-6 (S.D. Ohio Dec. 17, 2009). In other words, dual criminality failed for no reason other than the lack of substantially analogous domestic laws criminalizing the alleged conduct.

Petitioner's suggestion that this Court should deny extradition based on the victims' nationality is thus not supported by any authority. It is also contrary to the Supreme Court's prohibition against construing requirements in an extradition treaty, such as dual criminality, narrowly. See <u>Factor v. Laubenheimer</u>, 290 U.S. 276, 293-94 (1933). (<u>See also</u> HR 37 at 28-29 (citing cases).) Therefore, Petitioner's argument should be flatly rejected.

### B. Petitioner's Assertion that the Armistice Agreement is Not in Force is Both Factually Erroneous and Legally Irrelevant

Even if the Court were to consider the nationality of the victims in this case (which it should not), Petitioner's assertion that his conduct would not be criminal in the United States still fails <u>ab initio</u>. In particular, Petitioner asserts that he could not be prosecuted here because the United States no longer is bound by the Armistice Agreement. (<u>See</u> HR 38 at 18.) This bold assertion, however, is neither grounded in fact nor law.

Contrary to Petitioner's assertion, the Armistice Agreement is in force. According to the Department of State, "the Armistice

7

1    Agreement is and remains in force."  (Decl. of John J. Lulejian,

2    dated 03/24/2023 ("Lulejian Decl."), at ¶ 2, Exh. A (Decl. of Robert

3    K. Harris).)  The United States' position is supported by the fact

4    that the Agreement is listed in the current edition of Treaties in

5    Force, an official Department of State publication identifying

6    treaties that it considers to be currently in force.[6]  (See Lulejian

7    Decl. at ¶ 3, Exh. B.)  It is well settled that this Court must defer

8    to the Department of State on this issue.  See Then v. Melendez, 92

9    F.3d 851, 854 (9th Cir. 1996) ("The continuing validity of [a treaty]

10   presents a political question and we must defer to the intentions of

11   the State Departments of the two countries.") (internal citation

12   omitted); In re Extradition of Camelo-Grillo, No. CV 16-9026 JVS

13   (SS), 2017 WL 2945715, *5 (C.D. Cal. Jul. 10, 2017) (concluding in

14   Colombian extradition case that "[t]he State Department's

15   determination of the continuing validity of a treaty is entitled to

16   deference."); In re Extradition of Fletcher, No. 16-00334 KJM, 2017

17   WL 1034199, *4 (D. Haw. Feb. 1, 2017) (citing Then, 92 F.3d at 854)

18   ("The existence of a valid treaty of extradition between the

19   United States and [another nation] is a political question about

20

21       [6] See Office of the Legal Adviser, U.S. Dep't of State, Treaties
     in Force:  A List of Treaties and Other International Agreements of
22   the United States in Force on January 1, 2020 § 2 at 38 (2020),
     available at https://www.state.gov/wp-content/uploads/2020/08/TIF-
23   2020-Full-website-view.pdf; Office of the Legal Adviser, U.S. Dep't
     of State, Treaties in Force:  Supplemental List of Treaties and Other
24   International Agreements (2022), available at
     https://www.state.gov/wp-content/uploads/2022/05/TIF-Supplement-
25   2022.pdf.  Courts regularly cite to this publication when considering
     the validity of treaties.  See, e.g., Hoxha v. Levi, 465 F.3d 554,
26   562 (3d Cir. 2006) (Department of State's publication Treaties in
     Force "includes treaties that have not expired and have not been
27   otherwise terminated"); New York Chinese TV Programs, Inc. v. U.E.
     Enters., Inc., 954 F.2d 847, 851 (2d Cir. 1992) ("The State
28   Department annually publishes Treaties in Force, listing all treaties
     that are honored by the United States.").

which courts defer to the executive branch."); <u>see also</u> <u>Arias Leiva</u>, 928 F.3d at 1289 ("[W]e are deferring to the Executive's judgment on a <u>political issue</u> — that is, treaty recognition.") (emphasis in original; citations omitted); <u>Meza v. U.S. Attorney General</u>, 693 F.3d 1350, 1358 (11th Cir. 2012) (relying solely on declaration of Attorney Adviser in State Department's Office of Legal Adviser because "[w]e must defer to the determination of the executive branch that the [extradition] treaty . . . remains in force"); <u>Kastnerova v. United States</u>, 365 F.3d 980, 986 (11th Cir. 2004) (recognizing Department of State's view that U.S.-Czech extradition treaty was in effect, and noting that "every other Court of Appeals to consider whether a treaty has lapsed has deferred to the Executive's determination"); <u>Sayne v. Shipley</u>, 418 F.2d 679, 684 (5th Cir. 1969) (holding that Article XVI of extradition treaty with Panama in effect because "[t]he Assistant Legal Advisor [sic] for Treaty Affairs of the State Department has advised the District Court that Article XVI of the 1903 Treaty is still in effect"); <u>Arambasic v. Ashcroft</u>, 403 F. Supp. 2d 951, 955 (D.S.D. 2005) (noting that "this Court will give substantial weight to the determination of the political departments of the Government on the issue of whether a treaty is still in effect," and relying on declaration from Attorney Adviser in State Department's Office of Legal Adviser in rejecting fugitive's claim that extradition treaty lapsed).

Such deference arises out of the "generally accepted view" that "foreign policy [is] the province and responsibility of the Executive," whose authority in foreign policy derives from Article II of the United States Constitution. <u>Dep't of Navy v. Egan</u>, 484 U.S. 518, 529 (1988) (quoting <u>Haig v. Agee</u>, 453 U.S. 280, 293-94 (1981)).

The authority of the Executive in the field of foreign relations is "very delicate, plenary and exclusive." Dames & Moore v. Regan, 453 U.S. 654 (1981) (quoting United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319-20 (1936)). Accordingly, "[t]he courts have generally exercised great restraint in dealing with matters involving our relations with foreign nations, deferring instead to the Executive Branch." United States v. Williams, 617 F.2d 1063, 1092 n.9 (5th Cir. 1980) (en banc) (citations omitted) (Roney, J., Godbold, J., Hill, J. Fay, J. Tate, J., and Clark, J., specially concurring); Curtis A. Bradley, Chevron Deference and Foreign Affairs, 86 Va. L. Rev. 649, 659 (2000) ("Since early in the nation's history, courts have been reluctant to contradict the executive branch in its conduct of foreign relations.").

Even if a party to the Armistice Agreement were to have violated it, as Petitioner suggests (HR 38 at 18-19), such action would not automatically invalidate the obligations of the aggrieved party under the agreement, nor would it be the appropriate role for a private individual not party to the agreement to determine the existence of or the remedies for such alleged breach. See Charlton v. Kelly, 229 U.S. 447, 474 (1913) ("Where a treaty is violated by one of the contracting parties, it rests alone with the injured party to pronounce it broken, the treaty being, in such case, not absolutely void, but voidable, at the election of the injured party . . . .") (citation omitted); see also Vienna Convention on the Law of Treaties, art. 60(2), May 23, 1969, 1155 U.N.T.S. 331 ("A material breach of a multilateral treaty by one of the parties entitles . . . [¶](b) a party specially affected by the breach to invoke it as a ground for suspending the operation of the treaty in whole or in part

in the relations between itself and the defaulting State.").  Here, the allegedly aggrieved party to the treaty, the United Nations Command, to which the United States is a "Sending State,"[7] continues to treat "the 1953 Korean War Armistice Agreement [as] <u>a living document</u> necessary for maintaining security and stability on the Korean Peninsula until diplomacy can achieve a lasting peace."[8] Thus, Petitioner's claims (HR 38 at 18) that the DPRK has "repudiated" and "materially breached" the Armistice Agreement are thus beside the point.

Moreover, the Armistice Agreement itself establishes that it "shall remain in effect until expressly superseded either by mutually acceptable amendments and additions or by provision in an appropriate agreement for a peaceful settlement at a political level between both sides."  Armistice Agreement, art. 62.  Petitioner does not offer any authority demonstrating that the Agreement has been expressly superseded — because none exists.

In sum, Petitioner's characterization of the DPRK officials and their family members is fatally flawed from the outset because the Armistice Agreement is in force.[9]  (See HR 38 at 19.)  Accordingly,

---

[7] The signatories to the Armistice Agreement were the military commanders from the United States (representing the United Nations Command), the Korean People's Army, and Chinese People's Volunteer Army.  See https://www.unc.mil/Resources/FAQs/ (last visited Mar. 24, 2023).

[8] United Nations Command, Military Armistice Commission - Secretariat, https://www.unc.mil/Organization/UNCMAC-S/ (emphasis added) (last visited Mar. 24, 2023).

[9] As such, this Court need not address Petitioner's unfounded assumption that so-called "enemy aliens" "have no right to seek the protection of United States law."  (HR 38 at 19.)  Even were the Armistice Agreement not currently in force (which it is), the United States does not concede that so-called "enemy aliens" would "have no right to seek the protection of United States law."

his reliance on cases that allowed the government to seize property and limit an enemy alien's ability to sue civilly in a court of law is misplaced.  (See id. (citing Fairfax's Devisee v. Hunter's Lessee, 11 U.S. 603 (1812), Johnson v. Thirteen Bales, Etc., 13 F. Cas. 836 (Cir. Ct., D.N.Y. 1814), and The Santa Lucia, 44 F. Supp. 793 (S.D.N.Y. 1942)).)  Putting aside the absurd suggestion that the seizure of an individual's property is comparable to the violent attack of an embassy and its occupants, whether a DPRK victim could initiate a civil lawsuit in the United States is irrelevant to whether Petitioner's conduct would be criminal in the United States. Thus, Petitioner cannot rely on the Armistice Agreement to shield him from a finding of dual criminality.

### C. Even if It Were Relevant, Petitioner's Assertion that DPRK Officials in the United States Are Not Protected Under United States and International Law is Wrong

Petitioner's assertion that dual criminality cannot be based on United States laws enacted to protect diplomats and internationally protected persons is premised on his incorrect belief that no DPRK officials have diplomatic status here.  (See HR 38 at 20-24.)  For the reasons explained above, the Court should not take into consideration the status of DPRK officials in the United States when conducting its dual criminality analysis.  But even if it did, dual criminality is still met because Petitioner is wrong about the diplomatic status of DPRK officials in the United States, both factually and legally.

Petitioner claims that DPRK officials and their property are not protected under United States statutes criminalizing certain violent acts committed against diplomats and their property because, in his view, DPRK officials (1) are not in the United States "on official

business" (HR 38 at 21-22), (2) "would not be granted official credentials in the United States" (id. at 19), and (3) enjoy protection only as "officials of the United Nations" (id. at 22).[10] However, as the Department of State has explained, none of that is true.  (See Lulejian Decl. at ¶ 4, Exh. C (Decl. of James Donovan).)

In fact, the DPRK maintains a permanent mission to the United Nations in New York ("DPRK Permanent Mission"), whose members enjoy diplomatic status in the United States as a result of their accreditation to represent the DPRK to the United Nations.  According to the Department of State, the members of the DPRK Permanent Mission, like any members of a U.N. permanent mission, are first notified to the United Nations of their appointment, and the United Nations then notifies the Department of State (through its Office of Host Country Affairs at the United States Mission to the United Nations).  (See id.)  If accepted by the Department of State, the members are registered as accredited officials of the DPRK and afforded relevant privileges and immunities, as indicated on a diplomatic identification card issued to them by the Department of State.  (See id.)

Accordingly, the relevant United States statutes apply.  None of Petitioner's arguments, even if true, would implicate the application of 18 U.S.C. § 970(a), which protects the "property . . . belonging

---

[10] This position contradicts Petitioner's purported expert, upon whom Petitioner relies (HR 38 at 22), who referred to DPRK diplomats who are part of their diplomatic mission to the United Nations in New York as "DPRK officials."  (ER 11-7 at 6.)  Per Article IV, Section 11 of the Agreement Between the United Nations and the United States of America Regarding the Headquarters of the United Nations, June 26, 1947, 61 Stat. 3416, T.I.A.S. 1676, the United Nations draws a distinction between "representatives of Members" and its own officials.  See 1947 WL 26377.

to or utilized or occupied by any foreign government," because a
"foreign government" is simply "the government of a foreign country,"
without further qualification, under 18 U.S.C. § 1116(b)(2).
Moreover, given the information provided by the Department of State,
it is unequivocal that the statutes protecting a "foreign official"
or "internationally protected person" would apply here because the
members of the DPRK Permanent mission are both (1) "duly notified to
the United States as an officer or employee of [the DPRK], and . . .
in the United States on official business" (18 U.S.C. § 1116(b)(3)(B)
(defining "[f]oreign official"), and also (2) "representative[s] . .
. of [the DPRK] . . . entitled pursuant to international law to
special protection against attack upon his person, freedom, or
dignity" (18 U.S.C. § 1116(b)(4)(B) (defining "[i]nternationally
protected person")).  See 18 U.S.C. §§ 112(a), 112(b)(2), and
1201(a)(4).  The fact that the United States does not have formal
relations with the DPRK does not change this result.

## III.   PETITIONER CANNOT PREVAIL ON ARGUMENTS HE FAILED TO DEVELOP UNTIL NOW

Putting aside the unsoundness of Petitioner's assertions, they
are unavailing.  Petitioner made "a dual criminality argument" that
the Extradition Court rejected (HR 38 at 26), but that argument was
based on a claim that his actions were consensual and that he was
acting under the direction of the United States government.  (ER 175
at 30-33.)  While he separately urged in a footnote that the Court
reject the federal statutes cited by the United States because Spain
had not alleged any crimes pertaining exclusively to foreign
officials and because DPRK representatives in the United States would
enjoy no status given the lack of diplomatic relations between the

1  DPRK and the United States, he never further developed that point.

2  (See id. at 31 n.10.)  He did not repeat this argument in any fashion

3  in his habeas petition.  In that way, he failed to preserve the dual

4  criminality challenge he now presents to this Court.

5      It is well settled that general contentions mentioned only in

6  passing and unsupported by meaningful argument are waived.

7  United States v. Stoterau, 524 F.3d 988, 1003 n.7 (9th Cir. 2008);

8  see also Martinez-Serrano v. I.N.S., 94 F.3d 1256, 1259 (9th Cir.

9  1996) ("Issues raised in a brief that are not supported by argument

10 are deemed abandoned.").  The Ninth Circuit repeatedly has relied on

11 these rules to refuse review where the appellant "failed to present

12 . . . specific, cogent argument[s] for [the court's] consideration."

13 United States v. Williamson, 439 F.3d 1125, 1138 (9th Cir. 2006)

14 (quotation and citation omitted); see Hilao v. Estate of Marcos, 103

15 F.3d 767, 778 n.4 (9th Cir. 1996) ("The summary mention of an issue

16 in a footnote, without reasoning in support of the appellant's

17 argument, is insufficient to raise the issue on appeal.") (internal

18 citations omitted).  This is "especially" true where "'a host of

19 other issues are presented for review.'"  Williamson, 439 F.3d at

20 1138.  After all, "'[j]udges are not like pigs, hunting for truffles

21 buried in briefs.'"  Indep. Towers of Wash. v. Washington, 350 F.3d

22 925, 929 (9th Cir. 2003) (citing United States v. Dunkel, 927 F.2d

23 955, 956 (7th Cir. 1991)).

24     Petitioner cannot save his argument by claiming that the Court

25 could sua sponte remedy his error.  (HR 38 at 26-27.)  Courts do "not

26 manufacture arguments for a party."  United States v. Reyes, 660 F.3d

27 454, 463 (9th Cir. 2011) (cleaned up).  Rather, "courts are

28 essentially passive instruments of government.  They do not, or

should not, sally forth each day looking for wrongs to right.  They wait for cases to come to them, and when cases arise, courts normally decide only questions presented by the parties." United States v. Sineneng-Smith, 140 S. Ct. 1575, 1579 (2020) (cleaned up).  That is why the Ninth Circuit routinely treats arguments as waived when a party fails to raise them in the opening brief.  See, e.g., United States v. Kelly, 874 F.3d 1037, 1051 n.9 (9th Cir. 2017); United States v. Perez-Silvan, 861 F.3d 935, 939 (9th Cir. 2017). That rule applies to habeas petitioners on appeal, see Delgadillo v. Woodford, 527 F.3d 919, 930 n.4 (9th Cir. 2008) (argument waived where petitioner failed to raise it until reply brief), and district courts apply the same rule themselves, see, e.g., Dzyuba v. United States, Nos. 3:11-cr-00209-JO-01, 3:15-cv-00575-JO, 2016 WL 4367247, at *1 (D. Or. Aug. 15, 2016); Johnson v. Brazelton, No. EDCV 12-2123 SJO(JC), 2015 WL 3405426, at *18 n.19 (C.D. Cal. May 21, 2015); DeGracia v. United States, Nos. 07-CV-2099 W, 94-CR-0371 W, 2008 WL 4601466, at *2 (S.D. Cal. Oct. 15, 2008).

## IV.  CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court find that Spain's extradition request satisfies the requirements of dual criminality and probable cause and deny Petitioner's habeas petition.

1

**DECLARATION OF JOHN J. LULEJIAN**

2
I, John J. Lulejian, declare as follows:

3
    1.   I am an Assistant United States Attorney and am assigned to

4
represent the United States of America in the matter of <u>Ahn v.</u>

5
<u>Singer</u>, Case No. 2:22-CV-04320-FLA.  I make this declaration in

6
support of the Respondent's Reply to Order to Show Cause re: Whether

7
Probable Cause Supporting Extradition Exists in Light of Ongoing

8
Hostilities Between the United States and North Korea.

9
    2.   Attached hereto as Exhibit A is a true and correct copy of

10
the Declaration of Robert K. Harris, dated March 24, 2023.  Mr.

11
Harris is employed by the U.S. Department of State, where he

12
currently serves as the Assistant Legal Adviser for East Asia and

13
Pacific Affairs.

14
    3.   Attached hereto as Exhibit B is a true and correct copy of

15
the relevant pages of <u>Treaties in Force</u>, listing the Armistice

16
Agreement among the treaties in force.

17
    4.   Attached hereto as Exhibit C is a true and correct copy of

18
the Declaration of James Donovan, dated March 23, 2023.  Mr. Donovan

19
is employed by the U.S. Department of State, where he currently

20
serves as a Minister-Counselor for Host Country Affairs at the

21
United States Mission to the United Nations.

22
    5.   I declare under penalty of perjury that the foregoing is

23
true and correct.

24
    Executed this <u>24th</u> day of March, 2023, at Los Angeles,

25
California.

26
                               */s/John J. Lulejian*
                                 JOHN J. LULEJIAN

27

28