JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER AHN,<br><br>                    Petitioner,<br><br>          v.<br><br>DAVID M. SINGER,<br><br>                    Respondent. | Case No. 2:22-cv-04320-FLA<br><br>**ORDER GRANTING PETITIONER CHRISTOPHER AHN'S PETITION FOR WRIT OF HABEAS CORPUS [DKT. 1], FINDING LACK OF DUAL CRIMINALITY [DKT. 36], AND ENJOINING EXTRADITION** |

1

## **RULING**

"The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Case of Rebellion or Invasion the public Safety may require it."  U.S. Const. art. 1, § 9, cl. 2.  "The uniqueness of habeas corpus in the procedural armory of our law cannot be too often emphasized.  It differs from all other remedies in that it is available to bring into question the legality of a person's restraint and to require justification for such detention."  *Brown v. Allen*, 344 U.S. 443, 512 (1953) (Frankfurter, J., concurring).  "Its history and function in our legal system and the unavailability of the writ in totalitarian societies are naturally enough regarded as one of the decisively differentiating factors between our democracy and totalitarian governments."  *Id.*

For the reasons stated herein, the court GRANTS Petitioner Christopher Ahn's ("Petitioner" or "Ahn") Petition for Writ of Habeas Corpus ("Petition," Dkt. 1)[1] and ENJOINS Ahn's extradition from the United States on the grounds that the Magistrate Judge clearly erred in finding: (1) there is probable cause to extradite Petitioner on the charges certified; and (2) the United States of America (the "government") met its burden to establish dual criminality.  The court additionally holds extradition would violate Petitioner's substantive due process rights and is barred under the state-created danger doctrine and the humanitarian exception to extradition, if it exists.

Execution of this Order is STAYED for thirty-five (35) days from the date of the Order, to allow the government the opportunity to appeal this decision.  If the government fails to file a notice of appeal timely, the Clerk of the court shall exonerate Petitioner's bond.

///

///

[1] The court cites documents by the page numbers added by the court's CM/ECF system, rather than any page numbers listed on documents natively.

2

**BACKGROUND**

Ahn was among a small group of men, some or all of whom were part of an organization called Free Joseon, who are accused of entering unlawfully the Democratic People's Republic of Korea's ("North Korea") embassy in Madrid, Spain, on February 22, 2019. *United States v. Ahn*, 2:19-cv-05397-FLA (JPRx) ("Case 19-5397"), Dkt. 233 ("Certification," filed in this action at Dkt. 11-1) at 1–2.  The government contends Ahn and others, including Adrian Hong Chang ("Hong Chang"), the apparent leader of Free Joseon, attacked the North Korean embassy, "breaking down doors, seizing electronic items, physically assaulting and restraining diplomats, and holding them and their families hostage for approximately four-and-a-half hours," before escaping from the embassy and fleeing to the United States.  Dkt. 30 at 15 (footnote omitted).  Ahn asserts they were asked by certain residents of the embassy to aid their defection from North Korea by staging their departure as an involuntary kidnapping to protect their families from retaliation by the North Korean government.  Dkt. 14 at 29–31.

On June 20, 2019, the government, acting on behalf of the Kingdom of Spain ("Spain"), filed a Request for Petitioner's Extradition for six offenses under Spanish law: (1) breaking and entering, (2) making threats, (3) causing injury, (4) illegal restraint, (5) criminal organization, and (6) robbery with violence or intimidation.  Case 19-5397, Dkt. 44.  The extradition request came to hearing on May 25, 2021, at which time the Magistrate Judge denied certification as to the sixth offense of robbery with violence or intimidation while taking under submission the questions of whether probable cause existed as to the other five offenses, whether to admit and consider Petitioner's declaration in making that judgment, and whether a humanitarian exception to extradition existed and was appropriate to invoke as to Petitioner. *Id.*, Dkt. 201 (Extradition Hr'g Minute Order) at 2, Dkt. 231 (Extradition Hr'g Tr.).

On May 9, 2022, the Magistrate Judge issued a Reluctant Certification of Extraditability ("Certification"), certifying Ahn's extradition to Spain for the offenses

3

of: (1) breaking and entering, (2) making threats, (3) causing injury, and (4) illegal restraint, while denying certification as to offenses of (5) criminal organization, and (6) robbery with violence or intimidation.  Certification at 1, 4 at 19–28, 50.[2]  The Magistrate Judge rejected Petitioner's request to refuse certification on humanitarian grounds, finding the extradition court was barred by clearly established law from invoking the humanitarian exception to deny extradition.  *Id.* at 34, 52.

On June 23, 2022, Petitioner filed the subject Petition for Writ of Habeas Corpus ("Petition," Dkt. 1), challenging the certification of his extradition on grounds including: (1) the competent evidence presented was insufficient to support the Magistrate Judge's probable cause determination; (2) the Magistrate Judge erred in finding dual criminality; and (3) Petitioner's extradition would violate his Fifth Amendment right to substantive due process and must be enjoined under the humanitarian exception.  Dkt. 1-1 at 1; Dkt. 14 at 42–64.  The government opposes the Petition.  Dkt. 30.  The Magistrate Judge's denial of certification of the fifth and sixth offenses are not at issue in this habeas proceeding.  *See id.* at 35–43.

On January 9, 2023, the court ordered the parties to show cause ("OSC") whether the dual criminality requirement of the extradition treaty between the United States and Spain ("Extradition Treaty," Dkt. 11-14) was satisfied, in light of the ongoing hostilities and unique circumstances surrounding the United States' relationship with North Korea.  Dkt. 36.  The government and Petitioner responded to the OSC timely.  Dkts. 37, 38, 39.  The Petition and OSC came to hearing on January 26, 2024 (the "January 2024 Hearing").  Dkt. 57.

/ / /

/ / /

/ / /

---

[2] The Magistrate Judge's findings of fact in the Certification (Dkt. 11-1 at 1–3, 7–19) are incorporated into this Order by reference, except as specified otherwise herein.

**DISCUSSION**

**I.    Legal Standard**

"[E]xtradition is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that the statute interposes a judicial function." *Vo v. Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006) (quotation marks and citations omitted).  A United States citizen may be subject to extradition for offenses committed in another country, "provided that an extradition treaty exists between the United States and the country seeking extradition and the crime charged is covered by the treaty." *Id.* (citing 18 U.S.C. § 3184).  "After the warrant issues, the judicial officer conducts a hearing to determine whether there is 'evidence sufficient to sustain the charge under the provisions of the proper treaty or convention,' or, in other words, whether there is probable cause." *Id.* (quoting 18 U.S.C. § 3184, citation omitted).

"If the judicial officer determines that there is probable cause, he is required to certify the individual as extraditable to the Secretary of State." *Id.* (cleaned up). "After an extradition magistrate certifies that an individual can be extradited, it is the Secretary of State, representing the executive branch, who ultimately decides whether to surrender the fugitive to the requesting country." *Id.*  "The authority of a magistrate judge serving as an extradition judicial officer is thus limited to determining an individual's eligibility to be extradited, which he does by ascertaining whether a crime is an extraditable offense under the relevant treaty and whether probable cause exists to sustain the charge." *Id.*

As the party seeking extradition, the government bears the initial burden to establish extraditability. *Barapind v. Enomoto*, 400 F.3d 744, 747 (9th Cir. 2005) (*en banc*) (*per curiam*) ("Certification of extradition is lawful only when the requesting nation has demonstrated probable cause to believe the accused person is guilty of committing the charged crimes.").  A reviewing court defers to the extradition court's factual findings unless they are clearly erroneous, and reviews legal questions and mixed questions of fact and law *de novo*. *Quinn v. Robinson*, 783 F.2d 776, 791–92

5

(9th Cir. 1986).

"There is no right of direct appeal to a district court or a court of appeals from the extradition court's certification of extraditability.  Because the extradition court's order is not final for purposes of 28 U.S.C. § 1291, the only available avenue to challenge an extradition order is through a habeas petition." *Santos v. Thomas*, 830 F.3d 987, 1001 (9th Cir. 2016) (quotation marks and citations omitted).  "The district court's habeas review of an extradition order is limited to whether: (1) the extradition magistrate had jurisdiction over the individual sought, (2) the treaty was in force and the accused's alleged offense fell within the treaty's terms, and (3) there is any competent evidence supporting the probable cause determination of the magistrate." *Vo*, 447 F.3d at 1240 (quotation marks and citations omitted).

**II.      The Magistrate Judge's Probable Cause Determination**

**A.      Probable Cause in Extradition Proceedings**

Pursuant to the Extradition Treaty, a request to extradite "a person who has not yet been convicted" is to "be accompanied by … such information as would justify the committal for trial of the person if the offense had been committed in the requested country."  Dkt. 11-14 at 14, art. X, § D.  United States courts have interpreted this provision in similar treaties as "requiring a showing by the requesting party that there is probable cause to believe that the accused has committed the charged offense." *Quinn*, 783 F.2d at 783.  "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Garcia v. County of Merced*, 639 F.3d 1206, 1209 (9th Cir. 2011).  The government and the requesting nation bear the initial burden of establishing the existence of probable cause. *Barapind*, 400 F.3d at 747.

"[E]xtradition courts do not weigh conflicting evidence in making their probable cause determinations[.]" *Id*. at 750 (cleaned up).  "The Federal Rules of Evidence do not apply in an extradition hearing," and "evidence is not incompetent

simply because it is hearsay." *Mainero v. Gregg*, 164 F.3d 1199, 1206 (9th Cir. 1999). "For information to amount to probable cause, it does not have to be conclusive of guilt, and it does not have to exclude the possibility of innocence …." *Garcia*, 639 F.3d at 1209. "All that is required is a 'fair probability,' given the totality of the evidence" "that a suspect has committed a crime." *Id.*

"If the judicial officer determines that there is probable cause, [she] is required to certify the individual as extraditable to the Secretary of State." *Vo*, 447 F.3d at 1237 (cleaned up). This determination "serves only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based." *Quinn*, 783 F.2d at 791.[3] "Because the magistrate's probable cause finding is … not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues, it must be upheld if there is any competent evidence in the record to support it." *Id.* (quotation marks and citations omitted).

### B.    Competency of the Evidence Supporting the Determination

Petitioner contends the Magistrate Judge committed clear error by: (1) finding North Korean witness Cho Sun Hi's ("Ms. Cho")[4] initial statements to the Spanish police to be competent; and (2) excluding Petitioner's declaration and medical records as inadmissible contradictory evidence. Dkt. 14 at 60–64.

---

[3]    In probable cause hearings under American law, the evidence taken need not meet the standards for admissibility at trial. … This is because a preliminary hearing is not a minitrial of the issue of guilt; rather, its function is the more limited one of determining whether probable cause exists to hold the accused for trial. An extradition hearing similarly involves a preliminary examination of the evidence and is not a trial.

*United States v. Kin-Hong*, 110 F.3d 103, 120 (1st Cir. 1997) (quotation marks and citations omitted).

[4] For the sake of consistency and clarity, the court lists the Korean witnesses' family names before their given names, in accordance with the standard naming convention in both North and South Korea.

### 1. Ms. Cho's Testimony

In the underlying proceeding, Petitioner argued that the North Korean witnesses' statements regarding the events at the embassy were not competent because they were coerced. Certification at 11. After considering the testimony of Professor Lee Sung-Yoon ("Professor Lee"), a professor of Korean Studies at the Fletcher School of Law and Diplomacy at Tufts University, the Magistrate Judge agreed in large part and excluded all of the North Korean witness' statements aside from Ms. Cho's initial statements to the Spanish police.[5] *Id.* at 11–16.[6]

Professor Lee "testified that North Korean witnesses' statements are 'inherently unreliable'" because "North Koreans abroad are 'captives of the state whose loved ones and associates back home are held hostage against their actions abroad.'" Certification at 13–14 (citing Dkt. 11-7 at 11). Based on this testimony, the Magistrate Judge found, "the North Koreans at the embassy would have had a 'compelling need to keep their story together' for fear that officials back home might think the intruders were there to help one or more of them defect," since they would "face the certainty of banishment to a gulag with their entire family and even execution" "[i]f they were thought to have tried to defect[.]" *Id.* at 14.[7]

Because all excluded statements were made in the presence of and translated into Spanish by the North Korean Acting Ambassador, So Yun Sok ("Ambassador

---

[5] This witness is referred to by different names throughout the record. *See* Certification at 10 n. 8. The court will follow the Magistrate Judge's practice and refer to her as "Ms. Cho."

[6] The government did not present any evidence to contest Professor Lee's testimony regarding North Korea and the North Korean government.

[7] "Prof. Lee testified that the situation for those North Koreans who hold government posts, and particularly those in foreign countries, is even more dire than for average citizens. As an example, he noted that when a North Korean university professor defected to South Korea in 1997, '5,000 of his friends, relatives, distant relatives, [and] colleagues' were 'all killed' in North Korea." Certification at 14.

So"), who was superior in title to every single North Korean involved and deeply self-interested in what was said, the Magistrate Judge found these statements were not competent. *Id.* at 15, 18 ("As Prof. Lee testified, [Ambassador So] would have made sure the other North Koreans' statements matched his, whether by coercing them to say what he wanted or simply translating them as he liked.").

While noting "it was a close call," the Magistrate Judge found Ms. Cho's initial statements to the Spanish police officers to be competent because they were "translated by Google Translate and not Ambassador So." *Id.* at 17. No evidence, however, was presented to establish that Google Translate translated, or was even capable of translating in February 2019 when the statements were made, Ms. Cho's statements from North Korean to a language understood by the Spanish police officers accurately. The evidence in the record demonstrates clearly that Google Translate did not.

The Spanish police officers noted Ms. Cho was disoriented, Case 19-5397, Dkt. 118-1 ("Suppl. Extradition Doc.") at 17,[8] and "didn't speak Spanish at all," *id.* at 48, and that her translated statements "made no sense," *id.*, and were "a little strange," *id.* at 19. One officer testified "the translation that came up … said that some individuals had entered the Embassy and they were killing people, they were eating people and there were children there." *Id.* at 19. He further testified they "changed [the program] … both from Korean to Spanish and from Korean to English," "just in case maybe it might change the context of what she meant a little bit," because the translated

---

[8] Excerpts of the Document Supporting the Request for Extradition (Case 19-5397, Dkt. 226-3, "Extradition Docs.") and Supplemental Extradition Document (*id.*, Dkt. 118-1) were filed in this action as Dkts. 11-15 and 11-16, respectively. Because these exhibits were filed with the CM/ECF headers from Case 19-5397, the court will cite these exhibits by the relevant page numbers of the documents from the underlying extradition proceeding rather than Dkts. 11-15 and 11-16 in this action.

statements "seemed very strange." *Id.* at 19.[9]  The Magistrate Judge noted similarly that "[s]ome of [Ms.] Cho's initial statements were fantastical – South Koreans had entered the embassy and were 'killing people' and 'eating' them …." Certification at 17 n. 12.[10]  The government also referred to Ms. Cho's translated statements as "fantastical" at the January 2024 Hearing.  Dkt. 57 at 45.

In these circumstances, it was clear error for the Magistrate Judge to consider Ms. Cho's initial statements to the Spanish police, as they were clearly not competent evidence.  *See, e.g.*, *Novelty Textile, Inc. v. Windsor Fashions, Inc.*, Case No. 2:12-cv-05602-DDP (MANx), 2013 WL 1164065, at \*3 (finding "a translation by Google Translate is not sufficiently reliable to make it admissible," and that "[t]he translation's unreliability is clear on its face," given the "nonsensical" results provided).[11]

### 2. Petitioner's Declaration

"The admission of evidence proffered by the fugitive at an extradition proceeding is left to the sound discretion of the court, guided of course by the principle that a fugitive's right to introduce evidence rebutting probable cause is limited to introducing evidence that is 'explanatory,' but not 'contradictory.'" *Santos*, 830 F.3d at 992 (cleaned up).  "The difference between 'explanatory' and 'contradictory' evidence is easier stated than applied," and "federal courts have

---

[9] Tellingly, the police officers were unclear whether the translation stated "[Ms. Cho] had hit her head or that her head had been hit[.]"  Dkt. 11-16 at 48.  There is no evidence in the record to establish Ms. Cho actually stated what the officers believed she was trying to say, based on the translation provided by Google Translate.

[10] It is undisputed that neither murder nor cannibalism occurred at the Embassy during the events at issue.

[11] This ruling is limited to the Spanish police officers' testimony regarding Ms. Cho's statements and does not affect the competency of the portions of their testimony based on statements made by Spanish-speaking witnesses and the officers' personal observations.  *See* Suppl. Extradition Doc. at 17–18, 48.

struggled to distinguish between the two." *Id.*

The Ninth Circuit "ha[s] generally settled on the principle that 'explanatory' evidence is evidence that 'explains away or completely obliterates probable cause,' whereas contradictory evidence is that which 'merely controverts the existence of probable cause, or raises a defense.'" *Id.* "In practice, this means that an individual contesting extradition may not, for example, present alibi evidence, facts contradicting the government's proof, or evidence of defenses like insanity, as this tends to call into question the credibility of the government's offer of proof. However, the accused may testify to things which might have explained ambiguities or doubtful elements in the government's case." *Id.* at 993 (quotation marks and citations omitted)

The Magistrate Judge ruled Petitioner's declaration was inadmissible evidence because it contradicted the government's version of events, as established by Ms. Cho's admitted initial statements to the Spanish police. Certification at 9–10. As stated, however, Ms. Cho's initial statements were not competent and cannot be considered in determining whether Petitioner's evidence was "explanatory" or "contradictory."

With the exclusion of Ms. Cho's initial statements to the Spanish Police, only the following competent evidence remains: (1) images showing Petitioner entering the embassy along with other members of his group;[12] (2) images and documents establishing that Petitioner's group had purchased items found in the embassy; (3) photographs of damage to the embassy, which were taken approximately one hour-

---

[12] In finding probable cause for the crimes certified, the Magistrate Judge "generally, although not entirely," avoided relying on images recorded by security cameras located within the embassy that the government offered as evidence because "some of the footage, particularly that taken after dark, [was] grainy and difficult to make out," and the time "between when the 'so-called infiltrators' left the embassy and when Acting Ambassador So allowed Spanish police to enter," provided "ample time [for the North Koreans] to coordinate and to lay out … damaging evidence." Certification at 20–21 n. 13 (internal quotation marks and citations omitted, ellipses in Certification).

11

and-a-half after the incident and once the Spanish police were allowed to enter the embassy; (4) statements by Spanish witnesses who were not present inside the embassy during the incident; and (5) medical records of Ms. Cho and Ambassador So. *See* Dkt. 14 at 19–20 (identification of admitted evidence); Dkts. 11-15, 11-16.

Petitioner's declaration explains his motive for entering the embassy with the items identified in the government's evidence and details what occurred once they were inside.  Dkts. 10-1 ("Ahn Decl." unredacted version) & 11-12 (redacted version). This is explanatory evidence.

The government argues Petitioner's declaration is contradictory evidence because it contradicts the narrative Spain and the government have presented.[13]  The court disagrees.  The relevant standard is not whether evidence contradicts the government's theory or "narrative" of events, but whether the evidence contradicts the government's offer of proof.  *See Santos*, 830 F.3d at 992.  Petitioner's declaration does not contradict or challenge the credibility of any facts established by the government's competent evidence, and challenges only the inferences the government draws from these facts by presenting supplemental facts regarding Petitioner's motives and the events that occurred outside the view of the Spanish witnesses and images of security footage presented.  This is explanatory evidence.  *See Santos*, 830 F.3d at 1003.[14]

---

[13] When questioned at the January 2024 Hearing, the government was unable to identify any specific evidence contradicted by Petitioner's declaration and stated only that the declaration "contradict[ed] the narrative that the Spanish have presented …." Dkt. 57 at 48–49.  The Spanish government's narrative is not evidence.

[14] The Magistrate Judge also found Petitioner's declaration was not explanatory because "Ahn's statements 'explain' the government's evidence only to the extent they are true.  And assessing that would require a prohibited credibility determination." Certification at 8.  To the extent the Certification suggests a relator's testimony is contradictory if the government challenges the relator's credibility, the court disagrees.  The relevant question is not whether the relator's credibility can be

Accordingly, the court holds the Magistrate Judge clearly erred by excluding Petitioner's declaration as contradictory evidence. *See* Certification at 9. The court declines to address the Magistrate Judge's exclusion of Petitioner's medical records, as unnecessary to the court's ultimate ruling on the Petition.

### 3.    The Existence of Probable Cause after Evidentiary Rulings

The Magistrate Judge found probable cause existed to believe Petitioner committed the offenses of breaking and entering, illegal restraint, causing injuries, and threats under Spanish law. Certification at 23–26, 28, 50. After excluding Ms. Cho's statement to the Spanish Police as incompetent and admitting Petitioner's declaration as explanatory evidence, the competent evidence supporting the Magistrate Judge's probable cause determination establishes the following facts:

Petitioner arrived in Spain on the morning of the embassy incident. Certification at 20 (citing Extradition Doc. at 3). The prior day, "his compatriots prepared for the operation by buying balaclavas, knives, imitation pistols, handcuffs, flashlights, electrical tape, and a ladder …, as shown by store receipts and video-camera surveillance." *Id.* (citing Extradition Doc. at 51–56). "Ahn does not contest that he went to and entered the embassy with the others, as surveillance footage seems to show." *Id.*

"Two civilians who were waiting for a bus outside the embassy when Ahn and the others entered heard 'screams' from inside the compound [Suppl. Extradition Doc. at 77, 80–81, 101], and one of them testified that when she peeked through a hole in

---

challenged or disputed—since the credibility of a witness' testimony can always be questioned—but whether the relator's evidence: (a) "explains away or completely obliterates probable cause" by "explain[ing] ambiguities or doubtful elements in the government's case," or (b) "merely controverts the existence of probable cause or raises a defense" by contesting facts established by the government's competent evidence. *See Santos*, 830 F.3d at 993. If the government's challenge to the truthfulness and credibility of a relator's testimony rendered that testimony contradictory, then a relator could never provide explanatory testimony. That is not the standard established under *Santos* and other relevant authority.

the compound's wall[,] she saw someone on the ground with three people on top [*id.* at 80–81], one of them holding a pistol [*id.* at 81]." Certification at 21. "The other witness saw people on top 'grabbing the person who was on the ground.'" *Id.* (citing Suppl. Extradition Doc. at 102). A student who was with this witness said, "I think they're practicing." *Id.* at 21 n. 14; Suppl. Extradition Doc. at 81.

Two Spanish police officers were dispatched to assist the Madrid Municipal Emergency Assistance and Rescue Service (SAMUR) with Ms. Cho after she was discovered "walking along the public highway." Suppl. Extradition Doc. at 17. The Spanish police officers and a bystander testified Ms. Cho "was very scared and appeared to be seriously injured." Certification at 21 (citing Extradition Doc. at 7–8, 17, 39–41; Suppl. Extradition Doc. at 9, 18–19, 48, 65–66).

"Spanish police also testified that after they went to the embassy to investigate, [Hong Chang] answered the door and pretended to be North Korean, telling the officers nothing was wrong and that if they had heard noises inside[,] it was because 'he couldn't open a door' and had had to 'give it a kick[.]'" *Id.* at 21–22 (citing Suppl. Extradition Doc. at 21, 49). "Officers stationed outside the embassy saw Ahn and his group leave in embassy cars 'quite fast' and 'at great speed,' one of those cars with its lights off." *Id.* at 22 (citing Suppl. Extradition Doc. at 24, 50–51). "They took with them pen drives, computers, hard drives, and a mobile telephone belonging to the North Koreans." *Id.* (citing Extradition Doc. at 3, 9). "After police were allowed to enter the compound, they found scattered about various accoutrements of criminal activity, including restraints, handcuffs, knives, and replica guns, items consistent with those Ahn's cohorts had bought before the incident." *Id.* (citing Extradition Doc. at 9).

Ahn states the following facts in his declaration: "On a few occasions, [Hong Chang] … ask[ed] [him] to help on specific tasks related to helping with North Korean defections," in connection with Free Joseon. Ahn Decl. ¶ 4. "[Ahn's] involvement usually entailed making travel arrangements for people, escorting them

14

from one place to another, and making sure they ended up at the next leg of their intended destination." *Id.* ¶ 5.[15]  According to Petitioner, he was only "called upon to assist … to facilitate the defection of someone who had reached out to [Hong Chang] for help," and "never had any reason to believe that [Hong Chang] or his organization were involved in forcing anyone to defect against their will." *Id.* ¶ 6.

When Petitioner arrived in Madrid, "[Hong Chang] explained ██████████ ████████████████████████████████████ had asked for help defecting ████████████████. [Hong Chang] also told [Ahn] ████████ ███████████████████████████████████████████ ████████████████████████████████████████." *Id.* ¶ 8. "[Hong Chang] said ████████ asked [them] to stage the defection as a kidnapping to protect against any retaliation." *Id.*  "Knowing North Korea to be a surveillance state, [they] had every expectation that the embassy would be covered with security cameras and that the North Korean government would be able to see everything [they] were doing." *Id.* ¶ 11.  Accordingly, they brought the items later retrieved from the embassy, which included fake guns, "to make the 'kidnapping' look real, not to hurt anybody." *Id.* ████████████████████████████ ████████████████████████ *Id.*

"When [they] arrived at the embassy, one of the North Korean officials let [Hong Chang] in and left the door open," which Petitioner believes was "done on purpose to allow [the group] to enter." *Id.* ¶ 12.  "[The group] then entered the embassy, and several members of [the] group went through the motions of tying people up." *Id.*  "[Petitioner] did not hit anyone or commit any violence or take any

---

[15] In 2017, Hong Chang and Ahn, in connection with Free Joseon, helped Kim Han-Sol, the nephew of North Korea's dictator and supreme leader, Kim Jong-Un, "disappear" after his father, Kim Jong-Nam, the dictator's brother, whom many considered to be the rightful heir, was assassinated by North Korea and Han-Sol's life appeared also to be in danger.  Certification at 37.

property while in the embassy," and "[b]ased on what [he] saw, the others were taking great pains to make the restraining look real without actually hurting anyone." *Id.* According to Petitioner, "[he] believed any resistance from the North Koreans was being performed due to North Korean surveillance." *Id.*

"A little less than an hour after [they] arrived, the Spanish police rang the doorbell. [Hong Chang] went to the door to speak to them, and they told [the group] a woman had jumped out of the window and reported a disturbance at the embassy." *Id.* ¶ 13.[16] "The police left after a few minutes. After this incident, the energy in the embassy changed, and the North Koreans grew increasingly distressed." *Id.* "[Hong Chang] and a few others ██████████████████████████ ██████." *Id.* ¶ 14. "The phone in the embassy kept ringing during this time," which "seemed to terrify the North Koreans, who were viscerally upset and seemed to be convinced the phone ringing was proof that they were all being monitored." *Id.*

"Eventually, [Hong Chang] came out and told [Petitioner] ██████████ ████████████████ did not want to go through with the defection." *Id.* ¶ 15. ████████████████████████████████████████ ████████████████████████ and departed the embassy. *Id.* ¶¶ 15–16. Petitioner further states they were very concerned about the safety of the North Koreans and "[he] understand[s] someone from the group sent an email to the Spanish government to let them know that the people inside the embassy might be in danger from the North Korean government." *Id.* ¶ 17.

/ / /

---

[16] The Magistrate Judge's observation that Hong Chang's appearance at the embassy door "suggest[s] that the real North Koreans were all restrained or unwilling to play along," Certification at 24, is *dicta* and does not constitute a finding of fact. The court notes, without making credibility determinations or findings, that a reasonable factfinder could find alternatively that Hong Chang appeared in *lieu* of the North Koreans to allow them to maintain the fiction of a kidnapping rather than revealing the attempted defection, as Petitioner maintains in his declaration.

Based on the totality of the competent evidence presented, the court finds the Magistrate Judge clearly erred in finding the government met its burden to establish probable cause for the crimes certified. It is undisputed that Ahn, Hong Chang, and members of Free Joseon aided high-profile North Koreans in defecting previously. The government did not present any evidence to establish or even suggest that Ahn, Hong Chang, or members of Free Joseon had ever engaged in acts of violence or aggression against the North Korean government or governmental officials similar to what the government contends occurred here.

Petitioner does not contest the government's competent evidence or dispute he entered the North Korean embassy with the other members of the group. *See* Certification at 20–22 & n. 13. Instead, Ahn explains they acted ████████ ████████████████████████ with the understanding that they were staging a performance to allow the embassy staff to defect while minimizing harm and danger to their family, relatives, and friends in North Korea.[17] If ████████████████ Free Joseon and Ahn to assist the embassy staff in defecting by staging a kidnapping as Petitioner attests—and there is no competent evidence to establish otherwise—there can be no probable cause for the crimes certified, since all conduct occurred █ ████████████████████████ without the requisite intent.[18]

---

[17] The fact that the North Korean embassy officials allowed individuals with South Korean accents to enter the embassy without taking any security precautions, *see* Dkt. 11-16 at 114–20 (images of an individual inside the embassy opening the front door and allowing the group to enter the embassy over a 5-minute period, without any request for identification, supervision, security presence, or resistance), further supports Ahn's testimony that they entered the embassy ████████████████████ ████████████ to stage the North Koreans' attempted defection as a kidnapping to protect against retaliation by the North Korean government.

[18] The government's narrative—that members of an organization that aided high-profile North Koreans defect, which had no established history of violence, decided to stage an assault on the North Korean embassy in Spain with knives and fake pistols in an effort to convince the unsuspecting embassy staff to defect, ████████████

Ambassador So's testimony and his translations of the other North Korean witnesses' statements are not competent evidence because the singularly repressive, draconian, and murderous nature of the North Korean government put Ambassador So under "enormous pressure" to say whatever he believed was necessary ensure that the North Korean government would not blame him for the incident or accuse him of attempting to defect. *See* Certification at 14–15. The Spanish witnesses' testimony and other competent evidence submitted by the government do not shed any light on Ahn and his group's motives and interactions with the embassy staff inside the embassy. It is clear the Spanish witnesses, who were mere bystanders on a public street outside the embassy, had no personal knowledge regarding the truth of Petitioner's testimony.

The competent evidence in the record, thus, is insufficient to establish probable cause for the offenses of breaking and entering, illegal restraint, and threats under Spanish law. The Magistrate Judge certified the remaining offense of causing injuries finding: (1) Ms. Cho suffered sufficiently serious injuries "from when she jumped off the terrace to escape the strangers in the embassy" were foreseeable; and (2) extradition would be appropriate based on Ambassador So's "only marginal 'injuries' because the other offenses certified carry potential punishments of more than one year. Certification at 24–25. After Ms. Cho's initial statements to the Spanish police are excluded from, and Petitioner's declaration is included in, the evidence

███████████████████████████████████████████████ and no knowledge of what security or armed resistance they may face inside—is illogical and implausible. Based on their prior experience aiding North Korean defectors, Ahn, Hong Chang, and the other members of Free Joseon would have known that the North Korean embassy staff would be highly unlikely to defect spontaneously, given the extreme and deadly consequences their family and friends in North Korea would inevitably suffer if they did defect. This observation does not constitute findings of fact or credibility determinations regarding the government's evidence and is intended only to highlight the unreasonableness of the government's theory, based on the totality of the evidence in the record.

considered, the court finds there is insufficient competent evidence to establish probable cause that Petitioner or the other members of his group caused injury to Ms. Cho. The remaining "marginal 'injuries' suffered by Ambassador So are alone insufficient to support extradition. *See id.* at 25.

Accordingly, the court finds the Magistrate Judge erred clearly in finding there was probable cause for the crimes charged, and GRANTS habeas relief on this basis.

## III.    Dual Criminality

"[U]nder the doctrine of 'dual criminality,' an accused person can be extradited only if the conduct complained of is considered criminal by the jurisprudence or under the laws of both the requesting and requested nations." *Quinn*, 783 F.2d at 783. This doctrine is incorporated in the extradition treaty between the United States and Spain.[19] "[T]o satisfy the 'dual criminality' requirement, each element of the offense purportedly committed in a foreign country need not be identical to the elements of a similar offense in the United States." *In re Extradition of Russell*, 789 F.2d 801, 803 (9th Cir. 1986). "It is enough if the particular variety of conduct was criminal in both jurisdictions." *Id.* (quoting *Kelly v. Griffin*, 241 U.S. 6, 14 (1916)) (cleaned up).

### A.    The United States' Hostile Relationship with North Korea

As stated in the OSC, which the court incorporates into this Order by reference, the United States has been involved in a military conflict with North Korea since President Truman committed American troops to Korea in June 1950, in support of United Nations Security Council Resolutions during the Korean War. Although officers of the United States and North Korean armies signed the Armistice

---

[19] Article II of the Extradition Treaty states in relevant part: "A. An offense shall be an extraditable offense if it is punishable under the laws in both Contracting Parties by deprivation of liberty for a period of more than one year or by a more severe penalty …. B. Extradition shall also be granted for participation in any of these offenses, not only as principals or accomplices, but as accessories, as well as for attempts to commit or conspiracy to commit any of the aforementioned offenses, when such participation, attempt, or conspiracy is subject, under the laws of both Parties, to a term of imprisonment exceeding one year." Dkt. 11-14 at 3.

Agreement for the Restoration of the South Korean State ("Armistice Agreement") on July 27, 1953, https://www.archives.gov/milestone-documents/armistice-agreement-restoration-south-korean-state, that agreement only ceased hostilities between the armed forces involved in the conflict and established a demilitarized zone.  The United States has never declared peace or entered into a peace treaty with North Korea, and the two countries do not maintain diplomatic relations.  *See* Certification at 5–6 n. 6 (recognizing the United States "has no North Korean embassy nor any diplomatic relations at all with that country.").

In the intervening decades, North Korea has breached the Armistice Agreement repeatedly, including through the capture of the *USS Pueblo* and her crew on January 23, 1968, the shooting down of a U.S. Navy EC-121 airplane on April 15, 1969, the attempted assassination of the South Korean President in Rangoon, Myanmar on October 9, 1983, the bombing of Korean Air Flight 858 on November 29, 1987, the sinking of the *ROKS Cheonan* on March 26, 2010, and the shelling of the South Korean island of Yeonpyeong-do on November 23, 2010.  Dkt. 38 at 10–13.  North Korea and South Korea continue to exchange artillery and missile fire on a regular basis.[20]  North Korea has also repudiated the Armistice Agreement publicly on multiple occasions, including in 2003, 2009, and 2013.  Madison Park, *North Korea Declares 1953 Armistice Invalid*, CNN (Mar. 11, 2013), https://www.cnn.com/2013/03/11/world/asia/north-korea-armistice/index.html.  As recently as October 7, 2024, North Korea warned it may use nuclear weapons in potential conflicts with the United States and South Korea.  *E.g.*, Hung-Jin Kim, *North Korea's Kim Again Threatens to*

---

[20] *E.g.*, *South Hits Back as North Korea Fires Most Missiles in a Day*, BBC (Nov. 2, 2022), https://www.bbc.com/news/world-asia-63481183; Choe Sang-Hun, *North Korea Launches Two Ballistic Missiles: What to Know*, N.Y. TIMES (Dec. 23, 2022), https://www.nytimes.com/article/north-korea-missile-launches.html; Hyung-Jin Kim and Kim Tong-Hyung, *North Korea Test-Fires Ballistic Missiles ahead of Trump's Asia Trip*, ASSOCIATED PRESS (Oct. 21, 2025), https://apnews.com/article/koreas-ballistic-missile-d15e268cf071780b623a1dbac670f417.

*Use Nuclear Weapons against South Korea and US*, ASSOCIATED PRESS (Oct. 7, 2024), https://apnews.com/article/north-korea-kim-nuclear-weapons-5812004982995598bd8c38e0b902dfae.

On November 20, 2017, the United States designated the North Korean government a State Sponsor of Terrorism.  U.S. Dep't of State, State Sponsors of Terrorism, https://www.state.gov/state-sponsors-of-terrorism/.  The State Department routinely issues statements condemning the North Korean regime and reaffirming our nation's commitment to promoting human rights and supporting North Korean refugees and defectors, along with the countries, organizations, and individuals who aid them.  *E.g.*, Press Statement, U.S. Dep't of State, Supporting Human Rights in North Korea (Sept. 17, 2023), https://2021-2025.state.gov/supporting-human-rights-in-north-korea-2/; Press Release, U.S. Dep't of State, North Korea Freedom Week (July 8, 2024), https://2021-2025.state.gov/north-korea-freedom-week/.

Congress has similarly recognized that the United States should provide support to North Korean defectors and refugees, and encouraged the government to aid North Koreans fleeing that country in the North Korean Human Rights Act of 2004, 22 U.S.C. §§ 7801–7846, which was most recently reauthorized in the North Korean Human Rights Reauthorization Act of 2017, Pub. L. No. 115-198, 132 Stat. 1519.

In the OSC, the court asked the parties whether Petitioner committed acts that would be considered criminal under United States law in light of the ongoing hostilities and unique circumstances surrounding the relationship between the United States and North Korea.  Dkt. 36.  The government does not dispute North Korea is a hostile power, but argues that the status of relations between the United States and North Korea has no bearing on the question of dual criminality.  Dkt. 37 at 16.

**B.    Waiver**

As an initial matter, the government contends Petitioner has waived any defense related to the question presented in the OSC by failing to raise this objection in the underlying proceeding.  Dkt. 37 at 29–31.  Petitioner responds there was no waiver

because he challenged dual criminality in the underlying proceeding, and, regardless, this court may raise issues *sua sponte* in connection with the subject habeas proceeding.  Dkt. 38 at 26–27.  The court agrees with Petitioner.

"The general rule is that 'a federal appellate court does not consider an issue not passed upon below.'" *Lo Duca v. United States*, 93 F.3d 1100, 1104 (9th Cir. 1996) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)).  "That rule, however, is one of prudence and not appellate jurisdiction," and a reviewing court "retain[s] broad discretion to consider issues not raised initially in the [lower court]." *Id.*  This is in accord with the court's supervisory authority to raise *sua sponte* matters that may affect the rights of defendants in criminal actions.  *United States v. Delgado-Cardenas*, 974 F.2d 123, 126 (9th Cir. 1992).

In the underlying proceeding, Petitioner challenged the government's request for extradition on grounds including lack of dual criminality and the unique relationship between the United States and North Korea.  Case 19-5397, Dkt. 175 at 10–14, 29–33.  Petitioner now seeks habeas relief on grounds including that the Magistrate Judge clearly erred in finding there was dual criminality because the conduct charged was not criminal under United States law.  Dkt. 14 at 57.

In certifying Petitioner's extraditability, the Magistrate Judge did not find expressly that dual criminality was satisfied with respect to any crime certified.  *See* Certification at 3–5; Case 19-5397, Dkt. 231 (Extradition Hr'g Tr.) at 171–72 (summarizing court's findings at extradition hearing).[21]  Although the Magistrate Judge rejected Petitioner's challenge to dual criminality based on lack of intent, she did not discuss dual criminality otherwise or find the conduct charged would be considered criminal under United States law.  *See generally* Certification; Case 19-

---

[21] The Certification states, "[t]he court … rejected Ahn's dual-criminality argument because any required intent, which he argued the government had no evidence of, may be inferred from action, … and the government's evidence … provided probable cause of any necessary specific intent." Certification at 4–5.

5397, Dkt. 231 (Extradition Hr'g Tr.).

The government bears the initial burden to establish extraditability. *Barapind*, 400 F.3d at 747.[22]  Because the Magistrate Judge did not find expressly that the crimes certified would be considered criminal under United States law, the court finds it is appropriate to consider whether dual criminality is satisfied on the subject Petition and will not discharge the OSC based on waiver.

### C.     Whether Petitioner's Conduct Would Be Considered Criminal in the United States

"The question of whether an offense is extraditable involves determining: (1) whether it is listed as an extraditable crime in the relevant treaty; (2) whether the alleged conduct is criminalized in both countries; and[] (3) whether the offenses in both countries are substantially analogous." *United States v. Knotek*, 925 F.3d 1118, 1128–29 (9th Cir. 2019).  "These are purely legal questions that [are] review[ed] de

---

[22] The government argues that, because "extradition treaties must be construed liberally," Petitioner must demonstrate that his conduct would unambiguously not be criminal in the United States to defeat extradition based on a lack of dual criminality. Dkt. 37 at 28–29 (citing *United States v. Kaulukukui*, 520 F.2d 726, 731 (9th Cir. 1975) & *Factor v. Laubenheimer*, 290 U.S. 276, 293–94 (1933)).  The court disagrees. It is undisputed that the Extradition Treaty requires dual criminality.  Dkt. 37 at 15 ("the treaty establishes a requirement of dual criminality").  Whether Petitioner's conduct would be criminal in the United States does not concern ambiguities within the Extradition Treaty, but the separate question of whether Petitioner's conduct could be punishable under our country's state and federal criminal laws. *Cf. Factor*, 290 U.S. at 294 (holding petitioner must be extradited because the crime with which he was charged was an enumerated crime under the treaty, "even though the act with which he [was] charged would not be a crime if committed in Illinois").  The government does not cite any legal authority that supports its assertion that courts must interpret our nation's criminal statutes liberally in favor of finding a relator's conduct would be criminal for purposes of extradition proceedings.  Under the rule of lenity, "ambiguity concerning the ambit of [United States] criminal statutes should be resolved in favor of lenity." *Skilling v. United States*, 561 U.S. 358, 410 (2010).  The court, therefore, rejects the government's argument that the question of whether Petitioner's conduct would be criminal under United States law must be resolved in favor of extradition.

novo." *Id.* at 1129.  Determining whether a relator's conduct would be punishable in the United States involves "a fact-based inquiry into the conduct alleged in the documents filed by the [requesting government], through the U.S. government, in support of the extradition request." *Id.*

Two offenses are "substantially analogous" if "the essential character of the transaction is the same[] and made criminal by both statutes.'" *Knotek*, 925 F.3d at 1131 (brackets omitted).  "There is no need for the scope of criminal liability to be coextensive or the same in both the United States and requesting country.  Rather, it is enough if the particular act charged is criminal in both jurisdictions.  The elements of one offense need not be identical to the elements of a similar offense in the United States." *Id.* (cleaned up).  "It is immaterial whether one country's law is broader than the other, so long as 'the essential character of the acts criminalized is the same.'" *Id.* (cleaned up).

The government raises two primary arguments for why Petitioner's conduct in Spain would be considered criminal in the United States.  First, the government notes Spain charged Petitioner with general crimes against persons and property.  Dkt. 37 at 12.  According to the government, if Petitioner committed the charged conduct in the United States, he could be charged with general crimes under federal and state criminal statutes including: (1) assault resulting in serious bodily injury under 18 U.S.C. § 133(a)(6), (2) battery under California Penal Code § 242, (3) false imprisonment under California Penal Code § 236, (4) forcible entry and detainer under California Penal Code § 459, and (5) criminal threats under California Penal Code § 422.  *Id.* at 19–21.

Petitioner argues "it has historically been the case under international law that 'if an enemy alien entered a hostile country during time of war … ***any subject*** may seize them and gain a property in the goods, as a prize taken in open war," unless the government formally issues a "grant of safe conduct."  Dkt. 38 at 18–19 (citing *Al-Quraishi v. Nakhla*, 728 F. Supp. 2d 702, 743 (D. Md. 2010), *rev'd on other grounds*,

24

658 F.3d 413 (2011) (emphasis in Petitioner's response); *see also Fairfax's Devisee v. Hunter's Lessee*, 11 U.S. 603, 620 (1813) ("During [a] war, the property of alien enemies is subject to confiscation jure belli, and their civil capacity to sue is suspended."); *The Santa Lucia*, 44 F. Supp. 793, 794 (S.D.N.Y. 1942) ("The principle is well-established that war suspends the rights of non-resident alien enemies to prosecute actions in our courts."). These cases demonstrate that citizens of a hostile government may be treated differently under United States law during times of conflict than in times of peace.

The government contends the criminal statutes identified "do not depend on the identity of the victim or the nature of dwelling targeted," Dkt. 37 at 19, "or take into account in any way, the nationality or diplomatic status of the victim," Dkt. 39 at 12–13. The government, however, does not cite any legal authority to establish that the general state and federal criminal statutes identified apply to the conduct charged, when directed at the property or officials of a hostile nation like North Korea. *See* Dkt. 37 at 11–13, 18–21.[23] Similarly, the government does not identify any cases in which extradition was certified for, or a law enforcement agency or department within the United States and related territories brought criminal charges against, a United States citizen for similar conduct against the property or officials of a hostile power. This argument is non-responsive to the subject of the OSC and inapposite.

---

[23] On reply, the government cites *United States v. Noel*, 893 F.3d 1294, 1298 (11th Cir. 2018), to argue that a victim's nationality or diplomatic status is irrelevant to the general criminal statutes cited. Dkt. 39 at 12–13. In *Noel*, 893 F.3d at 1297–98, the Eleventh Circuit held that a prosecutor need not prove knowledge that the victim is an American citizen to establish a violation of 18 U.S.C. § 1203, which contains a jurisdictional requirement that the victim be American. *Noel* does not support the government's argument that an individual's nationality and relationship with a hostile government are irrelevant to whether a general criminal statute is violated under these circumstances. Furthermore, the government has not identified 18 U.S.C. § 1203 as a substantially analogous crime to the Spanish crimes charged. *Noel*, therefore, is inapposite.

Alternatively, the government argues that North Korea's conduct and its hostile relationship with the United States are irrelevant because the Armistice Agreement remains in force.  Dkt 39 at 16–21.  The government does not cite any legal authority to establish that the representatives and officials of a nation like North Korea, with whom the United States has only suspended open hostilities rather than formally declaring peace, and which has breached and repudiated the Armistice Agreement repeatedly and continues to engage in hostile actions against the United States and its allies, should not be treated as enemy aliens who have not been granted safe-conduct for purposes of our nation's criminal laws and the Petition.  *See* Dkts. 37, 39.

The court, therefore, finds the government has not met its initial burden to establish the conduct charged is punishable under the general state and federal criminal statutes identified, in the unique and specific factual circumstances present here.  This finding is intended to be narrow, limited to the specific circumstances of this case, and based on the government's failure to meet its burden of persuasion.

Second, the government argues Petitioner's conduct would be considered criminal in the United States based on federal statutes that protect diplomats, family members, and employees attached to diplomatic missions in the United States, including 18 U.S.C. §§ 112(a) & (b)(2), 970(a), and 1201(a)(4).  Dkt. 37 at 21–22.  The government does not present any specific arguments to establish these federal statutes are substantially analogous to, or have the same essential character as, the Spanish general crimes certified, and appears to simply assume they are.  *See id*. at 21–28; Dkt. 39 at 21–23.  The government, however, notes expressly that these statutes relate to the government's obligations to other nations under international law, *id.* at 21–28, whereas "Spain has charged Petitioner with general crimes against person and property, and not crimes specifically against diplomatic personnel and premises," *id.* at 12.

In these circumstances, the court finds the government fails to meet its initial burden to establish these federal statutes are sufficiently analogous to the Spanish

general crimes charged. *See United States v. Khan*, 993 F.2d 1368, 1373 (9th Cir. 1993) (finding dual criminality not satisfied where U.S. statutes identified by the government were not sufficiently analogous to the foreign crimes charged).

The court, therefore, finds the government failed to meet its initial burden to establish the acts charged by the Spanish government would be criminal in the United States, in light of the ongoing hostilities and unique circumstances surrounding the relationship between the United States and North Korea, and GRANTS the Petition and habeas relief on this additional basis.

## IV.    Constitutional Challenges to Extradition

Petitioner additionally challenges his extradition for violation of his due process rights under the Constitution. Dkt. 14 at 42–51. "The United States' actions in reviewing a request for extradition are, of course, subject to the constraints of the Constitution. The constitutional rights of individuals, including the right to due process, are superior to the government's treaty obligations." *Martin v. Warden*, 993 F.2d 824, 829 (11th Cir. 1993); *see also Reid v. Covert*, 354 U.S. 1, 17 (1957) ("[The Supreme] Court has regularly and uniformly recognized the supremacy of the Constitution over a treaty.").[24]

### A.    The State-Created Danger Doctrine

The Due Process Clause of the Fifth Amendment provides in relevant part: "No person shall be … deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. "Historically, [the] guarantee of due process has been invoked

---

[24] As the Supreme Court explained: "It would be manifestly contrary to the objectives of those who created the Constitution, as well as those who were responsible for the Bill of Rights -- let alone alien to our entire constitutional history and tradition -- to construe Article VI as permitting the United States to exercise power under an international agreement without observing constitutional prohibitions. In effect, such construction would permit amendment of that document in a manner not sanctioned by Article V. The prohibitions of the Constitution were designed to apply to all branches of the National Government and they cannot be nullified by the Executive or by the Executive and the Senate combined." *Reid*, 354 U.S. at 17.

27

only to remedy deliberate decisions of government officials to deprive a person of life, liberty, or property." *Estate of Imrie v. Golden Gate Bridge*, 282 F. Supp. 2d 1145, 1148 (N.D. Cal. 2003).

"As a general rule, the government is not liable for the actions of third parties." *Morgan v. Gonzales*, 495 F.3d 1084, 1092 (9th Cir. 2007). "This rule is modified by two exceptions: (1) the 'special relationship' exception; and (2) the 'danger creation' exception," which together comprise the state-created danger doctrine. *Id.* (quotation marks and citations omitted). "In these limited circumstances, the [government] has an affirmative duty under the Due Process Clause to protect individuals." *Estate of Imrie*, 282 F. Supp. 2d at 1148; *see also Morgan*, 495 F.3d at 1093 ("We have repeatedly held that government agents may be liable for affirmative conduct placing a party in a danger of the government's creation even though the general rule is that the [Due Process Clause] does not impose a duty on government officers to protect individuals from third parties."); *Wang v. Reno*, 81 F.3d 808, 818 (9th Cir. 1996) (recognizing the government has a "constitutional duty to protect a person when it creates a special relationship with that person, or when it affirmatively places that person in danger").

The government creates a "special relationship" when it acts affirmatively to "restrain[] [an] individual's freedom to act on his own behalf -- through incarceration, institutionalization, or other similar restraint of personal liberty[.]" *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). "The danger creation exception arises when affirmative conduct on the part of the [government] places a party in danger he otherwise would not have been in." *Morgan*, 495 F.3d at 1093 (quotation marks and citation omitted). The government's awareness of dangers is alone insufficient to create a duty if the government "played no part in their creation, nor did … anything to render [a person] more vulnerable to them." *DeShaney*, 489 U.S. at 201.

/ / /

At the January 2024 Hearing, the government argued that this court was not the appropriate forum to consider Petitioner's safety or what steps the Secretary of State may take, if any, to ensure his safety after extradition. Dkt. 57 at 52–60. The court disagrees. Petitioner's constitutional due process right to be free from state-created danger is a matter that does not fall within the Secretary's discretion and which is properly before this court. *See Wang*, 81 F.3d at 818.

Based on the evidence presented, the court finds extradition would violate Petitioner's substantive due process rights under the danger creation exception of the state-created danger doctrine. As stated in the Certification, Petitioner's life will be in danger from North Korea if he is extradited, because of his actions here and for aiding other high-profile defectors, including the North Korean dictator's nephew, Kim Han-Sol. Certification at 36–39. The government not only acknowledges Ahn is at risk of assassination by North Korea if extradited, but has warned him on at least two separate occasions through the Federal Bureau of Investigation ("FBI") that he faces credible threats of death from North Korean agents and should not leave the United States for his safety. Dkt. 11-6 (Rim Decl.) ¶¶ 2–3; Ahn Decl. ¶ 18; Certification at 31 ("The truly significant difference here from [prior] cases is that the [c]ourt needn't make any messy inquiry into just how real the threat is: the FBI has conceded that North Korea wants to kill Ahn and that that threat is easier to carry out in Spain than here in the United States.").[25]

This warning is consistent with the State Department's finding that North Korea has engaged in politically motivated reprisals and "attempted to target, harass, and threaten defectors and other perceived enemies resident outside of the country." U.S.

---

[25] Petitioner's counsel also states she was warned "the U.S. government had recently learned that [North Korea] plans to approach [her] personally as Christopher Ahn's attorney to determine what [she] know[s] about [Hong Chang's] location and whereabouts." Dkt. 11-6 (Rim Decl.) ¶ 4. This suggests North Korea may also attempt to kidnap and torture Petitioner to obtain information about Hong Chang, Free Joseon, and the individuals Petitioner has previously helped defect.

Dep't of State, *2020 Country Reports on Human Rights Practices: North Korea* at 12 (Mar. 30, 2021), https://www.state.gov/wp-content/uploads/2021/10/KOREA-DEM-REP-2020-HUMAN-RIGHTS-REPORT.pdf.[26]  The North Korean government has indicated through public statements that it is watching these proceedings closely and awaits Petitioner's extradition to Spain.[27]  *E.g.*, Certification at 43; Press Release of DPRK Embassy in Spain (Apr. 4, 2023), translation available at: https://kcnawatch.org/newstream/1680559585-998031369/press-release-of-dprk-embassy-in-spain/; Yi Wonju, *N. Korea Demands U.S. Extradite 2019 Embassy Suspects to Spain* (Apr. 4, 2023), https://en.yna.co.kr/view/AEN20230404001200325.

Despite acknowledging and warning Petitioner that his life would be in danger if he left the country, the government divulged Petitioner's name to the Spanish government without requesting Spain investigate and prosecute Petitioner confidentially.  *See* Dkt. 11-15 at 10 (stating Hong Chang revealed Petitioner's identity in a statement made before FBI agents on March 14, 2019), 81 (stating the

---

[26] Courts have similarly held that North Korea tortures and kills its political enemies, including individuals who aid and provide services to defectors and refugees who flee the country to seek asylum.  *Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1045–46 (D.C. Cir. 2014) ("Admissible record evidence demonstrates that North Korea abducted Reverend Kim [after finding out about his activities providing humanitarian and religious services to North Korean defectors and refugees who fled to China seeking asylum], that it invariably tortures and kills political prisoners, and that through terror and intimidation it prevents any information about those crimes from escaping to the outside world."); *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 48 (D.C. Cir. 2018) (recognizing North Korea considers acts that challenge the dictator and regime, such as removing a poster that said, "Let's arm ourselves strongly with Kim Jong-il patriotism!" to be the "ultimate crime in North Korea," punishable by "particularly brutal treatment" and deportation without judicial process to a political prison camp where torture, mistreatment, and disregard of human rights are routine).

[27] *See Warmbier*, 356 F. Supp. 3d at 60 (recognizing "North Korea is 'keenly aware' of the 'political environment' in the United States, including judgments issued by United States courts").

Spanish government received information from the FBI the following day).

Having acted affirmatively in a manner that increased the known dangers to Petitioner of kidnapping, torture, and assassination by North Korea, the government cannot render him more vulnerable to these known dangers by taking the very steps it warned him against—removal from the United States to Spain. *See Wang*, 81 F.3d at 818–19 (finding the government affirmatively placed petitioner in danger by interfering with his transfer to the Chinese courts, paroling him into this country, and subjecting him to a life-or-death choice that caused him to lose the possibility of lenient treatment by the Chinese courts, and affirming district court's issuance of a permanent injunction barring his removal from the United States).

The court, therefore, finds Petitioner's extradition is barred under the danger creation exception of the state-created danger doctrine and GRANTS habeas relief on this additional basis.

### B.    The Humanitarian Exception to Extradition

"Under the rule of non-inquiry, an extraditing court will generally not inquire into the procedures or treatment which await a surrendered fugitive in the requesting country because such determinations are to be made solely by the executive branch." *Mainero*, 164 F.3d at 1210 (quotation marks and citation omitted). "The rule of non-inquiry is based on the principle that the Secretary of State's exercise of discretion regarding whether to extradite an individual may be based not only on considerations individual to the person facing extradition but may be based on foreign policy considerations instead." *Prasoprat v. Benov*, 421 F.3d 1009, 1016 (9th Cir. 2005) (quotation marks and citation omitted).

The Ninth Circuit has recognized a humanitarian exception to this rule may exist in "situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require examination of the general principle upholding extradition," but has "never relied on it to create a humanitarian exception to extradition." *Mainero*, 164 F.3d at 1210

31

(cleaned up); *see also Prasoprat*, 421 F.3d at 1016 ("We have, on occasion, cited the possibility of a humanitarian exception to extradition; however, we have never actually relied on it to create such an exception.") (quotation marks omitted, collecting cases). The humanitarian exception is similar and related to the doctrine of state-created danger, except that the latter focuses on affirmative acts taken by the United States government to place an individual in danger, while the humanitarian exception, to the extent it exists, is an equitable doctrine that focuses more on the severity and certainty of the dangers the relator may face after extradition, along with other equitable considerations, than the United States government's conduct in bringing about those dangers.

Petitioner argues his extradition would violate his Fifth Amendment right to substantive due process and must be enjoined under the humanitarian exception. Dkt. 14 at 42. The government responds that the decision whether to surrender Petitioner to Spain "is properly placed in the hands of the Secretary [of State,] given the Executive's powers to conduct foreign affairs, which include the ability to make confidential diplomatic inquiries and receive confidential diplomatic assurances about the treatment of an extraditee," and that this court "should not be the first to violate the rule of non-inquiry by applying a purported 'humanitarian exception.'" Dkt. 30 at 63–64 (cleaned up).

In the Certification, the Magistrate Judge stated in detail why extradition should be denied under the humanitarian exception, Certification at 28–49, while acknowledging that "the Ninth Circuit's no-exceptions, couldn't-be-clearer language" barred magistrate judges from invoking the humanitarian exception to deny certification, *id.* at 34. After reviewing and considering the Certification, the parties' briefs and arguments at the January 2024 Hearing, and all relevant portions of the record, this court agrees with the Magistrate Judge that the humanitarian exception to the rule of non-inquiry must apply under the unique facts of this case. The court incorporates by reference the Magistrate Judge's reasoning in the Certification at

32

pages 36 to 47, while emphasizing the following key facts and considerations.

As stated, it is undisputed Petitioner will be at high risk of kidnapping, torture, and assassination by the North Korean government if extradited to Spain.[28]  If the humanitarian exception exists, it must apply here, where: (1) Congress and the State Department have made findings regarding the North Korean government's treatment of defectors and attempted defectors;[29] (2) the United States government has supported North Korean defectors and those who aid defectors with Congress' authorization and approval; (3) the undisputed evidence establishes Petitioner was a member of and/or acting with Free Joseon, which is a group that helps North Koreans defect; (4) no evidence was presented to suggest Petitioner or Free Joseon ever engaged in acts of violence in connection with their activities or forced any North Koreans to defect; (5) Petitioner testified he was present at meetings with U.S. government officials in connection with his work with Free Joseon, which the government has not denied;[30] (6) all three branches of the United States government

[28] As stated in the Certification at 36–40, Petitioner is at far greater risk in Spain than in this country, because North Korea maintains diplomatic ties with Spain and other European countries, while our country does not.

[29] The State Department and Congress have found specifically that "the North Korean Penal Code is draconian, stipulating capital punishment and confiscation of assets for a wide variety of 'crimes against the revolution,' including defection, attempted defection, [and] slander of the policies of the Party or State[.]"  22 U.S.C. § 7801(5) (cleaned up).

[30] Ahn states in his declaration: "In 2011, while I was visiting Washington D.C., I attended a meeting between [Hong Chang] and several U.S. government officials. During this meeting, [Hong Chang] and the U.S. officials spoke collaboratively about ways to further empower North Koreans and improve defection efforts.  … [I]n 2017, … two agents from the United States Central Intelligence Agency showed up in a different country to assist me in the process of helping several North Koreans proceed to their next destination during a highly sensitive defection."  Ahn Decl. ¶ 7.
The government does not deny Petitioner's testimony that government officials met with Hong Chang and Ahn previously to discuss improving defection efforts and

have recognized and made factual findings that the North Korean government abducts, tortures, and kills those it designates as its enemies; (7) the government acknowledges and even warned Petitioner on multiple occasions that his life will be at risk if he leaves the United States;[31] (8) the North Korean government has stated through press statements that it is aware of Petitioner's identity and is awaiting his extradition to Spain; (9) the government has refused to address Petitioner's concerns regarding safety and has instead disclaimed any and all interest in Petitioner's safety if and when he is extradited;[32] and (10) it appears highly unlikely Petitioner could be brought to

---

assist Free Joseon with prior defections, and argues only that these assertions are irrelevant and not supported by corroborating evidence. *See* Dkt. 30 at 51–54.  At the January 2024 Hearing, the government stated it had "checked with the FBI" regarding Petitioner's request for relevant evidence in the government's possession and was not aware of any exculpatory information.  Dkt. 57 at 84.  The government, however, did not provide any specifics regarding what had been requested and received, stating there were portions of the response the government could not discuss in open court. *Id.* at 87–88.  The government's representations are too vague and conclusory to refute Petitioner's testimony that, at a minimum, the government was aware generally of, and approved tacitly, Hong Chang and Free Joseon's efforts to aid North Korean defectors.

[31] The government cites *Escobedo v. United States*, 623 F.2d 1098, 1107 (5th Cir. 1980), to argue "the degree of risk to the fugitive's life from extradition is an issue that properly falls within the exclusive purview of the executive branch."  Dkt. 30 at 66 n. 51 (cleaned up).  To the extent the government argues the executive branch has the sole authority to determine whether Petitioner should be extradited despite the known and acknowledged risk of assassination by North Korea, the court disagrees for the reasons stated in connection with the state-created danger doctrine. *See also Munaf v. Green*, 553 U.S. 674, 706 (2008) (Souter, J., concurring) (stating that it would be appropriate "to ask whether substantive due process bars the Government from consigning its own people to torture" in "an extreme case in which the Executive has determined that a detainee in United States custody is likely to be tortured but decides to transfer him anyway") (cleaned up).

[32] At the January 2024 Hearing, the court asked the government why Petitioner could not be tried in the United States, where it would be substantially safer for Petitioner, as Article IV of the Extradition Treaty expressly allows.  Dkt. 57 at 60; *see also* Dkt.

34

trial in Spain since North Korea has never made its citizens available to serve as witnesses at foreign trials.[33]

In these unique circumstances, where a hostile foreign government which has been declared a state sponsor of terrorism, routinely engages in hostilities with the United States, and has both the means and an established history of kidnapping, torturing, and executing its enemies (including defectors and those who aid them) has indicated its clear interest in the extradition of a U.S. citizen who is before this court, and the U.S. government has disclaimed any interest in protecting that citizen after acknowledging and warning him expressly that his life and safety are at risk if he leaves the country, the court finds that the humanitarian exception must apply. To do otherwise would be "antipathetic to [this] federal court's sense of decency." *Mainero*,

---

11-14 at 11 ("If extradition is refused solely on the basis of the nationality of the person sought, the requested Party shall, at the request of the requesting Party, submit the case to its authorities for prosecution."). The government disclaimed any interest in bringing such a request, stating "it really is up to how Spain wants to handle this case." *Id.* at 62–63.

[33] "Spain apparently requires in criminal trials that the evidence will be heard first-hand through the testimony of witnesses, rather than through the reading of documents," and "[p]retrial statements are generally not admissible if the witness was not subjected to adversarial cross-examination when they were made." Certification at 41 (quotation marks and citations omitted). "Prof. Lee testified that North Korea was extremely unlikely to make its witnesses available to testify in any trial, much less allow them to be cross-examined" since, "[t]o his knowledge, the statements the North Koreans gave to the Spanish authorities marked the first time the country had ever participated in any judicial proceeding in any other country." *Id.* at 40–41; *see also Kim*, 774 F.3d at 1048 (noting North Korea "refused to appear in court and subject itself to discovery, and is known to intimidate defectors and potential witnesses"); *Warmbier*, 356 F. Supp. 3d at 36, 60 (recognizing "North Korea never entered an appearance in, or defended against, [the] action," despite being "'keenly aware' of the 'political environment' in the United States, including judgments issued by United States courts"). At the January 2024 Hearing, Petitioner stated that the North Korean embassy in Madrid had closed in October 2023, further reducing the already negligible likelihood that North Korea would make its witnesses available to testify at a trial in Spain. Dkt. 57 at 98.

164 F.3d at 1210.

The court, therefore, GRANTS the Petition and habeas relief on this additional basis.

### CONCLUSION

For the aforementioned reasons, the court GRANTS Petitioner Christopher Ahn's Petition for Writ of Habeas Corpus and ENJOINS Petitioner's extradition from the United States on the grounds that the Magistrate Judge clearly erred in finding: (1) there is probable cause to extradite Petitioner on the charges certified; and (2) the government met its burden to establish dual criminality. The court additionally holds extradition would violate Petitioner's substantive due process rights and is barred under the state-created danger doctrine and the humanitarian exception to extradition, if it exists. Having granted the Petition on this basis, the court need not consider the parties' remaining arguments.

The court STAYS execution of this Order for thirty-five (35) days from the date of the order to allow the government the opportunity to appeal this ruling. If the government fails to file a notice of appeal timely, the Clerk of the court shall exonerate Petitioner's bond.

IT IS SO ORDERED.

Dated: March 31, 2026

FERNANDO L. AENLLE-ROCHA
United States District Judge

36